Mitchell J. Langberg, Nevada Bar No. 10118
Thomas A. Clare, P.C.*
Elizabeth M. Locke, P.C.*
Eric D. Hageman*
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
(202) 628-7401
mitch@clarelocke.com
tom@clarelocke.com
libby@clarelocke.com
eric.hageman@clarelocke.com
* *Applications to appear* pro hac vice
*forthcoming*

*Attorneys for Plaintiff*
*Amy Griffin*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| Amy Griffin,<br><br>     Plaintiff,<br><br>     v.<br><br>Joleene Altum,<br><br>     Defendant. | Case No.:<br><br>**COMPLAINT** |

**INTRODUCTION**

1. In 2025, Joleene Altum told *The New York Times*—and through it, the world—that Amy Griffin is a fraud and a thief. According to Ms. Altum, Mrs. Griffin's bestselling memoir, *The Tell*, which recounts the brutal sexual abuse Mrs. Griffin suffered at the hands of a middle-school teacher in Amarillo, Texas, is not Mrs. Griffin's story at all. It is, Ms. Altum claims, *her* story, a story Mrs. Griffin pried from her through a "talent agent" hired to coax out its details. On Ms. Altum's telling, Mrs. Griffin stole the rape of another woman and built a bestseller on it.

2. Every element of Ms. Altum's account is false. *The Tell* recounts Mrs. Griffin's own abuse: memories she recorded in writing and reported to the police before Ms. Altum claims they were stolen. The "talent agent" Ms. Altum identified has affirmed in an affidavit that he has never spoken to Mrs. Griffin or Ms. Altum, and Mrs. Griffin has not spoken with Ms. Altum since they attended the same middle school over 35 years ago. Ms. Altum's claims—that Mrs. Griffin contacted her out of the blue and met her for coffee in Palm Springs in late 2019; that in 2022, a man employed by Mrs. Griffin and posing as a talent agent coaxed the details of Ms. Altum's abuse from her; and that Mrs. Griffin appropriated Ms. Altum's story as her own in *The Tell*—are fabricated.[1]

3. Four indisputable facts prove this. *First*, the meeting at the beginning of Ms. Altum's story never happened. Mrs. Griffin was not in Palm Springs in 2019 (or in 2018 or 2020), and she has never called Ms. Altum. Ms. Altum, for her part, has essentially conceded that she does not possess a single document, communication, photograph, or receipt substantiating the meeting at the center of her account. The meeting cannot be corroborated because it never occurred.

[1] Mrs. Griffin takes no position on whether Ms. Altum has been sexually abused at the hands of a teacher or anyone else. Mrs. Griffin alleges only that Ms. Altum's claim that Mrs. Griffin stole her story of abuse is false and defamatory.

4.    *Second*, Dominique Price, the "talent agent" Mrs. Griffin supposedly deployed to extract Ms. Altum's story, has sworn under penalty of perjury that he has never spoken with Ms. Altum, communicated with Mrs. Griffin, or posed as a "talent agent." Ex. A, ¶¶ 5, 15–16, 19–20. He told the *Times* exactly that weeks before it published Ms. Altum's story.

5.    *Third*, Ms. Altum played no role in *The Tell*. Ms. Altum claimed to the *Times* that she is a character in *The Tell*. The book refers to a woman pseudonymized as "Claudia," who attended the middle school at which Mrs. Griffin was raped. As told in *The Tell* (and in reality), Mrs. Griffin had recalled that "Claudia" spent time around Mrs. Griffin's assailant when Mrs. Griffin did. On April 21, 2023, while she was writing *The Tell*, Mrs. Griffin met with the real Claudia in a coffee shop thousands of miles from Palm Springs (and from Las Vegas, Nevada, where Ms. Altum currently resides). That meeting was attended by Sam Lansky, who collaborated on the book, and was documented thoroughly during and shortly after it ended. After having learned of Mrs. Griffin's abuse through *The Tell*, Ms. Altum claimed that *she* is "Claudia." This, too, is false.

6.    *Fourth*, and most importantly, Mrs. Griffin had already recorded her account of the abuse she suffered well before Ms. Altum claims she stole it. Ms. Altum claims that Mr. Price began coaxing her story from her in April 2022. But Mrs. Griffin recorded the memories recounted in *The Tell* in writing beginning in the summer of 2020. Passages Mrs. Griffin wrote in 2020 and 2021 appear nearly verbatim in the published memoir. And in 2021, Mrs. Griffin reported her abuse in great detail in a recorded interview with the Amarillo Police Department. By March 2022, Mrs. Griffin had finished a full draft of the article that would become *The Tell*. Only the next month, in April 2022, did Mr. Price supposedly begin calling Ms. Altum to extract her story.[2]

---

[2] Ms. Altum has since produced a document indicating that even on her (false) account, Mr. Price's first contact with her was after March 22, 2023. *See* Ex. F. At that point, *The Tell*'s book proposal had already been circulated. *See infra* ¶¶ 29, 76.

2

Mrs. Griffin could not have stolen in April a story she finished writing in March.

7.    *The Tell* was published three years later, on March 11, 2025. In June 2025, the *Times* contacted Ms. Altum and mailed her a copy of the book. Only after reading it (or learning its contents from the *Times*) did Ms. Altum claim the story as her own. Ms. Altum has not produced a shred of evidence that she ever recounted her story to anyone before the *Times* contacted her. That is because Ms. Altum did not have the story to recount until she learned of *The Tell*.

* * *

8.    The story of how Ms. Altum came to tell these lies begins not with her but with the *Times*. In the spring of 2025, *The Tell* became a bestseller, and its success drew the attention of *Times* reporter Katherine Rosman. Ms. Rosman doubted Mrs. Griffin's story from the start, telling a source she could not believe that the child of a wealthy family could be violently abused without anyone noticing. Together with her colleague Elisabeth Egan, Ms. Rosman spent four months combing Mrs. Griffin's hometown, interviewing dozens of Mrs. Griffin's former classmates and teachers and asking leading questions designed to elicit doubt. This shows that the *Times*' investigation began with its conclusion. Its "reporting" was a hunt for a reason to disbelieve *The Tell*.

9.    The hunt led to Ms. Altum. Dead set on finding "Claudia," the reporters obtained a confidential, watermarked copy of Mrs. Griffin's book proposal. The proposal indicated that Claudia had grown up in a children's home, a detail that did not appear in the final draft of *The Tell*. Presumably, the reporters believed that this detail had been cut from the final draft to obscure Claudia's identity. What they did not know is that it was cut from the book because after the proposal was circulated, Mrs. Griffin met with the real Claudia and learned that she had not grown up in a children's home.

