# Exhibit A

**Zach Rosenblatt (SNB# 345034)**
**ZSR LAW**
406 Broadway, #125
Santa Monica CA 90401
Telephone: (310)-529-1213
Email: zachsrosenblatt@gmail.com
Attorney for JANE DOE

Electronically FILED by Superior Court of California, County of Los Angeles 3/04/2026 2:24 PM David W. Slayton, Executive Officer/Clerk of Court, By Y. Tarasyuk, Deputy Clerk

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF LOS ANGELES**

JANE DOE.,

Plaintiff,

vs.

AMY GRIFFIN, AN INDIVIDUAL; SAM LANSKY, AN INDIVIDUAL; PENGUIN RANDOM HOUSE, LLC; DIAL PRESS; DOES 1-50; ROE CORPORATIONS 1-50

Defendants,

**Case No.:** 26STCV07012

**COMPLAINT FOR DAMAGES**

1) **INVASION OF PRIVACY/INTRUSION**
2) **PUBLICATION OF PRIVATE FACTS**
3) **FALSE LIGHT**
4) **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
5) **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
6) **UNFAIR COMPETITION**
7) **NEGLIGENCE**

## INTRODUCTORY STATEMENT

This Complaint revolves around a bestselling book called "The Tell" (hereinafter "The Tell" or "the memoir" or "the book") by author AMY GRIFFIN, published by PENGUIN RANDOM HOUSE, LLC. "The Tell" purports to be a true memoir recounting how Defendant GRIFFIN, through her use of the illegal drug MDMA (commonly known as "Ecstasy"), recovered suppressed memories of childhood sexual abuse by her middle school teacher, "Mr. Mason" (a pseudonym) beginning when she was twelve years old while growing up in Amarillo, Texas. Defendant GRIFFIN claims that after "discovering" these memories, she achieved a new level of self-realization, sought justice, deepened her relationships, confessed her secrets, and empowered other women to do the same.

However, Plaintiff asserts that "The Tell" constitutes neither a genuine nor harmless memoir. Contrary to GRIFFIN's public assertions that she wrote "The Tell" by herself on her "bathroom floor", we are informed and believe the memoir is a ghostwritten work by Defendant LANSKY. Among other things, the book also acts as a *de facto* advertisement for "the efficacy" of MDMA therapy – an experimental treatment involving a non-FDA approved drug in which the author concedes that she and her husband have a financial interest. In doing so, Defendants fabricated/lifted multiple key events of "The Tell", which were actual events from the life of a third-party, Plaintiff, JANE DOE.

Moreover, we believe these events were unlawfully obtained from JANE DOE in a tortious scheme that had a strong nexus to California. Plaintiff, JANE DOE, asserts that Defendants, and each of them, directed or participated in acts of: 1) Intrusion; 2) Invasion of Privacy; 3) Publication of Private Facts; 4) Negligence; and 5) Infliction of Emotional Distress - all of which have caused significant harm and damages to Plaintiff, JANE DOE.

# I. PARTIES

1. Plaintiff JANE DOE is an individual who alleges she had her identity, likeness, and private information unlawfully used in Defendants' memoir "The Tell". Further, Plaintiff alleges that she is identifiable in the community where Plaintiff JANE DOE and the author both grew up, and is referenced multiple times in the memoir under the pseudonym "Claudia.".

2. Defendant AMY GRIFFIN is the credited author of the “memoir” titled “The Tell". Defendant GRIFFIN has received a substantial amount of financial compensation due to sales of said memoir.

3. Plaintiff is informed and believes that Defendant SAM LANSKY is the ghostwriter of the “memoir” titled the “The Tell”. As the ghostwriter, LANKSY acted as an agent for principals GRIFFIN and/or RANDOM HOUSE. Defendant LANSKY has also received substantial financial compensation from his efforts in the making and creation of “The Tell”.

4. Defendant PENGUIN RANDOM HOUSE is a corporation engaged in the business of publishing and distributing memoirs, including "The Tell," throughout California and the United States.

5. Plaintiff is informed and believes that Defendant DIAL PRESS is a subsidiary of Defendant PENGUIN RANDOM HOUSE and is the division credited as being the publisher of "The Tell."

6. Defendants DOES 1-50 and ROE CORPORATIONS 1-50 are persons or entities whose true names are unknown to Plaintiff, but who participated in the wrongful conduct alleged herein.

## II. JURISDICTION AND VENUE

7. This Court has jurisdiction over this action because Plaintiff seeks relief for tortious conduct— including invasion of privacy, publication of private facts, and infliction of emotional distress - which involve a number of acts that were committed and/or directed within California, and specifically within Los Angeles County, giving rise to liability under California law pursuant to Code of Civil Procedure § 410.10.

8. Defendants, and each of them, purposefully availed themselves of the privilege of conducting business within the state of California. They participated in a tortious scheme with acts that occurred in this state, including Los Angeles County, such that assertion of personal jurisdiction is consistent with traditional notions of fair play and substantial justice as articulated by the U.S. Supreme Court in *International Shoe Co. v. Washington* (1945) 326 U.S. 310.

9. Plaintiff is informed and believes Defendant LANSKY was a resident of Los Angeles County California at the time the book was written, and Plaintiff JANE DOE was also a California resident during the time the book was written and during the time a tortious meeting was held with Defendant AMY GRIFFIN in the state of California, and harm from Defendants' conduct—including deception, publication, and resulting distress—was also suffered within California.

10. Venue is proper in Los Angeles County under CCP §§ 395 and 396, as a substantial part of the acts and omissions giving rise to the claims—including publication of private facts - occurred here.

11. Distribution and sale of the subject memoir and its audio content were carried out and promoted through Defendant PENGUIN RANDOM HOUSE'S audio division, which has its headquarters located at 20970 Warner Center Lane, Suite B, Woodland Hills, California 91367, and is located in Los Angeles County.

12. Plaintiff is also informed and believes that Defendant GRIFFIN is represented by Creative Artists Agency (CAA), whose primary place of business is located at 2000 Ave of the Stars, Los Angeles, CA 90067. Relevant interviews, commercial speech, and podcasts involving Defendant GRIFFIN which promoted the tortious conduct were produced and distributed in Los Angeles County. Moreover, "The Tell" received extraordinary media attention and promotional support as well as multiple book tour events which occurred throughout California, including an in person promotional event held in Los Angeles County at 1113 Montana Ave., Santa Monica, California 90403.

13. This Court may exercise general personal jurisdiction over Defendant LANSKY based on his California residency at the time the cause of actions arose. *Boaz v. Boyle & Co*. (1995) 40 CA4th 700, 717, 46 CR2d 888, 899. Defendant LANSKY is an author and Hollywood screenwriter who recently co-wrote the sequel to “I Know What You Did Last Summer” (released in July 2025). Plaintiff is informed and believes that when the tortious conduct occurred Defendant Lansky maintained a residence on N. Genesee Avenue, Los Angeles, California beginning in 2021 and was a resident of Los Angeles County during the time period in which "The Tell" was ghostwritten, edited, and published. As a California domiciliary at all times relevant to this action, Defendant LANSKY is subject to the general jurisdiction of California courts.

14. This Court may also exercise specific jurisdiction over Defendant LANSKY. Defendant GRIFFIN and/or Defendant PENGUIN RANDOM HOUSE, LLC engaged Defendant LANSKY as the “ghostwriter”[1] for "The Tell." Plaintiff is

[1] A ghostwriter is a professional writer hired to author or substantially contribute to a work officially credited to another person, with the ghostwriter's role typically undisclosed to the public. *Black's Law*

informed and believes Defendant LANSKY participated in crafting the book's narrative, organizing the material, and the writing of substantial portions of the published memoir, despite public representations that GRIFFIN wrote the memoir by herself "on her bathroom floor."

15. Defendant LANSKY performed all or part of this work while he was a resident of Los Angeles County, California. As a ghostwriter, Defendant LANSKY presumably would maintain drafts, correspondence, notes, and other documents related to the creation of "The Tell" at his place of residence, which is located in Los Angeles County, California. Witnesses to his tortious conduct may also be located in Los Angeles County, California.

16. In his role as ghostwriter, Defendant LANSKY inflicted harm on Plaintiff in California through his actions with respect to the acts taken during the ghostwriting process.

17. Plaintiff JANE DOE was a California resident during the time we are informed and believe Defendant LANSKY was involved in ghostwriting the book and engaged in tortious conduct as further described below. This conduct included misrepresenting her private facts and wrongfully publishing her private facts when he incorporated them into the manuscript for "The Tell". The tortious conduct of fraudulently obtaining and publishing Plaintiff's private facts by incorporating into the manuscript occurred in California and targeted a Plaintiff residing in California, resulting in significant proximate harm.

18. Drafts of the manuscript as well as communications between Defendants GRIFFIN and LANSKY regarding the content of "The Tell," source materials,

---

*Dictionary* (11th ed. 2019) (defining ghostwriter as "one who writes for and gives credit of authorship to another")

investigative files, and documents showing LANSKY's role in creating and publishing the memoir would presumptively be located in Los Angeles County, California, where Defendant LANSKY resided.

19. Beyond Defendant LANSKY's California-based activities, "The Tell" was selected as “Oprah Winfrey's Book Club Choice”, which also promoted the tortious conduct. Plaintiff is informed and believed that this “Book Club” is owned, operated, and/or managed in whole or part by OWN (Oprah Winfrey Network) and O (Oprah Magazine), which are both headquartered at 1041 N. Formosa Ave., West Hollywood, California 90046, within Los Angeles County.

20. In addition to the foregoing, Plaintiff JANE DOE had private details of her life solicited by phone in or about April 2022 by a man claiming his name was “Dominique”. This individual contacted Plaintiff from telephone number (774) 314-1449, a phone number which is connected to a “Dominique Price”, who, according to California Secretary of State records is the registered manager of Sleevd LLC, a California limited liability company with its principal place of business at 4750 Lincoln Blvd., Apt. 121, Marina del Rey, California 90292.

