UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| AMY GRIFFIN,<br><br>*Plaintiff,*<br><br>v.<br><br>JOLEENE ALTUM,<br><br>*Defendant.* | Case No.: 2:26-cv-01811-GMN-DJA |

**DECLARATION OF JERROD MILLS**

I, Jerrod Mills, declare and state as follows:

1. I am employed by TrialQuest, a US Legal Support company. I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

2. TrialQuest was provided with an audio recording identified as the Eatley interview audio file and a corresponding transcript containing designated redactions. A true and accurate copy of the redacted transcript is attached hereto as **Exhibit A**.

3. TrialQuest was instructed to apply audio redactions consistent with the redactions reflected in the transcript.

4. To perform the requested work, TrialQuest used Adobe Premiere to mute portions of the audio recording corresponding to the redacted portions identified in the transcript.

5. After the requested redactions were applied, the edited recording was exported and saved as an MP3 audio file.

6. Other than muting the portions of the audio specified by the provided transcript redactions, no other edits, changes, alterations, or modifications were made to the audio recording by TrialQuest.

7. No artificial intelligence (AI) tools or AI-assisted editing processes were used in performing the audio redactions.

8. The resulting MP3 file accurately reflects the original recording except for the requested muted portions corresponding to the transcript redactions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 31st day of August, 2026, in Tampa, Florida.

Jerrod Mills
Senior Vice President
TrialQuest, A US Legal Support Company

# EXHIBIT A

In re: Gordon Eatley Interview
Of Amy Griffin,

____________________________________/

AUDIO RECORDING

FILE NAME: Eatley August 31, 2021

Transcribed By: Sarah Albaladejo

INDEX TO EXAMINATION


| | PAGE |
|---|---|
| RECORDING | 3 |
| CERTIFICATE OF TRANSCRIPTIONIST | 99 |

SERGEANT EATLEY: Station 8, Sergeant Eatley.

MS. GRIFFIN: Hi Sergeant Eatley. It's -- it's Ms. Griffin -- Amy Griffin calling back.

SERGEANT EATLEY: Oh. Okay. All right. Thank you. I appreciate you taking the time. I was trying to figure something out for a different case.

MS. GRIFFIN: Oh. Please. No worries.

SERGEANT EATLEY: Be real honest with me and -- and it's kind of weird that I -- be honest with me and I'm just trying to -- I was on the phone trying to confirm something for him, but thank you for giving me a few minutes. I appreciate that.

MS. GRIFFIN: Oh. No problem at all. I'm quite happy to -- thank you for giving me the time to talk to you today.

SERGEANT EATLEY: Oh. It's not -- it's nota problem. It's what I'm here for.

Let's start with the basics real quick. Could you spell your first name for me?

MS. GRIFFIN: Amy, A-M-Y.

SERGEANT EATLEY: Middle name?

MS. GRIFFIN: Mitchell, M-I-T-C-H-E-L-L.

SERGEANT EATLEY: And spell your last name for me?

MS. GRIFFIN: Griffin, G-R-I-F --

SERGEANT EATLEY: F-F-I-N?

MS. GRIFFIN: Uh-huh.

SERGEANT EATLEY: And what is your date of birth?

MS. GRIFFIN: XX/XX/XX.

SERGEANT EATLEY: What's a current address for you ma'am?

MS. GRIFFIN: [redacted]

SERGEANT EATLEY: You did say [redacted] correct?

MS. GRIFFIN: Uh-huh.

SERGEANT EATLEY: Okay. Do you have your driver's license number by chance, ma'am? If not, it's fine. I can look it up.

MS. GRIFFIN: No. Hold on. I can pull it up. I finally got a New York driver's license. I was sad to give up my Texas -- my Texas license, but I eventually had to do it after I had children. I was living in New York City. My --

SERGEANT EATLEY: I haven't been to New York in quite a few years, not since I lived in Connecticut, so.

MS. GRIFFIN: Oh. Well, it's -- it's a place that's definitely coming back now after everything that's happened. And I'm -- I'm -- I'm proud to be from both states. But I do have a New York driver's license. I have the number.

SERGEANT EATLEY: Okay.

MS. GRIFFIN: It is [redacted]

SERGEANT EATLEY: [redacted] And your social? And that'll

be the last that I need.

MS. GRIFFIN: No, that's okay. XXX-XX-XXXX.

SERGEANT EATLEY: And I'm assuming the [redacted] is going to be a good callback number for you when I need to reach you?

MS. GRIFFIN: Absolutely. Hold. I'm going to grab one thing in my bathroom. Give me 12 seconds.

Sorry about that.

SERGEANT EATLEY: No. No problem.

MS. GRIFFIN: Okay.

SERGEANT EATLEY: Okay. So I've got -- I did say when I talked to you the other day, I'm recording the conversation. It's just basically so that I don't have to stop you all the time. I can just -- I can go back and review --

MS. GRIFFIN: No problem.

SERGEANT EATLEY: -- the recording and take notes from that. I mean, I am going to be taking notes while I speak to you, but it just makes me (indiscernible) for everybody involved. And it also kind of is going to help me until such time as I can get an affidavit from you. So I may have to do that via mail and get you to send something back to me. And then I can -- technically, I'm a notary in the state of Texas as a police officer. So I can -- I can sign here.

Okay. Why don't you start by telling me what -- what's the -- what the situation is?

MS. GRIFFIN: Yeah. I mean, I -- you know, it's hard for me, and I going to tell you everything, and you can ask me anything you want. I'm trying to put myself back in the position that I was in because my two daughters are the ages that I was when I was abused. And so, it's so hard to think of my 12-year-old going through what I went through.

And so, if I start from the beginning, the abuse took place at Stephen F. Austin Middle School. And --

SERGEANT EATLEY: Okay.

MS. GRIFFIN: -- the teacher's name is [redacted]

SERGEANT EATLEY: [redacted] So I'm -- I'm going to assume that [redacted] is [redacted] I mean, I can --

MS. GRIFFIN: Correct.

SERGEANT EATLEY: -- (indiscernible) get in touch with AIST (indiscernible), but --

MS. GRIFFIN: No, that's exactly right.

SERGEANT EATLEY: And he was -- he was a teacher at Stephen F. Austin?

MS. GRIFFIN: Yes. He was a teacher at Stephen --

SERGEANT EATLEY: Do you remember what he taught?

MS. GRIFFIN: He taught [redacted]

SERGEANT EATLEY: Okay. Go ahead. I'm sorry.

MS. GRIFFIN: No, that's okay.

SERGEANT EATLEY: I'll try to interrupt you as a little as possible.

MS. GRIFFIN: No. You can interrupt me as much as you want. You can --

SERGEANT EATLEY: Okay.

MS. GRIFFIN: Because I probably -- I know the story so well because I lived it. So sometimes I may not answer because it's in my head. So feel free to stop me at any point.

SERGEANT EATLEY: What grade was --

MS. GRIFFIN: So I was in the seventh grade.

SERGEANT EATLEY: You were in seventh?

MS. GRIFFIN: I was in the seventh grade. And I -- I always knew -- you know, I've always -- there have been so many memories of my experience with him at the school that has sort of plagued me weekly for all of my life. And one of them being -- I can remember him being in the parking lot of the school. And I'm there by myself and he's leaving the parking lot and I'm the only person there. And he's the only person there. And he's driving a [redacted] like the [redacted] something like that. So, you know, where it's a [redacted] it. And he backs out of the driveway. And I see him and then he waves to me. And I remember waiving back, frightened, but waiving back. And he came to all my -- he came to a lot of my volleyball practices and would stand -- he was always present, you know, he would stand around at my volleyball practices as I walked in kind of in a way, like, don't tell anybody.

And he would -- he was very -- he was very well liked.

You know, he -- he was liked by everyone. And -- and one of the things that's very relevant is that he [redacted] someone, I will never win because I'm a girl. But I remember thinking, that's okay. I know I'm a leader, so I'm going to run anyway. And I lost. And then the first week -- first day, I think it was of eighth grade, I remember that's when all the notes started. And I have a very distinct memory of all of my middle school years that throughout my middle school years, I received notes from him calling me out of class often.

And he groomed me through that process by telling me I was special. [redacted] And I think about it probably once a week, every week, or I don't even know how often, but often. [redacted] at school. And I had many other distinct memories that are nonsexual but frightening. We had a dear friend who he passed away. His name was [redacted] (phonetic). He just passed away in [redacted]

[redacted] And --

SERGEANT EATLEY: This was a fellow student?

MS. GRIFFIN: A fellow student.

SERGEANT EATLEY: Okay.

MS. GRIFFIN: Who was a close friend. And I remember how terrifying it was that I looked over the funeral. And Mr. [redacted] was there in the room and I could feel his presence and knew he was there. And I think one of the things that's really confusing when you are 12, is that the person made me feel special and told me I was a leader. And so I believed him. And that's how the relationship started. And I also have a very distinct memory. This is really hard for me to see.

He once came over me in the cafeteria with all my friends. And I can see the lights streaming in the room and I can see all the tables. And we're sitting there. And he comes in the cafeteria door. He comes up behind me. He leans over me and he says, you know, what are you guys eating? And what -- what are you guys doing? And I remember looking around the room and thinking, okay, I am -- I'm safe. I'm safe. I'm safe. He's not -- he can't do anything. There's all these people here.

And, you know, my memory, which I think is really important to share with you, a lot of the stuff that I have and that my memories are of things that are colors and smells and feelings, surfaces. And so in this instance, I can remember

just staring down at the lunch tray. They were like this beige color and they have this lip. And I can remember thinking, please go away. Please go away. Please go away. And so, you know, those were the memories and parked -- some of the memories that have come to me and stayed with me forever and ever and ever. And I've carried and I -- you know, I think I tucked a lot of this stuff in the back of my brain as I got older and over time, I just -- it's just too hard to hold as an individual. As someone who didn't understand trauma or trauma of this sort to understand how the brain can process what was happening.

So at that point in the seventh grade, I know it was from my memory, it was at -- towards the end of my seventh grade year. And I can -- I know for a fact that I was -- [redacted]

SERGEANT EATLEY: Okay. Okay. What type of [redacted]? I -- I didn't quite catch that. I'm sorry.

MS. GRIFFIN: No. That's okay.

SERGEANT EATLEY: You --

MS. GRIFFIN: So --

SERGEANT EATLEY: -- said that [redacted] taught what again?

MS. GRIFFIN: So [redacted] taught [redacted] which was in a classroom.

SERGEANT EATLEY: [redacted]

MS. GRIFFIN: [redacted] So we learned about --

SERGEANT EATLEY: Okay. Like -- okay.

MS. GRIFFIN: -- [redacted] And we learned about -- I have a very distinct memory of learning about [redacted]

SERGEANT EATLEY: And that was an [redacted]

MS. GRIFFIN: No. [redacted] I believe it was spelled [redacted] And the reason why I remember [redacted] so well too is because [redacted]

SERGEANT EATLEY: Oh. Okay.

MS. GRIFFIN: -- [redacted] And so I was

close to [redacted] and spent, you know, [redacted] So I remember [redacted] extremely well. And then I know that in the spring of that year, when everything started, I had Mr. [redacted] for [redacted] or he taught us about [redacted] --

SERGEANT EATLEY: [redacted]

MS. GRIFFIN: [redacted] And I remember we did things for the first time [redacted] the room. And I mean, I can draw the room for you. I know exactly how.

SERGEANT EATLEY: This was seventh grade, correct?

MS. GRIFFIN: That was -- to -- to the best of my memory, that was towards the end of the seventh grade year. And I'll tell you why because I also --

SERGEANT EATLEY: What -- what year -- what -- what year -- which school year would that have been? You and I are basically the same age.

MS. GRIFFIN: Oh. Wow.

SERGEANT EATLEY: Maybe this much younger than me, but so it would have been like 87/88 or --

MS. GRIFFIN: I think that's right. I'm really good with --

SERGEANT EATLEY: (Indiscernible) were you a freshman in 90/91?

MS. GRIFFIN: I graduated from Tascosa (phonetic) in

1994.
SERGEANT EATLEY: Okay. So we graduated -- okay. I'm trying to --
MS. GRIFFIN: Are you from -- do we go to Tascosa?
SERGEANT EATLEY: We were -- we graduated the same year.
MS. GRIFFIN: Did -- did you go to Tascosa?
SERGEANT EATLEY: No, ma'am. I'm not from here.
MS. GRIFFIN: Oh. You're not.
SERGEANT EATLEY: I -- I actually graduated from a -- a school called (indiscernible) High School in (indiscernible) Louisiana.
MS. GRIFFIN: Oh. Wow.
SERGEANT EATLEY: So yeah. Yeah. I -- I (indiscernible) for that school about 11 years or so.
MS. GRIFFIN: Well, thank you. I -- I -- yeah. I -- I think -- I think those are the right -- the right term -- the right time, the right date. I'm better with knowing -- I know exactly --
SERGEANT EATLEY: It would have been 88/90.
MS. GRIFFIN: I think so. I think so.
SERGEANT EATLEY: 89.
MS. GRIFFIN: I can go back and get those. I know I graduated from high school and 1994, which would have meant I started 89/90, right? 90/94.

SERGEANT EATLEY: 90 into 91.