10.    This red herring led the reporters to Ms. Altum, the only member of Mrs. Griffin's class who grew up in a children's home. The reporters contacted her on June 17, 2025. Ms. Altum had not read *The Tell* and, on information and belief, had never told anyone a story of abuse resembling it. It was only after the *Times* mailed her the

3

book that Ms. Altum announced that the story was hers: that she was "Claudia," that Mrs. Griffin had met her for coffee in Palm Springs in 2019, and that in April 2022, Mr. Price had extracted her story of abuse for Mrs. Griffin's use. Even after attempts to verify Ms. Altum's story failed, the *Times* deemed the story too good to scrutinize, publishing Ms. Altum's accusations on September 24, 2025, in an article entitled *The Billionaire, the Psychedelics and the Best-Selling Memoir*.[3] The *Times* committed considerable resources to this reporting, sending Ms. Rosman to Las Vegas to meet with and photograph Ms. Altum, in addition to her travel to Amarillo.

11. Ms. Altum knew when she made these statements to the *Times* that they would be published to the *Times*' global audience. She even posed for a photograph that was included in the article. Then, on March 4, 2026, Ms. Altum made the claims again in a lawsuit improperly filed in California,[4] seeking to capitalize on the harm the *Times* article had already caused Mrs. Griffin. The *Times* covered the lawsuit, confirming that Ms. Altum was the source of its September article.[5]

12. Ms. Altum has had the opportunity to come clean at every step, including

---

[3] Katherine Rosman & Elisabeth Egan, *The Billionaire, the Psychedelics and the Best-Selling Memoir*, N.Y. Times (Sept. 24, 2025), https://www.nytimes.com/2025/09/24/nyregion/amy-griffin-memoir-psychedelic-drugs.html.

[4] Ms. Altum initially sought to proceed anonymously, despite identifying herself by name to the *Times*, posing for a silhouetted photograph with the *Times*, and claiming that she had been "identified" as "Claudia" in her community. In the three months during which the lawsuit has been pending, Ms. Altum has not moved to proceed anonymously, as California law requires.

Ms. Altum's lawyers first produced Ms. Altum's name subject to Mrs. Griffin's agreement to maintain her anonymity for one week, during which if Ms. Altum still wished to proceed anonymously, she would file a motion to do so. This deadline passed on May 27, 2026. Ms. Altum's attorneys have since produced her name multiple times in unsealed discovery with no protective order, making her identity a matter of public record. *See, e.g.*, Ex. C; Ex. D.

[5] Katherine Rosman & Elisabeth Egan, *Lawsuit Accuses Writer of Using Classmate's Story in Best-Selling Memoir*, N.Y. Times (Mar. 5, 2026), https://www.nytimes.com/2026/03/05/nyregion/amy-griffin-the-tell-lawsuit.html.

4

before the filing of this complaint. Ms. Altum's attorneys have personally reviewed the evidence described above. But Ms. Altum has insisted on maintaining her lies, continuing the enormous reputational harm she has already dealt Mrs. Griffin. This lawsuit's purpose is to set the record straight. It ends when Ms. Altum tells the truth publicly and plainly.

**PARTIES**

13. Plaintiff Amy Mitchell Griffin is domiciled in New York. She is the founder and managing partner of G9 Ventures and the author of *The Tell*.

14. Defendant Joleene Altum is domiciled in Las Vegas, Nevada.[6] She was the focus of a September 2025 *New York Times* article entitled *The Billionaire, the Psychedelics and the Best-Selling Memoir*. Ms. Altum is the plaintiff in *Jane Doe v. Griffin et al.*, No. 26STCV07012 (Cal. Super. Ct.).

**JURISDICTION AND VENUE**

15. This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendant and the amount in controversy exceeds $75,000, exclusive of costs and fees.

16. Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(1) because Ms. Altum resides in Clark County, Nevada.

17. On March 4, 2026, Ms. Altum sued Mrs. Griffin in California state court.[7] Today, Mrs. Griffin filed a demurrer and a special motion to strike Ms. Altum's complaint pursuant to Section 425.16 of the California Code of Civil Procedure, which stays discovery pending resolution of and appeal from a decision on that motion. Mrs. Griffin has not filed an answer in the California litigation and does not presently intend to file an answer. *See* Cal. Code Civ. P. § 426.30; *Cheiker v. Prudential Ins. Co. of Am.*, 820 F.2d 334 (9th Cir. 1987). No claim for relief by Mrs. Griffin is pending in the

[6] *See* Ex. B (Pl.'s Resp. to Def. Amy Griffin's Special Interr. 2, *Doe v. Griffin*, No. 26STCV07012 (Cal. Super. Ct.)).

[7] *Doe v. Griffin*, No. 26STCV07012 (Cal. Super. Ct. Mar. 4, 2026).

California litigation.

## FACTUAL ALLEGATIONS

### Mrs. Griffin Uncovers Detailed Memories of Abuse

18.    For many years, Mrs. Griffin felt deeply that she was running from something in her past.  This was more than a gut feeling; it was reflected by consistent and intense physical symptoms, including recurring pain in her back, ribcage, and pelvis; overwhelming anxiety; and deep emotional reactions when discussing parts of her childhood.  For instance, when one friend told Mrs. Griffin (in terms that were far from graphic) about an inappropriate interaction the friend had with an older man as a young girl, Mrs. Griffin broke down sobbing.

19.    As Mrs. Griffin would later tell Mr. Lansky as she was writing *The Tell*, she had long believed that something "sexual in nature" happened to her as a child, but she struggled to recall specific parts of the story.[8]  She has always had vivid memories of personal interactions with her assailant.  Mrs. Griffin also had preexisting and long-inexplicable fixations on banal details of her childhood, including a dress she lent a classmate (anonymized as "Claudia" in *The Tell*) for a middle-school dance.  Mrs. Griffin addressed these issues in traditional talk therapy for years, but it offered no clarity on the lingering questions about her childhood.

20.    This all came to a head when Mrs. Griffin's then–10-year-old daughter approached her about a perceived lack of connection.  Through tears, Mrs. Griffin's daughter shared that she felt her mother was present but emotionally distant, making it hard for the two to connect.

21.    To cope with this, Mrs. Griffin tried her old methods: exercising, raising her children, work, and traditional psychological therapy.  But these methods only

---

[8] This is a common experience of individuals who experience sexual trauma as children. *See* L.M. Williams, *Recall of Childhood Trauma: A Prospective Study of Women's Memories of Child Sexual Abuse*, 62 J. Consulting & Clin. Psych. 1167–76 (Dec. 1994), https://pubmed.ncbi.nlm.nih.gov/7860814/.

exacerbated the problem.