21. When “Dominique” contacted Plaintiff JANE DOE, Plaintiff documented this contact by writing down “Dominique’s” name and phone number on paper, which she preserved. Upon information and belief we believe “Dominique” was acting as an agent of Defendant GRIFFIN and/or Defendant LANSKY by falsely representing himself as a "talent agent" and "producer" in order to solicit Plaintiff’s private information and memories for unauthorized use in "The Tell." This tortious activity occurred over a number of weeks. The fraudulent procurement of Plaintiff's private information by an agent of a California limited liability company operating from Los Angeles County further establishes a substantial nexus to California for purposes of jurisdiction.

22. Defendant PENGUIN RANDOM HOUSE and other named and yet to be named co-Defendants maintain ongoing business contacts and regularly transacted business in Los Angeles County, establishing continuous and systematic connections sufficient to confer jurisdiction under California law, and satisfying the requirements set forth in International Shoe and CCP § 410.10. Filing in this venue is also appropriate because it has a locus of the actionable events, resulting harm, and business operations of the Defendants that are implicated in the alleged tortious conduct.

23. In *Daimler Trucks North America LLC v. Superior Court,* No. B316199, 2022 Cal. App. LEXIS 594 (July 7, 2022), the Court enumerates that California may exercise specific jurisdiction over nonresident Defendants if they have purposely availed themselves of forum benefits, the controversy is related to or arises out defendant's contacts with the forum, and the assertion of personal jurisdiction would comport with fair play and substantial justice.

24. Defendants, including Defendant GRIFFIN, all intentionally availed themselves of California benefits by selling and distributing the book in California and generating revenue from sales of the memoir to California residents.

25. Fair play and substantial justice mitigate in favor of exercising jurisdiction as Plaintiff JANE DOE should be allowed to choose her forum to adjudicate this matter where there exist sufficient minimum contacts, as is the case in California, consistent *Calder v. Jones*, 465 U.S. 783 (1984), Defendant LANSKY is further subject to personal jurisdiction in California, and Defendants GRIFFIN and PENGUIN RANDOM HOUSE both have more than significant contacts and financial resources and will suffer no harm in any jurisdiction chosen by Plaintiff JANE DOE.

## III. FACTUAL ALLEGATIONS

### Relationship of Parties

26. In or around the years 1988 and 1989, when they were minors, Defendant AMY GRIFFIN and Plaintiff JANE DOE met for the first time. They attended the same middle school together in Amarillo, Texas known as Stephen Austin Middle School.

27. Plaintiff DOE and Defendant GRIFFIN were also members of the same church youth group.

28. During the time that they were school classmates and members of the same church youth group, Plaintiff DOE borrowed a dress from Defendant GRIFFIN in order to wear it to attend a "Sadie Hawkins" dance sponsored by Austin Middle school in Amarillo, Texas.

29. During this event, Plaintiff JANE DOE was sexually assaulted in a closet by one of the school's teachers. She was seen by numerous attendees leaving the dance area at the behest of this teacher, and then seen by numerous attendees returning to the dance with her dress soiled and her hair tussled. Plaintiff DOE was too scared to report the sexual assault to authorities at the time.

30. Soon after said school dance, just prior to one of their church youth group meetings, Plaintiff DOE brought the dress she had borrowed from Defendant GRIFFIN and returned it to her. Said dress was still stained with bodily fluids from the teacher who had sexually assaulted her.

31. During said church youth group meeting, which both PLAINTIFF DOE and Defendant GRIFFIN attended with a number of other individuals, Plaintiff JANE DOE asked for Jesus's forgiveness due to the sexual assault by the teacher which had occurred at the Sadie Hawkins dance.

32. Approximately one month later, Plaintiff JANE DOE was once again sexually assaulted by the same schoolteacher, this time in the bathroom of Stephen

Austin Middle school. This assault was more violent, and during the incident the teacher put his boot on her back, stuffed a bandana in her mouth, which later caught on her braces,  slammed her against the wall, and whipped her with a belt. Plaintiff, who was only 12 years old at the time and was living in a Children's Home, was too scared to report said sexual assaults to authorities at the time.

33. Plaintiff JANE DOE alleges that the details of these two sexual assaults which she was the victim of were later converted by Defendant GRIFFIN for use in the memoir "The Tell". They were falsely claimed by Defendant GRIFFIN as her own "recovered memories" that she had only recently become aware of after going through MDMA therapy.

34. Plaintiff alleges that these sexual assaults were also falsely attributed by Defendant GRIFFIN to a different perpetrator, who she refers to in her memoir under the pseudonym "Mr. Mason", and who was readily identifiable in the community where he had been a teacher at Austin Middle School at the time.

35. After attending Austin Middle School in the late 1980s, Plaintiff JANE DOE and Defendant GRIFFIN did not have contact for close to thirty years.

36. Plaintiff JANE DOE is not and was not a public figure. She has never sought media attention, never voluntarily discussed her childhood sexual trauma publicly, and has no connection to any matter of public concern

37. The facts regarding Plaintiff's sexual molestation are non-newsworthy and not of legitimate public interest or concern. Details of Plaintiff's sexual assault are deeply embarrassing and humiliating private facts. Defendant GRIFFIN used these facts not as incidental details, but as the central focal point of the book.

38. Defendant GRIFFIN used these facts to promote the book  on commercial platforms including, but not limited to, podcasts such as Gwyneth Paltrow's Goop, the Drew Barrymore Show, and other commercial speech venues.

39. The exploitation of Plaintiff's childhood sexual trauma was not news or commentary on matters of public concern, but rather was used in a commercial speech capacity designed to generate sales, publicity, and profits for Defendants.

40. Moreover, the intimate details of sexual trauma that Plaintiff JANE DOE experienced as a child in Texas are not "newsworthy" events that are the legitimate basis for public dissemination. Plaintiff's childhood sexual assaults do not constitute newsworthy events or matters of legitimate public interest warranting publication without consent.

**California Meeting**

41. In the climax of the memoir "The Tell", Defendant GRIFFIN claims she had a meeting with "Claudia" in Amarillo, Texas in which they discuss Defendant's alleged sexual assault and whether "Claudia" was assaulted herself. This meeting forms a key point of the memoir, in which "Claudia" allegedly later alludes to a sexual assault in a postcard sent to Defendant GRIFFIN.

42. At some point in late 2019, Plaintiff JANE DOE, who is referenced in the book under the pseudonym "Claudia" was living in Morongo Valley, California. She was contacted on the telephone by an individual named Amy who claimed they had been part of the same church youth group when they were younger. She told Plaintiff JANE DOE that she was in the Palm Springs area and suggested they meet for coffee at a boutique coffee shop located in a tourist area of Palm Springs, California.

43. Plaintiffs allege that this 2019 meeting in California between the parties was neither casual nor random. Rather, Defendant GRIFFIN orchestrated this meeting as a pretextual investigative encounter. In the memoir, Defendant GRIFFIN writes: "I wondered where she [Claudia/JANE DOE] was and what kind of life she's built for herself. Eventually, I thought, I would find her." Amy Griffin, The Tell (New York: Dial Press, 2025), 101. (hereinafter "*The Tell*").

44. At this meeting, Defendant GRIFFIN and Plaintiff JANE DOE discussed Defendant GRIFFIN's involvement in a female business networking group and her support and promotion of female-owned businesses. When describing herself, she explicitly referred to herself as a "girlboss" and told Plaintiff DOE she was one too.

45. At this meeting, they also briefly discussed a few things about their past growing up in the Amarillo area, including being in the same church youth group, going to the same summer camp, as well as their mutual appreciation for "Taco Villa", a Mexican restaurant which both had patronized while growing up in Amarillo, Texas. They did not, however, discuss anything related to Defendant GRIFFIN's alleged sexual assault by a teacher at their middle school, nor did they discuss any so-called repressed memories relating to sexual assault.

46. At the end of their meeting in the coffee shop, Defendant GRIFFIN purchased two postcards that were for sale near the cashier. She suggested that the two of them mail each other post cards to keep in touch in the future. Defendant GRIFFIN also provided Plaintiff DOE with a promotional flyer with information about her female business networking group.

47. The two of them then each wrote their mailing addresses on respective postcards and exchanged them. The postcard on which Defendant GRIFFIN wrote her address and gave to Plaintiff DOE contained a photo of a statue of two children playing in a park which was located in Palm Springs, California.

48. Defendant GRIFFIN told Plaintiff DOE that after writing a message on the postcard she should put it in the mail. A few days later, Plaintiff JANE DOE wrote a brief sentence on the postcard related to their mutual church youth group, and placed it in the mail. She did not receive a return postcard from Defendant GRIFFIN, however. To her knowledge, she also never received contact from Defendant GRIFFIN again after said meeting.

49. In or about April 2022, Plaintiff JANE DOE was contacted on the telephone by someone ("DOE 1") who did not indicate he was any type of investigator but instead purported to be a "talent agent". Said individual informed Plaintiff JANE DOE her that he had heard from an unidentified third party that she had led a fascinating life, and expressed an interest in using her "life story" for commercial exploitation.

50. The phone number, which was provided to Plaintiff JANE DOE, and from which he called her multiple times, is listed on the California Secretary State's website as a phone number associated with a California Corporation, with its principal place of business in Los Angeles, California.

51. The individual in question spoke with Plaintiff JANE DOE for multiple hours per day, a few times a week, over approximately a one-month period. He solicited detailed stories from Plaintiff JANE DOE her about her life, including her childhood in Texas, which she discussed with him with the understanding and belief that her information would remain private unless or until she entered into an agreement for her life story to be turned into a book or movie. Plaintiff DOE was further asked by the individual to keep their communications confidential. She was also asked to warrant she had the legal right to convey exclusive rights to the use of her life story, which was referred to by DOE 1 as "her intellectual property".

52. After multiple phone calls soliciting stories from Plaintiff DOE's past, DOE 1 had a female individual ("DOE 2") call her to schedule a meeting in Los Angeles, California which would purportedly involve "producers" and/or "directors". It was represented to Plaintiff JANE DOE that at this meeting they would discuss further details of making a movie of her life story, and that they would have a "contract" for her to review detailing the compensation that would be paid to her and conditions for use of her life story.

53. Shortly thereafter, Plaintiff JANE DOE decided to consult with a licensed attorney prior to meeting with the aforementioned individuals in Los Angeles. The attorney she spoke with suggested that she first perform additional due diligence on the individuals in question prior to traveling to Los Angeles to meet with them, and that she confirm their identities, credentials, and experience. He further advised her to obtain a copy of the proposed contract in advance of said meeting so he could review it.