MS. GRIFFIN: And I graduated college in 98. So yeah, that sounds about right. And so, it started in the spring of that year. And, you know, I think I remember that I had missed -- I played tennis. And it's important, I think that, you know, I -- that the tennis center for both my high school and for the middle school, the Austin Tennis Center is attached to Stephen F. Austin School.

So oftentimes --

SERGEANT EATLEY: I did not know that.

MS. GRIFFIN: Yeah. So oftentime -- oftentimes, I would -- in the seventh grade, I played volleyball in the fall semester. For the spring semester, I played a tennis and I would go -- I would go over to the ten -- I'd just walk out the door, which was right outside. I mean, it was literally five feet from the back of the gymnasium. And I would leave --

SERGEANT EATLEY: Okay.

MS. GRIFFIN: -- the school and I would go to the tennis center to play tennis. And --

SERGEANT EATLEY: Okay.

MS. GRIFFIN: -- as I remember, I was rep -- I was returning from a tennis tournament or I'd been out sick. And I don't know why I missed class, but I -- and I don't remember how I was told to come to the class at a certain time or I don't remember what month it was, but I remember that he said to just

come up. I just remember coming to the -- knowing I was going to his classroom to get some help to make up for either take a test or go see him for why I'd missed the class.

SERGEANT EATLEY: And this is Mr. [redacted] class?

MS. GRIFFIN: Correct. [redacted] And I went to his classroom. And I just have the memories of [redacted] they just lay -- they just open up. And they -- they're -- you know, they -- the radiators below them. And I don't know what the school looks like now.

SERGEANT EATLEY: I've never been a student (indiscernible) --

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: -- so I couldn't tell you. (Indiscernible).

MS. GRIFFIN: And I remember him sort of talking to me and then making sort of a -- being joking and funny and chasing me around [redacted], sort of like -- like we were playing a game. And he started writing some things on the board and --

SERGEANT EATLEY: This was after school or --

MS. GRIFFIN: This was after school. And it ended up with me sitting on [redacted] And then he said, you know, let's get you ready for what's going to happen next.

And for the first time, he put his hands up inside of me like gynecologist appointment and that's all I remember from that point. And then I have, you know, many, many, many other instances that I know exactly what happened, but I don't remember what happened after I left the classroom or what happened after he did that or -- that was all that I remember at that point.

SERGEANT EATLEY: Okay.

MS. GRIFFIN: And --

SERGEANT EATLEY: Go ahead. I'm sorry.

MS. GRIFFIN: -- and second time -- do you want me to just start telling you them?

SERGEANT EATLEY: Oh. Yes -- yes, ma'am. I'm -- I'm -- I'm -- right now, I'm going to -- I'm -- I'm basically -- my goal is, I -- I want to let you -- tell you -- let you tell me everything you need to tell me. I'm going to take notes and jot things down that I might want to ask once you're done. Then we'll probably go back and try to get everything in more of a little bit of a chronological order --

MS. GRIFFIN: Oh.

SERGEANT EATLEY: -- so that I can -- so that I can present it in -- in -- in an organized fashion. And I get that you may not remember everything in a chronological order --

MS. GRIFFIN: No.

SERGEANT EATLEY: -- it's -- it's been quite a few years.

MS. GRIFFIN: You know what? I did -- I -- I mean, I've spent a lot of time healing around this. And I actually -- I know -- I mean, I -- to the best of my memory, I -- I jotted some notes.

SERGEANT EATLEY: Okay.

MS. GRIFFIN: I -- I -- I'm giving them to you in chronological order. So that was the first --

SERGEANT EATLEY: Okay.

MS. GRIFFIN: -- that was the first time it happened on a -- on a sexual basis. But I -- as I said to you and I can -- you know, I don't have a concept of exactly what month it was or, you know, what I was wearing.

SERGEANT EATLEY: No. Of course not. I wouldn't expect you to. I mean, it's -- it's --

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: -- been -- it's been too many years.

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: And I mean you were 12 years old.

MS. GRIFFIN: Yeah. Thank you for that. Thank you. That's very nice of you to say that.

I think a lot of this comes back because my daughters are the same age. And that's what my psychiatrist has told me.

But the next incident happened in the bathroom [redacted]

SERGEANT EATLEY: I know you don't know exactly (indiscernible) it's going to be hard to put like dates and times and I don't really expect that. But do you think it was like maybe the same -- still the -- like that same school year?

MS. GRIFFIN: Yeah. Yeah. That's my -- my -- my gut instinct. My -- my gut instinct is that it was -- it was that seventh grade year still. And that's just my feeling, you know, like, it could have been the beginning of the eighth grade year. So. But -- but my gut instinct is from the way I remember the -- the -- the way that things I remember the sunlight and the warmth of the room and the warmth of the -- of the light coming outside. And the -- I have a lot of memories of the light coming into the rooms. And I have a lot of memory. I know exactly where windows are and -- and where doors are because I can recall many times trying -- wanting to be able to get out and just staring at the door.

SERGEANT EATLEY: Is that the bathroom?

MS. GRIFFIN: Well, yeah. And in this case, I seem to remember going to his classroom [redacted]

[redacted] bathroom. Again, after school --

SERGEANT EATLEY: Okay. Pause. Was this the men -- was this a mens restroom? Was this the women's restroom?

MS. GRIFFIN: From my memory, it's a -- a -- a unisex bathroom. I -- or -- or maybe it was the women's. But I know what the bathroom looks like, and I can describe it to you.

From my memory, there's either one or two stalls because I remember a specific incident on the middle stall, the smaller stall or if there was another stall. I -- I know it was one stall, but the --

SERGEANT EATLEY: And it was [redacted]

MS. GRIFFIN: Yes. And then as you walk in the bathroom -- and you walk -- I -- I mean, I could draw it for you, but as you walk in the bathroom, you're staring at the window ahead of you. And to the left is the stalls -- or one stall with two big doors. I just don't know if there was another stall on it. But then to the left of the stalls is the sink. And I have many instances of being on the floor in that room, which I'll tell you because I know all of them or what I remember is many of them.

So the next situ -- the next time it happened, which was the first time that he -- he raped me, I'm in the bathroom with -- facing up against the wall closest to the door, like on par -- playing with the door. And he slams the back of my head

into the tile wall. And I feel my forehead touching the wall. And the next thing I hear is a belt falling on the floor and hitting the floor. And when I hear the belt, I -- I -- I know it's over. I know something bads going to happen. But I remember thinking, I don't even have the words to describe what's happening to me right now. And this is so out of context in my life that I just need to go somewhere else.

So I just check out. And I just -- the minute the belt hits the floor, my head hits the wall and he comes up behind me to rape me. I just disappear.

SERGEANT EATLEY: So it was the back of your head of the front of your head?

MS. GRIFFIN: He pushed the back of my head above my neck, right at the base of the head. He pushed my head and my forehead hit the wall.

SERGEANT EATLEY: Okay. Okay. Now -- okay. I understand. Okay. I understand.

MS. GRIFFIN: And -- and so he -- you know, definitely it was him behind me. You know, I was facing the wall, and he was behind me. And so I really didn't even know what was happening behind me.

SERGEANT EATLEY: Okay. Amy, I'm going to have to ask you something and it's because I need to clarify terms. Because of my experience, people use different terms for different things. And though we all tend to have the same types of

vocabulary by the time we reach our age. I need to ensure that --

MS. GRIFFIN: That's okay. That's okay.

SERGEANT EATLEY: -- I'm understanding what you're telling me, okay?

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: When -- when you use -- when you use the term "rape" -- I mean, I understand before when you told me the first incident, it's normally what I would refer to it as a -- as a digital penetration. And initially you said that he raped you.

MS. GRIFFIN: He -- he --

SERGEANT EATLEY: My understanding from what you're saying is that he penetrated your vagina with his penis.

MS. GRIFFIN: Yes.

SERGEANT EATLEY: Is that -- are we using the same term?

MS. GRIFFIN: Yes.

SERGEANT EATLEY: Okay. All right. Fair enough. You -- you can use whatever term you want now. I just want to make sure I understood that's what we were both referring to because it -- it makes a difference in how I (indiscernible).

MS. GRIFFIN: I'm happy to tell you the difference because I remember some of them. And some of them are foggy, which, I'll tell you when I don't know where to place some of

the instances. But in this case, which was the second time, he -- when the belt came down and his pants fell, he penetrated me with his penis.

SERGEANT EATLEY: Right.

MS. GRIFFIN: I have one of the hardest memories of my experience is me sitting on the toilet in that bathroom, which is why I believe it's the middle stall because there's walls on either side of me, and there's no tile. And there was tile in the bathroom. So I'm assuming it was the middle stall. And I'm sitting on the toilet and my shirt is off. And he has his hands on my breasts and he rams his penis into my mouth. And I remember it being so forceful and hurting so much that I pass out or just can't handle it. So I fall against the stall. And he drags me by the arm into the middle of the bathroom floor.

And at this point, I'm on my stomach, and he has on cowboy boots and he's stepping on my lower back while he's holding my arm.

SERGEANT EATLEY: Hello.

MS. GRIFFIN: Hello. I'm here.

SERGEANT EATLEY: Okay. My phone is a little wonky. Sometimes, I -- I start to lose the connection because the way my phone is set up. I wanted to make sure I hadn't -- hadn't lost you.

The last thing you told me that is that he stepped on your lower back when he held your arm.

MS. GRIFFIN: My arm was behind me. He's stepping on my lower back, pressing on it with his cowboy boots.

SERGEANT EATLEY: Take your time.

MS. GRIFFIN: The next incident that I remember, I do, for some reason, place this in the eighth grade, but I'm not sure.

SERGEANT EATLEY: Going back one second. On the -- what time of day was this? Do you know? I just --

MS. GRIFFIN: Always after school from my --

SERGEANT EATLEY: I'm having a hard time believing this is in the middle of the school day because there would just so many people present, would lead me to believe it's either before or after school. And I was curious if you can clarify that for me.

MS. GRIFFIN: No. No. There was never anyone there. I think one of the most -- the -- the biggest memories I have of my middle school year, I had asked people growing up was I the only one that felt that I roamed the school hallways at Stephen F Austin? Because I was there by myself all the time.

And something else that I think is really important to explain to you. No, there's never anyone ever around. Ever. Never.

SERGEANT EATLEY: Okay. So this would've been like after school or --

MS. GRIFFIN: So one of the things to explain to you

that's really hard because it -- my parents are so sad about this, is that I lived a block away on Bottom Street. And so every day after school, I walked from school about -- you know, I mean, you could throw a -- no, you can't throw it, but you could -- I could walk there in a matter of four minutes, five minutes. I walked from the school through the middle of the park to my house at 2815 -- 3005 -- no, that's my -- the 20 -- 2815 South Bottom, 28. Anyway, it was the house -- the second house on the left on Bottom Street.

And so I was the oldest of four children. And so there was really no specific time as to when I was required home because my mom was running carpool for others. And because I was the oldest, I was at school there. I was allowed to walk home. And in the fall of my seventh grade year, I played volleyball. And so, there was always a reason why I didn't have to be -- why -- why I came home later.

SERGEANT EATLEY: Well, that makes sense to me because my own daughter stays after school constantly for -- for stuff today. So things haven't -- things haven't changed all that much in the last 20-something years, so.

MS. GRIFFIN: Yeah. I mean, it's hard for me because now I could never leave my daughters after school. But yeah, it's -- you know, there's a lot of sadness in my family, that my mom says it's her fault. I said, mom, how would? You know, it's not -- you just expect that school is a safe place.

The next incident in the bathroom that I remember, he took me to the bathroom. Again, I always remember going there by myself and then him coming in the bathroom. So I'm guessing he told me -- I remember at one point, him telling me, just go -- you go over to the bathroom and I'll meet you there.

SERGEANT EATLEY: Okay. Is this -- is this the third incident or the second incident?

MS. GRIFFIN: This is -- this is the third incident.

SERGEANT EATLEY: Okay.

MS. GRIFFIN: I remember being on the bathroom floor and him coming down on his knees. And I'm face up, but I'm laying on the ground. And I look over, and I have all these memories of me from the way I'm positioned in the bathroom, I'm able to see the sink, like -- and I look over. And I do see -- and that's -- that's -- I don't know where to place it. But at different times, I see -- I remember seeing a tall beer can on the left hand side of the sink when I was in -- while I was in that bathroom, laying on the floor. And I can remember seeing the beer can to the left of the faucet.

And -- and in this instance, I was laying on the floor turned a different way, and I can see the sink and outside the stall. And he's on his knees penetrating me with his penis. And then I remember thinking he was peeing on me, which that's how I remember it. But I'm guessing he was probably ejaculating on me and I didn't know what that was.

SERGEANT EATLEY: Right.

MS. GRIFFIN: And I -- I remember having my knee pads from volleyball. He told me to clean it -- clean it up. That's just a memory. I -- I -- you know, I just remember the knee pads and me wiping it down, wiping the floor and wiping myself. So that's -- that's what I remember in the bathroom, other than some words he said. A lot of it's very -- as I see it happening, it's happening. And it's quiet and I'm kind of going to another place. So it's as if I'm watching it happen to me. It's hard to describe, but it's like I can't be in this place, so I'm just going to do things like stare at the door frame and look at the door handle and wish I could get out.