22.     Mrs. Griffin decided to meet with a respected practitioner of MDMA treatment.[9]  Mrs. Griffin's first MDMA therapy session took place on July 19, 2020.  Mrs. Griffin told the practitioner that "[t]here's something [she] can't face," and that she knew "something happened to [her]" but she "can't remember.  Or maybe [doesn't] want to remember."[10]

23.     Within minutes of the first administration of the MDMA—well before it fully took effect—Mrs. Griffin sat up and asked the practitioner, "why is he here?," referring to the middle-school teacher who assaulted her.  This was the beginning of a fuller recollection of brutal, repeated rapes Mrs. Griffin suffered at the hands of a teacher pseudonymized in *The Tell* as "Mr. Mason," all of which she shared with her practitioner in real-time over the course of three MDMA sessions.

24.     Mrs. Griffin's first memory involved a violent attack with her "head hitting the wall" while "Mr. Mason's hand was on the back of [her] head pushing [her] up against

[9] MDMA-assisted therapy is an emerging treatment in mental health, particularly for individuals with treatment-resistant PTSD.  By flooding the brain with serotonin, dopamine, and norepinephrine, MDMA provides mood stabilization alongside a calm alertness that creates ideal conditions for deep emotional work.  This neurochemical shift reduces activity in the brain's fear centers and enhances connectivity between memory and emotional circuits, opening a window of neuroplasticity that allows patients to reprocess traumatic memories in ways that conventional therapy often cannot.  The structured protocol, which combines preparatory sessions, carefully supervised 6-to-8-hour MDMA sessions, and integrative follow-up therapy, ensures patients are supported at every stage of the process.  *See* Jennifer Mitchell et al., *MDMA-assisted Therapy for Severe PTSD: A Randomized, Double-blind, Placebo-controlled Phase 3 Study*, Nature medicine vol. 27,6 (2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC8205851/; S. Pratas Penedos et al., *MDMA-Assisted Therapy for Treatment-Resistant Posttraumatic Stress Disorder (PTSD) – One step further toward a patient-centered treatment pathway*, European Psychiatry vol. 65 (Sept. 2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC9567733/; Keith Jenkins, *Breaking Trauma; Mechanisms of MDMA-Assisted Psychotherapy for PTSD*, Psychiatric Times vol. 43, 2 (Feb. 20, 2026), https://www.psychiatrictimes.com/view/breaking-trauma-mechanisms-of-mdma-assisted-psychotherapy-for-ptsd.

[10] Amy Griffin, *The Tell: A Memoir* 82–83 (2025).

the yellow tile in the bathroom of the middle school." In another instance, Mrs. Griffin was orally raped in a bathroom stall while her hands were tied behind her back with a bandanna.

25. An expert in MDMA therapy has since reviewed Mrs. Griffin's memories and concluded that they were recovered before the drug took effect.

### *Traditional Methods of Justice Run Dry, and Mrs. Griffin Shares Her Story*

26. Having recovered these memories, Mrs. Griffin first asked a lawyer about the possibility of pursuing legal recourse against Mr. Mason. Mrs. Griffin also connected with a detective in the Amarillo Police Department. The detective described her account as "very credible."[11] But he concluded that any charges would be barred by the statute of limitations.

27. Seeing this door close, Mrs. Griffin shifted her focus to helping other survivors. She began learning more about survivor advocacy. Eventually, Mrs. Griffin thought of publishing a version of her extensive writings on the subject. The idea for *The Tell* originated as a long-form article, based on journal entries dating back to 2020. Mrs. Griffin completed a draft of the article around March 2022 and continued to revise it in the months that followed. The article was reviewed by editors at a high-profile publication.

28. Then, in or around August 2022, Mrs. Griffin received a call from a publishing agent who pitched her the idea of writing a book about women in business. Mrs. Griffin relayed that she had a different story to share. She sent the agent a working draft of the article; the agent encouraged her to move forward with a book (rather than the planned article) about her trauma and recovered memories.

29. Mrs. Griffin and her collaborator, Sam Lansky, spent months drafting the proposal. On or about March 6, 2023, Mrs. Griffin's literary agent began submitting the proposal to various publishing houses. The proposal was met with excitement and praise.

---

[11] Rosman & Egan, *supra* note 3.

Mrs. Griffin received competing offers for the publishing rights to what would become *The Tell* and awarded those rights to The Dial Press, an imprint of Penguin Random House.

30. Mrs. Griffin produced the first full draft of the memoir in the summer of 2023. After more than two years of extensive edits and feedback, *The Tell* was published on March 11, 2025. Mrs. Griffin donated all book-sale proceeds to organizations that support sexual assault survivors and related causes.

### The Times *Doubts Mrs. Griffin's Story*

31. The book caught the attention of the *Times*, where Katherine Rosman took the reins on a months-long investigation.

32. From the start, Ms. Rosman was skeptical of Mrs. Griffin and of *The Tell*. As she has publicly stated, her interest was piqued by the memoir's success despite the fact "that outside of a circle of wealthy people and startup companies in New York City, not that many people have ever heard of Amy Griffin or have any idea of who she is."[12]

33. But Ms. Rosman later made clear to her sources that this was not the full extent of her interest. Ms. Rosman doubted Mrs. Griffin's story from the outset, stating that she could not believe that the child of a wealthy family could be violently abused without attracting attention. Early in her reporting, Ms. Rosman expressed skepticism about Mrs. Griffin's abuse and indicated excitement at the prospect of taking down Mrs. Griffin. She told at least one source that if Mrs. Griffin had been telling the truth, someone would have noticed severe injuries when she was a child.

34. Ms. Rosman teamed up with Elisabeth Egan, who covers the book and publishing industry for the *Times*, in search of a story. Ms. Rosman and Ms. Egan undertook this "investigation" months after Mrs. Griffin and her team had proactively reached out to the *Times* to promote the book's release. Ms. Egan had been invited to a dinner celebrating *The Tell* as early as November 2024, to which Ms. Egan did not RSVP

---

[12] *Id.* (reporter commentary at 1:14).

or attend. A Penguin Random House representative again contacted Ms. Egan in December 2024 offering more information about the book and its core message. Ms. Egan did not respond. A few days later, the same representative wrote to Ms. Egan again, suggesting that Ms. Egan might be interested in publishing a spotlight piece on Mrs. Griffin and *The Tell*. Again, Ms. Egan did not respond.

35. In another interview, Ms. Rosman cast doubt on Mrs. Griffin's story based on the fact that no other victims of the same teacher had come forward. Other sources reported that Ms. Egan was "fishing" for reasons to disbelieve Mrs. Griffin.

### *The* Times *Invades Amarillo*

36. Rather than engage with Mrs. Griffin's team—or seek honestly to verify the events described in *The Tell*—Ms. Rosman and Ms. Egan embarked on a months-long fishing expedition aimed at smearing Mrs. Griffin.