54. Plaintiff JANE DOE then followed the legal advice she was given. She researched online but could not find any relevant information about DOE 1 or his female associate, nor any information demonstrating that either had experience or credentials in making movies. During their next phone call, when Plaintiff asked a series of due diligence questions, DOE 1's female associate immediately became defensive. She did not provide substantive answers to Plaintiff's questions and abruptly ended the phone call.

55. Plaintiff JANE DOE received no additional contact from either DOE 1 or his female associate again after she had relayed intimate details of her life in phone calls over the previous few weeks, including details of incidents which found their way into "The Tell".

56. The stories Plaintiff JANE DOE relayed to these individuals included details of her sexual assaults by a teacher at Austin Middle School. The intimate details of these sexual assaults contain a number of the same ones found in the memoir "The Tell", and are falsely attributed to memories that the author, Defendant GRIFFIN, claims she had recovered after MDMA therapy. Notably, Plaintiff JANE DOE does not recall providing specific details of these sexual assaults to any other third-parties after the time period they occurred prior to the publication of "The Tell".

**The Memoir "The Tell" and Fraud/Misrepresentation**

57. The memoir "The Tell" was promoted and advertised as the purported true memoir of Defendant AMY GRIFFIN, where she recovers repressed memories of childhood sexual abuse through the use of experimental MDMA therapy.

58. Defendant LANSKY has publicly admitted to ghostwriting past books in which he blended fact and fiction. Plaintiff alleges Defendant LANSKY employed a similar methodology in ghostwriting "The Tell" - appropriating some of Plaintiff JANE DOE's actual traumatic experiences, blending them with fictional elements, and presenting them in the book as Defendant GRIFFIN's "recovered memories."

59. In "The Tell", three of the primary characters are: 1) Defendant AMY GRIFFIN, the named author; 2) "Mr. Mason", a pseudonym for a schoolteacher who allegedly sexually assaulted Defendant GRIFFIN on multiple occasions; and 3) "Claudia", a fellow classmate that in the book Defendant GRIFFIN suspects may also have been sexually assaulted by the same teacher.

60. In the book, Defendant GRIFFIN states Claudia is the key link to understand and confirm her own drug induced suppressed memories. Griffin's first journal entry after her first MDMA session involved Claudia and a "borrowed dress". *The Tell* at 99, 100 101, 217. GRIFFIN writes, "Through the prism of Claudia, I had experienced the horror of what was being done to me". *The Tell* at 100.

61. Plaintiff JANE DOE alleges that a number of her real-life experiences and identifying details establish that the character Claudia is based on herself. This includes, but is not limited to, her acquaintance with Defendant GRIFFIN at school, being members of a church youth group, her background growing up in a Children's home/foster home due to childhood abuse, and being one of the very few girls with said background attending this particular school with Defendant GRIFFIN. There also was an incident described in the book in which Defendant GRIFFIN claims

"Claudia" borrowed a "floral puffy dress" from her and then returned it after the school's "Sadie Hawkins" dance, as well as the author seeking out "Claudia" to meet with her for coffee close to 30 years later.

62. More particularly, there are graphic details in Defendant GRIFFIN's memoir relating to sexual assaults that purportedly occurred to Defendant GRIFFIN. Plaintiff JANE DOE alleges that many of these details match the specific details of the sexual assaults that occurred to her at the time, and are falsely attributed as GRIFFIN's own memories of sexual assault in the memoir "The Tell".

63. Throughout the memoir, Defendant GRIFFIN questions the validity and accuracy of her own memory. She further writes that she is not only uncertain whether her memories of abuse actually happened, but that she is also unsure of whether her memories are her own, or Claudia's, or are her own projections. *The Tell* at page 101.

64. In the memoir, Defendant GRIFFIN writes that she purportedly unsuccessfully sought justice against Mr. Mason, while simultaneously attempting to confirm that her memories were of incidents that had really occurred.

65. According to her memoir, Defendant GRIFFIN states that she hired private investigators via her husband's hedge fund after her MDMA therapy in order to track down information and find corroborating witnesses who could help prove that her alleged repressed rape memories were true.

66. In the memoir, Defendant GRIFFIN also claims that she found a "transcript" that was created by the investigators she had retained which detailed their interviews with "Claudia".

67. In the memoir, "Claudia" is portrayed as knowingly and voluntarily speaking with Defendant GRIFFIN's investigators. Plaintiff JANE DOE, however, never knowingly spoke to any investigators working on behalf of Defendant GRIFFIN.

68. At no time was Plaintiff JANE DOE ever informed that she was speaking with someone who was recording or transcribing her experiences to be used in Defendant's memoir. Further, at no time did Plaintiff knowingly consent to any recording or transcription for said use or purpose.

69. In "The Tell", the character of Claudia is falsely portrayed as being aware of the investigation that Defendant Griffin solicited, and purportedly states to the author: "Someone [the investigator] reached out to me [Claudia] a bit ago. As I explained to them, I have no memory of many of the people involved. But if I can assist, I will. Let me know when you are in town." GRIFFIN, *The Tell* (New York: Dial Press, 2025), 220-21. Later in the book, when face to face with Defendant GRIFFIN, Claudia purportedly states, "Like I told your lawyers, or whoever they were, I don't remember anything from that time." *Id*.

70. Any investigative conversations involving Plaintiff JANE DOE relating to her past which were transcribed would have been transcribed and recorded by someone without Plaintiff JANE DOE's knowledge, awareness, or consent. This constitutes an intentional intrusion upon Plaintiff's solitude and private affairs in a manner highly offensive to a reasonable person.

71. Plaintiff DOE alleges that the transcribed or recorded conversations with "Claudia" that are referenced in the memoir "The Tell" by Defendant GRIFFIN, if they actually were recorded or transcribed as claimed, were obtained through deception and fraud by Defendant's proxies.

72. Plaintiff DOE further alleges that all Defendants AMY GRIFFIN, SAM LANSKY, PENGUIN RANDOM HOUSE, DIAL PRESS, DOES 1-50, and ROE CORPORATIONS 1-50 owed a duty towards Plaintiff JANE DOE to ensure that she had knowingly and voluntary participated in the investigation process and was made aware that any statements she made were being transcribed for use in "The Tell".

73. Plaintiff DOE alleges that all Defendants breached said duty, thereby causing damages to Plaintiff.

**Publication and Identification**

74. Plaintiff is informed and believes that "The Tell" was published on or about March 11th, 2025 by PENGUIN RANDOM HOUSE.

75. Plaintiff is informed and believes that "The Tell" has been promoted by Defendant GRIFFIN and advertised by PENGUIN RANDOM HOUSE and DIAL PRESS as a self-authored non-fiction memoir.

76. Plaintiff is informed and believes "The Tell" was released as part of "Oprah's Book Club", with numerous celebrity endorsements and has since become a New York Times bestseller, selling over 100,000 copies as of the date of this Complaint for damages. The selection of "Tell" as Oprah's 112th Book Club choice generated significant national media attention, including but not limited to interviews with celebrities such as Oprah Winfrey, Drew Barrymore, an interview on "CBS Mornings" show, and appearances on major celebrity media platforms.

77. Plaintiff alleges that as the memoir was promoted and became more popular, the character of "Claudia" was identifiable as Plaintiff JANE DOE to others in the community where Plaintiff and Defendant GRIFFIN had resided. Following the publication of "The Tell," multiple individuals from the community where Plaintiff and Defendant GRIFFIN grew up contacted Plaintiff JANE DOE. These individuals recognized that the character "Claudia" in the memoir was based on Plaintiff. Through these communications, it became clear to Plaintiff that her identity as "Claudia" was known throughout the community, causing her severe embarrassment, humiliation, and emotional distress. The fact that people in her community identified her as the subject of the graphic descriptions of childhood

sexual trauma in the memoir demonstrates that Plaintiff was readily identifiable despite the use of a pseudonym

78. A short time after the memoir was published, Plaintiff JANE DOE was contacted by the New York Times. Plaintiff herself neither sought out the New York Times, nor was she aware they were investigating a story relating to Defendant GRIFFIN and/or "The Tell" and had not read nor had any knowledge of the memoir "The Tell".

79. After being contacted by the New York Times, Plaintiff JANE DOE then obtained a copy of the book and listened to an audio version of it. She immediately recognized that the character of Claudia appeared to be based on herself. She further recognized that a number of stories attributed to the memories of Defendant GRIFFIN that supposedly resurfaced during MDMA therapy were actually her own real life past experiences, not those of Defendant GRIFFIN.

## Harm and Damages

80. Upon discovering that Defendants GRIFFIN and/or LANSKY had written a book which contained private facts involving her past, and falsely portrayed her in the memoir as a knowing participant in discussions over Defendant GRIFFIN's purported recovery of lost memories, Plaintiff JANE DOE was forced to re-live her traumatic childhood sexual assaults.

81. Plaintiff JANE DOE has consequently endured months of severe emotional harm, which includes being admitted to a hospital for medical treatment due to the anxiety she suffered as a result of being forced to re-live the traumatic experiences she suffered in her youth. These traumatic experiences include the sexual assaults described in the memoir "The Tell".

82. Plaintiff JANE DOE has sought and has had to undergo professional psychological counseling since the publishing of “The Tell” and the memories of her past that it portrays.

83. Especially given the controversy over the validity of “repressed memories” supposedly recovered via the use of experimental drug therapy, Defendants – and each of them - maintained a heightened duty to fact-check and verify the accuracy of the statements contained in the memoir “The Tell”

84. Defendants – and each of them – failed to verify the accuracy of the claims made in the memoir “The Tell”. Along with the reckless publication of private facts, their actions have proximately caused Plaintiff severe emotional distress.

85. "The Tell" has forced Plaintiff JANE DOE, without her consent, to re-live and endure the horrific trauma that occurred to her when she was a minor, as well as be reminded of these details as they have been knowingly broadcasted to the world through Defendant GRIFFIN’S purported “memoir” and the activities of Defendants SAM LANSKY, PENGUIN RANDOM HOUSE, DIAL PRESS, DOES 1-50, and ROE CORPORATIONS 1-50.

86. The publication of Plaintiff JANE DOE's private facts in this tortious manner has involuntarily forced Plaintiff into the public spotlight against her will. As a result of the actions of Defendants, Plaintiff has suffered embarrassment and distress.