SERGEANT EATLEY: That's not uncommon in traumatic events. So you don't --

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: That's perfectly okay.

MS. GRIFFIN: Thank you. I -- I remember one point in time -- and this was -- I don't know where this would fit in. But at one point in time, he was doing something to me or -- while I was in the bathroom on the floor. And I crawled -- I crawled over to the wall and put my back against the wall, the same wall where the door was. The same wall where he raped me the first time. And I put my back against the wall. And I pushed my back against the wall.

And I looked at him and I remember he said, have you

had enough? And I remember, which I've always thought was so strange, that I smiled at him and I thought if I just smile at him, maybe he'll let me go. So I don't know where that part fits in. But I remember thinking, oh, you're being clever. You're being clever. Just put on a front. And he -- he -- maybe he'll let you go if he thinks it's enough or whatever that meant. I don't know.

I do, as I said, have lots of memories of sort of the angles, like the angles from the floor, looking sideways, looking up, looking at the windows, looking at the door. I see them low on the ground because a lot of times, I was on the floor. And then I remember him at one point in time, pushing my head in the sink, in the water. And I seem to remember it was after oral sex. And he stood behind me pushing my head forward into the sink. And I can feel the push on my -- back of my head towards the water. And I'm on my knees and -- or I think I'm on my knees. I just know that my head is kind of leaning forward into the sink. And I'm scared because --

SERGEANT EATLEY: Was it a sink or was it a toilet?

MS. GRIFFIN: It was a sink.

SERGEANT EATLEY: Okay. I -- I ask because think if you said -- but if you said you were on your knees at 12 --

MS. GRIFFIN: Yeah. Yeah.

SERGEANT EATLEY: Unless you were a very tall 12-year-old.

MS. GRIFFIN: Yeah. Maybe I was standing. I don't -- I just know my -- I'm hunched over.

SERGEANT EATLEY: Okay.

MS. GRIFFIN: And I'm going towards the sink or toilet. But I don't remember what -- the reason why I think of it as a sink, whether I'm standing or kneeling, is that I see the bathroom stall wall to the right. And I see the wall to the left. So I know exactly where I am positioned in the bathroom. If I was to draw you a picture of the -- of the bathroom, it would sort of make sense, which I can -- I can do that for you if you need me to.

And then, you know, there were -- I don't -- you know, I -- I -- I don't know if this was still seventh grade or eighth grade. I somehow -- I think this -- I don't know. I don't know what this one -- but he -- [redacted]

SERGEANT EATLEY: And this is a -- this is a separate incident than the other three, correct?

MS. GRIFFIN: Yes. This is the second -- a separate incident where this was completely separate.

SERGEANT EATLEY: So --

MS. GRIFFIN: And again, it's hard. So -- I'm sorry. Sorry. You know, I -- I -- I don't know. I -- I -- I don't know if this was seventh or eighth grade, but I know that I remember -- I remember Sergeant, the idea that this was not new.

So in this instance, I knew what was coming, sort of, if that makes sense. So I didn't --

SERGEANT EATLEY: Do you trust that you're not (indiscernible).

MS. GRIFFIN: Oh. Really? That's nice to hear.

SERGEANT EATLEY: So -- no. Well, I did mention to him that I was having an interview. This was a 16-year-old girl. I'm not going to get into all the details. But she said, I mean, we only have children. We have special interviews that tal to the kids.

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: I went to talk to them the way I am talking to you right now.

MS. GRIFFIN: Right.

SERGEANT EATLEY: But -- the girl says the exact same thing. She says when the suspect in that deal brought her to another room, she knew exactly what was going to happen. She knew. She absolutely knew.

MS. GRIFFIN: Yeah. So that --

SERGEANT EATLEY: It is not your -- I mean, trust me, the things you were saying don't -- you're -- you're not -- by telling me things I haven't heard before. You're not -- you're not crazy. You're not -- you -- you know, you're not any things that are strange. So what you're telling me is -- is -- is what we -- what we hear quite frequently. So don't -- don't beat

yourself up. Don't -- don't do anything like that. Is -- it's not uncommon at all.

MS. GRIFFIN: You know, it's --

SERGEANT EATLEY: And by the way, my name is Gordon. And you don't have to call me Sergeant.

MS. GRIFFIN: Oh. Thank you, Gordon. That's nice. Thank you. You know, it's -- it's one of those things. It's like my whole life, I've been trying to talk myself out of this because I know it's true and I know what happened. But, you know, some of the things he said to me in different times, which I can't place them, that were -- you know, you come from such a nice family. If they find out, they won't love you. You won't amount to anything. No one will care about you. And, you know, I think that only fueled my intensity to go out and realize a -- all I did from that point on is I just took a different path. I chose this path of, like, success, which was, if I can just use my body as an athlete to be better than everybody else and be smarter and steady all the time, I'll just get out. I can get out, and then I can get as far away as possible.

So I -- I mean, I killed it in the gym. I just -- it was my way of escaping what had happened to me. And -- yeah. And -- and -- and so thank you for that because one of the things that's really hard is that I can't tell you how I got

[redacted]

[redacted]
And I don't remember him penetrating me at that point in time. But I remember him kneeling over me and ejaculating on my stomach all using -- waving his penis around and I'm laying there horrified. But I don't remember where it went afterwards. But I don't remember if I wiped it up or if I walked home or if I cried. I don't remember.

SERGEANT EATLEY: But that's -- to be honest with you, that is not uncommon either. And I'll share something with you, maybe it'll have a little bit of respect (indiscernible). In my particular field of work, there's quite a bit of studies that go (indiscernible) officers that get involved in shootings, so they get involved in life threatening incidents where, you know, they could possibly die or they have to, you know -- they may -- they have to force against another person up to including, you know, shooting another person and harming them.

Once upon a time, I was in one of those situations. It was many years ago. I don't remember drawing my weapon. I don't remember how it got in my hand.

MS. GRIFFIN: Wow.

SERGEANT EATLEY: It was just -- it was just there. I don't remember really running across the street, but I know I got across the street. So I -- I know I had to run across the street. The mind focuses on what it needs to focus on.

MS. GRIFFIN: Yeah. Yeah. Yeah.

SERGEANT EATLEY: And so don't -- don't -- again, don't -- don't beat yourself up over it. We're also talking about 30 years ago.

MS. GRIFFIN: I know. I know. It's --

SERGEANT EATLEY: We're both in our 40's now. So that's, you know (indiscernible). I don't remember much about eighth grade.

MS. GRIFFIN: That's so nice of you to share. Thank you for sharing because, you know, well, I'll -- I'll tell you later, but I -- just all the work I've been doing to try to, you know, understand all this. I've read a million books on trauma and -- and all this. And I -- I find it so interesting that you might feel this way too. That I remember, like, certain details as well as the blade of grass. Not really grass, but I remember, like, certain little elements of either a step on a step or the feeling of the stone or opening the door handle with complete trepidation knowing what's going to happen. And I can re-elicit those feelings in my body. But I can't tell you what I was wearing that day. And so it's interesting. And there's that dichotomy for me of being so close to it and it's so in my body and yet sometime -- it's been, you know, 30 years.

SERGEANT EATLEY: Very, very common --

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: -- in traumatic incidents. Time

will slow down. You won't hear things, but you are -- you won't hear anything except like on particular thing. You might hear a voice, but you won't --

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: -- hear anything else. But you -- but -- but it happened by standing in traffic.

MS. GRIFFIN: Yeah. Yeah.

SERGEANT EATLEY: You could -- you know, things of the room, it could be a very small room. I can hear it through the bathroom (indiscernible) huge. It might seem like it's the biggest room -- in your memory, it's the biggest room in the world. In my particular incident (indiscernible) shooting, I was very new (indiscernible) and I can remember going back to where it happened after the fact. I was with my wife. And I was like, they -- this just -- this doesn't look anything like what I remember. This (indiscernible) was huge. And it wasn't. It was very small. I mean, the -- the area we were in was very, very small. And in your perspective, your perception of things can -- can very, very much be, you know, changed by trauma and the fact that there's adrenaline going and your -- flight or fight principles are kicking in, things are kicking in and -- and, yeah, it can all affect your memory. And that's very human. And it's very normal. I -- you know, it's -- I'd be surprised that there wasn't some of that in a traumatic incident.

MS. GRIFFIN: Yeah. It's -- it's so nice. I -- I -- I hear about this and I read it and it's -- it's so validating, as I say, as someone who's gone through it because unless you've really gone through trauma, it's so hard to explain the feelings and the emotions and how the brain can do certain things. But, you know, I -- I have a very -- you know, I've -- I talked to several of my friends. My best friends are still the women that were with me in -- also in middle school. And most of them don't even remember the teacher's name. And yet I remember -- I remember the color of his [redacted] I could draw the [redacted] down to where the lettering is on the [redacted] I can -- I can draw his hand waving at a certain level. I can see him grabbing the [redacted] of the car and pulling out and the fear that's in my brain as I stand there with my feet on the curb by myself knowing I'm all alone, but knowing he's leaving. So he's leaving. Thank god he's leaving. And I'm thinking, okay, I'm going to be -- I'm going to be released from his grasp once he leaves. And he smiles as he leaves. And I think I smile back and, you know, but I can remember -- I can tell you exactly [redacted], and I can tell you where all of that is.

And -- and so in this instance, I know where my head was on [redacted] I know where he was facing. He was, you know, on top of me, where he ejaculated and I was facing -- the door was in front of us on [redacted] And I can tell you

every single thing about the room and the desks.

I also want to tell you that he also raped me, which was also really sad. But there's something called Austin Day, which is the day that you wear, it's kind of like the prom for eighth grade. I don't know if they do it anymore. But --

SERGEANT EATLEY: So this wouldn't be like in eighth --

MS. GRIFFIN: This -- this was -- this was in the spring of eighth grade. And the reason that this one is so memorable to me is because I know exactly what my dress looked like. And it had these poofy sleeves. And I had borrowed it from a friend, my godmother's daughter. And it had flowers on it. And it was like pink and yellow and it had this floral pattern. And it was like a Cinderella dress. And I thought it was so pretty. And --

SERGEANT EATLEY: Hello.

MS. GRIFFIN: Yeah, I'm here. Can you hear me?

SERGEANT EATLEY: Okay. I'm sorry.

MS. GRIFFIN: No. That's okay.

SERGEANT EATLEY: I thought it cut out again.

MS. GRIFFIN: I think this is the one that's one of the harder ones for me because we were all -- we were in the park in our dresses. And I remember we -- we rode over to the school at a very early hour because, you know, it was middle school. And I remember taking photos with my date. And it must

have been like in the -- I don't know, 5:30/6:30 at night, my guess is, because it was still really light outside. And I can hear -- I can hear the cicadas.

SERGEANT EATLEY: Is this for like a dance?

MS. GRIFFIN: Yeah. I can hear the --

SERGEANT EATLEY: Okay.

MS. GRIFFIN: -- cicadas. I can hear them in the park. The park is right across the street. And we were standing in the -- in the -- in the park, and my parents had dropped me off. And I remember Mr. [redacted] coming over to me. And I can remember the feeling of my body going, no, no, no, no, no, no. And he said, come with me, we need to go do some [redacted] And I can remember --

SERGEANT EATLEY: He just came over to the park?

MS. GRIFFIN: He was -- he was [redacted] because [redacted]

SERGEANT EATLEY: Oh. I said park.

MS. GRIFFIN: Oh. Yeah. He -- yeah -- yeah, I'm sorry. He --

SERGEANT EATLEY: Park.

MS. GRIFFIN: -- he -- yeah, he was in -- he was in the park as everybody was coming and getting ready for the dance. And he told me we needed to go do some [redacted] stuff, so I needed to go with him before the dance started. So I have very distinct memories of putting one foot in front of

the other on the side entrance of the school in the front of going up the stairs. I can remember the door opening so slowly. Like, please don't open door, please. Like, I can remember the sludging through mud. And I remember he was behind me as we were walking and I was leading. And we walked into the classroom. And he shut the door. And he raped me from behind. He bent me over the first desk in the classroom or second row.

SERGEANT EATLEY: Which classroom?

MS. GRIFFIN: The [redacted] classroom.

SERGEANT EATLEY: [redacted]

MS. GRIFFIN: And he bent me over the desk. He left my dress on, so I had the poofy sleeves and he just pushed up the back of the dress. And all I remember was the dress being over my head while I'm laying on the desk. I'm laying on the desk, but my feet are on the ground. And he penetrated me with his penis with the dress over the top of my head. And then I don't know what happened after that. But I do have a photo that I found -- I don't know where it is now or someone -- my best friend found for me of us at the dance. And I look so sad.

And I remember that night going into the ballroom, not the ballroom. They turned the cafeteria --

SERGEANT EATLEY: Right.

MS. GRIFFIN: -- into the dance. And I remember being just, like, shattered. And I'm not even sitting, which is interesting in the photo. I'm not sitting with my date. I'm

sitting on the floor by myself with one friend and I'm not with my date. And I just can remember when I look at the photo, I look so miserable in the photo.

SERGEANT EATLEY: Do you still have that?