37. A critical piece of their strategy was to interview Mrs. Griffin's former middle-school classmates, with the hope that they might eventually stumble upon someone willing to cast doubt on Mrs. Griffin's story.

38. Ms. Rosman and Ms. Egan obtained a class list based on a middle school yearbook and began reaching out to Mrs. Griffin's former classmates, inviting them to be interviewed. Ms. Rosman and Ms. Egan spent four months interviewing "dozens and dozens of people,"[13] including more than 80 people from Amarillo, the publishing industry, the medical and MDMA communities, and Texas law enforcement and governmental agencies.

39. These interviews exposed the authors' true motives. They repeatedly asked leading questions designed to bait subjects into feeding their false, preconceived narrative that Mrs. Griffin had fabricated *The Tell*. For example, Ms. Egan asked one of Mrs. Griffin's classmates who later became a teacher how she would feel if a former student came forward after recalling a memory through an "unapproved" therapy and

---

[13] *Id.* at 3:25.

accused her of sexually abusing a student. When subjects indicated (as this classmate did) that they believed Mrs. Griffin, their comments were excluded from the *Times* article.

### The Times *Approaches Ms. Altum*

40.    As their reporting progressed, Ms. Rosman and Ms. Egan obtained a confidential, watermarked copy of Mrs. Griffin's book proposal. This proposal indicated that Mrs. Griffin believed Claudia may have grown up in a children's home, a detail that was not published in the book. On information and belief, Ms. Rosman and Ms. Egan believed that this detail had been removed only to obscure Claudia's identity. But, had they asked Mrs. Griffin, they would have known that it was cut because after the proposal was circulated, Mrs. Griffin met Claudia and learned that she had not, in fact, lived in a children's home.

41.    Following this red herring, Ms. Rosman and Ms. Egan searched for anyone who grew up in a children's home and attended Mrs. Griffin's school during the relevant time. As it turned out, only one person met these criteria: Joleene Altum.

42.    Ms. Rosman and Ms. Egan first contacted Ms. Altum on June 17, 2025 via Facebook direct message. At that point, Ms. Altum had not read *The Tell* or, on information and belief, told anyone the story of child sexual abuse described in the book. The *Times* "mailed [Ms. Altum] a copy of the memoir,"[14] planting the seed for exactly what they were hoping to find. In a text message on June 20, 2025, Ms. Egan told Ms. Altum that the *Times* was "specifically looking for the girl [Mrs. Griffin] calls Claudia, and [was] wondering if anyone knows who she is." Ex. C.

43.    Ms. Altum received her copy of *The Tell* from the *Times* around June 28, 2025. Ex. D. On information and belief, it was only after having read the book (or having been fed key details by the *Times*) that Ms. Altum told the *Times* that she had been abused by a middle-school teacher in the manner described in *The Tell* and that Mrs. Griffin stole her story to write *The Tell*.

---

[14] Rosman & Egan, *supra* note 3.

11

44.     After Ms. Altum told the *Times* Mrs. Griffin stole her story—and only after weeks of pressure from Mrs. Griffin's legal team—Ms. Rosman and Ms. Egan sent Mrs. Griffin and her legal counsel a fact check.

45.     The fact check, dated September 12, 2025, confirms that Ms. Altum told the *Times* the same lies she now tells through her complaint in the California action.[15] Most important, Ms. Altum told the *Times* that Mrs. Griffin stole her experiences and repackaged them as her own to publish *The Tell*.  The fact check indicates that Ms. Altum told the *Times* that:

    a.  Ms. Altum was repeatedly sexually assaulted by a teacher at Stephen Austin Middle School;

    b.  Ms. Altum's abuser and Mrs. Griffin's abuser were two different people;

    c.  Ms. Altum was "Claudia" in the book;

    d.  Ms. Altum borrowed a dress from Mrs. Griffin for a school dance, which she later returned during a "church youth group" meeting at Mrs. Griffin's house; and

    e.  Mrs. Griffin "appropriated" Ms. Altum's own stories of abuse in writing *The Tell*.

46.     The fact check included additional false claims made by Ms. Altum that were excluded from the article but later included in her complaint, including that she met with Mrs. Griffin at a coffee shop at which Mrs. Griffin provided Ms. Altum with a pre-addressed postcard so that the two could stay in touch.  Ms. Altum's complaint expands on this storyline with further detail, alleging that the meeting took place "in late 2019" after Mrs. Griffin contacted Ms. Altum and "suggested they meet for coffee at a boutique coffee shop located in a tourist area of Palm Springs, California."  Compl. ¶ 42, *Doe v. Griffin*, No. 26STCV07012 (Cal. Super. Ct. Mar. 4, 2026) ("Altum Complaint").  But

_____

[15] Mrs. Griffin's defamation claims are not predicated on Ms. Altum's complaint.  The allegations in Ms. Altum's complaint are evidence of the false information Ms. Altum provided the *Times*.

Ms. Altum has produced no evidence to support her claim that the Palm Springs meeting ever took place—telling Mrs. Griffin that she "will not produce responsive documents" and is "unable to comply with the request" on this subject because she does not have any documents or communications with Mrs. Griffin relating to the meeting, Ex. E, Pl.'s Second Suppl. Resp. to Def. Amy Griffin's Request No. 4, and could not locate a "promotional flyer" Mrs. Griffin supposedly gave to Ms. Altum during the meeting, Ex. E, Pl.'s Second Suppl. Resp. to Def. Amy Griffin's Request No. 5.

47.    From the start, Mrs. Griffin's counsel made it clear to the *Times* that Ms. Altum's story was demonstrably false.  Mrs. Griffin never stole Ms. Altum's story of abuse.  Mrs. Griffin never hosted a youth group meeting at her house.  And the supposed coffee-shop meeting between Mrs. Griffin and Ms. Altum never took place.

### Ms. Altum's Story Falters Before the Article Is Published

48.    Ms. Altum provided the *Times* one other key detail that it omitted from the fact check: that, on her account, after their 2019 coffee shop meeting, Mrs. Griffin employed Dominique Price, a well-known reality television contestant and social-media influencer, to pose as a talent agent and learn the details of Ms. Altum's story.  According to Ms. Altum's complaint, Ms. Altum did not share any story of abuse with Mrs. Griffin at the coffee shop.  Instead, after the meeting, Mrs. Griffin employed Mr. Price to contact Ms. Altum and, under the guise of developing a book or movie based on her life story, extract the details of her abuse.

49.    Although the detail about Mr. Price appeared nowhere in the fact check or the article, Ms. Altum had provided it to Ms. Rosman and the *Times* well before their article went to press.  On September 5, 2025, Ms. Rosman called Mr. Price and asked him to verify Ms. Altum's story.  Ex. A, ¶¶ 10–17.  But, as he has since stated in an affidavit executed under penalty of perjury, Mr. Price told Ms. Rosman the truth: that he had never heard of Ms. Altum, Mrs. Griffin, *The Tell*, or any of the other events Ms. Altum had described.  *Id.* ¶¶ 15–17.