87. Defendants GRIFFIN, LANSKY, PENGUIN RANDOM HOUSE, and DIAL PRESS chose to publish and promote the material as described in this Complaint as a true memoir *knowing* that the author’s so-called memories were unverified and resulted from the use of a non-FDA approved drug.

88. Defendants GRIFFIN, LANSKY, PENGUIN RANDOM HOUSE, and DIAL PRESS further chose to publish this material knowing that there were no

independent corroborating witnesses that attest to Defendant GRIFFIN's alleged memories of sexual assaults.

89. Compounding this negligence and recklessness is the fact that Defendant GRIFFIN concedes in "The Tell" that she has financial and pecuniary ties along with her husband to the development of experimental MDMA-based drugs, and that this drug is intended to be marketed for use in recovering allegedly lost memories and to treat traumatic conditions.

90. Plaintiff DOE is informed and believes that Defendant GRIFFIN and her husband have a significant financial interest in two companies which seek FDA approval for the distribution rights for MDMA's therapeutic use of this drug.

91. The coordination of the memoir's publication with the late-stage development of MDMA therapy drugs, Defendant GRIFFIN's financial ties to these companies, and the reckless disregard for private intimate facts of others, creates a pernicious background to a book that holds itself out to be a true memoir. Ex. 1

92. Plaintiff alleges that the Defendants' conduct in either directing or ratifying investigatory material obtained through misrepresentation/fraud, falsely portraying Plaintiff JANE DOE's voluntary participation, and publishing private traumatic details without Plaintiff's consent was extreme, outrageous, and intended to cause emotional distress, or was undertaken with reckless disregard for the probability of causing such distress.

## IV. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### (Cal. Civ. Code § 1708.08; Invasion of Privacy - Intrusion Upon Seclusion)

93. Plaintiff incorporates all preceding allegations.

94. Under California law, a cause of action for intrusion upon seclusion requires: (1) intrusion into a private place, conversation, or matter; (2) in a manner

highly offensive to a reasonable person; (3) where the defendant knew or should have known that the intrusion would be highly offensive; and (4) where the plaintiff had a reasonable expectation of privacy.

95. Defendants intentionally intruded upon Plaintiff's private conversations and personal matters by either directly or indirectly benefitting from the tortious actions of third parties for the purpose of extracting intimate personal information from Plaintiff JANE DOE.

96. Plaintiff alleges that this intrusion was accomplished through deceptive means, since Plaintiff never consented to participate in the process.

97. Plaintiff is informed and believes that DOE 1 and or other DOES were acting as agents, employees, or independent contractors of Defendants GRIFFIN, LANSKY, and/or PENGUIN RANDOM HOUSE when they contacted Plaintiff and solicited her private information. Plaintiff asserts that the solicitation was conducted for the benefit of and at the direction of Defendants in furtherance of creating content for "The Tell."

98. Defendant GRIFFIN states in "The Tell" that she hired private investigators through her husband's hedge fund to track down information and find corroborating witnesses. GRIFFIN further claims she found a "transcript" created by investigators detailing their interviews with "Claudia." These admissions establish that GRIFFIN directed and authorized an investigative scheme to obtain Plaintiff's private information. Alternatively, even if DOE 1 and DOE 2 were not formal agents at the time they contacted Plaintiff, Defendants ratified their conduct by knowingly accepting, using, and publishing Plaintiff's private information obtained through a fraudulent scheme. Defendants knew or should have known the information was obtained without Plaintiff's informed consent yet incorporated it into "The Tell" for commercial gain. By using and profiting from the fraudulently obtained information, Defendants adopted and ratified the intrusive conduct as their own.

99. The intrusion would be highly offensive to a reasonable person as it involved obtaining the most intimate details of Plaintiff's childhood sexual trauma through deception, using said details of Plaintiff's experiences in the memoir “The Tell”, and falsely attributing them to Defendant GRIFFIN.

100. Plaintiff alleges that this intrusion was accomplished through deceptive means. Plaintiff never consented to participate in any investigation related to "The Tell," never knowingly agreed to have her private communications recorded or transcribed for publication, and was affirmatively misled about the purpose of communications by DOE 1 and other DOES.

101. Defendants, and each of them, knew or should have known their conduct would be highly offensive and invade Plaintiff's privacy rights.

102. Plaintiff had a reasonable expectation that her private information and memories would remain confidential unless her explicit authorization was lawfully provided.

103. As a proximate result of Defendants' – and each of them – intrusion on Plaintiff's seclusion, Plaintiff has suffered damages including emotional distress, humiliation, and harm to reputation.

**SECOND CAUSE OF ACTION**

**(Invasion of Privacy - Publication of Private Facts)**

104. Plaintiff incorporates all preceding allegations.

105. Under California law, a cause of action for publication of private facts requires: (1) public disclosure; (2) of private facts; (3) which would be highly offensive and objectionable to a reasonable person of ordinary sensibilities; and (4) which are not of legitimate public concern or newsworthiness.

106. Regardless of how they were obtained, Defendants – and each of them- publicly disclosed private facts about Plaintiff's life by publishing intimate details of her childhood experiences in "The Tell," which is a memoir that has been widely distributed and promoted by all Defendants.

107. The disclosed facts include highly personal and private information about Plaintiff's experiences of sexual trauma as a minor.

108. These disclosures would be highly offensive and objectionable to a reasonable person as they involve the most intimate and private aspects of Plaintiff's childhood without her consent.

109. The private facts are not of legitimate public concern or newsworthiness and were published solely for Defendants' commercial gain.

110. As a proximate result, Plaintiff has suffered damages including emotional distress, humiliation, and invasion of her privacy.

**THIRD CAUSE OF ACTION**

**(False Light Invasion of Privacy)**

**(California Common Law)**

111. Plaintiff incorporates all preceding allegations.

112. Under California law, false light invasion of privacy occurs when: (1) the defendant publicly disclosed information about the plaintiff; (2) the disclosed information was false or created a false impression; (3) the disclosure would be highly offensive to a reasonable person; and (4) the defendant acted with actual malice or reckless disregard for the truth.

113. Defendants falsely portrayed Plaintiff JANE DOE as a knowing, willing, and consenting participant in the creation of "The Tell." The memoir depicts "Claudia" as being aware she was speaking with investigators working on behalf of

Defendant GRIFFIN, voluntarily providing information for use in the memoir, and supportive of the publication of her private traumatic experiences.

114. This portrayal is demonstrably false. Plaintiff never knowingly spoke with any investigators working on behalf of Defendants. She never consented to have her private information used in the memoir. She never agreed to or supported the publication of intimate details about her childhood sexual trauma. The character "Claudia" is falsely depicted as stating to investigators: "Someone [the investigator] reached out..." suggesting voluntary participation that never occurred.

115. The false portrayal gives the highly offensive and misleading impression that Plaintiff was informed about the investigation, voluntarily participated in it, supported Defendant GRIFFIN's alleged pursuit of justice, and consented to the publication of private facts about her sexual molestation. This false impression would be highly offensive to any reasonable person, as it misrepresents Plaintiff's agency, consent, and attitude toward the disclosure of her most private and traumatic experiences.

116. Defendants acted with actual malice or reckless disregard for the truth by publishing these false characterizations despite knowing or having reason to know that: (a) Plaintiff never knowingly participated in any investigation; (b) the individuals who contacted Plaintiff misrepresented their identities and purposes; (c) Plaintiff was deceived and defrauded; and (d) she never provided consent for any use of her information in the memoir.

117. As a proximate result of Defendants' false light portrayal, Plaintiff has suffered severe damages including emotional distress, reputational harm, humiliation, and mental anguish from being falsely depicted as a willing participant in the exploitation of her own trauma.

118. Defendants LANSKY, PENGUIN RANDOM HOUSE and DIAL PRESS' conduct was particularly egregious given their knowledge that Defendant

GRIFFIN had financial incentives to promote MDMA therapy through her and her husband's disclosed investments in companies attempting to gain FDA approval and to market the drug - creating additional reasons to exercise heightened scrutiny in fact-checking the claims made.

**FOURTH CAUSE OF ACTION**

**(Intentional Infliction of Emotional Distress)**

119. Plaintiff incorporates all preceding allegations.

120. Under California law, the elements of intentional infliction of emotional distress are: (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff suffered severe or extreme emotional distress; and (3) the outrageous conduct was the actual and proximate cause of the emotional distress.

121. Defendants' conduct in retaining investigators to obtain Plaintiff's private and intimate information and then publishing that information for commercial gain while falsely portraying her as agreeable was extreme and outrageous.

122. Defendants acted either with the intention of causing emotional distress or with reckless disregard for the probability that such distress would result from their fraudulent scheme and unauthorized publication of private facts.

123. Plaintiff has suffered severe emotional distress as a result of discovering that her private traumatic experiences were obtained through fraud, published without her consent, and was forced to re-live said traumatic experiences in the public sphere against her will.

124. Defendants' conduct is particularly extreme and outrageous because they published detailed accounts of Plaintiff's childhood sexual trauma while simultaneously converting them for commercial gain. Griffin's acknowledgment in "The Tell" that she cannot distinguish her own experiences from "Claudia's" (Plaintiff's) demonstrates that Defendants knowingly published Plaintiff's private trauma with reckless disregard for truth.

125. The exploitation of Plaintiff's sexual assault trauma to promote illegal drug therapy and generate profits, while admitting the "memories" may be false, exceeds all bounds of decency.

126. Defendants' outrageous conduct was the actual and proximate cause of Plaintiff's severe emotional distress.

**FIFTH CAUSE OF ACTION**

**(Negligent Infliction of Emotional Distress)**

**(California Civil Code § 1714; Common Law)**

127. Plaintiff incorporates all preceding allegations.

128. Under California law, the elements of negligent infliction of emotional distress are: (1) the defendant owed the plaintiff a duty of care; (2) the defendant negligently breached that duty; (3) the breach was a substantial factor in causing plaintiff's emotional distress; and (4) the emotional distress was severe.

129. Defendants owed Plaintiff a duty of care to refrain from negligent conduct that would foreseeably cause emotional distress when they initiated contact and solicited her private information.