MS. GRIFFIN: I do. I'd have to go back and find it. Someone showed it to me in past years, but I can find it somehow. And yeah, I -- another instance that I'm almost certain -- I know for a fact, it was in the eighth grade because I was very close to this volleyball coach. Her name is [redacted]

SERGEANT EATLEY: Give that to me one more time.

MS. GRIFFIN: Time -- that's okay. Her name is [redacted]

SERGEANT EATLEY: [redacted]

MS. GRIFFIN: [redacted]

SERGEANT EATLEY: Yeah. Yeah. I got the [redacted] I meant the last name.

MS. GRIFFIN: Oh, I'm sorry. [redacted]

SERGEANT EATLEY: Okay.

MS. GRIFFIN: And --

SERGEANT EATLEY: That's probably short for [redacted]

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: And you said this was another -- another teacher, and she means the volleyball coach?

MS. GRIFFIN: Yeah. And she was -- sorry. Let me just catch my breath for one second.

She was the [redacted] volleyball coach. And so I know it was the eighth grade because I remember when you came into the gym, oftentimes, he would be standing there before practice started. And he'd be -- I can see him rocking on his boots from his toe to his heel with his hands in his pocket. And he has this very jovial, relaxed, smiley, kind of dumby moving body as he's, like, kind of joking with everybody. And as I walk --

SERGEANT EATLEY: Are you talking about practices?

MS. GRIFFIN: He would come as we were starting to go to practice. And part of me thinks -- my memory serves me that it was like he kind of would be standing in the door between leaving this -- there was a door that came from the school hallway into the gym. And then you took another right into the women's locker room. And he would stand -- there were two doors. One door was the coach's office and one door was the locker room.

He would stand next to my coach by the locker room. So you had to go around him to get into the girls' locker room. And I don't know how I got there or where the coach was. But in this instance, I see the locker room door opening, and I see a hand. I saw the hand, like, the hand opening the door push -- it was a swing door, like a swinging door that -- from my

memory, that locked, like, you push it. And I remember, sorry, New York City, you know.

SERGEANT EATLEY: That sounds like the police there are busy too.

MS. GRIFFIN: Yeah. Yeah. And I see like a hand pushing the door open. And then when I -- the door is opened, and I can tell you the door swings inward -- swings inward. I step into the locker room. And there are windows coming straight ahead from above. And then there is a row of lockers straight across. And then there is a -- perpendicular to that, there is a -- another row of lockers. And he's standing in the empty space in the locker room. And he's smiling, and he's waive --

SERGEANT EATLEY: The women's -- the women's locker room?

MS. GRIFFIN: In the women's locker room. He's standing in the women's locker room waving at me. And he says something to the effect of, this won't take long. And I turn on to the locker facing -- not the wall -- not the lockers that are straight ahead of me on the side of the -- the side, which I can draw again what the locker room look like. And he raped me from behind in the locker room.

SERGEANT EATLEY: Okay. So this is you're -- you're going, I'm assuming, to volleyball practice, correct?

MS. GRIFFIN: No. I recall for some reason, and I

don't know exactly. You can't -- this is one I don't know for sure. I seem to remember having on a tennis skirt, which would have made it easier because again, like I said --

SERGEANT EATLEY: Right.

MS. GRIFFIN: But I just have -- the memories are somehow together about it wasn't the day that the coach was obviously, you know, standing there with him. That happened often. He would often come to practices. And I can remember when I'd be playing volleyball, he would always be in the crowd and I would look and I would see him there.

SERGEANT EATLEY: Was -- and that's why I was asking.

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: -- because in a situation like that --

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: -- that would have been your teammates around.

MS. GRIFFIN: Yeah. No. No. There was no one there.

SERGEANT EATLEY: (Indiscernible) why you were alone --

MS. GRIFFIN: There was no one there. There was no one there. And I remember there was no one in the gym. There was no one in the coach's office. And the locker room was dark that there was light coming in from the -- the -- the windows above as well. I remember the light was light. It was -- it

was -- I mean, it -- it was not light. It was -- it was -- it was -- it was dusk. It was a dusty light. I remember the light, whether they weren't windows as I recall them, they are windows coming from the top. But the light that day is dusty. It's not bright. The lights are on in the locker room, but it's also not dark.

And -- and -- but -- but I do have, you know, what makes me think of -- I can think of all the times that I would look over in the stands and I would see him there. And I would have this sort of -- I would be confused as to why -- whether I was happy he was there or horrified he was there. Did I want him there or did I not want him there? And I couldn't quite make sense of it. So I would just turn away and go back to focus on my sport.

SERGEANT EATLEY: So it's nothing really wrong with that either.

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: It's not on uncommon. Sometimes -- sometimes victims have positive feelings for their abusers. They may care very deeply for their abusers. That doesn't (indiscernible) to get abused. So I mean, it's -- you know, it's not -- having mix dealing that means you may still have very well, you know, appreciated, you know, the initial -- you say [redacted] and you thought he was nice to you. And -- so --

MS. GRIFFIN: Yeah. I didn't know to make sense of it.

SERGEANT EATLEY: (Indiscernible). I don't -- I don't see that as being completely, you know, out of the ordinary or you know, (indiscernible) things like that.

MS. GRIFFIN: Yeah. I -- I didn't -- I didn't know how to make sense of it. I didn't -- I didn't know how to organize it in my brain. And so, I just thought, we'll just be better than it. You know, just be better than the -- these thoughts and be -- be better. And -- and -- and also, you have to do what he says so you can get away.

But I have a very -- I remember -- oh gosh, it must have been 15 years ago. My mom -- I -- I remember this conversation like it was yesterday. My mom was on the phone with me, and she said to me, oh, guess what? I saw, Mr. [redacted] And he was talking all -- asking me all about you and how you were doing. And I remember so vividly holding the phone and immediately saying, oh, really, great. And then I remember not being able to handle it. I couldn't handle -- and I didn't say anything further. And I didn't say, how is he? What is he doing? What is he -- I just said, uh-huh, yeah, uh-huh and I went on.

But I remember that conversation with my mom like it was yesterday. Makes me want to throw up. Because even then, I couldn't process -- I couldn't be honest with myself, you know,

I couldn't tell anyone. And I'd be lying if I said to you that I have thought about the sexual memories every day, all the time, all the time. That's just not how it's been. It's been, you know, I see something, I remember something. It comes back to me then. It happens then. I see -- I see -- if I see a hand, I feel a touch. I see the whole thing. Sometimes they're longer, sometimes they're shorter.

SERGEANT EATLEY: Sure.

MS. GRIFFIN: And -- and so --

SERGEANT EATLEY: That makes sense.

MS. GRIFFIN: Yeah. And -- and, you know, before I sort of tell you how I've been working through it, I -- the last one, which is the hardest one for me because even I am like, I don't really want -- I just don't -- how did this happen? I remember there's two gymnasiums in the school. And the first one was the one you walk into to go to the locker room. And the second gymnasium, which, again, I can draw everything. I can draw the exits because I just wanted to get away. And I can draw the -- I can draw the whole layout of the second gym. The second gym connects to the first gym through one passage, which is just between the first and the second. And on the other side of the gym, it connects to the area where you leave -- to leave the school on the back side.

And he -- and I don't remember how I got there, but I just remember being under the bleachers in the second gymnasium,

and I'm on my back and the bleachers are out. And we walk under that void of a space where the bleachers are out and he's on top of me. And I'm frantic. And I'm saying, someone is going to see. Someone is going to see. And he's saying, we have to hurry. We have to hurry so someone doesn't see.

And I can remember now as I've done a lot of work around it, of course, that was around me blaming myself. And I feel as though as an adult, I can look at this a little bit like he liked the thrill of maybe getting caught or me being with him. It was me being with him. It was like we were connected. It was us doing something, not him doing something to me, which is more of the reason why I couldn't tell anyone. And so, I --

SERGEANT EATLEY: Is -- so the -- I mean, there was -- he -- he -- he had sex with you on that occasion as well or --

MS. GRIFFIN: I don't know if he penetrated me. I know he's on top of me. I just remember, in this instance, laying on the ground. I'm -- my back is on the floor. I can feel my hip bones on the floor. And my knees --

SERGEANT EATLEY: What?

MS. GRIFFIN: My hip bones are touching the --

SERGEANT EATLEY: Oh. Your hip.

MS. GRIFFIN: They're touching the gym hardwood floor, which is shiny, it's polished and it's brown.

SERGEANT EATLEY: All right.

MS. GRIFFIN: Light brown and under the bleachers it's

dark and it's dirty.

And he says, we have to hurry because we're going to get caught. And I'm frantic, frantic, frantic not about what's happening to me, but more about being caught.

And Gordon, I also want to say something that's so interesting to me is, I don't view any of this as sexual. I only view it as powerful. So he never kissed me. That's what I remember. He never touched his face to my face. And I can remember being grateful for that.

SERGEANT EATLEY: But none of (indiscernible) remember -- it just -- it -- it's -- it's -- none of it was about you. It was -- it was about him and him doing what he wanted to do. It was never --

MS. GRIFFIN: I know. I know.

SERGEANT EATLEY: You know, providing -- providing any kind of -- well, in a normal sexual relationship, any kind of love or infection is what -- what you would expect to provide. But this -- this is about what that's about. And I agree with you when you say that this is never -- it never was about that -- that -- this wasn't a loving sexual relationship. This -- this was power -- this -- this was a power -- this was a power type feel. And he had power over you and he took advantage of that.

So no, I -- I -- I understand what you're saying.

MS. GRIFFIN: Yeah. Thank you. That -- that was, you

know, I think at that age, without having the words or an understanding of those body parts, it's so foreign that I chose to just go somewhere else. And I always say -- you know, I used to make jokes. Then I would ask god when I die, if Michael -- Michael Ja -- if -- if -- if OJ really killed his wife, if that was the first question that I had to ask. I used to --

SERGEANT EATLEY: That's a waste of a question because I think we all know the answer.

MS. GRIFFIN: I know. That's right. And then I recently know over the last few years, I -- instead, I thank god. And I -- I know that when I die, the first thing I'll say is, where did you take me? Every time this happened to me, where did you take me? Where did I go?

SERGEANT EATLEY: I see what you're saying.

MS. GRIFFIN: Because I wasn't present. You know, when people ask me -- recently, I told my daughters. And one of the first things my 12-year-old said to me was, mom. She said, it's so lovely. She said, did you have any health problems afterwards? I said, I don't know. I have four beautiful children and -- you know, but the truth is that's not true. I've had two major hip surgeries, one on each hip, six or seven hours long because my hips have been me -- labral tears. I have horrible labral tears in my hips. I've also had --

SERGEANT EATLEY: Is that from athletics -- I mean, you told me you were super athletics --

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: -- (indiscernible) and everything.

MS. GRIFFIN: Yeah. I was -- I was a division one athlete. And then I -- I think all -- I played volleyball.

SERGEANT EATLEY: Volleyball or --

MS. GRIFFIN: Yeah. I played volleyball.

SERGEANT EATLEY: Okay.

MS. GRIFFIN: And I think Gordon, one of the things that's, like, more -- not about the case in a legal perspective, but, you know, my whole life, I've been running from this, and I became a triathlete. I've done the Iron Man. And I remember doing the Iron Man several years ago and finishing late in the night. And I remember ending up and saying, you know, I've run as fast and as far as one can take you, but I can't make this go away.

And so in the last few years, I've done so many things I've done. I work with a psychiatrist many days a week. I've done MDMA therapy with a therapist, if you know what MDMA is, if you followed that.

SERGEANT EATLEY: No, ma'am. I'll be honest with you, I'm not familiar with that.

MS. GRIFFIN: That's okay. It's -- it's really just using -- enabling the brain to use serotonin to relax your brain to just, you know, allow you to access traumatic events. I've done that with a therapist, which was helpful in bringing back

some of the memories. I do EMDR, which is e -- so I've done MDMA with a therapist assisted, and I've done EMDR with a therapist, which EMDR is the process of -- oftentimes, the woman I work with, she -- she's just brilliant. She's -- I think she lives in Utah, and she worked with veterans and she -- when you remember a specific incident --

So for instance, one of the, the things I've been working through -- and I -- I don't know how it's -- how my body's doing this. But whenever I talked to her on the phone and certain things come up, one of them, for instance, one of the last ones that I worked with her on, her name is Amy too. One of the last ones I did was I had a lot of body tra -- a lot of trauma around the idea of him coming into the cafeteria to hang over me, you know? And -- and that -- those memories, although not sexual, I -- I feel like I was going to throw up. And I can elicit those memories now in other situations in my life because they had become the fabric of my life.

So when you do EMDR, you -- you work on tap -- you -- you -- you touch your -- you know, you -- you touch your throat and you tap and you -- you try to elicit the horrible feelings. And then you try to remember something really positive, and you try to help get rid of those awful feelings that you had about the trauma. And I'm obviously not doing it justice. But EMDR has been really helpful to me.

And the -- and then, you know, I've had major -- major

bouts of depression and that's been difficult and worked with my therapist on that. I -- for the first time, I actually went away this year for two weeks to process with the doctor, to try to get rid of it -- rid of it. I don't know that I'll ever be rid of it, but to -- to -- to sort of relieve some of the anxiety and the, you know, the stress.