13

50. Specifically, Mr. Price has testified that on September 5, 2025, he received a text message from an individual identifying herself as Katie Rosman, a reporter for the *Times*, requesting to speak with him about a story concerning *The Tell*. *Id.* ¶¶ 10–13. She stated that she could provide more detail over the phone. *Id.* ¶ 13.

51. Mr. Price, confused about how his name could be linked to a memoir he had never read written by a woman he had never heard of, agreed to have a call with Ms. Rosman. During that conversation, Mr. Price told Ms. Rosman in no uncertain terms that she had the wrong person. *Id.* ¶ 17. He stated that he was unfamiliar with *The Tell*, with Mrs. Griffin, and with Ms. Altum, whom Ms. Rosman identified by her true name during their conversation. *Id.* ¶¶ 16, 19–20. Mr. Price told the *Times* that he never worked for a casting or talent agency or producer, never solicited abuse narratives from anyone, never met or requested confidential communications from Ms. Altum, and never contacted anyone for the purpose of gathering personal or traumatic stories as Ms. Altum claimed. *Id.* ¶¶ 5–8, 15.

52. Mr. Price further testified that he has never communicated with, worked with, or been affiliated in any way with Mrs. Griffin, Mr. Lansky, Penguin Random House, The Dial Press, or Ms. Altum. *Id.* ¶¶ 19–22.

### *Ms. Altum Knew Her Statements Were False*

53. It is no surprise that the *Times* could not verify this key allegation regarding Mr. Price. It never happened—and Ms. Altum knew it. Yet Ms. Altum provided her defamatory accusations to the *Times*, which she knew would publish them in the article, knowing that they were untrue.

54. At a minimum, Ms. Altum had actual knowledge that:

    a. She did not meet with Mrs. Griffin in 2019 at all, let alone at a coffee shop in Palm Springs;

    b. Mrs. Griffin has never called Ms. Altum;

    c. Mrs. Griffin never asked Ms. Altum to mail her a postcard;

14

d.  Ms. Altum did not tell Mrs. Griffin about her alleged childhood abuse at any time;

e.  Mr. Price had never attempted to extract Ms. Altum's story of abuse;

f.  Mrs. Griffin did not steal Ms. Altum's experiences to write *The Tell*;

g.  She was not in a church group with Mrs. Griffin in Amarillo; and

h.  She did not attend a church group meeting at Mrs. Griffin's home.

55.    Upon information and belief, the *Times* shared with Ms. Altum evidence that these claims were false during the fact-checking process described above, in which Mrs. Griffin's counsel made clear that Ms. Altum had manufactured her story.

56.    Many other details of Ms. Altum's story are easily disproven, such that she could not have believed they were true.  For instance, Ms. Altum told the *Times* that she borrowed a floral-patterned dress from Mrs. Griffin for an eighth-grade dance.  But the dress the real Claudia borrowed was pink, not floral-patterned.  Ms. Altum claimed it was floral-patterned because *The Tell* said it was.  But that detail had been deliberately changed during the editing process to protect Claudia's identity, as proven by extensive documentation of the book's editorial process.  Ms. Altum has been in possession of this documentation for seventeen days.[16]  In truth, Mrs. Griffin never let Ms. Altum borrow a dress for an eighth-grade dance.

57.    In addition, Ms. Altum alleges in her complaint that she returned the dress "just prior to" a "church youth group meeting" with Mrs. Griffin and others, during which she "asked for Jesus's forgiveness due to the sexual assault by the teacher which had occurred at the Sadie Hawkins dance."  Altum Compl. ¶ 31.  Ms. Altum told the *Times* that when she returned the dress, she told the group she had been a "bad girl" and asked them to pray for her, and that the meeting included a ceremony in which the students laid their hands on Ms. Altum and prayed.  In truth, Mrs. Griffin was not a regular member of

---

[16] This documentation was produced in discovery in the California litigation on May 29, 2026.

15

a youth group, she never hosted a middle-school church youth group meeting at her home, and she has never participated in a "laying on of hands" ceremony.  Mrs. Griffin was raised attending an Episcopalian church that did not use such ceremonies.

58.　Were there any doubt, Ms. Altum's attorneys, and, on information and belief, Ms. Altum herself, have seen evidence of her claims' falsity through discovery in the California litigation.  In the California litigation, Mrs. Griffin produced to Ms. Altum her text messages with the real Claudia, photographs and notes relating to Mrs. Griffin's meeting with the real Claudia, as well as contemporaneous personal journal entries documenting Mrs. Griffin's therapy sessions and the memories she recovered well before Ms. Altum claims Mr. Price approached her.  Mrs. Griffin also produced to Ms. Altum numerous drafts of *The Tell*, which reflect many falsities in Ms. Altum's story, *see supra* ¶ 56.

59.　Ms. Altum's attorneys and, on information and belief, Ms. Altum herself, have also reviewed the sworn affidavit of Mr. Price.  As described above, Mr. Price affirmed that at the time he was contacted by the *Times*, he had never heard of Mrs. Griffin, *The Tell*, or Ms. Altum.  *See supra* ¶¶ 48–52.  Nor had he ever worked for Mrs. Griffin or her publisher, or attempted to gather sensitive information from Ms. Altum as she claimed.  *Id.*

60.　Ms. Altum continues to refuse to retract her false claims.

61.　Ms. Altum's claims are also inherently improbable.  For Ms. Altum's story to be true, Mrs. Griffin must have already known about Ms. Altum's alleged abuse to set her up for targeted conversations.  But Ms. Altum does not explain how Mrs. Griffin would have obtained this information at any point prior to 2019 (when the two supposedly met for coffee) or 2022 (when Ms. Altum was supposedly approached by Mr. Price).  Moreover, Ms. Altum claims that the two women did *not* discuss Ms. Altum's alleged abuse when they met in 2019.

62.　Ms. Altum further claims that Mr. Price tricked Ms. Altum into sharing the details of her abuse in conversations that began around April 2022.  But by March 2022,

16

Mrs. Griffin had already drafted and circulated a complete article (which would become the basis for *The Tell*) about her recovered memories of sexual abuse. And she recorded memories of her abuse in a personal journal as early as 2020.

63. Ms. Altum also claims that she met Mrs. Griffin in a coffee shop in 2019, which catalyzed her years-long scheme to steal Ms. Altum's story of abuse through covert methods. Altum Compl. ¶¶ 42–43. This means that Mrs. Griffin, after having no contact with Ms. Altum for decades, must have started plotting to steal her story *six years* before Mrs. Griffin's memoir would see the light of day. According to Ms. Altum's order of events, this also means that Mrs. Griffin—who did not undergo MDMA therapy until 2020—underwent the treatment solely to stage a fake recollection of events to lend credibility to the claims she would make in *The Tell* years later.