130. Defendants negligently breached this duty through their careless and reckless handling of Plaintiff's private information and their failure to exercise reasonable care in verifying the truth of statements published about her.

131. Defendants' breach of duty was a substantial factor in causing Plaintiff's emotional distress.

132. Plaintiff suffered severe emotional distress that was a foreseeable result of Defendants' negligent conduct.

**SIXTH CAUSE OF ACTION**

**Violation Of Unfair Business Practices**

**Cal Civil Code §17200**

133. Plaintiff incorporates all preceding allegations.

134. California Business and Professions Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

135. Defendants' conduct constitutes unlawful business practices as it violates: (a) California Civil Code §§ 1708.8, 3344 governing privacy and commercial appropriation; (b) California Penal Code § 632 prohibiting recording of confidential communications without consent; (c) California Civil Code § 1750 et seq. (Consumer Legal Remedies Act) prohibiting deceptive practices; and (d) Business & Professions Code § 17500 prohibiting false advertising.

136. Defendants engaged in false advertising by marketing "The Tell" as Griffin's authentic recovered memories when substantial content was fabricated by appropriating Plaintiff's actual experiences. Tens of thousands of consumers were deceived into purchasing the memoir believing they were reading Griffin's true story, when key traumatic events were stolen from Plaintiff's life and falsely attributed to Griffin.

137. Defendants' conduct constitutes unfair business practices because it:

a. Offends public policy established in California's constitutional right to privacy (Art. I, § 1), truth in advertising laws, and consumer protection statutes prohibiting fraudulent acquisition and misrepresentation of commercial content;

b. Is immoral, unethical, oppressive, and unscrupulous by using deception to extract Plaintiff's traumatic sexual assault experiences, commercially exploiting them without consent, falsely representing them as Griffin's recovered memories, and deceiving over 100,000 consumers about the memoir's authenticity;

c. Provides no legitimate benefits - the fraudulent acquisition served only to enrich Defendants while deceiving Plaintiff and consumers, especially in light of their financial interest in MDMA companies.

138. Defendants' unfairness is demonstrated by their deviation from standard industry practices. Customarily, memoir authors write about their own experience; publishers obtain written life rights agreements with compensation when necessary; conduct on-the-record interviews with consent; employ fact-checkers; and market books truthfully. Defendants bypassed all legitimate channels through fraud.

139. In addition, Defendants' fraudulent scheme to obtain Plaintiff's private information constituted a deceptive business practice within the meaning of Business & Professions Code § 17200. DOE 1 represented that he was a legitimate talent agents and/or producer conducting business for commercial purposes - specifically, the purported development of a movie based on Plaintiff's life. These representations were false and we believe were made solely to extract Plaintiff's private information for unauthorized commercial exploitation in "The Tell." This fraudulent business conduct gave Defendants an unlawful competitive advantage by allowing them to acquire compelling narrative content through deception rather than through

legitimate means of licensing life story rights for compensation and obtaining proper consent and releases.

140. Defendants' conduct constitutes fraudulent business practices involving material misrepresentations and omissions:

Fraud against Plaintiff**:** DOE 1 and DOE 2 falsely represented themselves as talent agents offering commercial opportunities with contracts and compensation, when their actual purpose was extracting Plaintiff's private information for unauthorized use in "The Tell";

Fraud against consumers: Defendants falsely represented that "The Tell" contains Griffin's authentic recovered memories and that traumatic events described happened to Griffin, when the key content was fabricated by appropriating Plaintiff's real experiences. These misrepresentations were material to consumers' purchasing decisions as the memoir's authenticity was central to its market appeal as being Oprah's 112th Book Club selection.

141. Defendants obtained unlawful competitive advantage by: (a) avoiding legitimate life rights acquisition costs; (b) circumventing consent processes; (c) gaining exclusive use of Plaintiff's experiences without compensation; (d) enhancing marketability through false authenticity claims; and (e) undercutting honest competitors who properly fact-check and obtain releases.

142. Defendants have earned substantial unjust profits including: over 100,000 copies sold (over $3 million estimated gross revenue); audio, film/television, and international rights; speaking fees; and enhanced reputation for future works - all obtained through fraudulent appropriation and consumer deception.

143. Plaintiff suffered specific economic injury through: (a) loss of commercial value of life story rights; (b) loss of creative control; (c) foreclosure of market opportunities - Plaintiff can no longer develop her own memoir because

Defendants saturated the market with their fraudulent version; and (d) lost licensing revenue from film rights and other commercial exploitation.

144. The general public and marketplace have suffered injury through consumer deception, market distortion favoring dishonest competitors, diminished trust in memoir authenticity, and corrupted discourse about trauma therapy.

145. Plaintiff seeks relief under Business and Professions Code § 17203 including: (a) injunctive relief prohibiting continued publication and distribution of "The Tell" until Plaintiff's content is removed or consent obtained; (b) restitution of all profits derived from Plaintiff's appropriated experiences; (c) disgorgement of all revenue from the unfair and fraudulent practices; (d) corrective advertising disclosing to past purchasers that key content was fabricated; and (e) such other equitable relief as the Court deems appropriate.

## SEVENTH CAUSE OF ACTION

**(Negligence - Failure of duty to use due diligence in fact-checking and verifying truth or falsity of claims in "The Tell")**

**(Against Defendants Lansky, Penguin Random House and Dial Press)**

**(California Civil Code § 1714; Common Law)**

146. Plaintiff incorporates all preceding allegations.

147. Under California law, the elements of negligence are: (1) the defendant owed the plaintiff a legal duty of care; (2) the defendant breached that duty by failing to conform to the required standard of care; (3) the defendant's negligent conduct was a legal cause of the plaintiff's harm; and (4) the plaintiff was harmed.

148. As a major publishing house with significant resources and industry expertise, Defendants LANSKY, PENGUIN RANDOM HOUSE and DIAL PRESS owed a duty of care to exercise reasonable diligence in fact-checking and verifying

statements made in “The Tell” and particularly those that involve identifiable third parties and sensitive personal information.

149. This duty was heightened given that: (a) "The Tell" purported to be a non-fiction memoir containing factual statements about real people and events; (b) the memoir contained highly sensitive allegations regarding childhood sexual abuse; (c) the memoir identified specific individuals through detailed descriptive information; (d) The statements were made based on memories supposedly “recovered” under the influence of an unproven, illegal, non-FDA approved drug and (e) LANSKY, PENGUIN RANDOM HOUSE and DIAL PRESS possessed the resources and expertise to conduct proper fact-checking procedures.

150. Defendants' duty of care was further heightened by GRIFFIN'S own admissions of unreliability. When an author admits in her memoir that she cannot verify whether her memories are real or hallucinations, and that she is uncertain whether the memories are her own or someone else's, a reasonable publisher must: 1) Conduct independent fact-checking with the identifiable third parties mentioned; 2) Obtain written releases and consent from those portrayed; 3) Verify that "recovered memories" have some basis in objective reality; 4) Investigate whether the memories might actually belong to another person (as GRIFFIN herself suggested).

151. The fact that these unverifiable impressions were induced by an illegal Schedule I drug further heightened the duty to fact-check. MDMA is not FDA-approved, its therapeutic use is strictly experimental, and its capacity to generate false or jumbled memories is scientifically documented. Publishing drug-induced visions as factual memories about identifiable third parties, without verification, falls below any reasonable standard of care.

152. Defendants LANSKY, PENGUIN RANDOM HOUSE and DIAL PRESS breached their duty of care by failing to: (a) Verify the truthfulness of

Defendant GRIFFIN's statements regarding "Claudia's" alleged knowledge and participation in the investigation; (b) Confirm whether consent had been obtained from individuals whose private information was being published; (c) Investigate the suspicious circumstances surrounding Defendant GRIFFIN's "recovered memories" obtained through MDMA therapy; (d) Question the lack of corroborating witnesses or evidence for the events described; (e) Implement reasonable fact-checking procedures despite Defendant GRIFFIN's acknowledgment in the memoir that she could not verify the objective reality of her memories.

153. Defendants LANSKY, PENGUIN RANDOM HOUSE and DIAL PRESS knew or should have known that publishing unverified statements about identifiable individuals, particularly regarding sensitive matters of childhood sexual trauma, created a foreseeable risk of harm to those individuals.

154. Plaintiff alleges that it was reasonably foreseeable that publishing false statements portraying Plaintiff as a knowing and voluntary participant would cause severe emotional distress, reputational harm, and invasion of privacy.

155. Defendants LANSKY, RANDOM HOUSE and DIAL PRESS's negligent conduct in failing to fact-check and verify the statements about Plaintiff was a substantial factor and legal cause of Plaintiff's injuries.

156. As a direct and proximate result of Defendants LANSKY, PENGUIN RANDOM HOUSE and DIAL PRESS's negligence, Plaintiff has suffered and continues to suffer: (a) Severe emotional distress which was significant enough to receive medical care; (b) Invasion of privacy and loss of anonymity; (c) Humiliation from having private traumatic sexual experiences published without consent; (d) Damage to reputation from false portrayals of her character and conduct; (e) Loss of peace and tranquility; and (f) Other damages according to proof.

## EIGHTH CAUSE OF ACTION
## (Punitive Damages)
## (California Civil Code § 3294)

157. Plaintiff incorporates all preceding allegations.

158. California Civil Code § 3294 authorizes punitive damages for oppression, fraud, or malice - defined as despicable conduct carried on with willful and conscious disregard of others' rights.

159. Defendants acted with malice by publishing Plaintiff's childhood sexual trauma knowing: (a) Defendant GRIFFIN's "memories" were based on illegal MDMA-induced experiences with recollections which she admitted were unverifiable; (b) In “The Tell”, Defendant GRIFFIN acknowledged uncertainty whether "her memories are her own, or Claudia's" (*The Tell* at 101); (c) the detailed facts could only have come from Plaintiff's actual experiences; (d) Plaintiff never consented; and (e) "Claudia" was identifiable as Plaintiff.

160. Defendants' financial motive demonstrates intent and/or reckless disregard for the truth; Defendant GRIFFIN admittedly has financial investments in MDMA therapy companies and used "The Tell" to promote her investment while earning over $3 million in book sales plus significant additional revenue - all by fraudulently appropriating Plaintiff's life story.