And then I think that I'm just doing everything I can. And I think I -- you know, as the memories come back, I've had these seizures where I sort of fall to the ground and I'm shaking and my husband has to come help me when I remember them. Sometimes when things would come up, I would shake and fall on the floor. And I would just ask him to sit with me and put his hand on my shoulder. And, you know, there's been a night or two where I slept in my closet because I didn't feel safe.

SERGEANT EATLEY: Well, I'm -- I'm glad you're trying to work through these. I'm going to do my damndest to do my part to hopefully give you a little bit of (indiscernible). Obviously, I can't make promises. Do you mind if I ask you a couple of questions? There's a couple of things I'm -- I'm going to -- that might help me. The (indiscernible) and obviously, I'm listening to you and I've already taken five or six pages worth of notes.

MS. GRIFFIN: Okay.

SERGEANT EATLEY: But what I am trying -- I'm -- I'm trying to plan -- on a case like this, we're looking at the last

event having occurred well, 30 years ago. So obviously, there's not going to be physical evidence. Is -- it's not -- it's not going to be one of those types of (indiscernible). This is going to have your statement, obviously. And one of the things I'm going to ask you to do is, I'm going to get your email address from you here in a few minutes and I'm going to send you a digital copy of an affidavit.

Do you have the ability to scan something into email?

MS. GRIFFIN: I'm sure I can find a way. I'm -- I'm -- to be honest, my technical skills are not fabulous, but I -- I can easily make that happen for you. I'll just ask one of my teenagers to help me do it.

SERGEANT EATLEY: Okay. Because basically -- basically, what I'm going to do is I'm going to have you -- I'm going to send you, like, the front cover page, and I'm going to fill out as much of it as possible, but it's pretty self-explanatory, filling out, you know, your name, date of birth, you know, your email, you know, social security, driver's license, most of that information I have already. But I'm going to -- I'm going to have your phone call for you today. I'm going to send you that affidavit. Take your time. Take it -- like I said, this -- this case, there's no statute of limitations. We -- we've got plenty of -- plenty of time to make for sure everything is perfect before I move forward.

If you're comfortable with it, I'm going to have you

write out your entire story and you can take as many pages as you want, it -- it's fine. The more details, the more -- I mean, the more information you can provide do that, because everything you give me is something that -- at some point, I'm going to -- I'm going to try to speak with this gentleman. And I think I may have already located him. I'm not sure if it's same person, but I think I may have already been able to located him.

Was he very young when you knew him?

MS. GRIFFIN: Well, from my -- just trying to understanding my -- you know, what I've tried to do is look into it, you know, a couple of friends would -- and -- and from my [redacted]

SERGEANT EATLEY: Okay. So he's probably in his [redacted]?

MS. GRIFFIN: Years. Yeah. Yeah. And -- and -- and the one thing that I know is I -- I mean, I don't know for sure, [redacted]

SERGEANT EATLEY: Right.

MS. GRIFFIN: And, you know, yes, he was [redacted]. And

that's what's also really hard for me is I kind of did the math, [redacted]

SERGEANT EATLEY: Yeah.

MS. GRIFFIN: And --

SERGEANT EATLEY: And looking at the date of birth I'm looking at, that would be about right.

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: If this is the correct person. But, I mean, how many [redacted] could possibly work for (indiscernible)? So I mean there' can't be that many. Okay.

MS. GRIFFIN: Yeah. Can I tell you, Gordon, can I tell you one other thing too? Because I've done, you know --

SERGEANT EATLEY: Absolutely.

MS. GRIFFIN: -- I -- I've done a little bit of just, like, investigating on my own without trying to -- to -- to, you know, I don't know what the right word is, push the cactus or whatever, but just trying to get some facts on my own.

And so, you know, I don't know if he -- from my understanding, he might know or have gotten wind of this. But, you know, I -- that's why it was time for me to come, you know, share everything with you because it's hard -- it's hard not to have control of it, you know? Like, this was a huge step for me to be able to call you and hand my story over to someone that I

haven't met because this has been my life's work, you know? And then telling my parents, which I was told not to because that was the secret. That's the hardest thing I've ever had to do in my whole life.

And so, just so you're not surprised if he acts as though he knows, it means I haven't -- certainly haven't called him or talked to him, and I haven't asked anyone to talk to him. But I --

SERGEANT EATLEY: I don't really know -- I'll be honest with you. You're just poking around, and I'm assuming on the internet and talking to people. I don't really see how -- I mean, maybe it might, but he hasn't seen you in 30 years. Now, I guarantee you, he remembers. I can almost also guarantee you, you ain't been the only one. He's been teaching for that long, he's been around young girls for that long. I would be very, very (indiscernible) that you was his one and only. I don't --

MS. GRIFFIN: I know.

SERGEANT EATLEY: I -- I -- I have a hard time believing that.

MS. GRIFFIN: I've heard -- you know, I've heard weird things, like through the grape vine, like, oh, yeah, Mr. [redacted] was the guy that would lay between us at [redacted] He was so weird. Remember he was so weird. Remember Mr. [redacted] this. And -- and, you know, my memory reminds me of -- I have horrible, horrible memories of seeing the little

slips of paper. This is actually quite important. The little slips of paper that are the notes that were passed to other teachers for him to get me out of class. And again, I don't think -- oh my god. Oh my god. I just forgot. I forgot. There's one other instance. I forgot. It's so important. One more sexual instance that is so important that I didn't include.

I -- I have a very distinct memory of being in the janitor's closet on second floor. Oh, it makes my shoulder hurt just to talk about it. I'm on my knees. He's standing. And I can see all the shelves in the closet and the door is closed. And I can see the mop and the mop bucket and all the other school cleaning supplies. And he has his penis in my mouth and I'm on my knees.

And, you know, that's -- that's just been horrifying. But I still don't think that there was anybody in the school when that happened. And so --

SERGEANT EATLEY: Do you know if that was seventh or eighth grade?

MS. GRIFFIN: I would think it was in eighth grade. I don't know. I just feel like, again, it was like one of those, I'm here -- I'm here just to do whatever has to happen. I'm here.

And so, you know, I -- I -- I -- as I said to you about the -- the notes, I remember seeing -- I can see these little slips of paper that would come to me. They were more --

I -- I -- I view them as relationship building with him, not that anything sexual was happening at school. And so, that I can remember the feeling of [redacted] when he would say -- and he'd have a note, and he'd look up and say, so and so needs to come with me, or, so and so needs to go to so and such and such, a classroom. And I can remember thinking, please to god, not me, please. And then I can remember thinking, oh, I kind of want it to be me. I kind of wanted to be me. And, oh, please, god, please don't have it be me.

And so I can see the notes though and I can feel the -- the -- the paper in my hand. And so the no notes were like my currency of -- of -- of coolness, right? The notes were like what made me different.

SERGEANT EATLEY: Yeah. You got to get out a class. You got to go somewhere.

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: Everybody else had to stay in class.

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: Yeah.

MS. GRIFFIN: Yeah. Yeah. Yeah. And it was always on the guise of what I remember of it being around [redacted] I was a division one athlete.

I -- you know, I don't know. I'm pretty clean. I don't -- barely drink. Might have a margarita every now and again, but there's just -- I think I was scared -- I was scared into taking -- and -- and this is where I credit my parents. And I -- I just want to say I have the most loving parents and family and it's because of them I survived because I have this wonderful home appear that I would just go home and be surrounded with love. And so, I chose a path of, you know, success and working hard and trying hard and putting my best foot forward rather than, you know, drugs, sex, alcohol, which I'm told after reading a lot of these trauma books, that that's the way people go.

SERGEANT EATLEY: Not uncommon.

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: I mean, I'm not going to say it happens to everyone.

MS. GRIFFIN: No. No. Just -- just like, I'm just grateful -- regardless, I'm just grateful for the life I have. It's actually -- it's my mom's birthday. And she knew I was talking to you today. And I said, I'm so sorry that I have to do this on your birthday. But you know what, mom, I said, this is the greatest gift I could ever give you better than a birthday cake or any present because I'm telling my truth and I'm speaking up for anyone who doesn't feel they have a voice.

SERGEANT EATLEY: Amy, let me ask you this, what's

your -- what's your email address.

MS. GRIFFIN: It's [redacted] So it's --

SERGEANT EATLEY: Okay.

MS. GRIFFIN: -- [redacted] And then there's no --

SERGEANT EATLEY: [redacted]

MS. GRIFFIN: -- [redacted]

SERGEANT EATLEY: Okay. But if you need to read to me by email, of course, you can always call me.

MS. GRIFFIN: Okay.

SERGEANT EATLEY: It's -- [redacted] (indiscernible) [redacted]

MS. GRIFFIN: Sorry. What's -- [redacted]

SERGEANT EATLEY: Yes. At (indiscernible) [redacted]. And my first name is G-O-R-D-O-N. There's no A.

MS. GRIFFIN: Oh. G-O-R-D-O-N, okay.

SERGEANT EATLEY: O-N. Yeah. Usually, people throw an A in it at the end and it screws it all up and then I never get the email.

MS. GRIFFIN: [redacted] right?

SERGEANT EATLEY: Yeah. And standby one second.

MS. GRIFFIN: Okay.

SERGEANT EATLEY: I have another call coming in, and I need to make (indiscernible). Standby one second, okay?

MS. GRIFFIN: Okay.

(OFF THE RECORD.)

(ON THE RECORD.)

SERGEANT EATLEY: Amy, are you there?

MS. GRIFFIN: Hi.

SERGEANT EATLEY: I'm sorry. That was TPS calling me about another case I was working.

MS. GRIFFIN: I don't worry. I'm sure I -- I -- I've kept -- I don't want to keep you too long either.

SERGEANT EATLEY: They -- they've got my personal cell phone number, so they called me on that and it's a good thing because otherwise, I probably just -- just -- just (indiscernible) my phone calls because I'm on this one, so.

MS. GRIFFIN: Well, that's nice that you would take -- that you care enough to have both the phones working. So that means -- obviously means you're -- you're doing --

SERGEANT EATLEY: I don't mind -- don't mind giving them my personal cell phone because honestly, I can always block them. If somebody is blowing up my phone. And every now and then, we get -- well, every now and again we get crazy. So I mean, then they'll just call you and call you and call you and call you and call you, and they don't understand boundaries. I

just block them except when I need to talk to them and then I call them from my desk phone, so.

MS. GRIFFIN: Trust me, boundaries is something that I'm having to understand for myself because someone took them away from me when I was a child.

SERGEANT EATLEY: Yeah. That's --

MS. GRIFFIN: So Gordon, can I ask you a question? Can I -- can I -- can I just ask you to just tell me -- so I -- I mean, I'm very anxious, obviously, about the lack of control that I have over this as I guess one would be.

Just in terms of what happens next or, like, what could happen next or what should I -- what do I look for?

SERGEANT EATLEY: Well -- well, number one thing, do you want to press charges?

MS. GRIFFIN: Yes.

SERGEANT EATLEY: Okay. That's the first step because I'll be honest with you, if I don't have cooperation with my victim, I don't really have a case.

So like I said earlier, there is no statute of limitations on this because it would have in Texas, this is aggravated sexual assault of a child base basically because you were under age -- you were under the age of 14. He also used force in the incident where he struck you. So we could go for probably multiple counts -- well, we'd have -- we have one or two depending on how the prosecutors would look at it as

aggravated sexual assault of a child. I also have several sexual assaults of the child based on individual incidents or possibly continuous as well. It just depends on what the prosecutors want to do. But if you put them all together, there's another offense in the state of Texas called continuous sexual abuse of a child. And that one requires there to be more than one instance of the sexual abuse over a 30-day period -- longer than a 30-day period. In which case, this would also fit the element. And -- and they're all -- sexual assault on a child is a second degree felony. Everything else is a first degree felony. So it's all basically kind of -- kind of the same, just like, 25 to life for the majority of these offenses.

So next the next step is, I actually have a couple of questions I want to ask you this. I'm going to have a couple of requests. You can tell me no at any point. If you don't --

MS. GRIFFIN: Okay.

SERGEANT EATLEY: -- want to go -- but -- but the things I'm going to be asking for, this entire case is going to come down to me put -- getting this gentleman to come speak with me. I'm going to do --

MS. GRIFFIN: Can -- can I ask the biggest favor?

SERGEANT EATLEY: -- a lot of bouncing around.

MS. GRIFFIN: Can I -- can I --

SERGEANT EATLEY: Hold on. Let me finish what I was saying.

MS. GRIFFIN: Okay.

SERGEANT EATLEY: I'm going to do a whole lot of bouncing around --

MS. GRIFFIN: Yeah. Yeah.

SERGEANT EATLEY: -- to be sure that I have the right [redacted]

MS. GRIFFIN: Okay.

SERGEANT EATLEY: I'm going to -- well, probably tomorrow, I'm going to go to the school and see if they have any old year books from that timeframe. That's a really easy way for me to identify him.

MS. GRIFFIN: I have one. I have one.

SERGEANT EATLEY: How many features there be -- well, if you have one, if you could -- you could take a photograph with your phone of the yearbook page with his name on there as a teacher and circle it and send it to me.

MS. GRIFFIN: Oh. You know what?

SERGEANT EATLEY: I don't have a problem with identifying him that way.