64. These claims are nonsensical, and Ms. Altum knows it. In pre-answer discovery authorized by California law, *see* Cal. Civ. P. Code § 2030.020, she has been unable to present any verification that she has been in contact with Mrs. Griffin within the last several decades (because she has not been); any evidence of her supposed travel to Palm Springs in 2019 (because she did not meet Mrs. Griffin there); any detail about her supposed relationship with Mrs. Griffin during middle school that would have facilitated a dress exchange (because no such thing occurred); any evidence to suggest that a conversation ever took place in which Ms. Altum told Mrs. Griffin, or anyone close to Mrs. Griffin, about her alleged abuse (because no such conversation ever took place); or any evidence that Ms. Altum has ever spoken to Mr. Price, including the "document[ation]" her complaint promised, *see* Altum Compl. ¶ 21, or any record of the multiple, hours-long calls she claimed to have had with him, *see id.* ¶ 51. This demonstrates that Ms. Altum knew and knows her statements to the *Times* were false.

### Ms. Altum's Accusations Have Caused Mrs. Griffin Substantial Harm

65. Despite having no evidence to support her outlandish claims, Ms. Altum, with the support of one of the most influential news sources in the world, launched a

baseless lawsuit designed to capitalize on the *Times* article.

66. The *Times* published its article on September 24, 2025. It reported Ms. Altum's claims—as she knew it would—and even featured a silhouetted picture of Ms. Altum, taken by the *Times* in Las Vegas, where she resides.

67. Through the article, Ms. Altum's defamatory accusations have directly and proximately caused reputational harm to Mrs. Griffin. Before Ms. Altum published her defamatory statements and implications, Mrs. Griffin had a reputation as a trusted, respected businesswoman and advocate for sexual-abuse survivors. Ms. Altum's false and defamatory statements and implications about Mrs. Griffin have severely damaged that reputation by casting her as a liar who took advantage of a survivor and exploited that survivor's story for personal recognition and profit.

68. As a direct and proximate result of Ms. Altum's defamatory statements and implications, Mrs. Griffin has been forced to incur substantial expenses to attempt to correct the public record about herself and her actions, including hiring counsel and incurring attorneys' fees—separate from fees incurred in bringing this lawsuit—to engage with the *Times* about Ms. Altum's false and defamatory accusations, and hiring a public-relations firm to counter this false narrative.

69. Ms. Altum's defamatory accusations have likewise directly and proximately caused substantial economic harm to Mrs. Griffin. Among other things, Ms. Altum's defamatory statements and implications—and the fallout they reasonably and foreseeably caused and that Ms. Altum intended to cause with them—directly and proximately diverted Mrs. Griffin's attention from personal and professional endeavors, including her business and philanthropic work.

70. Ms. Altum's accusations have been repeated far and wide. A few days after the *Times* publication, the *Daily Caller* published an article titled *Best-Selling #MeToo Memoir Beloved by Elites Might Hinge on Made-Up Memories*. Natalie Sandoval, *Best-Selling #MeToo Memoir Beloved by Elites Might Hinge on Made-Up Memories*, Daily Caller (Sept. 26, 2025). The article reports that "[t]he abuse may never have happened,"

18

and calls into question not only Mrs. Griffin's trauma but the support she received from her network while promoting the book.  Another outlet published an article entitled *Why Trauma Writers Lie to Us*, which reported that Mrs. Griffin "thought that her story was true" because "[s]he needed it to be true" and that "a lot of other people . . . needed—or at least wanted—it to be true, impelling them to overlook the glaring red flags."  Alden Jones, *Why Trauma Writers Lie to Us*, UnHerd (Oct. 14, 2025).  And a popular podcaster called the *Times* article "a long in-depth piece kind of blowing the lid off of this."[17]  A guest on the same podcast, believing Ms. Altum's lies, called Mrs. Griffin "an amoral husk of a human being."  She continued, "She has committed a moral injury for the ages . . . against every survivor of childhood sexual abuse, especially those who find the courage to come forward to confront their abusers and take them to court. This is disgusting."  These and other reactions make clear that readers understood the *Times* article and Ms. Altum's claims to accuse Mrs. Griffin of having stolen Ms. Altum's story.

### Ms. Altum Sues Mrs. Griffin

71.     On March 4, 2026, Ms. Altum filed a lawsuit against Mrs. Griffin, repeating many of the false claims she made to the *Times*.  Ms. Altum has brought claims for invasion of privacy, publication of private facts, false light, intentional infliction of emotional distress, negligent infliction of emotional distress, unfair business practices, and negligence.  The next day, the *Times* published an article covering the lawsuit, confirming that the plaintiff in the lawsuit was the source for the *Times*' September article.[18]

72.     On March 18, 2026, Ms. Altum's lawyer, Zach Rosenblatt, appeared as a guest on *Hot Mics with Billy Bush*, stating that he and Ms. Altum "wouldn't have filed

---

[17] *Shock Lawsuit Against "The Tell" Author, Kouri Richins Bombshells, and Nancy Guthrie Investigation Mess* (Mar. 12, 2026), https://podcasts.apple.com/us/podcast/shock-lawsuit-against-the-tell-author-kouri-richins/id1532976305?i=1000754888749.

[18] Rosman & Egan, *supra* note 5.

the complaint if we were not prepared to prove the allegations in court." Hot Mics with Billy Bush, *Pt. 1 Jumbo Screen Scandal- Kristin Cabot Tells All + Best Selling Author Scandal Heats Up* (Mar. 18, 2026), https://podcasts.apple.com/us/podcast/pt-1-jumbo-screen-scandal-kristin-cabot-tells-all-best/id1789827802?i=1000756024759.

73. Ms. Altum initially sought to proceed anonymously, despite having identified herself by name to the *Times*, having posed for a silhouette photograph with the *Times*, and having claimed that she had been "identified" as "Claudia" by "people in her community." Altum Compl. ¶ 77. Ms. Altum has not moved to proceed anonymously, as California law requires of a party seeking to proceed anonymously. Ms. Altum's attorneys have since produced her name in unsealed discovery with no protective order, making her identity a matter of public record.

74. Mrs. Griffin propounded discovery on Ms. Altum on April 13, 2026, requesting, among other things, all documents and communications with anyone who identified her as "Claudia"; all documents and communications relating to her meeting with Mrs. Griffin in Palm Springs, California in 2019, including the flyer that Mrs. Griffin allegedly gave her; and all documents and communications relating to her conversations with Mr. Price and the "Doe" defendants. Ms. Altum has produced no evidence of any interactions with Mr. Price, no evidence of communications with any "Doe" defendants, no evidence of a single person identifying her as "Claudia," and no evidence of a meeting or conversation with Mrs. Griffin at any point in time.