161. Defendants' conduct can be categorized as despicable: they exploited a 12-year-old rape victim's private trauma, which Plaintiff JANE DOE kept private for over 30 years, by extracting it through fraud and publishing it to tens of thousands of readers without consent, causing Plaintiff severe emotional distress as well as hospitalization and ongoing treatment.

162. Enhanced punitive damages are warranted to: (a) punish ongoing exploitation; (b) deter similar industry conduct; and (c) ensure accountability given

Defendants' substantial resources and profits far exceed likely compensatory damages.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows on all counts:

1. For general damages according to proof;
2. For special damages according to proof;
3. For punitive damages pursuant to California Civil Code § 3294;
4. For restitution and disgorgement of profits derived from the use of Plaintiff's private information pursuant to Business and Professions Code §§ 1700, 17203;
5. For attorneys' fees;
6. For independent accounting of proceeds derived from "The Tell";
7. For costs of suit;
8. For prejudgment interest
9. For post judgment interest; and
10. For such other and further relief as the Court deems just and proper.

## VI. DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury on all issues so triable.

Executed on this 4th day of March 2026, at Los Angeles, California.

/s/ Zach Rosenblatt

Zach Rosenblatt
ZSR LAW
Attorney for Plaintiff JANE DOE

# EXHIBIT 1

archive.today webpage capture | Saved from https://www.nytimes.com/2025/09/24/nyregion/amy-griffin-memoir-psychedel | search | 24 Sep 2025 12:51:55 UTC
All snapshots from host www.nytimes.com | history ←prior next→
Webpage | Screenshot | share | download .zip | report bug or abuse | Buy me a coffee

The New York Times



# *The Billionaire, the Psychedelics and the Best-Selling Memoir*

Amy Griffin wrote a book based on recovered memories of childhood sexual abuse. Oprah Winfrey and a slew of celebrities promoted it. Then questions arose.

Amy Griffin, who sits on the board of the Metropolitan Museum of Art, at the Met Gala in May. Amir Hamja for The New York Times

**By Katherine Rosman and Elisabeth Egan**

Sept. 24, 2025 Updated 7:49 a.m. ET

Oprah Winfrey, Reese Witherspoon and Jenna Bush Hager looked ecstatic as they stood onstage at the Ford Foundation in Manhattan earlier this year, posing with a new book. The crowd was so large it required an overflow room.

**Listen to this article with reporter commentary**

Listen · 39:17 min

The book was "The Tell," a memoir by Amy Griffin, a first-time author and one of the wealthiest women in the country. Not only did Ms. Griffin receive the first-ever joint promotion by the three influential book club leaders, but Ms. Winfrey had selected "The Tell" as her 112th book club pick.

In the memoir, Ms. Griffin, 49, writes that she engaged in illegal psychedelic-drug therapy. While under the influence of MDMA, the active chemical in Ecstasy and Molly, she said she recovered memories of being raped on many occasions by a middle-school teacher in Amarillo, Texas, starting when she was 12.

"I knew that these memories were real," Ms Griffin writes. "My body knew what had happened to me. The way I'd shake when I'd tell my story; the way my eyes welled up with tears at the mention of Texas."

Ms. Griffin was paid nearly $1 million to write her story, according to two people with knowledge of the deal. The book was an instant sensation, receiving heartfelt endorsements from celebrities and influencers with huge social media followings.

Many of those supporters were Ms. Griffin's friends, part of a rarefied world where billionaires and celebrities share private planes to remote getaways and display their friendships on Instagram.

Some were also involved with businesses, charities and political campaigns that receive financial backing from Ms. Griffin, who sits on the board of the Metropolitan Museum of Art and Bumble, the parent company of the dating app.

"It's an unbelievable book," Gwyneth Paltrow said on the Goop podcast, introducing Ms. Griffin without revealing that the author was an investor in Ms. Paltrow's business.

"I'm so deeply proud of her," Ms. Paltrow continued, describing Ms. Griffin as "this beautiful, incredibly positive, brilliant woman."

"The Tell" sold more than 100,000 copies, spent four weeks on the New York Times best-seller list for hardcover nonfiction this spring and attracted accolades from many readers. It also launched Ms. Griffin on a publicity tour befitting an Oscar winner.

**Editors' Picks**

He May Be a 'Slow Horse,' but He's in Peak Condition

How Good Is Exercise That Feels Effortless?

Can Ginger Really Settle an Upset Stomach?




Ms. Griffin celebrated the publication of her memoir in March, onstage with Oprah Winfrey and Mariska Hargitay. Bryan Bedder/Getty Images

In the wake of the #MeToo movement, stories of sexual abuse are generally met with sympathy and support, not probing questions. "The Tell" also benefited from the publishing industry's increasing reliance on books with the kind of celebrity connections that can pump sales. Many of these books are memoirs, which are rarely fact-checked.

But increasingly, readers have raised suspicions about "The Tell," including in online reviews. Some have questioned the reliability of decades-old memories unearthed during drug-assisted therapy. Others have wondered how such abuse could take place in a public school without any adults picking up clues.

"This is a book that has been swallowed whole by the media industrial complex," said Maureen Callahan, a sharp-tongued columnist, discussing the memoir on her podcast, "The Nerve."

She added, "There is, on the other side of it, a guy who doesn't have Amy Griffin's money, power, resources."

“The Tell” has been a topic of conversation from the Texas Panhandle to the beachfront estates of East Hampton to the well-financed labs of the pharmaceutical industry. In recent months The New York Times interviewed dozens of people from Amarillo, the publishing industry and the medical and MDMA communities, along with Texas authorities, and reviewed the book proposal Ms. Griffin used to pitch her project to publishing houses.

One classmate shared detailed accounts of being attacked — by a different teacher — in the very locations that Ms. Griffin wrote about, including at the same middle-school dance.

It may be impossible to know what happened between Ms. Griffin and her teacher in the late 1980s. In the book, Ms. Griffin herself acknowledges that she had no way to confirm her account: “There was no smoking gun, no physical evidence, no tangible proof. There had been no witnesses.”

Still, the book has had significant ramifications for those who were in Ms. Griffin’s childhood orbit.

It has also left many who live in Amarillo, a city of 200,000, feeling in some ways well observed but also reduced to caricature by an author who has not lived there for decades.

Following the outpouring of publicity, Amarillo law enforcement officials and victims rights advocates expected allegations from other students of Ms. Griffin’s teacher, who worked in the school district for 30 years. During his career as an educator, no one filed a complaint against him, state education and law enforcement officials said — nor has anyone done so since the book’s publication.

Ms. Griffin’s allegations hinge on her experiences in therapy with an illegal psychedelic that the Food and Drug Administration declined to approve for therapeutic use last year — a drug backed by a company that she and her husband have invested in through their foundation. Whether the drug actually helps patients recover accurate memories is a matter of debate.

Rick Doblin, the country’s leading advocate for the therapeutic use of MDMA, said he connected Ms. Griffin to her therapists. In an interview this summer, he said he read several drafts of the book and called it “important.”

But he played down the reliability of memories retrieved with MDMA, saying they are often “symbolic.”

"Whether it's real or not — meaning whether the incident actually happened — from a therapeutic perspective, it doesn't matter," he said. "A lot of times people will develop stories that help them make sense of their life."

He added, "In the therapeutic setting, what Amy went through, whether it's true or not, it has value because the emotion is real."

Mr. Doblin said both that "frightening memories that people have pushed out of their mind come back under MDMA" and "you have to be somewhat dubious, I guess, about recovered memories." (The day before this article was published, Mr. Doblin contacted The Times and insisted that he did believe Ms. Griffin's memories were real.)

Ms. Griffin describes the teacher she accuses of attacking her with enough specificity that some readers in Amarillo were able to discern his identity, even though she gave him a pseudonym. The Times was able to learn his identity as well: Ms. Griffin cited the teacher by name as her rapist in the book proposal sent to publishers, and she included details about a family tragedy he suffered. His name was also shared with people in Amarillo by her relatives after they learned of Ms. Griffin's retrieved memories.

Over the course of more than three months, Ms. Griffin declined requests for an interview.

Penguin Random House, the publisher of "The Tell," did not alert the teacher to the book or its accusations before publication because they believed his identity was sufficiently disguised, according to Thomas A. Clare, the author's defamation lawyer. It is unclear whether local school officials were notified. A lawyer for Amarillo Independent School District declined to comment.

The teacher did not respond to letters left at and mailed to his house, or to email requests for comment. Some people who have worked at and attended the middle school say they are troubled by the specter of undetected child abuse. But others are alarmed that a teacher with an unblemished record has been deemed a rapist without a chance to defend himself. Since the book was published, locals say they have not seen the now-retired teacher around town.

Earlier this month, The Times sent Mr. Clare an 11-page list of questions and information likely to be included in this article, for fact-checking purposes.

Mr. Clare said that "the mere sending of this document has caused additional trauma and extreme physical and emotional harm to a survivor of sexual assault, which is inexcusable."

## ‘The most honest thing’

After the book launch at the Ford Foundation, where the actress Mariska Hargitay moderated a discussion, Ms. Griffin hit the road.

She was interviewed by Sheryl Sandberg (in Menlo Park, Calif.), Hoda Kotb (New Canaan, Conn.), Ms. Witherspoon (Nashville), Ms. Paltrow (Summerland, Calif.), and Ms. Hager (Austin, Texas).

For Ms. Winfrey’s podcast, Ms. Griffin sat with the talk-show host before cameras and a rapt audience. On Martha Stewart’s podcast, she said she thought of MDMA therapy as “permission to go in and explore and be compassionate with myself.” On Drew Barrymore’s talk show, the women held hands while Ms. Griffin described her book as “by far the most honest thing I will ever do.”

Her appearances were boosted by her selection this spring as one of Time magazine’s “most influential” people of the year. “By opening her heart, she became a beacon for women everywhere,” Ms. Witherspoon wrote in an accompanying essay for the magazine.




Time magazine named Ms. Griffin as one of the most influential people of the year. Dimitrios Kambouris/Getty Images For Time

In “The Tell,” Ms. Griffin paints a portrait of halcyon days growing up in Amarillo in the 1980s, with young girls riding banana-seat bikes to the candy store.

But in middle school, Ms. Griffin writes, her idyllic life took a horrifying turn — one she said she remembered more than three decades later with the help of MDMA, which she refers to as “the medicine.”