MS. GRIFFIN: I -- I have -- I know this sounds crazy. I can't open the book. It makes me sick to my stomach. So maybe I should just send it.

SERGEANT EATLEY: Put it -- you can put it in a FedEx bag and --

MS. GRIFFIN: I -- I'll have someone do it for me.

I'll have someone take the photo or put the bag -- I -- I can't -- I can't open it. I just can't open the yearbook. It's --

SERGEANT EATLEY: Yeah. Just -- just have them email it to me and that's fine.

MS. GRIFFIN: Okay.

SERGEANT EATLEY: A couple of other things. Like I said, this is going to really come down to me talking to this man and trying to get a confession from him because without one, it's going to come down to -- I'm -- I'm going to be blunt with you. I think you deserve total honesty.

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: If -- it comes down to your -- your version of events versus his. You come across as incredibly credible? You know, sometimes when I talk to people -- as a matter of a fact, the case I was just talking to (indiscernible) on the other phone, I'll be honest with you, when I first heard it, and it's a teenager, but it comes across as a bunch of bull. And the young lady has a history of making false allegations. So, you know, it -- it just comes across as being a very odd deal.

Yours on the other hand, I'm -- you come across as very credible. But you also have to understand, let's say -- let's say again, I'm going to -- I'm -- I'm going to send that -- I'm going to email you -- you shortly a new copy of affidavit. I'm going to get you to write out of your story,

okay? I'm going to have you sign it. You'll sign it at the end on every page. And then you will send it back to me. And then I will sign it.

I will call you on the phone and swear you to it over the phone, and I'll record that as well. That way I can sign off saying that you swear that it's true and correct and everything else. And then I will add that to my case file. That's going to be the biggest thing is getting that -- have this conversation, as well as that affidavit. From then, what I'd like to get from you because these things are all going to play into my interview with Mr. [redacted] Any photos with you from that time period would be helpful to me. Because -- well, I know, you've never really been in an interrogation, but it's nice to be able to have things, especially when it's that long ago to say, hey, remember her, basically?

MS. GRIFFIN: Yeah. My best friend took a bunch of photos, yeah.

SERGEANT EATLEY: And -- I'm sorry. Go ahead.

MS. GRIFFIN: No. Sorry. My -- I have a bunch of photos. And it's -- it's funny because I've always --

SERGEANT EATLEY: I would particularly like to have the photos from the -- from -- from the Austin thing.

MS. GRIFFIN: Oh. Yeah. Yeah. I'm going to find that. I'm going to find that, yeah.

SERGEANT EATLEY: Photos of you from that time, you

know, maybe in your -- in your volleyball outfits or any other things that he's probably going to remember because I want to be honest, that's probably what he was attracted to. Any -- anything like that, that I could kind of -- well, I'll be honest with you, sometimes you like to mess with these people when you're in the room with them because I don't want to show them that I know a whole bunch. And if I could just keep badgering them of what I -- what I know, a lot of the times, they get emotional and people get emotional, they say things that they're trying not to say (indiscernible).

So every little bit I have that I could take into that room with me is going to be helpful to me. So let me see. I've got -- I'll sent you the affidavit.

MS. GRIFFIN: What about -- can I ask Gordon, what about things --

SERGEANT EATLEY: (Indiscernible) identify him --

MS. GRIFFIN: What about --

SERGEANT EATLEY: I'm sorry, what?

MS. GRIFFIN: -- what bout things like -- sorry, I interrupted -- I interrupted you. Sorry.

What --

SERGEANT EATLEY: You're fine.

MS. GRIFFIN: -- what about things like my friend, you know, my three best friends with one of them saying, you know, oh, yeah, I remember -- I remember you getting notes all the

time, you know, like, no one -- my friends, you know, obviously, my best friend is devastated. My best friends are devastated by this. And they're like, oh my god, I see how this happened. But it's -- that's the hard thing, you know, I -- I've read so many books about trauma where it talks about when people are in car accidents, people remember them and they talk about them. And then people were there as -- as witnesses.

But in this, you know, it's only my word against his, which I know that. And I know exactly what happened, you know, whether my memory is foggy and I wasn't on my knees or I was on my feet, you know, I start to discredit myself if I can't remember that exact detail, and I have to give myself more credit because it's just, you know, the rest --

SERGEANT EATLEY: Yeah, most people realize too, we're talking about, you know -- you know, a 44-year-old women versus the memory of the 12-year-old.

MS. GRIFFIN: I know. I know.

SERGEANT EATLEY: That's the big that difference.

MS. GRIFFIN: I know.

SERGEANT EATLEY: I mean, you know, this is -- we're not talking about like, you know, you're trying to remember something that happened two weeks ago. I mean, this was like a long time ago, so.

MS. GRIFFIN: I know. I know. My 12-year-old brain just could not handle it. So I remember the details that my

12-year-old brain remembered. And now I'm trying to process them as a -- sadly, I'm a 45-year-old woman, not 44. I wish I was. But I -- I process -- I'm trying to make sense of all of them. And that's -- that's, you know, that's the real healing that's happening here is -- is me, you know, honoring that child that lost -- I lost it all, you know, I -- I lost -- I lost it all in that moment. And -- and -- and so I'm -- you know, I'm really grateful to you, but I -- you know, I ha -- I have those people that my friends that say, oh, yeah, I -- I remember when you got notes all the time. You know, I don't know who the notes were from or I --

SERGEANT EATLEY: If you have their names and you have their contact information, and you would like me to reach out to them, email that information to me. That way, it'll be your decision if you'd like me to reach out to them. So give me that and I will contact them. I'm assuming that some of them are still here in Amorella.

MS. GRIFFIN: Most of my best friends live in -- people kind of live all over. Yeah. Some of them live in Amerella. I mean, I -- I have recently reconnected with the volleyball coach. And -- and so --

SERGEANT EATLEY: Coach [redacted]?

MS. GRIFFIN: Yes. After -- I never spoken to her since leaving the school, but I've reconnected with her.

SERGEANT EATLEY: Is she aware of any of this?

MS. GRIFFIN: No. And I didn't -- I wanted to tell you that I did not tell her -- I called her the first time, and I just wanted to reconnect with her. I did not say one word. And then at the very end of the conversation, she said -- I just said, how are you? How are your kids? We talked about my kids, her kids. I didn't say one word. I just said, where do you live now. This, not the other.

And at the very end of the conversation, I said, oh, well, I'm still best friends with my best friends from home. Do you still keep in touch with anybody from the school? And she said to me, oh, well, you heard what's happened with Mr. [redacted] And I said --

SERGEANT EATLEY: Oh.

MS. GRIFFIN: Yeah. She said that. And I -- I almost passed out. And I said, well, I've heard because this is part of it, Gordon, that you should. I don't know where this falls in, but it makes my heart sink.

[redacted]

SERGEANT EATLEY: Okay.

MS. GRIFFIN: And which is, you know, shattering to me because in my heart --

SERGEANT EATLEY: (Indiscernible) [redacted]

[redacted]

MS. GRIFFIN: [redacted]

SERGEANT EATLEY: [redacted]

MS. GRIFFIN: [redacted]

SERGEANT EATLEY: -- [redacted]

MS. GRIFFIN: [redacted]

SERGEANT EATLEY: Right.

MS. GRIFFIN: And I don't know any -- I don't know anything about that. I don't know -- I haven't -- you know, I [redacted]

SERGEANT EATLEY: [redacted]

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: I mean, that's normal human behavior. I mean, you know, we all thank god that [redacted]

MS. GRIFFIN: Yeah. Yeah.

SERGEANT EATLEY: -- I mean for lack of a better technical term for you. But I mean, so.

MS. GRIFFIN: But then what happened was she realized

I didn't say a word. And then later that afternoon, she started texting me pictures of her kids, and I texted her pictures of my kids. And then --

SERGEANT EATLEY: That's great.

MS. GRIFFIN: -- she said, oh, I'm so bummed. She said, I wish I had my yearbooks to look at you were -- you know, I -- whatever, whatever. And she said, I sent them to Mr. [redacted] so he could try to figure out once -- oh, by the way -- oh, I should mention this.

She said, when I heard all this was going on with him, I picked up the phone after not talking to him for 25 years and [redacted]

SERGEANT EATLEY: Snooping around? What's snooping around --

MS. GRIFFIN: Well, I -- she meaning -- meaning when she heard around town -- remember I told you that I'd asked a few friends, whatever. When she --

SERGEANT EATLEY: Oh.

MS. GRIFFIN: -- when she got word of it that someone was snooping around -- around him not knowing it was me, she -- she called him out of the blue to tell him that someone was --

SERGEANT EATLEY: That's very odd.

MS. GRIFFIN: It's very odd. And -- and --

SERGEANT EATLEY: Why would you reach out to somebody

you haven't seen in a quarter of a century to tell them that somebody was asking about them?

MS. GRIFFIN: Can I tell you how weird it is? Because then I -- she call -- she started texting me and I did -- and she said -- and then all of a sudden, she wrote, Amy, were you [redacted] And I said, yeah. And she wrote back, oh my god. Oh my god. Oh my god. I know. I know now what I'm done. Oh my god. Not meaning that -- she just meaning, oh my god, I told him and it's you. And she's like, if I've known it was you, I would have never said anything. You have to call me right away. And I was --

SERGEANT EATLEY: Oh. Crap.

MS. GRIFFIN: -- I was panicked. So -- so then I -- I -- I got myself together, and I realized I do not want to -- I want to not make her part of the case. So I called her. I did not say one word about what happened to me, except she knew -- she just knew, is it's. Him? And she's just like, that's son of a bitch. I should know have known, da, da, da. But I never told her incidents. I never told her where. I never told her what happened. I never told her a thing. I never told her.

SERGEANT EATLEY: Okay.

MS. GRIFFIN: So I made -- and then she told me that she said, well, you know, the whole conversation was about the trauma. She said, you know, that I was sexually abused as a child. And she told me for two hours about her sexual abuse.

And so I don't know. It -- it's all -- you know, that's a big part of it. And so, you know, I just want to -- I mean, I can write all these things down that I've sort of done my own work around this, but I want to save you the time or help you, or I'll say I'm obviously, I'm -- I'm out of it. I -- I want you to -- I -- I don't -- I trust you and I'm, I -- I -- I'm just grateful to you. And I'm -- I'm -- I'm anxious, you know. I'm nervous and I don't sleep well.

SERGEANT EATLEY: That -- that's okay. Look, right now, you're taking the steps you need to take. Trust me, I'm going to do the things that I can do. And that's all we can do. I mean, that -- that -- that -- that's all we can do.

If it gets to the point -- I mean, it would be nice if I can get -- I'm going to try to get as much information as I can. That's why I said, if you want to give me your friends contact info, send it to me. You have my email now. I'll look at it tomorrow. I'll start making phone calls. Those I can talk to or I can go meet in person, I'll go meet in person. Those that are out of town or don't live close enough for me to go I'll -- I'll get affidavits from them and email them (indiscernible). I mean, it -- it's not hard. I mean, I've done it before, I'll do it again.

I want to go into the interview room with him with as much information and as much MO as I have. Believe it or not, this is not my first teacher case. I had one just a few months

ago. So it's not -- not my first rodeo. I will do my best by you and I promise I'll do everything I can. Now, the best -- I mean, it's the best thing to hope for is that I get a confession out of him. And then he goes to jail for that. And hopefully, the prosecutor can get some kind of plea deal. With the number and seriousness of each of these charges, even a plea deal is going to be a long time in prison. Oh. We're also looking at -- and there's also the charge for -- there's a charge in Texas for incorporate relationship between educator and a student. So that's going to exacerbate things too. So it's -- there's a whole wide variety of things they're going to -- that we're -- we're probably going to hit it with once I get my case put together to be presented.

Stephen F. Austin Elementary School, where is that exactly? Do you know? I mean, I can Google it --

MS. GRIFFIN: It's --

SERGEANT EATLEY: -- obviously if you don't know off the top of your head because I don't -- I honestly (indiscernible).

MS. GRIFFIN: It's -- oh, gosh, it's in the neighborhood of Wolflyn (phonetic). And I -- I -- I can't tell you. You know, it's down by -- look up Bottom Street and then look up Stephen F. Austin Park. It's a big --

SERGEANT EATLEY: Yeah. I'm -- I'm searching it right then. I'm trying to figure out what county I'm dealing with.

MS. GRIFFIN: And you'll see there's the park, and then there's the school, and then there's the tennis center attached.

SERGEANT EATLEY: Uh-huh. Let me see. It looks like Empire County. That's what I wanted (indiscernible) all right. I'd rather do a (indiscernible) county on this. That's all. That's why I'm asking off the top of my head. Because I'm already thinking about a bunch of different things.

MS. GRIFFIN: Also --

SERGEANT EATLEY: What I need to do next and everything else.

MS. GRIFFIN: -- the last thing I -- the last thing I want to ask you was, you know, I also --

SERGEANT EATLEY: What?

MS. GRIFFIN: -- [redacted]

SERGEANT EATLEY: Well, do me a favor. Let me Do the asking around.

MS. GRIFFIN: Okay.

SERGEANT EATLEY: Okay. Because I don't want -- I -- I don't want you to accidentally -- I -- I don't want us to be

tripping on each other.