75. On June 5, 2026, Ms. Altum's attorneys were sanctioned by the Los Angeles Superior Court for failing to produce evidence specifically referred to in the complaint.

76. On June 10, 2026, Ms. Altum produced a handwritten note that she claims is the "documentation" of her calls with Mr. Price to which her complaint refers. The note is written in the margin of a page of handwritten meeting minutes that are dated March 22, 2023. *See* Ex. F. On information and belief, this note was written after March 22, 2023, meaning that even on Ms. Altum's account, Mr. Price's first contact with

Ms. Altum came after Mrs. Griffin had already produced a full book proposal for *The Tell*.

77.     On June 11, 2026, Ms. Altum's counsel received the affidavit of Mr. Price attached as Exhibit A.  On June 14, 2026, Mrs. Griffin served Ms. Altum a written retraction demand.[19]

**FIRST CLAIM FOR RELIEF**
**DEFAMATION PER SE**

78.     Mrs. Griffin repeats, re-alleges, and incorporates by reference the allegations in Paragraphs 1 through 77 as if set forth fully herein.

79.     Beginning in or about June 2025, Ms. Altum spoke with *New York Times* reporters on several occasions and claimed that Mrs. Griffin had appropriated her childhood sexual assault to write Mrs. Griffin's memoir, *The Tell*.

80.     Specifically, Ms. Altum told the *Times* that Mrs. Griffin had stolen her story of abuse.

81.     Ms. Altum made the statement to the *Times* and directly and proximately caused it to be published by the *Times*.

82.     The statement is of and concerning Mrs. Griffin.  Mrs. Griffin was identified by name both by Ms. Altum and in the *Times* article.

83.     This statement is factual and is reasonably understood as factual— specifically, as an assertion that Mrs. Griffin defrauded Ms. Altum and appropriated her experiences of sexual assault.

84.     The statement is false.  Mrs. Griffin did not appropriate Ms. Altum's experiences.  Mrs. Griffin wrote about her own experiences of childhood sexual abuse at the hands of a teacher.  She detailed these experiences in her journals years before Ms. Altum claims she told Mrs. Griffin, through Mr. Price, about them.  Mrs. Griffin spent years investigating her memories and seeking justice before publishing her memoir, *The Tell*.

---

[19] No retraction demand is required by applicable law.

21

85. The statement is defamatory, and readers understood it to be defamatory, because it tends to hold Mrs. Griffin up to scorn, hatred, ridicule, or contempt in the minds of a considerable and respectable segment in the community, tends to impair her standing in the community, tends to lower the esteem in which she is held, and tends to discourage others from associating with her, including by accusing her of lying and appropriating another's sexual assault for a profit.

86. The statement is also defamatory per se because on its face, it maligns and prejudices Mrs. Griffin in her trade, business, or profession, including by accusing her of stealing another person's life rights. The statement further amounts to an accusation that Mrs. Griffin gave false information to a police officer, a crime in Texas, New York, and Nevada. *E.g.*, Tex. Penal Code § 37.08 (False Report to Peace Officer); N.Y. Penal Law §§ 240.50, 240.55, 240.60 (Falsely Reporting an Incident); *id.* § 210.45 (Making a Punishable False Written Statement); Nev. Rev. Stat. § 207.280 (False Reporting of a Crime); Nev. Rev. Stat. § 197.190 (Obstructing a Public Officer).

87. For the reasons set forth in detail above, Ms. Altum published the statement with actual malice, including with actual, subjective awareness of its falsity or, at an absolute minimum, with reckless disregard for the truth, as evidenced in part by the facts that Ms. Altum:

    a. Had actual, subjective knowledge of the falsity of her accusations against Mrs. Griffin at the time she published them to the *Times*;

    b. Had a preconceived narrative that Mrs. Griffin was making up her abuse and aligned her false statement with that preconceived narrative;

    c. Published her claims against Mrs. Griffin despite not having any evidence to support them; and

    d. Published her claims against Mrs. Griffin despite knowing they were inherently improbable.

88. Ms. Altum had no applicable privilege or legal authorization to publish the statement, or, if she did, she abused that privilege or authorization. Ms. Altum published

her statement in bad faith, with actual malice, and with common law express malice such that any otherwise potentially applicable common interest privilege is vitiated and cannot apply.

89.    Ms. Altum published the statement maliciously, willfully, wantonly, heedlessly, with common law malice, with express malice, with actual malice, and with a conscious, reckless, and willful indifference to Mrs. Griffin's rights, and with ill will, animus, and a desire to cause injury to Mrs. Griffin.  Accordingly, punitive damages are appropriate.

90.    As a direct and proximate result of the statement, and as detailed above, Mrs. Griffin has suffered substantial economic damage including, among other things, loss of current and future business opportunities and investments, diversion of time from personal and professional endeavors, including her business and philanthropic work, and such other compounding and growing losses as will be shown at trial.

91.    As a direct and proximate result of the statement, and as detailed above, Mrs. Griffin has suffered severe mental anguish and reputational damage.  She has had to spend considerable sums of money to correct the public record about her actions, including hiring counsel and incurring attorneys' fees—separate from fees incurred in bringing this lawsuit—to engage with the *Times* about Ms. Altum's false and defamatory accusations, and hiring a public-relations firm to counter this false narrative.

92.    Ms. Altum knew the substantial danger of injury to Mrs. Griffin and her reputation from the statement, which is readily apparent, and in fact intended to cause injury to Mrs. Griffin by publishing the statement.

93.    In view of the foregoing, Mrs. Griffin is entitled to actual, presumed, special, exemplary, and punitive damages in amounts to be specifically determined at trial.

## SECOND CLAIM FOR RELIEF
## DEFAMATION PER SE BY IMPLICATION

94.    Plaintiff repeats, re-alleges, and incorporates by reference the allegations in

23

Paragraphs 1 through 77 as if set forth fully herein.

95.    Beginning in or about June 2025, Ms. Altum spoke with *New York Times* reporters on several occasions and juxtaposed several statements to imply that Mrs. Griffin had appropriated her childhood sexual assault to write Mrs. Griffin's memoir, *The Tell*.