“The first thing I remembered was my head hitting the wall,” Ms. Griffin writes. And then, “I heard a *clang!* as his belt buckle hit the floor.”

She shares the locations where she said she was assaulted: the middle-school bathroom, the locker room, a classroom and under the bleachers. “He raped me there, too,” she writes.

The abuse is described as violent and brazen.

She writes that the teacher tied her hands behind her back with a bandanna and described “his penis in my mouth” and “his pubic hair on my face.” She says he beat her, dragged her on the bathroom floor, washed her mouth out with soap. On the night of the eighth-grade dance, Ms. Griffin says, he assaulted her in his classroom.

“If you tell anyone,” she says he told her at one point, “I’ll rip your teeth out.”

In the book, she writes that the final assault happened when she was 16. She was en route to a tennis match and ran into the teacher. Moments later, she found herself following him “numbly” into the team room at the tennis center.

In describing this incident, Ms. Griffin addresses a reader’s potential skepticism, as she does frequently in the book: “You’d assume that remembering this, I’d have thought, *But wasn’t I sixteen then?* I must have wondered, *Why didn’t I stop him? I must have thought, How could he have done this in such a public place? Why didn’t I say no? I must have thought, Where were my boundaries?”*

“But I didn’t think any of that,” she writes. “Held in the golden arms of the medicine, the compassion I felt for young Amy was absolute.”

## A seemingly perfect life

Ms. Griffin grew up a scion of one of Amarillo's most influential families, the Mitchells. When she was young, they owned about 50 Toot'n Totum convenience stores. Now they own 100, according to a lengthy article published this spring in Brick & Elm, an Amarillo lifestyle magazine.

After graduating from the University of Virginia in 1998, she worked in marketing for Sports Illustrated, a job she left several months before marrying John A. Griffin, whose former hedge fund, Blue Ridge Capital, managed about $9 billion at its peak. The couple has four children and live in an Upper East Side townhouse that they purchased in 2019 for $77 million. They also have homes in various locations, including the Bahamas and New Zealand.




An Amarillo magazine wrote about Ms. Griffin's family and their convenience store business this spring. Vincent Alban/The New York Times

Through a company she started in 2017, G9 Ventures, Ms. Griffin invests in companies founded by women. According to an email to The Times from her publicist, Ms. Griffin is "the start-up investor" behind companies including Goop.

In "The Tell," Ms. Griffin writes that her adult life might have appeared charmed to outsiders, but she wasn't always happy.

She recalls how she and her 10-year-old daughter had a door-slamming fight, with the girl questioning her mother's need to appear perfect.

"Do you have any idea how hard it is to have you as a mother?" she said, according to Ms. Griffin's book.

"Perfect had always been my expectation for myself," Ms. Griffin writes. "But hearing my daughter say it aloud bothered me, the way it always had when strangers told me I had the perfect life."

She began to ponder what her need for perfection might be masking. Her husband's interest in psychedelic-assisted therapy piqued her curiosity, and she decided to try it herself.

Before taking the MDMA pill, Ms. Griffin told the facilitator, "There's something I can't face. I know something happened to me, something I'm talking around. But I don't know what it is."

Five minutes into the session, she writes in the book, she sat up and said, "Why is he here?"

The facilitator asked, "Who?"

**The Great Read**

Exceptional writing that takes you someplace you might not expect to go.



**What Dwayne 'the Rock' Johnson Knows About Pain**



**When Dementia Steals the Imagination of a Children's Book Writer**



**Did a Brooklyn Couple Kill a Neighbor's Trees for a Better View in Maine?**

"Mr. Mason. From my middle school," Ms. Griffin said. (Mr. Mason is the pseudonym she uses for the teacher in the book.)

In the book, Ms. Griffin describes two more MDMA experiences and subsequent psychotherapy sessions with a counselor who assured her that her violent memories were most likely real.

She writes that the counselor told her, "I have no reason to suspect that these are false or implanted memories."

## 'I can't not write this book'

Ms. Griffin assembled a team of lawyers and private investigators to help her mount a case against the teacher.

One lawyer cautioned her about potential consequences. "'You're wealthier than your former teacher," Ms. Griffin writes that the lawyer told her. "If you bring charges, there's a chance he'll come after you for defamation.'"

Still, another of her lawyers reached out to the district attorney's office in Amarillo, prompting a phone call from a police detective, whom she refers to in the book as Sgt. Hank Jones.

Ms. Griffin writes that the lawyer advised her not to tell the police that her recollections of being attacked were retrieved through the use of illegal psychedelics. (Asked for comment, the lawyer did not respond.)

Over the course of a two-hour conversation, Ms. Griffin writes, she detailed her memories of abuse to Sergeant Jones.

"This is one of the most credible calls I've had in all my years of doing this," the detective said, according to the book.

But before he could begin to investigate, Ms. Griffin writes, Sergeant Jones called her with devastating news. The incidents she reported from middle school fell outside of the statute of limitations. (In 2007, Texas eradicated its statute of limitations for most child sex crimes, but Ms. Griffin's case could not be grandfathered in.)

"There would be no justice," Ms. Griffin writes.

She considered bringing a civil case but ultimately chose not to do so.

She decided to write a book. Sam Lansky, a ghostwriter who contributed to Britney Spears's memoir, "The Woman in Me," was hired.

"As high-profile friends in my network have reminded me," Ms. Griffin writes in her book proposal, "I am fortunate to have a life this rewarding and abundant, yet to have held on to my privacy and my anonymity. Why would I jeopardize that by inviting the attention that publishing this book would bring? And yet, I know that I must. I can't not write this book."

## The classmate

Aside from Ms. Griffin and Mr. Mason, "Claudia" — a pseudonym for a middle- school classmate — is one of the most important characters in "The Tell."

Throughout the book, Ms. Griffin describes harboring a suspicion that Claudia, too, had been victimized as a child by Mr. Mason, mostly because she long remembered seeing them together in a school hallway, with the teacher's hand on Claudia's shoulder.

In "The Tell," Ms. Griffin recalls lending Claudia a dress for Cotillion, a dance unaffiliated with the school. This emerges as a central anecdote in the book. "The joy I felt to be able to offer Claudia that dress was boundless," she writes.

She also writes that "in my memory, the dress and Claudia and Mr. Mason were all linked in some mysterious way I couldn't explain."

After Ms. Griffin's MDMA experience, she writes, she felt an urgency to reconnect with Claudia.

According to the book, they met at a coffee shop. "I was abused by Mr. Mason beginning in the seventh grade," she says she told Claudia. Ms. Griffin then asks if Mr. Mason had abused her too. Claudia says no.

Representatives for Ms. Griffin declined to share Claudia's identity.

Relying on a middle-school yearbook class list, The Times interviewed many classmates of Ms. Griffin, including one who said she had experienced sexual abuse during middle school by a different teacher from the one Ms. Griffin writes about. That man left the Amarillo school district decades ago.

The classmate, who grew up in a group home for foster children in Amarillo, has clear memories that dovetail with central anecdotes in "The Tell."



A classmate of Amy Griffin told The New York Times that some of the descriptions in "The Tell" of Ms. Griffin being assaulted are eerily similar to the abuse she herself endured in middle school — by a different teacher. Mikayla Whitmore for The New York Times

When contacted by a reporter, the woman wrote back that she remembered Ms. Griffin but was "unfamiliar with the book." After she was mailed a copy of the memoir and read it, she said she was deeply unnerved. Some of the descriptions in "The Tell" of Ms. Griffin's being assaulted are eerily similar to the abuse she herself endured, she said. She has since retained a lawyer.

The classmate agreed to speak to The Times on the condition of anonymity because she never had sought to make her private life public.

She said that she had been haunted by the abuse for decades and had confided in a few people close to her, including a daughter. Now an adult, the daughter told The Times that her mother described the assaults to her a dozen years ago.

Today, the lives of Ms. Griffin and her classmate are markedly different. This summer, while Ms. Griffin traveled to the Venice wedding of Jeff Bezos and Lauren Sanchez, the classmate worked for $21 an hour as a home aide to an Alzheimer's patient.

In middle school, Ms. Griffin and the classmate were not friends, but their lives intersected at school and at church. The classmate, who described a childhood of profound abuse and transience, said that as she strove for acceptance by the popular girls, Ms. Griffin, their leader, treated her with distant benevolence.

The classmate told The Times that she borrowed a dress from Ms. Griffin for Cotillion, but was ultimately unable to attend. Instead, she wore the borrowed dress to the school's eighth-grade dance.

At this very dance, Ms. Griffin writes in the book, she herself was raped while wearing a borrowed dress.

"I was in Mr. Mason's classroom," Ms. Griffin writes. "It was early evening and still light outside. The frilly dress was pulled up over my head and I was bent over a desk while he was raping me from behind. I could feel the weight of the dress over my head, blotting out the light."

In interviews, the classmate recounted a detailed story about her own experience at that dance. She said she left the dance floor with her abuser — a teacher who was not Mr. Mason — and went to a supply closet under the guise of looking for decorations. There, the teacher assaulted her and, in the process, soiled the dress she had borrowed from Ms. Griffin.

The classmate recalled the shame she felt when she and the teacher rejoined the crowd, her hair disheveled and what she described as the smell of sex clinging to her. She felt certain at the time that other students knew why she and the teacher left and returned together, but she said it was never explicitly discussed.

The classmate also said she recalled returning the dress at a church youth gathering at Ms. Griffin's house, where she apologized profusely for the stain on the dress. (Ms. Griffin's lawyer said her family never hosted a church group at their house.)

Mr. Clare, the lawyer for Ms. Griffin, said that the classmate interviewed by The Times was not the character referred to as Claudia in the book.

He added that The Times had been "duped by a fabulist" and threatened to sue, pointing to discrepancies between what Ms. Griffin wrote and what the classmate told The Times.

Among the discrepancies: The classmate told The Times that she had reconnected once in person with Ms. Griffin in recent years, and Ms. Griffin's lawyer said she disputed this.

Mr. Clare also questioned the woman's truthfulness in asserting that she was abused by a teacher in middle school: "Anyone who read the book could claim (falsely) to have" memories of abuse that align with what Ms. Griffin wrote, he said, calling the classmate "a liar."