MS. GRIFFIN: I -- I -- I'm not doing a thing. You got it, my friend. It is all you. I will not -- I'm going to seal my lips and not say a word until I --

SERGEANT EATLEY: Thank you. (Indiscernible) that way because somebody might be willing to talk about something one time. And if they talk to you -- talk to you -- well, that's all cool, but I'd much rather them talk to me because I can testify to what somebody told me.

MS. GRIFFIN: Right.

SERGEANT EATLEY: But I can't testify to what somebody told you and then you told me because now I'm dealing with hearsay. So I would rather talk to them first and I -- I'd rather talk to them myself.

MS. GRIFFIN: I hope I haven't missed any of that up along the way in talking to, you know, various people. But I -- I haven't done -- you know, I have -- I've -- I've only gone so far. And that was when -- you know, I -- I've only gone so far. And because I didn't want -- I -- I don't have any -- I don't -- I've never -- I think I've gotten a speeding ticket.

SERGEANT EATLEY: Right.

MS. GRIFFIN: I don't know anything about this, you know. This is so foreign to me too. It's like not a world that I want to live in.

SERGEANT EATLEY: For most people, it is a bit

foreign. They know what they see on television and that is about it. And I --

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: -- I can tell you, I've been a policeman for a very long time (indiscernible) I teach it at the university. There's a lot more to it than what you see on television.

MS. GRIFFIN: I know. I know. I'm sure. I can only imagine.

SERGEANT EATLEY: Trust me, I -- I've -- I've got it. I'm going to take care of you. I can't make promises, but I can promise you I'm going to do the best job I can?

MS. GRIFFIN: Oh. Gordon, so the last question I have is, how does this play out in a timeframe? Is this like months? Is this like years? Is this like --

SERGEANT EATLEY: Months.

MS. GRIFFIN: Months.

SERGEANT EATLEY: Months, if not longer.

MS. GRIFFIN: Months, okay.

SERGEANT EATLEY: I can guarantee -- okay. Okay. Let me -- let me dial that back just a little bit.

My part of this going to probably take me, depending -- mind you, I'm -- I'm on my -- I consider all my case to -- well, not all. Because the one I just told you about is not a priority for me. But most of my cases are priorities.

So I'm having to juggle everything at once. And there's so many hours in a day. But I'm going to be working heavily on this because if I'm not mistaken from what I'm looking on the internet he's still a teacher. So I have super concerns about that.

I am going -- I mean, I'm going to be working this pretty heavy.

MS. GRIFFIN: I think he's retired. I think he's retired.

SERGEANT EATLEY: (Indiscernible) in a room. If not next week, the week after. I --

MS. GRIFFIN: Okay.

SERGEANT EATLEY: -- really like for me, that's going to be that quick. We working through this case and filing it is not -- it's going to take, you know, a week or two, depending on how much -- I mean, depending on how much background and how many people I reach out to and how long it takes me to talk to identified folks and -- and get affidavits. That's what's going to slow me down. But I mean, that's -- but at the same time, it's not difficult to work through. I will have my work done, it'll probably be three weeks tops. I don't even think it'll take that long, to be honest with you. Maybe the end of next week, I hopefully will have everything pieced together and we'll get him into -- take him in here and try to talk to him and hopefully get a confession. I just -- you just never know. I

mean, you just can't -- you just never know when you go in that room that they're going to be willing to talk.

MS. GRIFFIN: Does anybody ever confess.

SERGEANT EATLEY: Does anybody what?

MS. GRIFFIN: Does anybody actually, really -- I can't imagine what -- he would confess.

SERGEANT EATLEY: Oh. You go -- yes. 100 percent yes. Absolutely. They -- they want -- people -- okay.

MS. GRIFFIN: They want to get it off their chest. Like, I want to get it out.

SERGEANT EATLEY: Yes. You've been sitting here telling me that you wanted to keep this off your chest.

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: It was hard on you and you'd be keeping it a secret this whole (indiscernible). They feel same way. Believe it or not. I'm not trying --

MS. GRIFFIN: Wow.

SERGEANT EATLEY: -- I'm -- I'm not trying to like -- like, diminish you or (indiscernible) because I don't. But people, they want to talk. They do. A lot of the times, what happens is they won't just say yes, I did exactly that, this is how it is. That -- that's usually not what happens. It does happen. I've had it happen to me and I'll be honest, it shocks me every time. It does.

But with -- a lot of times, what happens is they want

to admit to it, but they want to find a way to minimize and mitigate their actions. So normally, what would happen during the course of an interview is you have to give them something that in their mind, they consider plausible, but at the same time when they admit to it, they're basically admitting to a crime. I'll give you a prime example.

I worked case not all that long ago. A woman, I eventually talked to her boy -- and this is -- this is like ten, 15 years ago, sexually assaulted her -- her -- her boyfriend's little girl. And she was like (indiscernible) or something like that. And she initially denied everything. And then she gave me a little bit oh, yes, I wasn't (indiscernible). So we refer -- that's not a confession, but it's what we refer to as an admission where they admit -- they give you a little bit. So she confirmed that she was. She remembered the time. And she confirmed that she was there.

Then she's, like, we'll I never bathed these kids. I never did that. It wasn't my place. I wasn't there (indiscernible) together. And then later on in the conversation, well, I might have given her -- I might have helped her that one time. And they give you an admission.

People start giving you admission after admission after admission, it starts to add up. It may not add up to a full confession, but it sure starts to sound that way and look that way after a little while. And juries will bite on it.

You know, and I -- and I told her, I was, like, explain to me how this little girl is (indiscernible) be a liar and yet what you're telling me is the truth? Provide me with some kind of plausible explantation (indiscernible). And her explanation was well, you know, I (indiscernible) with her dad quite frequently. And a lot of times when I was asleep I would wake up with my hands in his underwear and I would be stroking his penis. She says, it's possible that one night I was sleeping in the bed with this little girl. I might have (indiscernible) I might have mistook her for my boyfriend and my hand was in her pants and I was stroking what I thought was her penis. To her, that sounds reasonable. To you and I, that sounds like the most ridiculous --

MS. GRIFFIN: Right.

SERGEANT EATLEY: -- damn thing --

MS. GRIFFIN: Right.

SERGEANT EATLEY: You lied. Okay. So I mean, and that's usually -- and so a lot of times, that's how interviews go. They will give you those pieces. They will give you everything, except -- like she admits to the action. And trust me, that's -- that's -- that's enough. I filed on her, and they took the cases in. They took the charges. I mean, I -- I got -- I got three felony charges on this women.

MS. GRIFFIN: Wow.

SERGEANT EATLEY: Because it's the only thing --

MS. GRIFFIN: Wow.

SERGEANT EATLEY: And so it has -- trust me, they will -- they'll give you everything, but, like, you know, like, the total I -- I did it, you know. (Indiscernible) and the confession we'll get it, I mean, no. I mean, I use that because I capital -- I mean, I use that because (indiscernible). I mean, they don't normally give that, but a lot of times, they will flat out -- I mean, they'll give you enough that it's --

MS. GRIFFIN: I guess it's human. I guess it's human, you know, it's -- it's like it's in our nature to be -- to want to not have this on our chest. So I see that. I see both sides. It's like you're just, like you said, just because I want to get it off my chest, he probably will too. That's probably right.

SERGEANT EATLEY: Yeah.

MS. GRIFFIN: I -- that's -- that's so nice to hear. And if he doesn't, you know what, Gordon, the other part about this is that all I can do is tell you what I remember, and all I can do is get it off my chest because my healing really starts with my letting go of it, that it's not my fault. So it's not my fault. I did nothing wrong. And --

SERGEANT EATLEY: No. You didn't.

MS. GRIFFIN: And so --

SERGEANT EATLEY: This is my problem now. You don't need to worry about it. This is my problem now.

MS. GRIFFIN: But I will get you all the stuff.

SERGEANT EATLEY: (Indiscernible) take care of it. And I know you can't just -- you can't just forget it. And I'm not telling you to forget it because it's part of who you are. But this is -- this is my problem now. You've handed this off. And I will work through it. And I will take care of it the best as I can. I will keep you in the loop. Things happen. Now mind you, it could be days between phone calls. Things don't happen overnight, but I will do my best to keep you in the loop so you know what's going on.

MS. GRIFFIN: Okay. Okay. I'm so grateful. And I will -- I will -- what I will do to, is I have done, you know, in terms of -- I want to give you everything that has been done. I'm in so you don't have to backtrack and waste your time, which would take me some time to compile in terms of names that I've called or people that you should call or --

SERGEANT EATLEY: Good.

MS. GRIFFIN: -- things that I know. I just need to gather that. And if that's okay, I'll get you whatever I have.

SERGEANT EATLEY: Yeah, that's fine. I have all day. I have -- I have forever.

MS. GRIFFIN: Okay.

SERGEANT EATLEY: I don't have statute of limitations on this.

MS. GRIFFIN: Okay. Gordon --

SERGEANT EATLEY: I -- I don't -- I don't -- I -- I -- I got (indiscernible). If you want to draw up those pictures of those places that you described, do it.

MS. GRIFFIN: Okay.

SERGEANT EATLEY: Send it to me. That's one more thing -- I mean (indiscernible) admissible in court? Maybe not. But it's something I can take into an interview room.

MS. GRIFFIN: Okay.

SERGEANT EATLEY: I can also go over the -- I can also go over to Austin Elementary and go to these places and take a look at them for myself.

MS. GRIFFIN: Yeah. Yeah. That --

SERGEANT EATLEY: You know, I mean, you know, and your memory can be way off that. I mean, when it comes to rooms, I'll be honest with you, I used to remember certain things about my middle school and the last time I went over there, anything like -- I don't remember it being like that.

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: (Indiscernible). And it's just, you know, a kid. It's a child's memory. And -- and there's nothing wrong with that.

MS. GRIFFIN: That's the trauma of also thinking that I have to have every single detail. Like if I'm off on the size -- size of a tile sample, that means I'm not believed, you know.

SERGEANT EATLEY: It doesn't have to be perfect.

MS. GRIFFIN: I know.

SERGEANT EATLEY: It doesn't have to be. Do you think -- do you think -- my victim, one of the kids I was telling you about she's 17. Do you think she remembers everything she remembered from just like 12 or eight years old?

MS. GRIFFIN: Not even at 17, she probably doesn't.

SERGEANT EATLEY: No. Absolutely not.

MS. GRIFFIN: I don't remember what I had for dinner two nights ago.

SERGEANT EATLEY: She doesn't remember, but (indiscernible) -- I mean, there's enough for me to get a case filed and get charges --

MS. GRIFFIN: Well, if anything, I mean I -- I --

SERGEANT EATLEY: I also had (indiscernible) also had a confession. But I like the fact you told me what [redacted] he drove. It's so funny because the other case she told me that the lady that was abusing her also drove a [redacted] And I was able to use that in the interview.

MS. GRIFFIN: Oh. A [redacted]

SERGEANT EATLEY: One of the incidents actually occurred in the vehicle. And I mean, so it's always -- these little details you're giving me, I mean, everything I can confirm --

MS. GRIFFIN: Well, one of the things that --

SERGEANT EATLEY: -- makes it that much easier for me. So I mean, you know --

MS. GRIFFIN: One of the things my brother told me was that my brother asked his two best friends because he remembered people saying that he was creepy. And one of the things my friends told me was that -- was that he drove them off campus, like, during school hours to go to the Tuten Totum (phonetic) to -- to go get drinks and, like, snacks. Like, he would put them in the car and drive with them. I'm like, what? I don't -- and I'd asked other friends, do you know what Mr. [redacted] drove? Or just in general, I'd say to people, do you know what kind of car your teachers drove? What? I have no idea, what are he's talking about. Like, I don't remember my teacher's name. This was a [redacted] and I could see his -- I can see jeans in it.

SERGEANT EATLEY: (Indiscernible) tell me that. I have a program here on my computer called TLO. I'll be able to tell you (indiscernible).

(Indiscernible audio.)

SERGEANT EATLEY: So that I could confirm it because every little bit I can confirm helps. Even if it's just something as small as driving a car, a -- a particular [redacted] I mean, it's -- it's -- it's something. So there's going to be -- it's going to be okay. Just let me -- just take a breath. You've handed it off. Let it be my problem now. And we'll work

through it. All I can say is just when I do ask you for the things I'm asking you for, get them to me because those are the things I'm real -- I'm not going to ask you if anything that I get somewhere. If I can get it somewhere else, cool. And if I got to get it from you, though, I have no choice, I have to get it from you.

MS. GRIFFIN: I'm going to get you every --

SERGEANT EATLEY: My -- my goal is, honestly, is not -- it's to be able to keep you out of it as much as possible until we get to the point where we might have to go to the court for something. Because I -- I believe -- I believe in the concept of my (indiscernible) my victims (indiscernible) every time you got to tell me about it --

MS. GRIFFIN: Right. That's nice.

SERGEANT EATLEY: (Indiscernible) you and I prefer to keep it to a minimum.