96.    Specifically, Ms. Altum told the *Time*s the following:

a.    Ms. Altum "is certain that Claudia is based on her."

b.    Ms. Altum "wonders if you [Mrs. Griffin] were aware as a child of the abuse she was suffering and whether you have appropriated her experiences."

c.    When Ms. Altum "finished reading 'The Tell,' she wrote a song [about Mrs. Griffin] whose lyrics include, 'I feel so used./I didn't even know it was possible./To steal someone's abuse.'"

d.    That Mrs. Griffin lent Ms. Altum a "floral," "poofy" dress for Cotillion, as described in *The Tell* but that Ms. Altum "was ultimately forbidden by the Children's Home from attending cotillion. She wore the dress that you [Mrs. Griffin] lent to her to the eighth grade/Austin Day dance."

e.    Ms. Altum "shared a detailed story about her own experience at that dance, about how the teacher who was abusing her created a ruse to get her to leave the dance with him and walk to a different part of the school where he assaulted her. He then ejaculated on the dress that she had borrowed from you [Mrs. Griffin]."

f.    Ms. Altum "shared with the Times specific details about returning to the dance floor with her hair disheveled, her dress soiled and smelling of sex. She said she was certain students knew why she and the teacher left and returned together but that it was not explicitly discussed."

g.    Ms. Altum "said when she returned the dress to your [Mrs. Griffin's] house, it was during a church youth group meeting and that she apologized profusely to you for the stain on the dress (which she said was in fact in a

drycleaning bag but that the dress had not been cleaned). She said that she asked for you and her friends to pray for her so that no one would think she was 'a bad girl.' She believed everyone understood what had taken place at the dance."

h. Ms. Altum "said she met with you [Mrs. Griffin] at a coffee shop. She said you did not inquire about sexual assault and did not share your recovered memories. She said you mostly discussed your interest in empowering women."

i. Ms. Altum "said at the end of the coffee shop meeting that you [Mrs. Griffin] handed her a postcard, wrote your address in New York on the card and asked her to send [] a note if she was interested in getting involved in your network to support women's empowerment."

j. Ms. Altum "said she mailed the postcard several days later. She said that she has not heard from you [Mrs. Griffin] directly since."

97.    Ms. Altum made these statements to the *Times* and directly and proximately caused these statements to be published by the *Times*.

98.    The statements create the false and defamatory implication that Mrs. Griffin stole Ms. Altum's story of abuse and published *The Tell* claiming that Ms. Altum's trauma was her own.  In doing so, Ms. Altum intended to and did convey that Mrs. Griffin lied in *The Tell* and then exploited those lies for personal and commercial gain, which the *Times* then republished to a global audience.

99.    The implication is of and concerning Mrs. Griffin.  Mrs. Griffin was identified by name both by Ms. Altum and in the *Times* article.

100.    The implication is factual and is reasonably understood as factual— specifically, as an assertion that Mrs. Griffin defrauded Ms. Altum and appropriated her experiences of sexual assault.

101.    The implication is defamatory, and readers understood it to be defamatory, because it tends to hold Mrs. Griffin up to scorn, hatred, ridicule, or contempt in the minds

25

of a considerable and respectable segment in the community, tends to impair her standing in the community, tends to lower the esteem in which she is held, and tends to discourage others from associating with her, including by accusing her of lying and appropriating another's sexual assault for a profit.

102. The implication is also defamatory per se because it maligns and prejudices Mrs. Griffin in her trade, business, or profession, including by accusing her of stealing credit for the accomplishments of others. The implication further amounts to an accusation that Mrs. Griffin gave false information to a police officer, a crime in Texas, New York, and Nevada. *E.g.*, Tex. Penal Code § 37.08 (False Report to Peace Officer); N.Y. Penal Law §§ 240.50, 240.55, 240.60 (Falsely Reporting an Incident); *id.* § 210.45 (Making a Punishable False Written Statement); Nev. Rev. Stat. § 207.280 (False Reporting of a Crime); Nev. Rev. Stat. § 197.190 (Obstructing a Public Officer).

103. Ms. Altum knew the substantial danger of injury to Mrs. Griffin and her reputation from the implication, which is readily apparent, and in fact intended to cause injury to Mrs. Griffin by publishing the implication.

104. For the reasons set forth in detail above, Ms. Altum published the implication with actual malice, including with actual, subjective awareness of its falsity or, at an absolute minimum, with reckless disregard for the truth, as evidenced in part by the facts that Ms. Altum:

    a. Had actual, subjective knowledge of the falsity of her accusations against Mrs. Griffin at the time she published them to the *Times*;

    b. Had a preconceived narrative that Mrs. Griffin was making up her abuse and aligned her false statements with that preconceived narrative;

    c. Published her claims against Mrs. Griffin despite not having any evidence to support them; and

    d. Published her claims against Mrs. Griffin despite knowing they were inherently improbable.

105. Ms. Altum had no applicable privilege or legal authorization to publish the

implication, or, if she did, she abused that privilege or authorization.  Ms. Altum published the implication in bad faith, with actual malice, and with common law express malice such that any otherwise potentially applicable common interest privilege is vitiated and cannot apply.

106.   As a direct and proximate result of the implication, and as detailed above, Mrs. Griffin has suffered substantial economic damage including, among other things, loss of current and future business opportunities and investments, diversion of time from personal and professional endeavors, including her business and philanthropic work, and such other compounding and growing losses as will be shown at trial.

107.   As a direct and proximate result of the implication, and as detailed above, Mrs. Griffin has suffered severe mental anguish and reputational damage.  She has had to spend considerable sums of money to correct the public record about her actions, including hiring counsel and incurring attorneys' fees—separate from fees incurred in bringing this lawsuit—to engage with the *Times* about Ms. Altum's false and defamatory accusations, and hiring a public-relations firm to counter this false narrative.

108.   Ms. Altum published the implication maliciously, willfully, wantonly, heedlessly, with common law malice, with express malice, with actual malice, and with a conscious, reckless, and willful indifference to Mrs. Griffin's rights, and with ill will, animus, and a desire to cause injury to Mrs. Griffin.  Accordingly, punitive damages are appropriate.

109.   In view of the foregoing, Mrs. Griffin is entitled to actual, presumed, special, exemplary, and punitive damages in amounts to be specifically determined at trial.

WHEREFORE, Mrs. Griffin prays for the following relief:

1.   A declaration that the statement identified in paragraph 80 and the implication identified in paragraph 98 are false and defamatory;

2.   An award of compensatory damages as alleged hereinabove, in an amount to be proven at trial, but not less than the jurisdictional minimum of this

27

Court;

3.    Awardable costs; and

4.    Such other and further relief as the Court may deem just and proper.

CLARE LOCKE LLP

By: /s/ Mitchell Langberg
     Mitchell J. Langberg
     Thomas A. Clare
     *Subject to admission* pro hac vice
     Elizabeth M. Locke
     *Subject to admission* pro hac vice
     Eric D. Hageman
     *Subject to admission* pro hac vice

     *Attorneys for Plaintiff*
     *Amy Griffin*