Merely telling a story of abuse, Mr. Clare continued, is "not proof or corroboration."

## 'Book publishers are not investigators'

In the "The Tell's" pivotal section, Ms. Griffin describes receiving an unsigned postcard not long after her visit with Claudia that says in part, "I didn't have it in me to tell you the truth." She texts Claudia, who denies sending the postcard. The reader is left to wonder.

Mr. Clare agreed to show The Times the postcard described in the book. The black-and-white photo, taken in 1964 by Garry Winogrand, depicts children playing on a fence in the Bronx — an image incongruent with the message on the other side.

One detail of the message that is written on the card in traditional cursive does not match the one Ms. Griffin described in her memoir.

In the culminating section of “The Tell,” Ms. Griffin describes receiving an unsigned postcard that says in part, “I didn’t have it in me to tell you the truth.” Mr. Clare brought the postcard to The New York Times office for inspection. The New York Times

In “The Tell,” the author says that the postcard writer includes a quote ascribed to “Amy, circa 7th grade,” the year Ms. Griffin writes that the abuse began.

But on the postcard shared with The Times by Ms. Griffin’s lawyer, the quote is attributed to “Amy, circa 2nd grade.”

The Times also found notable omissions in the book.

Ms. Griffin writes that her husband was “funding research” into psychedelic-assisted therapy without describing the extent of their involvement. Mr. Griffin donated $1 million to the Multidisciplinary Association for Psychedelic Studies, known as MAPS. In addition, the couple, through their foundation, invested in Lykos Therapeutics (now known as Resilient Pharmaceuticals), a for-profit pharmaceutical company focused on MDMA, according to

Mr. Doblin, the president of MAPS, which holds a stake of at least 15 percent in Resilient. Resilient — which is controlled in part by Antonio Gracias, a close friend of Elon Musk who has worked for the Department of Government Efficiency — is poised to sell MDMA should the F.D.A. approve it for therapeutic use.

Also, in her book proposal, Ms. Griffin writes that MDMA helped her remember another man she says sexually abused her when she was child.

She names the man, a well-to-do family friend, but does not include him or the claim of assault in the memoir. Reached by The Times, the man denied Ms. Griffin's claim.

Though Ms. Griffin writes of her husband, "John was successful and respected in his career," the scope of the family's wealth is absent from the book. The influence of Ms. Griffin's own family, the Mitchells, is also understated.

Like most memoirs, this one was vetted by lawyers but was not fact-checked by its publisher.

"Book publishers are not investigators," said Whitney Frick, Ms. Griffin's editor at the Dial Press, an imprint of Penguin Random House. "This is Amy's story. We trust her, and all of our authors, that they are recounting their memories truthfully."

## A tidal wave of adulation

In March 2023, when Ms. Griffin circulated her 38-page book proposal, she called it "Believe Me."

Like many proposals, Ms. Griffin's was accompanied by a list of people who might help to promote the book upon publication.

Among the more than 90 names were celebrities (Amy Schumer, Laura Dern, Naomi Watts), media big shots (Anna Wintour, Savannah Guthrie, Katie Couric) and women whose companies Ms. Griffin has invested in (Becky Kennedy, Whitney Wolfe Herd, Sara Blakley).

Publishing houses were enticed, and Ms. Griffin sold the book to the Dial Press. (Ms. Griffin's lawyer said that she has "given away all proceeds from the book.")

One person who was not on the list was Gayle King, an anchor of "CBS Mornings" and Ms. Winfrey's best friend. But an acquaintance of Ms. Griffin got a copy of "The Tell" to Ms. King.

Ms. Winfrey said on television that Ms. King told her about the book and then she read it.

In October 2024, nearly five months before "The Tell" came out, Instagram accounts for Oprah Daily and Oprah's Book Club promoted the memoir to a combined following of more than 4.3 million people.

This set off a tidal wave of adulation. Dozens of friends of Ms. Griffin who have large social media followings raved about the book on the same day, including Ms. Guthrie, Jessica Seinfeld and Charles Porch, the vice president of global partnerships for Instagram.

On March 11, her publication day, Ms. Griffin sent an email to her own network, encouraging friends to show their support for "The Tell." She shared a five-page deck, promotional language and videos from Ms. Winfrey and a reader who was moved to tears.

Suddenly, social media was awash in superlative-laced posts featuring "The Tell."




Ms. Griffin speaks about "The Tell" with Sara Blakely, the founder of Spanx. Bryan Bedder/Getty Images for Amy Griffin

In person, conversations were more nuanced.

Just outside Amarillo this spring, more than a dozen people gathered at Burrowing Owl Books to discuss the memoir. The group talked for more than two hours.

"I'm reading and I'm like, 'Get him,'" one man said. "Nail him right to the wall, right where he belongs."

They acknowledged the pressure that Ms. Griffin probably felt growing up in a prominent family, and how upholding appearances might make it difficult to report abuse.

Two women said they had been students of the teacher; one had considered him a favorite, the other had not. A third woman said her son had found the teacher to be "ick."

Toward the end of the evening, the careful conversation turned more skeptical.

One woman, who said she believed Ms. Griffin, still had questions. "If he brutalized her in those ways," she said, "did she not have bruises? Did she not have hair missing?"

Then the group began to grapple with the fact that no one else has publicly accused Ms. Griffin's teacher of sexual assault.

"The things that she described that he did to her," one woman said. "You cannot picture him being just a one-time offender."

"You're not going to target the wealthiest person in Amarillo as your first victim," another added.

The attendees were struggling. "She's the only one saying this," one woman said, "and it was under the influence of something." But she quickly added, "I believe her. I do not doubt her story."

Then someone posed the most challenging question of the night:

"Do we believe all women, or do we not?"

Across Amarillo, many said they believe Ms. Griffin's account, because they admire her family and do not see what she had to gain by writing "The Tell."

An advocate for assault survivors in Texas said that reporting sex crimes can be especially challenging in a patriarchal culture.

## Hometown response

Some in Ms. Griffin's hometown had anticipated a different response to "The Tell."

At Family Support Services, an organization that helps survivors of domestic and sexual violence, a “soft interview room” had been set up to provide a place for adult survivors of any sexual violence in Amarillo to share their stories with law enforcement officers. The space was outfitted with comfortable chairs and state-of-the-art recording equipment, in part with money donated by Ms. Griffin.

Nearly six months after the book’s launch, the room had yet to be used for its intended purpose, according to Michelle Shields, the organization’s director of advocacy services.

Ms. Shields said that she knows it is difficult for some women to report abuse but that the organization expected that survivors inspired by Ms. Griffin’s book — and other victims of Ms. Griffin’s teacher — would come forward.




In Amarillo, Ms. Griffin’s hometown, advocates expected a surge of survivors reporting abuse after her memoir was published. Nick Oxford for The New York Times

“I’m really surprised, to be honest,” Ms. Shields said.

Gordon Eatley was surprised too.

Sergeant Eatley is a detective in the Amarillo Police Department’s Special Victims Unit who specializes in child sex crimes. He

appears in "The Tell" as "Sgt. Hank Jones," the detective to whom Ms. Griffin reported her claims of abuse. She writes that he listened "intently, responding kindly."

In an interview with The Times, Sergeant Eatley confirmed Ms. Griffin's recollection of their conversations. He said he was eager to begin investigating her claims before realizing that the statute of limitations precluded prosecution.

"The story she gave, and the way she gave it, came across as very credible," he said. "I was like, cool, this will be an interesting case to work. I'm really going to freaking test my chops."

Until the book was published, he did not know she had taken MDMA.

"I was never told that it was a recovered memory," Sergeant Eatley said. "I was just told she was finally willing to talk."

Even if he had known, he said, and if there had been no statute of limitations, he would have tried to mount a case.

The involvement of illegal drugs, however, would have presented a significant impediment.

"How do you determine what memories are hallucinations and which ones are real?" Sergeant Eatley said. "The D.A. would have been like, 'Bro, what's this?' And the defense attorney would have ate it for breakfast."

Several years later, when he heard about the book, Sergeant Eatley anticipated a "firestorm" of survivors coming forward to report abuse by this teacher.

"I'm like, 'Cool, I'm going to get a second bite of the apple,'" he said.

There would be no second bite.

Typically, Sergeant Eatley said, perpetrators of sex crimes against children abuse numerous victims. "They don't stop."

He added, "I've worked older cases before. You find other people."

That Ms. Griffin's memoir received enormous publicity and still did not yield additional claims against Mr. Mason is particularly confounding to Sergeant Eatley.

"There is nothing," the detective said. "Zero."

**Read by Katherine Rosman**

Audio produced by Tally Abecassis.

**Katherine Rosman** covers newsmakers, power players and individuals making an imprint on New York City.

**Elisabeth Egan** is a writer and editor at the Times Book Review. She has worked in the world of publishing for 30 years.

See more on: Gwyneth Paltrow, Reese Witherspoon

**More in New York**




Middle School Boy Accused of Catfishing Classmates in Sextortion Scheme



Gary Busey Sentenced to Two Years' Probation for Sex Offense



A Shop for Black Women Who Love Women Who Love Books

Two Accused of Draining Accounts of Couple Who Disappeared From Mansion

**Trending in The Times**

After Days of Silence, Joe Rogan Weighs In on Kimmel's Suspension

Elk Hunters Found Dead Near Colorado Trail Had Been Struck by Lightning

Iranian Diplomats in the U.S. Are Barred From Shopping at Costco

$550,000 Homes in Massachusetts, Georgia and Iowa

Opinion: What the World Gets Wrong About Israel

Opinion: Trump Is Pulling the Plug on Puerto Rico's Economy

Sushi Is Bigger Than Ever in America. There's One Main Reason.

Elon Musk's Father Accused of Child Sexual Abuse

The Next Big Thing in Pop Culture: Public Bathrooms

Jimmy Kimmel Makes a Tearful Return to Late Night

**Editors' Picks**

Mermaids, Mascots and Elon Musk's Daughter

Can Ginger Really Settle an Upset Stomach?

The New York Times

Go to Home Page »

NEWS

ARTS

LIFESTYLE

OPINION

MORE

© 2025 The New York Times Company

NYTCo Contact Us Accessibility Work with us Advertise T Brand Studio Privacy Policy Cookie Policy Terms of Service Terms of Sale Site Map Help Subscriptions