MS. GRIFFIN: I think I -- you know, I feel like I worked really, really, really hard in this call with you and -- and that I sorted -- you now, I sorted through things in my brain before I called you. And so, I feel like if I could really just take what we talked about today and reformat that. I mean, I feel like, honestly, I'm sure I'll think of things after we hang up and go, oh, I forgot to tell him these five things. But I have a million, like, friends and names and places that I can give you that stuff. But I feel like this

call, if you were to use it as a frame of reference, this is it -- like I've done it here for you. Like, this is -- I did a lot of work before, and as I said, taking notes about thing to really analyzing in my brain, which are the certain instances.

And then also, in being honest as to which ones I can't add up. Like I told you, I don't know where I was when I crawled to the wall and said, you know, smiled. I don't know what was happening before that. I don't know if it was part of another incident or its own separate incident. So that one, I -- I -- I don't know where it falls in, but I remember that.

SERGEANT EATLEY: I think --

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: -- that's (indiscernible) I mean, you know, I -- I remember -- I remember getting treated by a bull when I was a kid. I know it happened. Yeah. I remember sitting in the tree.

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: I remember staring down at the bull.

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: I wasn't a big kid. I'll be honest with you, I don't remember how I got up the damn tree. I don't remember how it resolved and I got down. Clearly I did because I'm sitting here today. But I mean --

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: -- I mean, there are things, you

know -- I -- I remember the bull chasing me. And I remember I ran (indiscernible) and that's all I remember.

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: And sitting in the trees. But I don't know how I got there. I don't remember how I got down. And you know, there's other events in my life that I might remember certain things, but I don't remember it all. So don't -- don't beat yourself over that. You really -- it -- it was fine. I mean, your interview is about the details as most, I -- I guess, especially with this much delay in time.

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: So I do have some questions.

MS. GRIFFIN: Okay. Yeah.

SERGEANT EATLEY: This case came to me through your parents to the district attorney's office.

MS. GRIFFIN: Through my parents?

SERGEANT EATLEY: And that's fine. Well, that's my understanding. I -- I got this case --

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: Your case did not come to me through the normal chain, okay. It -- it came to me, and that's fine. I understand how the things work, it's not a big deal.

But you're an adult. If for some reason, your parents inquire about this case, what do you want me to say?

MS. GRIFFIN: Oh. You know what? You're fine to

talk. My parents know. They -- they give me full -- they've been so wonderful in knowing this is mine to deal with. I think the reason my parents were involved in calling was that I don't live there anymore. So my parents called the people to ask, like, who should Amy -- how should Amy do this? And my parents are -- yeah, they're my parents can be involved in any way. I -- I don't care. They probably won't call you because they know this is mine, but they are every bit a part of all of this. They know everything. And yes, I'm a grown adult. And I think, you know, Gordon, that's -- that's a hard part of it too.

SERGEANT EATLEY: I work for you right now.

MS. GRIFFIN: Yes.

SERGEANT EATLEY: I'm working for you. I work for my victims. So I mean, you're the boss, so I --

MS. GRIFFIN: That's so nice.

SERGEANT EATLEY: -- just (indiscernible) --

MS. GRIFFIN: That's so nice.

SERGEANT EATLEY: A lot of my victims are children. So I mean, I just -- parents care. And sometimes parents kind of want to be involved. And necessarily, that's not always the most helpful thing in the world.

MS. GRIFFIN: You know what, you're --

SERGEANT EATLEY: So --

MS. GRIFFIN: -- exact on the money. My parents would do anything to make this go away and --

SERGEANT EATLEY: Right.

MS. GRIFFIN: -- and they can't. So they -- and they live there still. So I've tried to tell her mom and dad, I'm take -- I've got this. And -- and I will tell them how wonderful you are and that you've got this. And -- and for that, I'm super grateful.

And I will get you every detail from the people that I've worked with to help me get some, you know, information around what's going on there without going too far because I knew who was of the utmost -- I don't have a legal background and I don't pretend to. So that's why I came to you. And also, it's just been -- it's been -- you know, it's been a process for me in my healing to even be able to have this phone call just because it's so horrified -- horrifying.

SERGEANT EATLEY: Okay. All right. By the way, is this number you called me on, is this your cell phone?

MS. GRIFFIN: This is my cell phone. Yeah.

SERGEANT EATLEY: All right. I'm going to text you picture of my -- my -- my business card here in a minute that way you just have all that, my -- my email.

MS. GRIFFIN: You can text me anytime you want on this number.

SERGEANT EATLEY: (Indiscernible) have it. I haven't even opened -- it doesn't really matter, but I haven't actually opened a case report yet. So I will get that to you via email.

That being said, don't call -- don't -- don't -- don't -- just call me directly.

MS. GRIFFIN: Okay.

SERGEANT EATLEY: You don't need to call, like, the CID, the -- the detective division and get my report number and ask. Just -- just call me directly.

MS. GRIFFIN: On -- on your cell phone? I don't want to bother you on -- call you on your cell phone.

SERGEANT EATLEY: Well, I'm going to give you -- I'm going to give you my desk phone number.

MS. GRIFFIN: Okay.

SERGEANT EATLEY: And if push comes to shove, and you can't reach me any other way, you can call -- I -- like I told you earlier, I don't have a -- I dont have a whole lot of problem about handing out my cell phone number.

MS. GRIFFIN: Okay.

SERGEANT EATLEY: Because if push comes to shove, about the person, I can always block the person. I don't think you'll be one of those people. So if you need to -- if you need to contact me, that's fine. Just realize that -- that's my personal cell phone, so when they answer the phone I might be like, hey, I might not know who the heck is calling.

MS. GRIFFIN: And I wanted to ask you one more thing. I want to make sure I follow the rules. If I -- on my phone, I just -- I recorded on my iPad too, so I had something to refer

back to help me write the notes; is that okay?

SERGEANT EATLEY: Sure.

MS. GRIFFIN: Okay.

SERGEANT EATLEY: Say that one more time.

MS. GRIFFIN: I recorded on my iPad. I pushed star, and I didn't tell you that at the beginning because I wanted to have the notes so I could make notes to help me; is that okay that I have it recorded?

SERGEANT EATLEY: I don't care.

MS. GRIFFIN: Okay. Thank you.

SERGEANT EATLEY: It makes no difference to me. I didn't say anything that was bad.

MS. GRIFFIN: No. No. I just didn't know if it was -- I don't -- I don't want to hurt my own legal process. So I just wanted to tell you.

SERGEANT EATLEY: No. No. No. You're not going to be using your -- I'm -- I'm not going to ever ask for your copy of your recording anything else there. I'm pretty sure in New York for some things, just -- I -- yeah, I'm actually pretty positive about this, I'd have to look it up. But I'm almost -- almost 100 percent positive that New York requires both parties have a recorded conversation to be -- just be aware that it's being recorded to be amicable. Texas, however, it's not.

MS. GRIFFIN: I think --

SERGEANT EATLEY: There's always one person.

(Indiscernible) as long as one person knows -- one person knows that it's being recorded that is perfectly admissible.

MS. GRIFFIN: Okay.

SERGEANT EATLEY: Have you had any contact with this Mr. [redacted]

MS. GRIFFIN: No way. No way. No chance.

SERGEANT EATLEY: I'm going to throw something out there. You're 100 percent -- (indiscernible) go through myself and some -- sometimes this is -- this doesn't really fit your situation. I don't know -- well, you know what, no. I'm very -- I'm -- I'm going to tell you what I was going to say, but --

MS. GRIFFIN: Okay.

SERGEANT EATLEY: -- I don't think it's a really good idea. We have something here that the only called a one party can tape a phone call. And basically, I'll have a (indiscernible) and usually when it's like a boyfriend/girlfriend thing or say, I have, like, a juvenile victim who's under the age 14 and can't consent (indiscernible) boyfriend. I'll have them come into my office and I have them call from here. And I basically record the entire conversation and they -- they -- they basically during the course of the conversation, they -- what's the word I'm looking for? They elicit incriminating information from the individual.

But in your particular case, because there's just no reasonable, rational reason for you to reach out to him after

all this time, it wouldn't make any sense. So yeah, I don't think (indiscernible).

MS. GRIFFIN: Well, if you change your mind, you know, like -- change your mind.

SERGEANT EATLEY: (Indiscernible) my head, but there just be no real reason (indiscernible) why would you --

MS. GRIFFIN: I -- I've gone so far away from him --

SERGEANT EATLEY: Unless you took the (indiscernible) where you were going to call him and say, you know (indiscernible) look, after all these years, I'm just trying to find some closure. I don't want -- I don't want a big hassle, I don't want -- you know, I just -- you can come as -- I -- I just -- I just want an apology. And he might be willing -- I mean, and then, things like that, he might be willing to do it. The only problem with doing that is that you're (indiscernible) you're not here and there's no way for me to do it.

MS. GRIFFIN: Oh. I'm happy to come -- I'm happy to come to you.

SERGEANT EATLEY: You're recording it there -- if you're recording it there would be inadmissible in court.

MS. GRIFFIN: Well, I'm happy to come there and do any -- I'm always happy to come talk to you. I can fly to Texas and get a flight and come --

SERGEANT EATLEY: No. This -- before we go (indiscernible) --

MS. GRIFFIN: Okay.

SERGEANT EATLEY: (Indiscernible) but at the same time, it's -- it's --

MS. GRIFFIN: Anything I can do, I just will make anything work because this is obviously the most important work of my life. So I will leave that to you. But yes, I mean, if you told me to come to Texas because that was the way to do it, I just feel like, you know, I've never spoken to him again since I left the school. I'm horrified by -- I used -- I -- I call him Mr. Ex because I can't even say his name.

SERGEANT EATLEY: Oh. Oh. Crap. I was wrong (indiscernible) party consents to (indiscernible).

MS. GRIFFIN: Yeah, I thought so. I don't know. I was --

SERGEANT EATLEY: It's very difficult because -- well, I guess you could record the conversation because you're doing it right now. Are we on speakerphone?

MS. GRIFFIN: Yeah. I'm on speaker because otherwise, I couldn't record it.

SERGEANT EATLEY: Oh. Oh. Yeah, that's why I was asking. I was -- I thought there might be something new on the iPhone or iPad because I was not aware of it.

MS. GRIFFIN: I wish. I told how -- I told you, I'm not very skilled in that area. I'm not --

SERGEANT EATLEY: You -- you record a call while

talking.

MS. GRIFFIN: No. I wish I knew how to do that.

SERGEANT EATLEY: (Indiscernible) on my desk phone or what I -- what I do is I -- I'll put it on speaker. Let me go in the interview room where it's super quiet and we just record it using the recorded system in there. So -- and I also have a recorder that basically that your -- that your phone goes in your ear. And it's also a microphone and records everything else to the phone. So --

MS. GRIFFIN: Look, you know -- you know.

SERGEANT EATLEY: (Indiscernible).

MS. GRIFFIN: I know nothing. I'm just going to follow your lead. I feel a huge weight has been lifted --

SERGEANT EATLEY: I appreciate it.

MS. GRIFFIN: -- off my shoulders to give this to you because I -- I trust you and I'm grateful and, you know, I'm -- it's hard to also -- I'm sure you know also, but it's hard to be living so far away, which was on purpose by design. I had to get away from there. It's hard to then just call someone on the phone and recall your story of -- for -- again. It's not --

SERGEANT EATLEY: Right.

MS. GRIFFIN: It's already swirling around in my head. So I really thank you for making me comfortable and hearing me out on every detail and, you know, just helping me get through the -- the last two hours.

SERGEANT EATLEY: No. That's not a problem, ma'am. And like I said, I'm working for you right now. Just I work for all my other victims. So I will do everything I can. I will send you my -- my information. I'll just text you a picture of my card here in a few minutes. And if you do not get an email from me this evening, please call me tomorrow because it just means I probably screwed up --

MS. GRIFFIN: Okay.

SERGEANT EATLEY: -- on your email.

MS. GRIFFIN: Okay.

SERGEANT EATLEY: I probably just screwed up somewhere writing it down or typing it in or something like that, but you should get an email from me probably here in the next --

MS. GRIFFIN: I can also email you right now too. I can also email the [redacted] or just [redacted]

SERGEANT EATLEY: No. [redacted]-

MS. GRIFFIN: Yeah. [redacted]

SERGEANT EATLEY: [redacted]

MS. GRIFFIN: Yeah. I've got it. I've got it. I'll just make the dot really big.

SERGEANT EATLEY: And I'm going to send you an email from that email address, that way you know it's me. And so when you see it (indiscernible). All right.

MS. GRIFFIN: Gordon, thank you so much. I so

appreciate your time and -- and -- and listening -- and listening to me.

SERGEANT EATLEY: It's not a problem, ma'am. I will speak with you soon --

MS. GRIFFIN: Okay.

SERGEANT EATLEY: -- as soon as I know something else, okay.

MS. GRIFFIN: Okay. Bye.

SERGEANT EATLEY: All right. Thank you, ma'am. Bye-bye.

(End of recording.)

# CERTIFICATE OF TRANSCRIBER

I, Sarah Albaladejo, do hereby certify that I was authorized to transcribe the foregoing recorded proceeding; and that the transcript is a true and accurate transcription, to the best of my ability, taken while listening to the provide recording.

I FURTHER CERTIFY that I am not of counsel or attorney for either or any of the parties to said proceedings, nor in any way interested in the events of this cause, and that I am not related to any of the parties thereto.

Dated this 3rd day of June 2026.

Sarah Albaladejo