Mitchell J. Langberg, Nevada Bar No. 10118
Thomas A. Clare, P.C.*
Elizabeth M. Locke, P.C.*
Eric D. Hageman*
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
(202) 628-7401
mitch@clarelocke.com tom@clarelocke.com
libby@clarelocke.com
eric.hageman@clarelocke.com
* *Appearing* Pro Hac Vice

*Attorneys for Plaintiff*
*Amy Griffin*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| Amy Griffin<br><br>Plaintiff,<br><br>vs.<br><br>Joleene Altum,<br><br>Defendant. | Case No.: 2:26-cv-01811-GMN-DJA<br><br>**DECLARATION OF AMY GRIFFIN IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S SPECIAL MOTION TO STRIKE** |

I, Amy Griffin, declare as follows:

1. I am the Plaintiff in the above-captioned action. I am over eighteen years of age and competent to make this declaration. I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would testify truthfully to them.

2. I make this declaration in support of my Opposition to Defendant Joleene Altum's Special Motion to Strike Under NRS 41.660 (the "Motion"). I understand that Ms. Altum is the same person who is proceeding as "Jane Doe" in *Doe v. Griffin*, No. 26STCV07012, pending in the Superior Court of California, County of Los Angeles (the "California action"), in which I am a defendant.

**I Am the Author of The Tell, Which Recounts My Own Abuse**

3. I am the author of *The Tell*, a memoir based on my experience being sexually abused by a middle school teacher in Amarillo, Texas. I was confronted with specific memories of that abuse nearly six years ago over the course of several MDMA-assisted therapy sessions conducted under the supervision of an experienced practitioner.

4. For years before I processed those memories, I was in traditional talk therapy addressing a persistent sense that something in my childhood was unaccounted for. That sense was accompanied by physical symptoms I could not explain and by a fixation—which likewise made no sense to me at the time—on a dress I had lent to a middle-school classmate.

5. Prior to my first MDMA-assisted session, I had long suspected that I had experienced sexual or similar trauma as a child or teenager. I decided to meet with a respected practitioner of MDMA treatment.

6. I attended my first MDMA-assisted therapy session on July 19, 2020. Prior to ingesting the medicine during that session, I relayed to the practitioner that I believed there was sexual trauma in my past that I could not process.

7. During that July 19, 2020 session, I processed specific memories of sexual abuse by my teacher at Stephen Austin Middle School in Amarillo, Texas, whom I pseudonymized as "Mr. Mason" in my memoir. The first of those memories surfaced within minutes of the medicine being administered. I continued to process memories of sexual abuse by Mr. Mason

during two subsequent therapy sessions with the same practitioner that took place shortly thereafter. Across those three sessions, I processed detailed memories of repeated, brutal rapes committed by Mr. Mason at Stephen F. Austin Middle School.

8. The memories recounted in *The Tell* are my own. I did not learn them, or any part of them, from Ms. Altum, from any account given by Ms. Altum, or from any person acting on my behalf. I have recounted them continuously since 2020.

**<u>My Contemporaneous Journals (Beginning July 19, 2020)</u>**

9. Beginning on July 19, 2020—the day of my first session—I recorded the memories I had processed in extensive journal entries. Attached hereto as **Exhibit B** (GRIFFIN001826) and **Exhibit C** (GRIFFIN001827) are true and correct copies of some of those notes, dated July 19, 2020. I wrote each of these entries myself, in my own hand, on or about the dates they bear.

10. Passages I wrote in 2020 and 2021 appear nearly verbatim in the published memoir. Attached hereto as **Exhibit D** are true and correct excerpts from the final draft of *The Tell* (GRIFFIN001926). Compare **Exhibit B** ("being kind and doing for others rather than excepting [sic] what was actually happening") with **Exhibit D** at GRIFFIN002034 ("Being kind and doing things for others created a distraction from what was happening to me.").

**<u>I Reported the Abuse to the Amarillo Police Department on August 31, 2021</u>**

11. I decided to report the abuse to law enforcement. I was interviewed by a detective with the Amarillo Police Department on August 31, 2021. That interview was conducted by telephone with Detective Gordon Eatley and lasted approximately two hours.

12. Attached hereto as **Exhibit L** is a true and correct copy of the audio recording of my August 31, 2021 conversation with Detective Eatley. I have listened to that recording in full. I recognize my own voice on the recording, and I recognize the voice of Detective Eatley. The recording is a fair, accurate, and complete recording of the conversation I had with Detective Eatley on August 31, 2021. It has not been altered, edited, or manipulated in any way, except for certain redactions to protect against the disclosure of sensitive information.

13. Attached hereto as **Exhibit A** (GRIFFIN002475) is a true and correct copy of a transcript of that August 31, 2021 conversation. I have compared the transcript against the recording attached as **Exhibit L**, and the transcript accurately and completely reflects what Detective Eatley and I said during that conversation.

14. During that August 31, 2021, interview, I recounted my abuse in great detail. Among other things, I described to Detective Eatley the Austin Day dance; the "poofy" floral dress; the rape that occurred at that dance; a separate assault in the school bathroom; and Mr. Mason's cowboy boot on my back. I described each of those details to Detective Eatley on August 31, 2021.

**<u>I Completed a Full Draft Article in March 2022</u>**

15. I first considered writing an article about my experience and trauma in or around March 8, 2022. The idea for the article originated from my extensive journal entries dating back to the summer of 2020, in which I recorded the memories processed through therapy and later recounted in *The Tell*.

16. I completed the first draft of an article sharing my story at the end of March 2022. Attached hereto as **Exhibit E** (GRIFFIN001830) is a true and correct copy of the draft of my article prepared in March 2022, which discusses the abuse I endured in middle school that is recounted in *The Tell*.

17. The memories in that draft and many of its specific details appear in the published memoir. Compare, e.g., **Exhibit E** at GRIFFIN001831 ("she didn't allow chewing gum in the office") with **Exhibit D** at GRIFFIN001948 ("Chewing gum was discouraged in my family, so much so that my grandmother Novie didn't allow it[.]"); **Exhibit E** at GRIFFIN001837 ("No one will ever believe you. You are from one of the nicest families in town[.]") with **Exhibit D** at GRIFFIN002037 ("'You come from one of the nicest families in town,' he said, 'No one will believe you.'"); **Exhibit E** at GRIFFIN001837 ("'The earthworm' I said") with **Exhibit D** at GRIFFIN002096 ("'The earthworm?' I said incredulously."); **Exhibit E** at GRIFFIN001835 (discussing Mr. Mason wearing cowboy boots) with **Exhibit D** at GRIFFIN002024 (same).

18. Redactions have been applied to some of the exhibits to this document to protect the identity of third parties whose identities require protection. None of the identities redacted in these documents is Ms. Altum.

**The Article Became a Book Proposal and Then The Tell**

19. Months later, in or around August 2022, I received a call from a literary agent who pitched me on writing a book about women in business. I told the literary agent that I might be interested in sharing a different story and sent her a draft of my article. The agent encouraged me to turn the draft article into a book.

20. In the months that followed, I worked closely with my collaborator Sam Lansky to turn the draft article into a book proposal. The proposal was extensive. Once the proposal was drafted in or around early March 2023, I worked with my agent to submit it to various publishing houses. Final bids for the proposal were due on or around March 28, 2023.

21. The Dial Press, an imprint of Penguin Random House, was ultimately awarded the rights to the book. I then began the years-long process of transforming the proposal into a complete draft of what would become *The Tell*.

22. I first circulated a complete draft of *The Tell* to The Dial Press team in the summer of 2023. The draft then went through multiple and extensive rounds of edits. *The Tell* was published on March 11, 2025.

**"Claudia" Is a Real Person, and She Is Not Ms. Altum**

23. I understand that Ms. Altum contends she is the person pseudonymized as "Claudia" in *The Tell*. She is not. Claudia is a real person whom I knew in middle school, and Claudia is not Ms. Altum.

24. I texted the real Claudia on or around April 1, 2023 in connection with my efforts to reconstruct my memories and asked her if she would be willing to meet. She said yes. Attached hereto as **Exhibit H** (GRIFFIN002459) are true and correct copies of my text messages with the real Claudia from April 2023. Redactions have been applied to protect the identity of the real Claudia consistent with my memoir. Ms. Altum is not Claudia and is not a participant in these messages.

25. I met with the real Claudia once, at a coffee shop in Tennessee—thousands of miles away from Palm Springs, California—on April 21, 2023. Attached hereto as **Exhibits I** (GRIFFIN00053) and **J** (GRIFFIN00054) are true and correct copies of emails between me and Sam Lansky discussing my trip to Tennessee to visit the real Claudia, scheduled for April 21, 2023. I sent and received these emails. Redactions have been applied to protect the identity of the real Claudia.

26. During the meeting, Claudia shared with me that, while I had loaned her a dress for a middle school dance as described in *The Tell*, she had no recollection of being abused by Mr. Mason. Ms. Altum was not present at this meeting.

27. Immediately following the meeting with Claudia, on April 21, 2023, Mr. Lansky and I discussed the meeting. That conversation was recorded. Attached hereto as **Exhibit K** (GRIFFIN001885) is a true and correct copy of a transcription of that April 21, 2023, conversation with Mr. Lansky, which was made and certified September 15, 2025. The transcript accurately reflects the conversation. Redactions have been applied to protect the identity of the real Claudia.

28. While drafting the book, I met with the individual pseudonymized as Claudia for the reason described above: as recounted in *The Tell*, I had vivid memories of lending Claudia a dress for a middle school dance and believed that Claudia could have been abused by Mr. Mason.

29. The dress I lent to the real Claudia was pink and not floral-patterned. The book describes the dress as "floral-patterned" because that detail was changed during the editing process to further protect Claudia's identity. Attached hereto as **Exhibit F** (GRIFFIN000210-11) is a true and correct copy of notes surrounding my meeting with the real Claudia, dated August 30, 2023, which include a reference to the pink dress. Attached hereto as **Exhibit G** (GRIFFIN0000234) are true and correct excerpts of a draft of *The Tell*, dated September 6, 2023, referencing the pink dress before it was pseudonymized. Attached hereto as **Exhibit M** (GRIFFIN002234-35) are true and correct excerpts of a draft of *The Tell*, dated April 27, 2024, referencing the pink dress.

30. I never let Ms. Altum borrow a dress for an eighth-grade dance, or for any other occasion. The dress described in *The Tell* was lent to the real Claudia, not to Ms. Altum.

**<u>I Never Met, Called, or Corresponded With Ms. Altum</u>**

31. I understand that Ms. Altum asserts that I met with her in Palm Springs in 2019. That is not true. In the years leading up to the publication of *The Tell*, I never met with Ms. Altum, including in 2019. I have not seen, spoken to, or heard from Ms. Altum since we were middle school classmates over 35 years ago. I have no recollection of having met her during middle school.

32. I have never called Ms. Altum. I never gave Ms. Altum a postcard, a promotional flyer, or any other item during any meeting, because no such meeting ever took place.

33. I never traveled to Palm Springs, California or the surrounding area in 2019, or in 2018 or 2020, let alone for a meeting with Ms. Altum. The coffee shop meeting Ms. Altum describes never took place.

34. I never exchanged postcards or any other correspondence with Ms. Altum.

35. Contrary to Ms. Altum's assertions, I was not a regular member of a youth group in middle school. I never hosted a middle school church youth group meeting at my home. Ms. Altum never returned a dress to me, stained or otherwise, at my home or anywhere else.

36. Other than through the filing of her complaint in the California action, Ms. Altum has never shared with me, or with anyone working on my behalf, any allegations of childhood sexual abuse.

**<u>I Never Employed Dominique Price or Any Other "Talent Agent"</u>**

37. I understand that Ms. Altum contends that I hired a man posing as a talent agent to steal her experiences and recount them as my own memories in my memoir. I never hired any private investigator, talent agent, or other person to contact Ms. Altum or to elicit her memories of sexual abuse.

38. I have never met or spoken with an individual by the name of Dominique Price, whether for the purpose of contacting Ms. Altum or for any other purpose. I have never personally communicated with, worked with, retained, paid, or been affiliated in any way with

Dominique Price. I have never instructed anyone working on my behalf to contact Ms. Altum for any reason. I am unaware of anyone working on behalf ever having contacted Ms. Altum except to serve her process in the present lawsuit.

39. I understand that Ms. Altum points to portions of my memoir that discuss the use of private investigators. I did hire investigators through my lawyer in connection with my investigation and verification process after I underwent therapy in 2020. Those investigators contacted individuals who lived in Amarillo, Texas and could have known Mr. Mason. They also contacted the real Claudia. To my knowledge, none of those investigators contacted Ms. Altum, and the investigators completed their work well before April 2022. The investigators, whom I discuss openly in my memoir, found other individuals to attempt to verify my memories. *See* **Exhibit D** at GRIFFIN002151-53.

**<u>The Times' Investigation and the September 12, 2025 Fact Check</u>**

40. In the spring and summer of 2025, I learned that *New York Times* reporters Katherine Rosman and Elisabeth Egan were investigating *The Tell*. I did not identify Ms. Altum to the *Times*, direct the *Times* to her, or have any role in the *Times*'s decision to contact her.

41. On September 12, 2025, the *Times* sent me a written fact check in advance of publication. Attached hereto as **Exhibit N** is a true and correct copy of the fact-check document I received from the *Times* on September 12, 2025.

42. The fact check reflected that Ms. Altum had told the reporters, among other things: that she is "Claudia"; that she borrowed a floral-patterned dress from me for a school dance and returned it, stained, at a church youth group meeting at my home; that she met me for coffee and received from me a pre-addressed postcard; and that I had appropriated her experiences of abuse to write *The Tell*. Each of those assertions is false, for the reasons set forth above.

43. The *Times* published its article on September 24, 2025. I did not consent to, authorize, or participate in Ms. Altum's statements to the *Times*.

**The Harm I Have Suffered**

44. Ms. Altum's accusation—that I defrauded a survivor of child sexual abuse and published her trauma as my own—has caused me severe and continuing harm. Since the *Times* article was published, I have been publicly described as a thief and a fraud.

45. I have incurred substantial out-of-pocket expenses in attempting to correct the public record concerning Ms. Altum's accusations.

46. I have lost business opportunities and investment opportunities as a result of Ms. Altum's accusations, and I have been required to divert substantial time from my work and family to respond to them.

47. I have also suffered significant mental anguish and emotional distress as a result of Ms. Altum's accusations.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 31st day of August, 2026, in New York.

Amy Griffin

# EXHIBIT A

In re: Gordon Eatley Interview
Of Amy Griffin,

_______________________________/

AUDIO RECORDING

FILE NAME: Eatley August 31, 2021

Transcribed By: Sarah Albaladejo

# INDEX TO EXAMINATION


| | PAGE |
|---|---|
| RECORDING | 3 |
| CERTIFICATE OF TRANSCRIPTIONIST | 99 |

SERGEANT EATLEY: Station 8, Sergeant Eatley.

MS. GRIFFIN: Hi Sergeant Eatley. It's -- it's Ms. Griffin -- Amy Griffin calling back.

SERGEANT EATLEY: Oh. Okay. All right. Thank you. I appreciate you taking the time. I was trying to figure something out for a different case.

MS. GRIFFIN: Oh. Please. No worries.

SERGEANT EATLEY: Be real honest with me and -- and it's kind of weird that I -- be honest with me and I'm just trying to -- I was on the phone trying to confirm something for him, but thank you for giving me a few minutes. I appreciate that.

MS. GRIFFIN: Oh. No problem at all. I'm quite happy to -- thank you for giving me the time to talk to you today.

SERGEANT EATLEY: Oh. It's not -- it's nota problem. It's what I'm here for.

Let's start with the basics real quick. Could you spell your first name for me?

MS. GRIFFIN: Amy, A-M-Y.

SERGEANT EATLEY: Middle name?

MS. GRIFFIN: Mitchell, M-I-T-C-H-E-L-L.

SERGEANT EATLEY: And spell your last name for me?

MS. GRIFFIN: Griffin, G-R-I-F --

SERGEANT EATLEY: F-F-I-N?

MS. GRIFFIN: Uh-huh.

SERGEANT EATLEY: And what is your date of birth?

MS. GRIFFIN: XX/XX/XX.

SERGEANT EATLEY: What's a current address for you ma'am?

MS. GRIFFIN: [redacted]

SERGEANT EATLEY: You did say [redacted] correct?

MS. GRIFFIN: Uh-huh.

SERGEANT EATLEY: Okay. Do you have your driver's license number by chance, ma'am? If not, it's fine. I can look it up.

MS. GRIFFIN: No. Hold on. I can pull it up. I finally got a New York driver's license. I was sad to give up my Texas -- my Texas license, but I eventually had to do it after I had children. I was living in New York City. My --

SERGEANT EATLEY: I haven't been to New York in quite a few years, not since I lived in Connecticut, so.

MS. GRIFFIN: Oh. Well, it's -- it's a place that's definitely coming back now after everything that's happened. And I'm -- I'm -- I'm proud to be from both states. But I do have a New York driver's license. I have the number.

SERGEANT EATLEY: Okay.

MS. GRIFFIN: It is [redacted]

SERGEANT EATLEY: [redacted] And your social? And that'll

be the last that I need.

MS. GRIFFIN: No, that's okay. XXX-XX-XXXX.

SERGEANT EATLEY: And I'm assuming the [redacted] is going to be a good callback number for you when I need to reach you?

MS. GRIFFIN: Absolutely. Hold. I'm going to grab one thing in my bathroom. Give me 12 seconds.

Sorry about that.

SERGEANT EATLEY: No. No problem.

MS. GRIFFIN: Okay.

SERGEANT EATLEY: Okay. So I've got -- I did say when I talked to you the other day, I'm recording the conversation. It's just basically so that I don't have to stop you all the time. I can just -- I can go back and review --

MS. GRIFFIN: No problem.

SERGEANT EATLEY: -- the recording and take notes from that. I mean, I am going to be taking notes while I speak to you, but it just makes me (indiscernible) for everybody involved. And it also kind of is going to help me until such time as I can get an affidavit from you. So I may have to do that via mail and get you to send something back to me. And then I can -- technically, I'm a notary in the state of Texas as a police officer. So I can -- I can sign here.

Okay. Why don't you start by telling me what -- what's the -- what the situation is?

MS. GRIFFIN: Yeah. I mean, I -- you know, it's hard for me, and I going to tell you everything, and you can ask me anything you want. I'm trying to put myself back in the position that I was in because my two daughters are the ages that I was when I was abused. And so, it's so hard to think of my 12-year-old going through what I went through.

And so, if I start from the beginning, the abuse took place at Stephen F. Austin Middle School. And --

SERGEANT EATLEY: Okay.

MS. GRIFFIN: -- the teacher's name is [redacted]

SERGEANT EATLEY: [redacted] So I'm -- I'm going to assume that [redacted] is [redacted] I mean, I can --

MS. GRIFFIN: Correct.

SERGEANT EATLEY: -- (indiscernible) get in touch with AIST (indiscernible), but --

MS. GRIFFIN: No, that's exactly right.

SERGEANT EATLEY: And he was -- he was a teacher at Stephen F. Austin?

MS. GRIFFIN: Yes. He was a teacher at Stephen --

SERGEANT EATLEY: Do you remember what he taught?

MS. GRIFFIN: He taught [redacted]

SERGEANT EATLEY: Okay. Go ahead. I'm sorry.

MS. GRIFFIN: No, that's okay.

SERGEANT EATLEY: I'll try to interrupt you as a little as possible.

MS. GRIFFIN: No. You can interrupt me as much as you want. You can --

SERGEANT EATLEY: Okay.

MS. GRIFFIN: Because I probably -- I know the story so well because I lived it. So sometimes I may not answer because it's in my head. So feel free to stop me at any point.

SERGEANT EATLEY: What grade was --

MS. GRIFFIN: So I was in the seventh grade.

SERGEANT EATLEY: You were in seventh?

MS. GRIFFIN: I was in the seventh grade. And I -- I always knew -- you know, I've always -- there have been so many memories of my experience with him at the school that has sort of plagued me weekly for all of my life. And one of them being -- I can remember him being in the parking lot of the school. And I'm there by myself and he's leaving the parking lot and I'm the only person there. And he's the only person there. And he's driving a [redacted] like the [redacted] something like that. So, you know, where it's a [redacted] it. And he backs out of the driveway. And I see him and then he waves to me. And I remember waiving back, frightened, but waiving back. And he came to all my -- he came to a lot of my volleyball practices and would stand -- he was always present, you know, he would stand around at my volleyball practices as I walked in kind of in a way, like, don't tell anybody.

And he would -- he was very -- he was very well liked.

You know, he -- he was liked by everyone. And -- and one of the things that's very relevant is that he [redacted] someone, I will never win because I'm a girl. But I remember thinking, that's okay. I know I'm a leader, so I'm going to run anyway. And I lost. And then the first week -- first day, I think it was of eighth grade, I remember that's when all the notes started. And I have a very distinct memory of all of my middle school years that throughout my middle school years, I received notes from him calling me out of class often.

And he groomed me through that process by telling me I was special. [redacted] And I think about it probably once a week, every week, or I don't even know how often, but often. [redacted] at school. And I had many other distinct memories that are nonsexual but frightening. We had a dear friend who he passed away. His name was [redacted] (phonetic). He just passed away in [redacted]

[redacted] And --

SERGEANT EATLEY: This was a fellow student?

MS. GRIFFIN: A fellow student.

SERGEANT EATLEY: Okay.

MS. GRIFFIN: Who was a close friend. And I remember how terrifying it was that I looked over the funeral. And Mr. [redacted] was there in the room and I could feel his presence and knew he was there. And I think one of the things that's really confusing when you are 12, is that the person made me feel special and told me I was a leader. And so I believed him. And that's how the relationship started. And I also have a very distinct memory. This is really hard for me to see.

He once came over me in the cafeteria with all my friends. And I can see the lights streaming in the room and I can see all the tables. And we're sitting there. And he comes in the cafeteria door. He comes up behind me. He leans over me and he says, you know, what are you guys eating? And what -- what are you guys doing? And I remember looking around the room and thinking, okay, I am -- I'm safe. I'm safe. I'm safe. He's not -- he can't do anything. There's all these people here.

And, you know, my memory, which I think is really important to share with you, a lot of the stuff that I have and that my memories are of things that are colors and smells and feelings, surfaces. And so in this instance, I can remember

just staring down at the lunch tray. They were like this beige color and they have this lip. And I can remember thinking, please go away. Please go away. Please go away. And so, you know, those were the memories and parked -- some of the memories that have come to me and stayed with me forever and ever and ever. And I've carried and I -- you know, I think I tucked a lot of this stuff in the back of my brain as I got older and over time, I just -- it's just too hard to hold as an individual. As someone who didn't understand trauma or trauma of this sort to understand how the brain can process what was happening.

So at that point in the seventh grade, I know it was from my memory, it was at -- towards the end of my seventh grade year. And I can -- I know for a fact that I was -- [redacted]

SERGEANT EATLEY: Okay. Okay. What type of [redacted]? I -- I didn't quite catch that. I'm sorry.

MS. GRIFFIN: No. That's okay.

SERGEANT EATLEY: You --

MS. GRIFFIN: So --

SERGEANT EATLEY: -- said that [redacted] taught what again?

MS. GRIFFIN: So [redacted] taught [redacted] which was in a classroom.

SERGEANT EATLEY: [redacted]

MS. GRIFFIN: [redacted] So we learned about --

SERGEANT EATLEY: Okay. Like -- okay.

MS. GRIFFIN: -- [redacted] And we learned about -- I have a very distinct memory of learning about [redacted]

SERGEANT EATLEY: And that was an [redacted]

MS. GRIFFIN: No. [redacted] I believe it was spelled [redacted] And the reason why I remember [redacted] so well too is because [redacted]

SERGEANT EATLEY: Oh. Okay.

MS. GRIFFIN: -- [redacted] And so I was

close to [redacted] and spent, you know, [redacted] So I remember [redacted] extremely well. And then I know that in the spring of that year, when everything started, I had Mr. [redacted] for [redacted] or he taught us about [redacted] --

SERGEANT EATLEY: [redacted]

MS. GRIFFIN: [redacted] And I remember we did things for the first time [redacted] the room. And I mean, I can draw the room for you. I know exactly how.

SERGEANT EATLEY: This was seventh grade, correct?

MS. GRIFFIN: That was -- to -- to the best of my memory, that was towards the end of the seventh grade year. And I'll tell you why because I also --

SERGEANT EATLEY: What -- what year -- what -- what year -- which school year would that have been? You and I are basically the same age.

MS. GRIFFIN: Oh. Wow.

SERGEANT EATLEY: Maybe this much younger than me, but so it would have been like 87/88 or --

MS. GRIFFIN: I think that's right. I'm really good with --

SERGEANT EATLEY: (Indiscernible) were you a freshman in 90/91?

MS. GRIFFIN: I graduated from Tascosa (phonetic) in

1994.

SERGEANT EATLEY: Okay. So we graduated -- okay. I'm trying to --

MS. GRIFFIN: Are you from -- do we go to Tascosa?

SERGEANT EATLEY: We were -- we graduated the same year.

MS. GRIFFIN: Did -- did you go to Tascosa?

SERGEANT EATLEY: No, ma'am. I'm not from here.

MS. GRIFFIN: Oh. You're not.

SERGEANT EATLEY: I -- I actually graduated from a -- a school called (indiscernible) High School in (indiscernible) Louisiana.

MS. GRIFFIN: Oh. Wow.

SERGEANT EATLEY: So yeah. Yeah. I -- I (indiscernible) for that school about 11 years or so.

MS. GRIFFIN: Well, thank you. I -- I -- yeah. I -- I think -- I think those are the right -- the right term -- the right time, the right date. I'm better with knowing -- I know exactly --

SERGEANT EATLEY: It would have been 88/90.

MS. GRIFFIN: I think so. I think so.

SERGEANT EATLEY: 89.

MS. GRIFFIN: I can go back and get those. I know I graduated from high school and 1994, which would have meant I started 89/90, right? 90/94.

SERGEANT EATLEY: 90 into 91.

MS. GRIFFIN: And I graduated college in 98. So yeah, that sounds about right. And so, it started in the spring of that year. And, you know, I think I remember that I had missed -- I played tennis. And it's important, I think that, you know, I -- that the tennis center for both my high school and for the middle school, the Austin Tennis Center is attached to Stephen F. Austin School.

So oftentimes --

SERGEANT EATLEY: I did not know that.

MS. GRIFFIN: Yeah. So oftentime -- oftentimes, I would -- in the seventh grade, I played volleyball in the fall semester. For the spring semester, I played a tennis and I would go -- I would go over to the ten -- I'd just walk out the door, which was right outside. I mean, it was literally five feet from the back of the gymnasium. And I would leave --

SERGEANT EATLEY: Okay.

MS. GRIFFIN: -- the school and I would go to the tennis center to play tennis. And --

SERGEANT EATLEY: Okay.

MS. GRIFFIN: -- as I remember, I was rep -- I was returning from a tennis tournament or I'd been out sick. And I don't know why I missed class, but I -- and I don't remember how I was told to come to the class at a certain time or I don't remember what month it was, but I remember that he said to just

come up. I just remember coming to the -- knowing I was going to his classroom to get some help to make up for either take a test or go see him for why I'd missed the class.

SERGEANT EATLEY: And this is Mr. [redacted] class?

MS. GRIFFIN: Correct. [redacted] And I went to his classroom. And I just have the memories of [redacted] they just lay -- they just open up. And they -- they're -- you know, they -- the radiators below them. And I don't know what the school looks like now.

SERGEANT EATLEY: I've never been a student (indiscernible) --

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: -- so I couldn't tell you. (Indiscernible).

MS. GRIFFIN: And I remember him sort of talking to me and then making sort of a -- being joking and funny and chasing me around [redacted], sort of like -- like we were playing a game. And he started writing some things on the board and --

SERGEANT EATLEY: This was after school or --

MS. GRIFFIN: This was after school. And it ended up with me sitting on [redacted] And then he said, you know, let's get you ready for what's going to happen next.

And for the first time, he put his hands up inside of me like gynecologist appointment and that's all I remember from that point. And then I have, you know, many, many, many other instances that I know exactly what happened, but I don't remember what happened after I left the classroom or what happened after he did that or -- that was all that I remember at that point.

SERGEANT EATLEY: Okay.

MS. GRIFFIN: And --

SERGEANT EATLEY: Go ahead. I'm sorry.

MS. GRIFFIN: -- and second time -- do you want me to just start telling you them?

SERGEANT EATLEY: Oh. Yes -- yes, ma'am. I'm -- I'm -- I'm -- right now, I'm going to -- I'm -- I'm basically -- my goal is, I -- I want to let you -- tell you -- let you tell me everything you need to tell me. I'm going to take notes and jot things down that I might want to ask once you're done. Then we'll probably go back and try to get everything in more of a little bit of a chronological order --

MS. GRIFFIN: Oh.

SERGEANT EATLEY: -- so that I can -- so that I can present it in -- in -- in an organized fashion. And I get that you may not remember everything in a chronological order --

MS. GRIFFIN: No.

SERGEANT EATLEY: -- it's -- it's been quite a few years.

MS. GRIFFIN: You know what? I did -- I -- I mean, I've spent a lot of time healing around this. And I actually -- I know -- I mean, I -- to the best of my memory, I -- I jotted some notes.

SERGEANT EATLEY: Okay.

MS. GRIFFIN: I -- I -- I'm giving them to you in chronological order. So that was the first --

SERGEANT EATLEY: Okay.

MS. GRIFFIN: -- that was the first time it happened on a -- on a sexual basis. But I -- as I said to you and I can -- you know, I don't have a concept of exactly what month it was or, you know, what I was wearing.

SERGEANT EATLEY: No. Of course not. I wouldn't expect you to. I mean, it's -- it's --

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: -- been -- it's been too many years.

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: And I mean you were 12 years old.

MS. GRIFFIN: Yeah. Thank you for that. Thank you. That's very nice of you to say that.

I think a lot of this comes back because my daughters are the same age. And that's what my psychiatrist has told me.

But the next incident happened in the bathroom [redacted]

SERGEANT EATLEY: I know you don't know exactly (indiscernible) it's going to be hard to put like dates and times and I don't really expect that. But do you think it was like maybe the same -- still the -- like that same school year?

MS. GRIFFIN: Yeah. Yeah. That's my -- my -- my gut instinct. My -- my gut instinct is that it was -- it was that seventh grade year still. And that's just my feeling, you know, like, it could have been the beginning of the eighth grade year. So. But -- but my gut instinct is from the way I remember the -- the -- the way that things I remember the sunlight and the warmth of the room and the warmth of the -- of the light coming outside. And the -- I have a lot of memories of the light coming into the rooms. And I have a lot of memory. I know exactly where windows are and -- and where doors are because I can recall many times trying -- wanting to be able to get out and just staring at the door.

SERGEANT EATLEY: Is that the bathroom?

MS. GRIFFIN: Well, yeah. And in this case, I seem to remember going to his classroom [redacted]

[redacted] bathroom. Again, after school --

SERGEANT EATLEY: Okay. Pause. Was this the men -- was this a mens restroom? Was this the women's restroom?

MS. GRIFFIN: From my memory, it's a -- a -- a unisex bathroom. I -- or -- or maybe it was the women's. But I know what the bathroom looks like, and I can describe it to you.

From my memory, there's either one or two stalls because I remember a specific incident on the middle stall, the smaller stall or if there was another stall. I -- I know it was one stall, but the --

SERGEANT EATLEY: And it was [redacted]

MS. GRIFFIN: Yes. And then as you walk in the bathroom -- and you walk -- I -- I mean, I could draw it for you, but as you walk in the bathroom, you're staring at the window ahead of you. And to the left is the stalls -- or one stall with two big doors. I just don't know if there was another stall on it. But then to the left of the stalls is the sink. And I have many instances of being on the floor in that room, which I'll tell you because I know all of them or what I remember is many of them.

So the next situ -- the next time it happened, which was the first time that he -- he raped me, I'm in the bathroom with -- facing up against the wall closest to the door, like on par -- playing with the door. And he slams the back of my head

into the tile wall. And I feel my forehead touching the wall. And the next thing I hear is a belt falling on the floor and hitting the floor. And when I hear the belt, I -- I -- I know it's over. I know something bads going to happen. But I remember thinking, I don't even have the words to describe what's happening to me right now. And this is so out of context in my life that I just need to go somewhere else.

So I just check out. And I just -- the minute the belt hits the floor, my head hits the wall and he comes up behind me to rape me. I just disappear.

SERGEANT EATLEY: So it was the back of your head of the front of your head?

MS. GRIFFIN: He pushed the back of my head above my neck, right at the base of the head. He pushed my head and my forehead hit the wall.

SERGEANT EATLEY: Okay. Okay. Now -- okay. I understand. Okay. I understand.

MS. GRIFFIN: And -- and so he -- you know, definitely it was him behind me. You know, I was facing the wall, and he was behind me. And so I really didn't even know what was happening behind me.

SERGEANT EATLEY: Okay. Amy, I'm going to have to ask you something and it's because I need to clarify terms. Because of my experience, people use different terms for different things. And though we all tend to have the same types of

vocabulary by the time we reach our age. I need to ensure that --

MS. GRIFFIN: That's okay. That's okay.

SERGEANT EATLEY: -- I'm understanding what you're telling me, okay?

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: When -- when you use -- when you use the term "rape" -- I mean, I understand before when you told me the first incident, it's normally what I would refer to it as a -- as a digital penetration. And initially you said that he raped you.

MS. GRIFFIN: He -- he --

SERGEANT EATLEY: My understanding from what you're saying is that he penetrated your vagina with his penis.

MS. GRIFFIN: Yes.

SERGEANT EATLEY: Is that -- are we using the same term?

MS. GRIFFIN: Yes.

SERGEANT EATLEY: Okay. All right. Fair enough. You -- you can use whatever term you want now. I just want to make sure I understood that's what we were both referring to because it -- it makes a difference in how I (indiscernible).

MS. GRIFFIN: I'm happy to tell you the difference because I remember some of them. And some of them are foggy, which, I'll tell you when I don't know where to place some of

the instances. But in this case, which was the second time, he -- when the belt came down and his pants fell, he penetrated me with his penis.

SERGEANT EATLEY: Right.

MS. GRIFFIN: I have one of the hardest memories of my experience is me sitting on the toilet in that bathroom, which is why I believe it's the middle stall because there's walls on either side of me, and there's no tile. And there was tile in the bathroom. So I'm assuming it was the middle stall. And I'm sitting on the toilet and my shirt is off. And he has his hands on my breasts and he rams his penis into my mouth. And I remember it being so forceful and hurting so much that I pass out or just can't handle it. So I fall against the stall. And he drags me by the arm into the middle of the bathroom floor.

And at this point, I'm on my stomach, and he has on cowboy boots and he's stepping on my lower back while he's holding my arm.

SERGEANT EATLEY: Hello.

MS. GRIFFIN: Hello. I'm here.

SERGEANT EATLEY: Okay. My phone is a little wonky. Sometimes, I -- I start to lose the connection because the way my phone is set up. I wanted to make sure I hadn't -- hadn't lost you.

The last thing you told me that is that he stepped on your lower back when he held your arm.

MS. GRIFFIN: My arm was behind me. He's stepping on my lower back, pressing on it with his cowboy boots.

SERGEANT EATLEY: Take your time.

MS. GRIFFIN: The next incident that I remember, I do, for some reason, place this in the eighth grade, but I'm not sure.

SERGEANT EATLEY: Going back one second. On the -- what time of day was this? Do you know? I just --

MS. GRIFFIN: Always after school from my --

SERGEANT EATLEY: I'm having a hard time believing this is in the middle of the school day because there would just so many people present, would lead me to believe it's either before or after school. And I was curious if you can clarify that for me.

MS. GRIFFIN: No. No. There was never anyone there. I think one of the most -- the -- the biggest memories I have of my middle school year, I had asked people growing up was I the only one that felt that I roamed the school hallways at Stephen F Austin? Because I was there by myself all the time.

And something else that I think is really important to explain to you. No, there's never anyone ever around. Ever. Never.

SERGEANT EATLEY: Okay. So this would've been like after school or --

MS. GRIFFIN: So one of the things to explain to you

that's really hard because it -- my parents are so sad about this, is that I lived a block away on Bottom Street. And so every day after school, I walked from school about -- you know, I mean, you could throw a -- no, you can't throw it, but you could -- I could walk there in a matter of four minutes, five minutes. I walked from the school through the middle of the park to my house at 2815 -- 3005 -- no, that's my -- the 20 -- 2815 South Bottom, 28. Anyway, it was the house -- the second house on the left on Bottom Street.

And so I was the oldest of four children. And so there was really no specific time as to when I was required home because my mom was running carpool for others. And because I was the oldest, I was at school there. I was allowed to walk home. And in the fall of my seventh grade year, I played volleyball. And so, there was always a reason why I didn't have to be -- why -- why I came home later.

SERGEANT EATLEY: Well, that makes sense to me because my own daughter stays after school constantly for -- for stuff today. So things haven't -- things haven't changed all that much in the last 20-something years, so.

MS. GRIFFIN: Yeah. I mean, it's hard for me because now I could never leave my daughters after school. But yeah, it's -- you know, there's a lot of sadness in my family, that my mom says it's her fault. I said, mom, how would? You know, it's not -- you just expect that school is a safe place.

The next incident in the bathroom that I remember, he took me to the bathroom. Again, I always remember going there by myself and then him coming in the bathroom. So I'm guessing he told me -- I remember at one point, him telling me, just go -- you go over to the bathroom and I'll meet you there.

SERGEANT EATLEY: Okay. Is this -- is this the third incident or the second incident?

MS. GRIFFIN: This is -- this is the third incident.

SERGEANT EATLEY: Okay.

MS. GRIFFIN: I remember being on the bathroom floor and him coming down on his knees. And I'm face up, but I'm laying on the ground. And I look over, and I have all these memories of me from the way I'm positioned in the bathroom, I'm able to see the sink, like -- and I look over. And I do see -- and that's -- that's -- I don't know where to place it. But at different times, I see -- I remember seeing a tall beer can on the left hand side of the sink when I was in -- while I was in that bathroom, laying on the floor. And I can remember seeing the beer can to the left of the faucet.

And -- and in this instance, I was laying on the floor turned a different way, and I can see the sink and outside the stall. And he's on his knees penetrating me with his penis. And then I remember thinking he was peeing on me, which that's how I remember it. But I'm guessing he was probably ejaculating on me and I didn't know what that was.

SERGEANT EATLEY: Right.

MS. GRIFFIN: And I -- I remember having my knee pads from volleyball. He told me to clean it -- clean it up. That's just a memory. I -- I -- you know, I just remember the knee pads and me wiping it down, wiping the floor and wiping myself. So that's -- that's what I remember in the bathroom, other than some words he said. A lot of it's very -- as I see it happening, it's happening. And it's quiet and I'm kind of going to another place. So it's as if I'm watching it happen to me. It's hard to describe, but it's like I can't be in this place, so I'm just going to do things like stare at the door frame and look at the door handle and wish I could get out.

SERGEANT EATLEY: That's not uncommon in traumatic events. So you don't --

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: That's perfectly okay.

MS. GRIFFIN: Thank you. I -- I remember one point in time -- and this was -- I don't know where this would fit in. But at one point in time, he was doing something to me or -- while I was in the bathroom on the floor. And I crawled -- I crawled over to the wall and put my back against the wall, the same wall where the door was. The same wall where he raped me the first time. And I put my back against the wall. And I pushed my back against the wall.

And I looked at him and I remember he said, have you

had enough? And I remember, which I've always thought was so strange, that I smiled at him and I thought if I just smile at him, maybe he'll let me go. So I don't know where that part fits in. But I remember thinking, oh, you're being clever. You're being clever. Just put on a front. And he -- he -- maybe he'll let you go if he thinks it's enough or whatever that meant. I don't know.

I do, as I said, have lots of memories of sort of the angles, like the angles from the floor, looking sideways, looking up, looking at the windows, looking at the door. I see them low on the ground because a lot of times, I was on the floor. And then I remember him at one point in time, pushing my head in the sink, in the water. And I seem to remember it was after oral sex. And he stood behind me pushing my head forward into the sink. And I can feel the push on my -- back of my head towards the water. And I'm on my knees and -- or I think I'm on my knees. I just know that my head is kind of leaning forward into the sink. And I'm scared because --

SERGEANT EATLEY: Was it a sink or was it a toilet?

MS. GRIFFIN: It was a sink.

SERGEANT EATLEY: Okay. I -- I ask because think if you said -- but if you said you were on your knees at 12 --

MS. GRIFFIN: Yeah. Yeah.

SERGEANT EATLEY: Unless you were a very tall 12-year-old.

MS. GRIFFIN: Yeah. Maybe I was standing. I don't -- I just know my -- I'm hunched over.

SERGEANT EATLEY: Okay.

MS. GRIFFIN: And I'm going towards the sink or toilet. But I don't remember what -- the reason why I think of it as a sink, whether I'm standing or kneeling, is that I see the bathroom stall wall to the right. And I see the wall to the left. So I know exactly where I am positioned in the bathroom. If I was to draw you a picture of the -- of the bathroom, it would sort of make sense, which I can -- I can do that for you if you need me to.

And then, you know, there were -- I don't -- you know, I -- I -- I don't know if this was still seventh grade or eighth grade. I somehow -- I think this -- I don't know. I don't know what this one -- but he -- [redacted]

SERGEANT EATLEY: And this is a -- this is a separate incident than the other three, correct?

MS. GRIFFIN: Yes. This is the second -- a separate incident where this was completely separate.

SERGEANT EATLEY: So --

MS. GRIFFIN: And again, it's hard. So -- I'm sorry. Sorry. You know, I -- I -- I don't know. I -- I -- I don't know if this was seventh or eighth grade, but I know that I remember -- I remember Sergeant, the idea that this was not new.

So in this instance, I knew what was coming, sort of, if that makes sense. So I didn't --

SERGEANT EATLEY: Do you trust that you're not (indiscernible).

MS. GRIFFIN: Oh. Really? That's nice to hear.

SERGEANT EATLEY: So -- no. Well, I did mention to him that I was having an interview. This was a 16-year-old girl. I'm not going to get into all the details. But she said, I mean, we only have children. We have special interviews that tal to the kids.

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: I went to talk to them the way I am talking to you right now.

MS. GRIFFIN: Right.

SERGEANT EATLEY: But -- the girl says the exact same thing. She says when the suspect in that deal brought her to another room, she knew exactly what was going to happen. She knew. She absolutely knew.

MS. GRIFFIN: Yeah. So that --

SERGEANT EATLEY: It is not your -- I mean, trust me, the things you were saying don't -- you're -- you're not -- by telling me things I haven't heard before. You're not -- you're not crazy. You're not -- you -- you know, you're not any things that are strange. So what you're telling me is -- is -- is what we -- what we hear quite frequently. So don't -- don't beat

yourself up. Don't -- don't do anything like that. Is -- it's not uncommon at all.

MS. GRIFFIN: You know, it's --

SERGEANT EATLEY: And by the way, my name is Gordon. And you don't have to call me Sergeant.

MS. GRIFFIN: Oh. Thank you, Gordon. That's nice. Thank you. You know, it's -- it's one of those things. It's like my whole life, I've been trying to talk myself out of this because I know it's true and I know what happened. But, you know, some of the things he said to me in different times, which I can't place them, that were -- you know, you come from such a nice family. If they find out, they won't love you. You won't amount to anything. No one will care about you. And, you know, I think that only fueled my intensity to go out and realize a -- all I did from that point on is I just took a different path. I chose this path of, like, success, which was, if I can just use my body as an athlete to be better than everybody else and be smarter and steady all the time, I'll just get out. I can get out, and then I can get as far away as possible.

So I -- I mean, I killed it in the gym. I just -- it was my way of escaping what had happened to me. And -- yeah. And -- and -- and so thank you for that because one of the things that's really hard is that I can't tell you how I got [redacted]

[redacted]
And I don't remember him penetrating me at that point in time. But I remember him kneeling over me and ejaculating on my stomach all using -- waving his penis around and I'm laying there horrified. But I don't remember where it went afterwards. But I don't remember if I wiped it up or if I walked home or if I cried. I don't remember.

SERGEANT EATLEY: But that's -- to be honest with you, that is not uncommon either. And I'll share something with you, maybe it'll have a little bit of respect (indiscernible). In my particular field of work, there's quite a bit of studies that go (indiscernible) officers that get involved in shootings, so they get involved in life threatening incidents where, you know, they could possibly die or they have to, you know -- they may -- they have to force against another person up to including, you know, shooting another person and harming them.

Once upon a time, I was in one of those situations. It was many years ago. I don't remember drawing my weapon. I don't remember how it got in my hand.

MS. GRIFFIN: Wow.

SERGEANT EATLEY: It was just -- it was just there. I don't remember really running across the street, but I know I got across the street. So I -- I know I had to run across the street. The mind focuses on what it needs to focus on.

MS. GRIFFIN: Yeah. Yeah. Yeah.

SERGEANT EATLEY: And so don't -- don't -- again, don't -- don't beat yourself up over it. We're also talking about 30 years ago.

MS. GRIFFIN: I know. I know. It's --

SERGEANT EATLEY: We're both in our 40's now. So that's, you know (indiscernible). I don't remember much about eighth grade.

MS. GRIFFIN: That's so nice of you to share. Thank you for sharing because, you know, well, I'll -- I'll tell you later, but I -- just all the work I've been doing to try to, you know, understand all this. I've read a million books on trauma and -- and all this. And I -- I find it so interesting that you might feel this way too. That I remember, like, certain details as well as the blade of grass. Not really grass, but I remember, like, certain little elements of either a step on a step or the feeling of the stone or opening the door handle with complete trepidation knowing what's going to happen. And I can re-elicit those feelings in my body. But I can't tell you what I was wearing that day. And so it's interesting. And there's that dichotomy for me of being so close to it and it's so in my body and yet sometime -- it's been, you know, 30 years.

SERGEANT EATLEY: Very, very common --

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: -- in traumatic incidents. Time

will slow down. You won't hear things, but you are -- you won't hear anything except like on particular thing. You might hear a voice, but you won't --

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: -- hear anything else. But you -- but -- but it happened by standing in traffic.

MS. GRIFFIN: Yeah. Yeah.

SERGEANT EATLEY: You could -- you know, things of the room, it could be a very small room. I can hear it through the bathroom (indiscernible) huge. It might seem like it's the biggest room -- in your memory, it's the biggest room in the world. In my particular incident (indiscernible) shooting, I was very new (indiscernible) and I can remember going back to where it happened after the fact. I was with my wife. And I was like, they -- this just -- this doesn't look anything like what I remember. This (indiscernible) was huge. And it wasn't. It was very small. I mean, the -- the area we were in was very, very small. And in your perspective, your perception of things can -- can very, very much be, you know, changed by trauma and the fact that there's adrenaline going and your -- flight or fight principles are kicking in, things are kicking in and -- and, yeah, it can all affect your memory. And that's very human. And it's very normal. I -- you know, it's -- I'd be surprised that there wasn't some of that in a traumatic incident.

MS. GRIFFIN: Yeah. It's -- it's so nice. I -- I -- I hear about this and I read it and it's -- it's so validating, as I say, as someone who's gone through it because unless you've really gone through trauma, it's so hard to explain the feelings and the emotions and how the brain can do certain things. But, you know, I -- I have a very -- you know, I've -- I talked to several of my friends. My best friends are still the women that were with me in -- also in middle school. And most of them don't even remember the teacher's name. And yet I remember -- I remember the color of his [redacted] I could draw the [redacted] down to where the lettering is on the [redacted] I can -- I can draw his hand waving at a certain level. I can see him grabbing the [redacted] of the car and pulling out and the fear that's in my brain as I stand there with my feet on the curb by myself knowing I'm all alone, but knowing he's leaving. So he's leaving. Thank god he's leaving. And I'm thinking, okay, I'm going to be -- I'm going to be released from his grasp once he leaves. And he smiles as he leaves. And I think I smile back and, you know, but I can remember -- I can tell you exactly [redacted], and I can tell you where all of that is.

And -- and so in this instance, I know where my head was on [redacted] I know where he was facing. He was, you know, on top of me, where he ejaculated and I was facing -- the door was in front of us on [redacted] And I can tell you

every single thing about the room and the desks.

I also want to tell you that he also raped me, which was also really sad. But there's something called Austin Day, which is the day that you wear, it's kind of like the prom for eighth grade. I don't know if they do it anymore. But --

SERGEANT EATLEY: So this wouldn't be like in eighth --

MS. GRIFFIN: This -- this was -- this was in the spring of eighth grade. And the reason that this one is so memorable to me is because I know exactly what my dress looked like. And it had these poofy sleeves. And I had borrowed it from a friend, my godmother's daughter. And it had flowers on it. And it was like pink and yellow and it had this floral pattern. And it was like a Cinderella dress. And I thought it was so pretty. And --

SERGEANT EATLEY: Hello.

MS. GRIFFIN: Yeah, I'm here. Can you hear me?

SERGEANT EATLEY: Okay. I'm sorry.

MS. GRIFFIN: No. That's okay.

SERGEANT EATLEY: I thought it cut out again.

MS. GRIFFIN: I think this is the one that's one of the harder ones for me because we were all -- we were in the park in our dresses. And I remember we -- we rode over to the school at a very early hour because, you know, it was middle school. And I remember taking photos with my date. And it must

have been like in the -- I don't know, 5:30/6:30 at night, my guess is, because it was still really light outside. And I can hear -- I can hear the cicadas.

SERGEANT EATLEY: Is this for like a dance?

MS. GRIFFIN: Yeah. I can hear the --

SERGEANT EATLEY: Okay.

MS. GRIFFIN: -- cicadas. I can hear them in the park. The park is right across the street. And we were standing in the -- in the -- in the park, and my parents had dropped me off. And I remember Mr. [redacted] coming over to me. And I can remember the feeling of my body going, no, no, no, no, no, no. And he said, come with me, we need to go do some [redacted] And I can remember --

SERGEANT EATLEY: He just came over to the park?

MS. GRIFFIN: He was -- he was [redacted] because [redacted]

SERGEANT EATLEY: Oh. I said park.

MS. GRIFFIN: Oh. Yeah. He -- yeah -- yeah, I'm sorry. He --

SERGEANT EATLEY: Park.

MS. GRIFFIN: -- he -- yeah, he was in -- he was in the park as everybody was coming and getting ready for the dance. And he told me we needed to go do some [redacted] stuff, so I needed to go with him before the dance started. So I have very distinct memories of putting one foot in front of

the other on the side entrance of the school in the front of going up the stairs. I can remember the door opening so slowly. Like, please don't open door, please. Like, I can remember the sludging through mud. And I remember he was behind me as we were walking and I was leading. And we walked into the classroom. And he shut the door. And he raped me from behind. He bent me over the first desk in the classroom or second row.

SERGEANT EATLEY: Which classroom?

MS. GRIFFIN: The [redacted] classroom.

SERGEANT EATLEY: [redacted]

MS. GRIFFIN: And he bent me over the desk. He left my dress on, so I had the poofy sleeves and he just pushed up the back of the dress. And all I remember was the dress being over my head while I'm laying on the desk. I'm laying on the desk, but my feet are on the ground. And he penetrated me with his penis with the dress over the top of my head. And then I don't know what happened after that. But I do have a photo that I found -- I don't know where it is now or someone -- my best friend found for me of us at the dance. And I look so sad.

And I remember that night going into the ballroom, not the ballroom. They turned the cafeteria --

SERGEANT EATLEY: Right.

MS. GRIFFIN: -- into the dance. And I remember being just, like, shattered. And I'm not even sitting, which is interesting in the photo. I'm not sitting with my date. I'm

sitting on the floor by myself with one friend and I'm not with my date. And I just can remember when I look at the photo, I look so miserable in the photo.

SERGEANT EATLEY: Do you still have that?

MS. GRIFFIN: I do. I'd have to go back and find it. Someone showed it to me in past years, but I can find it somehow. And yeah, I -- another instance that I'm almost certain -- I know for a fact, it was in the eighth grade because I was very close to this volleyball coach. Her name is [redacted]

SERGEANT EATLEY: Give that to me one more time.

MS. GRIFFIN: Time -- that's okay. Her name is [redacted]

SERGEANT EATLEY: [redacted]

MS. GRIFFIN: [redacted]

SERGEANT EATLEY: Yeah. Yeah. I got the [redacted] I meant the last name.

MS. GRIFFIN: Oh, I'm sorry. [redacted]

SERGEANT EATLEY: Okay.

MS. GRIFFIN: And --

SERGEANT EATLEY: That's probably short for [redacted]

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: And you said this was another -- another teacher, and she means the volleyball coach?

MS. GRIFFIN: Yeah. And she was -- sorry. Let me just catch my breath for one second.

She was the [redacted] volleyball coach. And so I know it was the eighth grade because I remember when you came into the gym, oftentimes, he would be standing there before practice started. And he'd be -- I can see him rocking on his boots from his toe to his heel with his hands in his pocket. And he has this very jovial, relaxed, smiley, kind of dumby moving body as he's, like, kind of joking with everybody. And as I walk --

SERGEANT EATLEY: Are you talking about practices?

MS. GRIFFIN: He would come as we were starting to go to practice. And part of me thinks -- my memory serves me that it was like he kind of would be standing in the door between leaving this -- there was a door that came from the school hallway into the gym. And then you took another right into the women's locker room. And he would stand -- there were two doors. One door was the coach's office and one door was the locker room.

He would stand next to my coach by the locker room. So you had to go around him to get into the girls' locker room. And I don't know how I got there or where the coach was. But in this instance, I see the locker room door opening, and I see a hand. I saw the hand, like, the hand opening the door push -- it was a swing door, like a swinging door that -- from my

memory, that locked, like, you push it. And I remember, sorry, New York City, you know.

SERGEANT EATLEY: That sounds like the police there are busy too.

MS. GRIFFIN: Yeah. Yeah. And I see like a hand pushing the door open. And then when I -- the door is opened, and I can tell you the door swings inward -- swings inward. I step into the locker room. And there are windows coming straight ahead from above. And then there is a row of lockers straight across. And then there is a -- perpendicular to that, there is a -- another row of lockers. And he's standing in the empty space in the locker room. And he's smiling, and he's waive --

SERGEANT EATLEY: The women's -- the women's locker room?

MS. GRIFFIN: In the women's locker room. He's standing in the women's locker room waving at me. And he says something to the effect of, this won't take long. And I turn on to the locker facing -- not the wall -- not the lockers that are straight ahead of me on the side of the -- the side, which I can draw again what the locker room look like. And he raped me from behind in the locker room.

SERGEANT EATLEY: Okay. So this is you're -- you're going, I'm assuming, to volleyball practice, correct?

MS. GRIFFIN: No. I recall for some reason, and I

don't know exactly. You can't -- this is one I don't know for sure. I seem to remember having on a tennis skirt, which would have made it easier because again, like I said --

SERGEANT EATLEY: Right.

MS. GRIFFIN: But I just have -- the memories are somehow together about it wasn't the day that the coach was obviously, you know, standing there with him. That happened often. He would often come to practices. And I can remember when I'd be playing volleyball, he would always be in the crowd and I would look and I would see him there.

SERGEANT EATLEY: Was -- and that's why I was asking.

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: -- because in a situation like that --

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: -- that would have been your teammates around.

MS. GRIFFIN: Yeah. No. No. There was no one there.

SERGEANT EATLEY: (Indiscernible) why you were alone --

MS. GRIFFIN: There was no one there. There was no one there. And I remember there was no one in the gym. There was no one in the coach's office. And the locker room was dark that there was light coming in from the -- the -- the windows above as well. I remember the light was light. It was -- it

was -- I mean, it -- it was not light. It was -- it was -- it was -- it was dusk. It was a dusty light. I remember the light, whether they weren't windows as I recall them, they are windows coming from the top. But the light that day is dusty. It's not bright. The lights are on in the locker room, but it's also not dark.

And -- and -- but -- but I do have, you know, what makes me think of -- I can think of all the times that I would look over in the stands and I would see him there. And I would have this sort of -- I would be confused as to why -- whether I was happy he was there or horrified he was there. Did I want him there or did I not want him there? And I couldn't quite make sense of it. So I would just turn away and go back to focus on my sport.

SERGEANT EATLEY: So it's nothing really wrong with that either.

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: It's not on uncommon. Sometimes -- sometimes victims have positive feelings for their abusers. They may care very deeply for their abusers. That doesn't (indiscernible) to get abused. So I mean, it's -- you know, it's not -- having mix dealing that means you may still have very well, you know, appreciated, you know, the initial -- you say [redacted] and you thought he was nice to you. And -- so --

MS. GRIFFIN: Yeah. I didn't know to make sense of it.

SERGEANT EATLEY: (Indiscernible). I don't -- I don't see that as being completely, you know, out of the ordinary or you know, (indiscernible) things like that.

MS. GRIFFIN: Yeah. I -- I didn't -- I didn't know how to make sense of it. I didn't -- I didn't know how to organize it in my brain. And so, I just thought, we'll just be better than it. You know, just be better than the -- these thoughts and be -- be better. And -- and -- and also, you have to do what he says so you can get away.

But I have a very -- I remember -- oh gosh, it must have been 15 years ago. My mom -- I -- I remember this conversation like it was yesterday. My mom was on the phone with me, and she said to me, oh, guess what? I saw, Mr. [redacted] And he was talking all -- asking me all about you and how you were doing. And I remember so vividly holding the phone and immediately saying, oh, really, great. And then I remember not being able to handle it. I couldn't handle -- and I didn't say anything further. And I didn't say, how is he? What is he doing? What is he -- I just said, uh-huh, yeah, uh-huh and I went on.

But I remember that conversation with my mom like it was yesterday. Makes me want to throw up. Because even then, I couldn't process -- I couldn't be honest with myself, you know,

I couldn't tell anyone. And I'd be lying if I said to you that I have thought about the sexual memories every day, all the time, all the time. That's just not how it's been. It's been, you know, I see something, I remember something. It comes back to me then. It happens then. I see -- I see -- if I see a hand, I feel a touch. I see the whole thing. Sometimes they're longer, sometimes they're shorter.

SERGEANT EATLEY: Sure.

MS. GRIFFIN: And -- and so --

SERGEANT EATLEY: That makes sense.

MS. GRIFFIN: Yeah. And -- and, you know, before I sort of tell you how I've been working through it, I -- the last one, which is the hardest one for me because even I am like, I don't really want -- I just don't -- how did this happen? I remember there's two gymnasiums in the school. And the first one was the one you walk into to go to the locker room. And the second gymnasium, which, again, I can draw everything. I can draw the exits because I just wanted to get away. And I can draw the -- I can draw the whole layout of the second gym. The second gym connects to the first gym through one passage, which is just between the first and the second. And on the other side of the gym, it connects to the area where you leave -- to leave the school on the back side.

And he -- and I don't remember how I got there, but I just remember being under the bleachers in the second gymnasium,

and I'm on my back and the bleachers are out. And we walk under that void of a space where the bleachers are out and he's on top of me. And I'm frantic. And I'm saying, someone is going to see. Someone is going to see. And he's saying, we have to hurry. We have to hurry so someone doesn't see.

And I can remember now as I've done a lot of work around it, of course, that was around me blaming myself. And I feel as though as an adult, I can look at this a little bit like he liked the thrill of maybe getting caught or me being with him. It was me being with him. It was like we were connected. It was us doing something, not him doing something to me, which is more of the reason why I couldn't tell anyone. And so, I --

SERGEANT EATLEY: Is -- so the -- I mean, there was -- he -- he -- he had sex with you on that occasion as well or --

MS. GRIFFIN: I don't know if he penetrated me. I know he's on top of me. I just remember, in this instance, laying on the ground. I'm -- my back is on the floor. I can feel my hip bones on the floor. And my knees --

SERGEANT EATLEY: What?

MS. GRIFFIN: My hip bones are touching the --

SERGEANT EATLEY: Oh. Your hip.

MS. GRIFFIN: They're touching the gym hardwood floor, which is shiny, it's polished and it's brown.

SERGEANT EATLEY: All right.

MS. GRIFFIN: Light brown and under the bleachers it's

dark and it's dirty.

And he says, we have to hurry because we're going to get caught. And I'm frantic, frantic, frantic not about what's happening to me, but more about being caught.

And Gordon, I also want to say something that's so interesting to me is, I don't view any of this as sexual. I only view it as powerful. So he never kissed me. That's what I remember. He never touched his face to my face. And I can remember being grateful for that.

SERGEANT EATLEY: But none of (indiscernible) remember -- it just -- it -- it's -- it's -- none of it was about you. It was -- it was about him and him doing what he wanted to do. It was never --

MS. GRIFFIN: I know. I know.

SERGEANT EATLEY: You know, providing -- providing any kind of -- well, in a normal sexual relationship, any kind of love or infection is what -- what you would expect to provide. But this -- this is about what that's about. And I agree with you when you say that this is never -- it never was about that -- that -- this wasn't a loving sexual relationship. This -- this was power -- this -- this was a power -- this was a power type feel. And he had power over you and he took advantage of that.

So no, I -- I -- I understand what you're saying.

MS. GRIFFIN: Yeah. Thank you. That -- that was, you

know, I think at that age, without having the words or an understanding of those body parts, it's so foreign that I chose to just go somewhere else. And I always say -- you know, I used to make jokes. Then I would ask god when I die, if Michael -- Michael Ja -- if -- if -- if OJ really killed his wife, if that was the first question that I had to ask. I used to --

SERGEANT EATLEY: That's a waste of a question because I think we all know the answer.

MS. GRIFFIN: I know. That's right. And then I recently know over the last few years, I -- instead, I thank god. And I -- I know that when I die, the first thing I'll say is, where did you take me? Every time this happened to me, where did you take me? Where did I go?

SERGEANT EATLEY: I see what you're saying.

MS. GRIFFIN: Because I wasn't present. You know, when people ask me -- recently, I told my daughters. And one of the first things my 12-year-old said to me was, mom. She said, it's so lovely. She said, did you have any health problems afterwards? I said, I don't know. I have four beautiful children and -- you know, but the truth is that's not true. I've had two major hip surgeries, one on each hip, six or seven hours long because my hips have been me -- labral tears. I have horrible labral tears in my hips. I've also had --

SERGEANT EATLEY: Is that from athletics -- I mean, you told me you were super athletics --

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: -- (indiscernible) and everything.

MS. GRIFFIN: Yeah. I was -- I was a division one athlete. And then I -- I think all -- I played volleyball.

SERGEANT EATLEY: Volleyball or --

MS. GRIFFIN: Yeah. I played volleyball.

SERGEANT EATLEY: Okay.

MS. GRIFFIN: And I think Gordon, one of the things that's, like, more -- not about the case in a legal perspective, but, you know, my whole life, I've been running from this, and I became a triathlete. I've done the Iron Man. And I remember doing the Iron Man several years ago and finishing late in the night. And I remember ending up and saying, you know, I've run as fast and as far as one can take you, but I can't make this go away.

And so in the last few years, I've done so many things I've done. I work with a psychiatrist many days a week. I've done MDMA therapy with a therapist, if you know what MDMA is, if you followed that.

SERGEANT EATLEY: No, ma'am. I'll be honest with you, I'm not familiar with that.

MS. GRIFFIN: That's okay. It's -- it's really just using -- enabling the brain to use serotonin to relax your brain to just, you know, allow you to access traumatic events. I've done that with a therapist, which was helpful in bringing back

some of the memories. I do EMDR, which is e -- so I've done MDMA with a therapist assisted, and I've done EMDR with a therapist, which EMDR is the process of -- oftentimes, the woman I work with, she -- she's just brilliant. She's -- I think she lives in Utah, and she worked with veterans and she -- when you remember a specific incident --

So for instance, one of the, the things I've been working through -- and I -- I don't know how it's -- how my body's doing this. But whenever I talked to her on the phone and certain things come up, one of them, for instance, one of the last ones that I worked with her on, her name is Amy too. One of the last ones I did was I had a lot of body tra -- a lot of trauma around the idea of him coming into the cafeteria to hang over me, you know? And -- and that -- those memories, although not sexual, I -- I feel like I was going to throw up. And I can elicit those memories now in other situations in my life because they had become the fabric of my life.

So when you do EMDR, you -- you work on tap -- you -- you -- you touch your -- you know, you -- you touch your throat and you tap and you -- you try to elicit the horrible feelings. And then you try to remember something really positive, and you try to help get rid of those awful feelings that you had about the trauma. And I'm obviously not doing it justice. But EMDR has been really helpful to me.

And the -- and then, you know, I've had major -- major

bouts of depression and that's been difficult and worked with my therapist on that. I -- for the first time, I actually went away this year for two weeks to process with the doctor, to try to get rid of it -- rid of it. I don't know that I'll ever be rid of it, but to -- to -- to sort of relieve some of the anxiety and the, you know, the stress.

And then I think that I'm just doing everything I can. And I think I -- you know, as the memories come back, I've had these seizures where I sort of fall to the ground and I'm shaking and my husband has to come help me when I remember them. Sometimes when things would come up, I would shake and fall on the floor. And I would just ask him to sit with me and put his hand on my shoulder. And, you know, there's been a night or two where I slept in my closet because I didn't feel safe.

SERGEANT EATLEY: Well, I'm -- I'm glad you're trying to work through these. I'm going to do my damndest to do my part to hopefully give you a little bit of (indiscernible). Obviously, I can't make promises. Do you mind if I ask you a couple of questions? There's a couple of things I'm -- I'm going to -- that might help me. The (indiscernible) and obviously, I'm listening to you and I've already taken five or six pages worth of notes.

MS. GRIFFIN: Okay.

SERGEANT EATLEY: But what I am trying -- I'm -- I'm trying to plan -- on a case like this, we're looking at the last

event having occurred well, 30 years ago. So obviously, there's not going to be physical evidence. Is -- it's not -- it's not going to be one of those types of (indiscernible). This is going to have your statement, obviously. And one of the things I'm going to ask you to do is, I'm going to get your email address from you here in a few minutes and I'm going to send you a digital copy of an affidavit.

Do you have the ability to scan something into email?

MS. GRIFFIN: I'm sure I can find a way. I'm -- I'm -- to be honest, my technical skills are not fabulous, but I -- I can easily make that happen for you. I'll just ask one of my teenagers to help me do it.

SERGEANT EATLEY: Okay. Because basically -- basically, what I'm going to do is I'm going to have you -- I'm going to send you, like, the front cover page, and I'm going to fill out as much of it as possible, but it's pretty self-explanatory, filling out, you know, your name, date of birth, you know, your email, you know, social security, driver's license, most of that information I have already. But I'm going to -- I'm going to have your phone call for you today. I'm going to send you that affidavit. Take your time. Take it -- like I said, this -- this case, there's no statute of limitations. We -- we've got plenty of -- plenty of time to make for sure everything is perfect before I move forward.

If you're comfortable with it, I'm going to have you

write out your entire story and you can take as many pages as you want, it -- it's fine. The more details, the more -- I mean, the more information you can provide do that, because everything you give me is something that -- at some point, I'm going to -- I'm going to try to speak with this gentleman. And I think I may have already located him. I'm not sure if it's same person, but I think I may have already been able to located him.

Was he very young when you knew him?

MS. GRIFFIN: Well, from my -- just trying to understanding my -- you know, what I've tried to do is look into it, you know, a couple of friends would -- and -- and from my [redacted]

SERGEANT EATLEY: Okay. So he's probably in his [redacted]?

MS. GRIFFIN: Years. Yeah. Yeah. And -- and -- and the one thing that I know is I -- I mean, I don't know for sure, [redacted]

SERGEANT EATLEY: Right.

MS. GRIFFIN: And, you know, yes, he was [redacted]. And

that's what's also really hard for me is I kind of did the math, [redacted]

SERGEANT EATLEY: Yeah.

MS. GRIFFIN: And --

SERGEANT EATLEY: And looking at the date of birth I'm looking at, that would be about right.

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: If this is the correct person. But, I mean, how many [redacted] could possibly work for (indiscernible)? So I mean there' can't be that many. Okay.

MS. GRIFFIN: Yeah. Can I tell you, Gordon, can I tell you one other thing too? Because I've done, you know --

SERGEANT EATLEY: Absolutely.

MS. GRIFFIN: -- I -- I've done a little bit of just, like, investigating on my own without trying to -- to -- to, you know, I don't know what the right word is, push the cactus or whatever, but just trying to get some facts on my own.

And so, you know, I don't know if he -- from my understanding, he might know or have gotten wind of this. But, you know, I -- that's why it was time for me to come, you know, share everything with you because it's hard -- it's hard not to have control of it, you know? Like, this was a huge step for me to be able to call you and hand my story over to someone that I

haven't met because this has been my life's work, you know? And then telling my parents, which I was told not to because that was the secret. That's the hardest thing I've ever had to do in my whole life.

And so, just so you're not surprised if he acts as though he knows, it means I haven't -- certainly haven't called him or talked to him, and I haven't asked anyone to talk to him. But I --

SERGEANT EATLEY: I don't really know -- I'll be honest with you. You're just poking around, and I'm assuming on the internet and talking to people. I don't really see how -- I mean, maybe it might, but he hasn't seen you in 30 years. Now, I guarantee you, he remembers. I can almost also guarantee you, you ain't been the only one. He's been teaching for that long, he's been around young girls for that long. I would be very, very (indiscernible) that you was his one and only. I don't --

MS. GRIFFIN: I know.

SERGEANT EATLEY: I -- I -- I have a hard time believing that.

MS. GRIFFIN: I've heard -- you know, I've heard weird things, like through the grape vine, like, oh, yeah, Mr. [redacted] was the guy that would lay between us at [redacted] He was so weird. Remember he was so weird. Remember Mr. [redacted] this. And -- and, you know, my memory reminds me of -- I have horrible, horrible memories of seeing the little

slips of paper. This is actually quite important. The little slips of paper that are the notes that were passed to other teachers for him to get me out of class. And again, I don't think -- oh my god. Oh my god. I just forgot. I forgot. There's one other instance. I forgot. It's so important. One more sexual instance that is so important that I didn't include.

I -- I have a very distinct memory of being in the janitor's closet on second floor. Oh, it makes my shoulder hurt just to talk about it. I'm on my knees. He's standing. And I can see all the shelves in the closet and the door is closed. And I can see the mop and the mop bucket and all the other school cleaning supplies. And he has his penis in my mouth and I'm on my knees.

And, you know, that's -- that's just been horrifying. But I still don't think that there was anybody in the school when that happened. And so --

SERGEANT EATLEY: Do you know if that was seventh or eighth grade?

MS. GRIFFIN: I would think it was in eighth grade. I don't know. I just feel like, again, it was like one of those, I'm here -- I'm here just to do whatever has to happen. I'm here.

And so, you know, I -- I -- I -- as I said to you about the -- the notes, I remember seeing -- I can see these little slips of paper that would come to me. They were more --

I -- I -- I view them as relationship building with him, not that anything sexual was happening at school. And so, that I can remember the feeling of [redacted] when he would say -- and he'd have a note, and he'd look up and say, so and so needs to come with me, or, so and so needs to go to so and such and such, a classroom. And I can remember thinking, please to god, not me, please. And then I can remember thinking, oh, I kind of want it to be me. I kind of wanted to be me. And, oh, please, god, please don't have it be me.

And so I can see the notes though and I can feel the -- the -- the paper in my hand. And so the no notes were like my currency of -- of -- of coolness, right? The notes were like what made me different.

SERGEANT EATLEY: Yeah. You got to get out a class. You got to go somewhere.

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: Everybody else had to stay in class.

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: Yeah.

MS. GRIFFIN: Yeah. Yeah. Yeah. And it was always on the guise of what I remember of it being around [redacted] I was a division one athlete.

I -- you know, I don't know. I'm pretty clean. I don't -- barely drink. Might have a margarita every now and again, but there's just -- I think I was scared -- I was scared into taking -- and -- and this is where I credit my parents. And I -- I just want to say I have the most loving parents and family and it's because of them I survived because I have this wonderful home appear that I would just go home and be surrounded with love. And so, I chose a path of, you know, success and working hard and trying hard and putting my best foot forward rather than, you know, drugs, sex, alcohol, which I'm told after reading a lot of these trauma books, that that's the way people go.

SERGEANT EATLEY: Not uncommon.

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: I mean, I'm not going to say it happens to everyone.

MS. GRIFFIN: No. No. Just -- just like, I'm just grateful -- regardless, I'm just grateful for the life I have. It's actually -- it's my mom's birthday. And she knew I was talking to you today. And I said, I'm so sorry that I have to do this on your birthday. But you know what, mom, I said, this is the greatest gift I could ever give you better than a birthday cake or any present because I'm telling my truth and I'm speaking up for anyone who doesn't feel they have a voice.

SERGEANT EATLEY: Amy, let me ask you this, what's

your -- what's your email address.

MS. GRIFFIN: It's [redacted] So it's --

SERGEANT EATLEY: Okay.

MS. GRIFFIN: --[redacted] And then there's no --

SERGEANT EATLEY: [redacted]

MS. GRIFFIN: --[redacted]

SERGEANT EATLEY: Okay. But if you need to read to me by email, of course, you can always call me.

MS. GRIFFIN: Okay.

SERGEANT EATLEY: It's --[redacted] (indiscernible) [redacted]

MS. GRIFFIN: Sorry. What's --[redacted]

SERGEANT EATLEY: Yes. At (indiscernible) [redacted]. And my first name is G-O-R-D-O-N. There's no A.

MS. GRIFFIN: Oh. G-O-R-D-O-N, okay.

SERGEANT EATLEY: O-N. Yeah. Usually, people throw an A in it at the end and it screws it all up and then I never get the email.

MS. GRIFFIN: [redacted] right?

SERGEANT EATLEY: Yeah. And standby one second.

MS. GRIFFIN: Okay.

SERGEANT EATLEY: I have another call coming in, and I need to make (indiscernible). Standby one second, okay?

MS. GRIFFIN: Okay.

(OFF THE RECORD.)

(ON THE RECORD.)

SERGEANT EATLEY: Amy, are you there?

MS. GRIFFIN: Hi.

SERGEANT EATLEY: I'm sorry. That was TPS calling me about another case I was working.

MS. GRIFFIN: I don't worry. I'm sure I -- I -- I've kept -- I don't want to keep you too long either.

SERGEANT EATLEY: They -- they've got my personal cell phone number, so they called me on that and it's a good thing because otherwise, I probably just -- just -- just (indiscernible) my phone calls because I'm on this one, so.

MS. GRIFFIN: Well, that's nice that you would take -- that you care enough to have both the phones working. So that means -- obviously means you're -- you're doing --

SERGEANT EATLEY: I don't mind -- don't mind giving them my personal cell phone because honestly, I can always block them. If somebody is blowing up my phone. And every now and then, we get -- well, every now and again we get crazy. So I mean, then they'll just call you and call you and call you and call you and call you, and they don't understand boundaries. I

just block them except when I need to talk to them and then I call them from my desk phone, so.

MS. GRIFFIN: Trust me, boundaries is something that I'm having to understand for myself because someone took them away from me when I was a child.

SERGEANT EATLEY: Yeah. That's --

MS. GRIFFIN: So Gordon, can I ask you a question? Can I -- can I -- can I just ask you to just tell me -- so I -- I mean, I'm very anxious, obviously, about the lack of control that I have over this as I guess one would be.

Just in terms of what happens next or, like, what could happen next or what should I -- what do I look for?

SERGEANT EATLEY: Well -- well, number one thing, do you want to press charges?

MS. GRIFFIN: Yes.

SERGEANT EATLEY: Okay. That's the first step because I'll be honest with you, if I don't have cooperation with my victim, I don't really have a case.

So like I said earlier, there is no statute of limitations on this because it would have in Texas, this is aggravated sexual assault of a child base basically because you were under age -- you were under the age of 14. He also used force in the incident where he struck you. So we could go for probably multiple counts -- well, we'd have -- we have one or two depending on how the prosecutors would look at it as

aggravated sexual assault of a child. I also have several sexual assaults of the child based on individual incidents or possibly continuous as well. It just depends on what the prosecutors want to do. But if you put them all together, there's another offense in the state of Texas called continuous sexual abuse of a child. And that one requires there to be more than one instance of the sexual abuse over a 30-day period -- longer than a 30-day period. In which case, this would also fit the element. And -- and they're all -- sexual assault on a child is a second degree felony. Everything else is a first degree felony. So it's all basically kind of -- kind of the same, just like, 25 to life for the majority of these offenses.

So next the next step is, I actually have a couple of questions I want to ask you this. I'm going to have a couple of requests. You can tell me no at any point. If you don't --

MS. GRIFFIN: Okay.

SERGEANT EATLEY: -- want to go -- but -- but the things I'm going to be asking for, this entire case is going to come down to me put -- getting this gentleman to come speak with me. I'm going to do --

MS. GRIFFIN: Can -- can I ask the biggest favor?

SERGEANT EATLEY: -- a lot of bouncing around.

MS. GRIFFIN: Can I -- can I --

SERGEANT EATLEY: Hold on. Let me finish what I was saying.

MS. GRIFFIN: Okay.

SERGEANT EATLEY: I'm going to do a whole lot of bouncing around --

MS. GRIFFIN: Yeah. Yeah.

SERGEANT EATLEY: -- to be sure that I have the right [redacted]

MS. GRIFFIN: Okay.

SERGEANT EATLEY: I'm going to -- well, probably tomorrow, I'm going to go to the school and see if they have any old year books from that timeframe. That's a really easy way for me to identify him.

MS. GRIFFIN: I have one. I have one.

SERGEANT EATLEY: How many features there be -- well, if you have one, if you could -- you could take a photograph with your phone of the yearbook page with his name on there as a teacher and circle it and send it to me.

MS. GRIFFIN: Oh. You know what?

SERGEANT EATLEY: I don't have a problem with identifying him that way.

MS. GRIFFIN: I -- I have -- I know this sounds crazy. I can't open the book. It makes me sick to my stomach. So maybe I should just send it.

SERGEANT EATLEY: Put it -- you can put it in a FedEx bag and --

MS. GRIFFIN: I -- I'll have someone do it for me.

I'll have someone take the photo or put the bag -- I -- I can't -- I can't open it. I just can't open the yearbook. It's --

SERGEANT EATLEY: Yeah. Just -- just have them email it to me and that's fine.

MS. GRIFFIN: Okay.

SERGEANT EATLEY: A couple of other things. Like I said, this is going to really come down to me talking to this man and trying to get a confession from him because without one, it's going to come down to -- I'm -- I'm going to be blunt with you. I think you deserve total honesty.

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: If -- it comes down to your -- your version of events versus his. You come across as incredibly credible? You know, sometimes when I talk to people -- as a matter of a fact, the case I was just talking to (indiscernible) on the other phone, I'll be honest with you, when I first heard it, and it's a teenager, but it comes across as a bunch of bull. And the young lady has a history of making false allegations. So, you know, it -- it just comes across as being a very odd deal.

Yours on the other hand, I'm -- you come across as very credible. But you also have to understand, let's say -- let's say again, I'm going to -- I'm -- I'm going to send that -- I'm going to email you -- you shortly a new copy of affidavit. I'm going to get you to write out of your story,

okay? I'm going to have you sign it. You'll sign it at the end on every page. And then you will send it back to me. And then I will sign it.

I will call you on the phone and swear you to it over the phone, and I'll record that as well. That way I can sign off saying that you swear that it's true and correct and everything else. And then I will add that to my case file. That's going to be the biggest thing is getting that -- have this conversation, as well as that affidavit. From then, what I'd like to get from you because these things are all going to play into my interview with Mr. [redacted] Any photos with you from that time period would be helpful to me. Because -- well, I know, you've never really been in an interrogation, but it's nice to be able to have things, especially when it's that long ago to say, hey, remember her, basically?

MS. GRIFFIN: Yeah. My best friend took a bunch of photos, yeah.

SERGEANT EATLEY: And -- I'm sorry. Go ahead.

MS. GRIFFIN: No. Sorry. My -- I have a bunch of photos. And it's -- it's funny because I've always --

SERGEANT EATLEY: I would particularly like to have the photos from the -- from -- from the Austin thing.

MS. GRIFFIN: Oh. Yeah. Yeah. I'm going to find that. I'm going to find that, yeah.

SERGEANT EATLEY: Photos of you from that time, you

know, maybe in your -- in your volleyball outfits or any other things that he's probably going to remember because I want to be honest, that's probably what he was attracted to. Any -- anything like that, that I could kind of -- well, I'll be honest with you, sometimes you like to mess with these people when you're in the room with them because I don't want to show them that I know a whole bunch. And if I could just keep badgering them of what I -- what I know, a lot of the times, they get emotional and people get emotional, they say things that they're trying not to say (indiscernible).

So every little bit I have that I could take into that room with me is going to be helpful to me. So let me see. I've got -- I'll sent you the affidavit.

MS. GRIFFIN: What about -- can I ask Gordon, what about things --

SERGEANT EATLEY: (Indiscernible) identify him --

MS. GRIFFIN: What about --

SERGEANT EATLEY: I'm sorry, what?

MS. GRIFFIN: -- what bout things like -- sorry, I interrupted -- I interrupted you. Sorry.

What --

SERGEANT EATLEY: You're fine.

MS. GRIFFIN: -- what about things like my friend, you know, my three best friends with one of them saying, you know, oh, yeah, I remember -- I remember you getting notes all the

time, you know, like, no one -- my friends, you know, obviously, my best friend is devastated. My best friends are devastated by this. And they're like, oh my god, I see how this happened. But it's -- that's the hard thing, you know, I -- I've read so many books about trauma where it talks about when people are in car accidents, people remember them and they talk about them. And then people were there as -- as witnesses.

But in this, you know, it's only my word against his, which I know that. And I know exactly what happened, you know, whether my memory is foggy and I wasn't on my knees or I was on my feet, you know, I start to discredit myself if I can't remember that exact detail, and I have to give myself more credit because it's just, you know, the rest --

SERGEANT EATLEY: Yeah, most people realize too, we're talking about, you know -- you know, a 44-year-old women versus the memory of the 12-year-old.

MS. GRIFFIN: I know. I know.

SERGEANT EATLEY: That's the big that difference.

MS. GRIFFIN: I know.

SERGEANT EATLEY: I mean, you know, this is -- we're not talking about like, you know, you're trying to remember something that happened two weeks ago. I mean, this was like a long time ago, so.

MS. GRIFFIN: I know. I know. My 12-year-old brain just could not handle it. So I remember the details that my

12-year-old brain remembered. And now I'm trying to process them as a -- sadly, I'm a 45-year-old woman, not 44. I wish I was. But I -- I process -- I'm trying to make sense of all of them. And that's -- that's, you know, that's the real healing that's happening here is -- is me, you know, honoring that child that lost -- I lost it all, you know, I -- I lost -- I lost it all in that moment. And -- and -- and so I'm -- you know, I'm really grateful to you, but I -- you know, I ha -- I have those people that my friends that say, oh, yeah, I -- I remember when you got notes all the time. You know, I don't know who the notes were from or I --

SERGEANT EATLEY: If you have their names and you have their contact information, and you would like me to reach out to them, email that information to me. That way, it'll be your decision if you'd like me to reach out to them. So give me that and I will contact them. I'm assuming that some of them are still here in Amorella.

MS. GRIFFIN: Most of my best friends live in -- people kind of live all over. Yeah. Some of them live in Amerella. I mean, I -- I have recently reconnected with the volleyball coach. And -- and so --

SERGEANT EATLEY: Coach [redacted]?

MS. GRIFFIN: Yes. After -- I never spoken to her since leaving the school, but I've reconnected with her.

SERGEANT EATLEY: Is she aware of any of this?

MS. GRIFFIN: No. And I didn't -- I wanted to tell you that I did not tell her -- I called her the first time, and I just wanted to reconnect with her. I did not say one word. And then at the very end of the conversation, she said -- I just said, how are you? How are your kids? We talked about my kids, her kids. I didn't say one word. I just said, where do you live now. This, not the other.

And at the very end of the conversation, I said, oh, well, I'm still best friends with my best friends from home. Do you still keep in touch with anybody from the school? And she said to me, oh, well, you heard what's happened with Mr. [redacted] And I said --

SERGEANT EATLEY: Oh.

MS. GRIFFIN: Yeah. She said that. And I -- I almost passed out. And I said, well, I've heard because this is part of it, Gordon, that you should. I don't know where this falls in, but it makes my heart sink.

[redacted]

SERGEANT EATLEY: Okay.

MS. GRIFFIN: And which is, you know, shattering to me because in my heart --

SERGEANT EATLEY: (Indiscernible) [redacted]

[redacted]

MS. GRIFFIN: [redacted]

SERGEANT EATLEY: [redacted]

MS. GRIFFIN: [redacted]

SERGEANT EATLEY: -- [redacted]

MS. GRIFFIN: [redacted]

SERGEANT EATLEY: Right.

MS. GRIFFIN: And I don't know any -- I don't know anything about that. I don't know -- I haven't -- you know, I [redacted]

SERGEANT EATLEY: [redacted]

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: I mean, that's normal human behavior. I mean, you know, we all thank god that [redacted]

MS. GRIFFIN: Yeah. Yeah.

SERGEANT EATLEY: -- I mean for lack of a better technical term for you. But I mean, so.

MS. GRIFFIN: But then what happened was she realized

I didn't say a word. And then later that afternoon, she started texting me pictures of her kids, and I texted her pictures of my kids. And then --

SERGEANT EATLEY: That's great.

MS. GRIFFIN: -- she said, oh, I'm so bummed. She said, I wish I had my yearbooks to look at you were -- you know, I -- whatever, whatever. And she said, I sent them to Mr. [redacted] so he could try to figure out once -- oh, by the way -- oh, I should mention this.

She said, when I heard all this was going on with him, I picked up the phone after not talking to him for 25 years and [redacted]

SERGEANT EATLEY: Snooping around? What's snooping around --

MS. GRIFFIN: Well, I -- she meaning -- meaning when she heard around town -- remember I told you that I'd asked a few friends, whatever. When she --

SERGEANT EATLEY: Oh.

MS. GRIFFIN: -- when she got word of it that someone was snooping around -- around him not knowing it was me, she -- she called him out of the blue to tell him that someone was --

SERGEANT EATLEY: That's very odd.

MS. GRIFFIN: It's very odd. And -- and --

SERGEANT EATLEY: Why would you reach out to somebody

you haven't seen in a quarter of a century to tell them that somebody was asking about them?

MS. GRIFFIN: Can I tell you how weird it is? Because then I -- she call -- she started texting me and I did -- and she said -- and then all of a sudden, she wrote, Amy, were you [redacted] And I said, yeah. And she wrote back, oh my god. Oh my god. Oh my god. I know. I know now what I'm done. Oh my god. Not meaning that -- she just meaning, oh my god, I told him and it's you. And she's like, if I've known it was you, I would have never said anything. You have to call me right away. And I was --

SERGEANT EATLEY: Oh. Crap.

MS. GRIFFIN: -- I was panicked. So -- so then I -- I -- I got myself together, and I realized I do not want to -- I want to not make her part of the case. So I called her. I did not say one word about what happened to me, except she knew -- she just knew, is it's. Him? And she's just like, that's son of a bitch. I should know have known, da, da, da. But I never told her incidents. I never told her where. I never told her what happened. I never told her a thing. I never told her.

SERGEANT EATLEY: Okay.

MS. GRIFFIN: So I made -- and then she told me that she said, well, you know, the whole conversation was about the trauma. She said, you know, that I was sexually abused as a child. And she told me for two hours about her sexual abuse.

And so I don't know. It -- it's all -- you know, that's a big part of it. And so, you know, I just want to -- I mean, I can write all these things down that I've sort of done my own work around this, but I want to save you the time or help you, or I'll say I'm obviously, I'm -- I'm out of it. I -- I want you to -- I -- I don't -- I trust you and I'm, I -- I -- I'm just grateful to you. And I'm -- I'm -- I'm anxious, you know. I'm nervous and I don't sleep well.

SERGEANT EATLEY: That -- that's okay. Look, right now, you're taking the steps you need to take. Trust me, I'm going to do the things that I can do. And that's all we can do. I mean, that -- that -- that -- that's all we can do.

If it gets to the point -- I mean, it would be nice if I can get -- I'm going to try to get as much information as I can. That's why I said, if you want to give me your friends contact info, send it to me. You have my email now. I'll look at it tomorrow. I'll start making phone calls. Those I can talk to or I can go meet in person, I'll go meet in person. Those that are out of town or don't live close enough for me to go I'll -- I'll get affidavits from them and email them (indiscernible). I mean, it -- it's not hard. I mean, I've done it before, I'll do it again.

I want to go into the interview room with him with as much information and as much MO as I have. Believe it or not, this is not my first teacher case. I had one just a few months

ago. So it's not -- not my first rodeo. I will do my best by you and I promise I'll do everything I can. Now, the best -- I mean, it's the best thing to hope for is that I get a confession out of him. And then he goes to jail for that. And hopefully, the prosecutor can get some kind of plea deal. With the number and seriousness of each of these charges, even a plea deal is going to be a long time in prison. Oh. We're also looking at -- and there's also the charge for -- there's a charge in Texas for incorporate relationship between educator and a student. So that's going to exacerbate things too. So it's -- there's a whole wide variety of things they're going to -- that we're -- we're probably going to hit it with once I get my case put together to be presented.

Stephen F. Austin Elementary School, where is that exactly? Do you know? I mean, I can Google it --

MS. GRIFFIN: It's --

SERGEANT EATLEY: -- obviously if you don't know off the top of your head because I don't -- I honestly (indiscernible).

MS. GRIFFIN: It's -- oh, gosh, it's in the neighborhood of Wolflyn (phonetic). And I -- I -- I can't tell you. You know, it's down by -- look up Bottom Street and then look up Stephen F. Austin Park. It's a big --

SERGEANT EATLEY: Yeah. I'm -- I'm searching it right then. I'm trying to figure out what county I'm dealing with.

MS. GRIFFIN: And you'll see there's the park, and then there's the school, and then there's the tennis center attached.

SERGEANT EATLEY: Uh-huh. Let me see. It looks like Empire County. That's what I wanted (indiscernible) all right. I'd rather do a (indiscernible) county on this. That's all. That's why I'm asking off the top of my head. Because I'm already thinking about a bunch of different things.

MS. GRIFFIN: Also --

SERGEANT EATLEY: What I need to do next and everything else.

MS. GRIFFIN: -- the last thing I -- the last thing I want to ask you was, you know, I also --

SERGEANT EATLEY: What?

MS. GRIFFIN: -- [redacted]

SERGEANT EATLEY: Well, do me a favor. Let me Do the asking around.

MS. GRIFFIN: Okay.

SERGEANT EATLEY: Okay. Because I don't want -- I -- I don't want you to accidentally -- I -- I don't want us to be

tripping on each other.

MS. GRIFFIN: I -- I -- I'm not doing a thing. You got it, my friend. It is all you. I will not -- I'm going to seal my lips and not say a word until I --

SERGEANT EATLEY: Thank you. (Indiscernible) that way because somebody might be willing to talk about something one time. And if they talk to you -- talk to you -- well, that's all cool, but I'd much rather them talk to me because I can testify to what somebody told me.

MS. GRIFFIN: Right.

SERGEANT EATLEY: But I can't testify to what somebody told you and then you told me because now I'm dealing with hearsay. So I would rather talk to them first and I -- I'd rather talk to them myself.

MS. GRIFFIN: I hope I haven't missed any of that up along the way in talking to, you know, various people. But I -- I haven't done -- you know, I have -- I've -- I've only gone so far. And that was when -- you know, I -- I've only gone so far. And because I didn't want -- I -- I don't have any -- I don't -- I've never -- I think I've gotten a speeding ticket.

SERGEANT EATLEY: Right.

MS. GRIFFIN: I don't know anything about this, you know. This is so foreign to me too. It's like not a world that I want to live in.

SERGEANT EATLEY: For most people, it is a bit

foreign. They know what they see on television and that is about it. And I --

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: -- I can tell you, I've been a policeman for a very long time (indiscernible) I teach it at the university. There's a lot more to it than what you see on television.

MS. GRIFFIN: I know. I know. I'm sure. I can only imagine.

SERGEANT EATLEY: Trust me, I -- I've -- I've got it. I'm going to take care of you. I can't make promises, but I can promise you I'm going to do the best job I can?

MS. GRIFFIN: Oh. Gordon, so the last question I have is, how does this play out in a timeframe? Is this like months? Is this like years? Is this like --

SERGEANT EATLEY: Months.

MS. GRIFFIN: Months.

SERGEANT EATLEY: Months, if not longer.

MS. GRIFFIN: Months, okay.

SERGEANT EATLEY: I can guarantee -- okay. Okay. Let me -- let me dial that back just a little bit.

My part of this going to probably take me, depending -- mind you, I'm -- I'm on my -- I consider all my case to -- well, not all. Because the one I just told you about is not a priority for me. But most of my cases are priorities.

So I'm having to juggle everything at once. And there's so many hours in a day. But I'm going to be working heavily on this because if I'm not mistaken from what I'm looking on the internet he's still a teacher. So I have super concerns about that.

I am going -- I mean, I'm going to be working this pretty heavy.

MS. GRIFFIN: I think he's retired. I think he's retired.

SERGEANT EATLEY: (Indiscernible) in a room. If not next week, the week after. I --

MS. GRIFFIN: Okay.

SERGEANT EATLEY: -- really like for me, that's going to be that quick. We working through this case and filing it is not -- it's going to take, you know, a week or two, depending on how much -- I mean, depending on how much background and how many people I reach out to and how long it takes me to talk to identified folks and -- and get affidavits. That's what's going to slow me down. But I mean, that's -- but at the same time, it's not difficult to work through. I will have my work done, it'll probably be three weeks tops. I don't even think it'll take that long, to be honest with you. Maybe the end of next week, I hopefully will have everything pieced together and we'll get him into -- take him in here and try to talk to him and hopefully get a confession. I just -- you just never know. I

mean, you just can't -- you just never know when you go in that room that they're going to be willing to talk.

MS. GRIFFIN: Does anybody ever confess.

SERGEANT EATLEY: Does anybody what?

MS. GRIFFIN: Does anybody actually, really -- I can't imagine what -- he would confess.

SERGEANT EATLEY: Oh. You go -- yes. 100 percent yes. Absolutely. They -- they want -- people -- okay.

MS. GRIFFIN: They want to get it off their chest. Like, I want to get it out.

SERGEANT EATLEY: Yes. You've been sitting here telling me that you wanted to keep this off your chest.

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: It was hard on you and you'd be keeping it a secret this whole (indiscernible). They feel same way. Believe it or not. I'm not trying --

MS. GRIFFIN: Wow.

SERGEANT EATLEY: -- I'm -- I'm not trying to like -- like, diminish you or (indiscernible) because I don't. But people, they want to talk. They do. A lot of the times, what happens is they won't just say yes, I did exactly that, this is how it is. That -- that's usually not what happens. It does happen. I've had it happen to me and I'll be honest, it shocks me every time. It does.

But with -- a lot of times, what happens is they want

to admit to it, but they want to find a way to minimize and mitigate their actions. So normally, what would happen during the course of an interview is you have to give them something that in their mind, they consider plausible, but at the same time when they admit to it, they're basically admitting to a crime. I'll give you a prime example.

I worked case not all that long ago. A woman, I eventually talked to her boy -- and this is -- this is like ten, 15 years ago, sexually assaulted her -- her -- her boyfriend's little girl. And she was like (indiscernible) or something like that. And she initially denied everything. And then she gave me a little bit oh, yes, I wasn't (indiscernible). So we refer -- that's not a confession, but it's what we refer to as an admission where they admit -- they give you a little bit. So she confirmed that she was. She remembered the time. And she confirmed that she was there.

Then she's, like, we'll I never bathed these kids. I never did that. It wasn't my place. I wasn't there (indiscernible) together. And then later on in the conversation, well, I might have given her -- I might have helped her that one time. And they give you an admission.

People start giving you admission after admission after admission, it starts to add up. It may not add up to a full confession, but it sure starts to sound that way and look that way after a little while. And juries will bite on it.

You know, and I -- and I told her, I was, like, explain to me how this little girl is (indiscernible) be a liar and yet what you're telling me is the truth? Provide me with some kind of plausible explantation (indiscernible). And her explanation was well, you know, I (indiscernible) with her dad quite frequently. And a lot of times when I was asleep I would wake up with my hands in his underwear and I would be stroking his penis. She says, it's possible that one night I was sleeping in the bed with this little girl. I might have (indiscernible) I might have mistook her for my boyfriend and my hand was in her pants and I was stroking what I thought was her penis. To her, that sounds reasonable. To you and I, that sounds like the most ridiculous --

MS. GRIFFIN: Right.

SERGEANT EATLEY: -- damn thing --

MS. GRIFFIN: Right.

SERGEANT EATLEY: You lied. Okay. So I mean, and that's usually -- and so a lot of times, that's how interviews go. They will give you those pieces. They will give you everything, except -- like she admits to the action. And trust me, that's -- that's -- that's enough. I filed on her, and they took the cases in. They took the charges. I mean, I -- I got -- I got three felony charges on this women.

MS. GRIFFIN: Wow.

SERGEANT EATLEY: Because it's the only thing --

MS. GRIFFIN: Wow.

SERGEANT EATLEY: And so it has -- trust me, they will -- they'll give you everything, but, like, you know, like, the total I -- I did it, you know. (Indiscernible) and the confession we'll get it, I mean, no. I mean, I use that because I capital -- I mean, I use that because (indiscernible). I mean, they don't normally give that, but a lot of times, they will flat out -- I mean, they'll give you enough that it's --

MS. GRIFFIN: I guess it's human. I guess it's human, you know, it's -- it's like it's in our nature to be -- to want to not have this on our chest. So I see that. I see both sides. It's like you're just, like you said, just because I want to get it off my chest, he probably will too. That's probably right.

SERGEANT EATLEY: Yeah.

MS. GRIFFIN: I -- that's -- that's so nice to hear. And if he doesn't, you know what, Gordon, the other part about this is that all I can do is tell you what I remember, and all I can do is get it off my chest because my healing really starts with my letting go of it, that it's not my fault. So it's not my fault. I did nothing wrong. And --

SERGEANT EATLEY: No. You didn't.

MS. GRIFFIN: And so --

SERGEANT EATLEY: This is my problem now. You don't need to worry about it. This is my problem now.

MS. GRIFFIN: But I will get you all the stuff.

SERGEANT EATLEY: (Indiscernible) take care of it. And I know you can't just -- you can't just forget it. And I'm not telling you to forget it because it's part of who you are. But this is -- this is my problem now. You've handed this off. And I will work through it. And I will take care of it the best as I can. I will keep you in the loop. Things happen. Now mind you, it could be days between phone calls. Things don't happen overnight, but I will do my best to keep you in the loop so you know what's going on.

MS. GRIFFIN: Okay. Okay. I'm so grateful. And I will -- I will -- what I will do to, is I have done, you know, in terms of -- I want to give you everything that has been done. I'm in so you don't have to backtrack and waste your time, which would take me some time to compile in terms of names that I've called or people that you should call or --

SERGEANT EATLEY: Good.

MS. GRIFFIN: -- things that I know. I just need to gather that. And if that's okay, I'll get you whatever I have.

SERGEANT EATLEY: Yeah, that's fine. I have all day. I have -- I have forever.

MS. GRIFFIN: Okay.

SERGEANT EATLEY: I don't have statute of limitations on this.

MS. GRIFFIN: Okay. Gordon --

SERGEANT EATLEY: I -- I don't -- I don't -- I -- I -- I got (indiscernible). If you want to draw up those pictures of those places that you described, do it.

MS. GRIFFIN: Okay.

SERGEANT EATLEY: Send it to me. That's one more thing -- I mean (indiscernible) admissible in court? Maybe not. But it's something I can take into an interview room.

MS. GRIFFIN: Okay.

SERGEANT EATLEY: I can also go over the -- I can also go over to Austin Elementary and go to these places and take a look at them for myself.

MS. GRIFFIN: Yeah. Yeah. That --

SERGEANT EATLEY: You know, I mean, you know, and your memory can be way off that. I mean, when it comes to rooms, I'll be honest with you, I used to remember certain things about my middle school and the last time I went over there, anything like -- I don't remember it being like that.

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: (Indiscernible). And it's just, you know, a kid. It's a child's memory. And -- and there's nothing wrong with that.

MS. GRIFFIN: That's the trauma of also thinking that I have to have every single detail. Like if I'm off on the size -- size of a tile sample, that means I'm not believed, you know.

SERGEANT EATLEY: It doesn't have to be perfect.

MS. GRIFFIN: I know.

SERGEANT EATLEY: It doesn't have to be. Do you think -- do you think -- my victim, one of the kids I was telling you about she's 17. Do you think she remembers everything she remembered from just like 12 or eight years old?

MS. GRIFFIN: Not even at 17, she probably doesn't.

SERGEANT EATLEY: No. Absolutely not.

MS. GRIFFIN: I don't remember what I had for dinner two nights ago.

SERGEANT EATLEY: She doesn't remember, but (indiscernible) -- I mean, there's enough for me to get a case filed and get charges --

MS. GRIFFIN: Well, if anything, I mean I -- I --

SERGEANT EATLEY: I also had (indiscernible) also had a confession. But I like the fact you told me what [redacted] he drove. It's so funny because the other case she told me that the lady that was abusing her also drove a [redacted] And I was able to use that in the interview.

MS. GRIFFIN: Oh. A [redacted]

SERGEANT EATLEY: One of the incidents actually occurred in the vehicle. And I mean, so it's always -- these little details you're giving me, I mean, everything I can confirm --

MS. GRIFFIN: Well, one of the things that --

SERGEANT EATLEY: -- makes it that much easier for me. So I mean, you know --

MS. GRIFFIN: One of the things my brother told me was that my brother asked his two best friends because he remembered people saying that he was creepy. And one of the things my friends told me was that -- was that he drove them off campus, like, during school hours to go to the Tuten Totum (phonetic) to -- to go get drinks and, like, snacks. Like, he would put them in the car and drive with them. I'm like, what? I don't -- and I'd asked other friends, do you know what Mr. [redacted] drove? Or just in general, I'd say to people, do you know what kind of car your teachers drove? What? I have no idea, what are he's talking about. Like, I don't remember my teacher's name. This was a [redacted] and I could see his -- I can see jeans in it.

SERGEANT EATLEY: (Indiscernible) tell me that. I have a program here on my computer called TLO. I'll be able to tell you (indiscernible).

(Indiscernible audio.)

SERGEANT EATLEY: So that I could confirm it because every little bit I can confirm helps. Even if it's just something as small as driving a car, a -- a particular [redacted] I mean, it's -- it's -- it's something. So there's going to be -- it's going to be okay. Just let me -- just take a breath. You've handed it off. Let it be my problem now. And we'll work

through it. All I can say is just when I do ask you for the things I'm asking you for, get them to me because those are the things I'm real -- I'm not going to ask you if anything that I get somewhere. If I can get it somewhere else, cool. And if I got to get it from you, though, I have no choice, I have to get it from you.

MS. GRIFFIN: I'm going to get you every --

SERGEANT EATLEY: My -- my goal is, honestly, is not -- it's to be able to keep you out of it as much as possible until we get to the point where we might have to go to the court for something. Because I -- I believe -- I believe in the concept of my (indiscernible) my victims (indiscernible) every time you got to tell me about it --

MS. GRIFFIN: Right. That's nice.

SERGEANT EATLEY: (Indiscernible) you and I prefer to keep it to a minimum.

MS. GRIFFIN: I think I -- you know, I feel like I worked really, really, really hard in this call with you and -- and that I sorted -- you now, I sorted through things in my brain before I called you. And so, I feel like if I could really just take what we talked about today and reformat that. I mean, I feel like, honestly, I'm sure I'll think of things after we hang up and go, oh, I forgot to tell him these five things. But I have a million, like, friends and names and places that I can give you that stuff. But I feel like this

call, if you were to use it as a frame of reference, this is it -- like I've done it here for you. Like, this is -- I did a lot of work before, and as I said, taking notes about thing to really analyzing in my brain, which are the certain instances.

And then also, in being honest as to which ones I can't add up. Like I told you, I don't know where I was when I crawled to the wall and said, you know, smiled. I don't know what was happening before that. I don't know if it was part of another incident or its own separate incident. So that one, I -- I -- I don't know where it falls in, but I remember that.

SERGEANT EATLEY: I think --

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: -- that's (indiscernible) I mean, you know, I -- I remember -- I remember getting treated by a bull when I was a kid. I know it happened. Yeah. I remember sitting in the tree.

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: I remember staring down at the bull.

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: I wasn't a big kid. I'll be honest with you, I don't remember how I got up the damn tree. I don't remember how it resolved and I got down. Clearly I did because I'm sitting here today. But I mean --

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: -- I mean, there are things, you

know -- I -- I remember the bull chasing me. And I remember I ran (indiscernible) and that's all I remember.

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: And sitting in the trees. But I don't know how I got there. I don't remember how I got down. And you know, there's other events in my life that I might remember certain things, but I don't remember it all. So don't -- don't beat yourself over that. You really -- it -- it was fine. I mean, your interview is about the details as most, I -- I guess, especially with this much delay in time.

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: So I do have some questions.

MS. GRIFFIN: Okay. Yeah.

SERGEANT EATLEY: This case came to me through your parents to the district attorney's office.

MS. GRIFFIN: Through my parents?

SERGEANT EATLEY: And that's fine. Well, that's my understanding. I -- I got this case --

MS. GRIFFIN: Yeah.

SERGEANT EATLEY: Your case did not come to me through the normal chain, okay. It -- it came to me, and that's fine. I understand how the things work, it's not a big deal.

But you're an adult. If for some reason, your parents inquire about this case, what do you want me to say?

MS. GRIFFIN: Oh. You know what? You're fine to

talk. My parents know. They -- they give me full -- they've been so wonderful in knowing this is mine to deal with. I think the reason my parents were involved in calling was that I don't live there anymore. So my parents called the people to ask, like, who should Amy -- how should Amy do this? And my parents are -- yeah, they're my parents can be involved in any way. I -- I don't care. They probably won't call you because they know this is mine, but they are every bit a part of all of this. They know everything. And yes, I'm a grown adult. And I think, you know, Gordon, that's -- that's a hard part of it too.

SERGEANT EATLEY: I work for you right now.

MS. GRIFFIN: Yes.

SERGEANT EATLEY: I'm working for you. I work for my victims. So I mean, you're the boss, so I --

MS. GRIFFIN: That's so nice.

SERGEANT EATLEY: -- just (indiscernible) --

MS. GRIFFIN: That's so nice.

SERGEANT EATLEY: A lot of my victims are children. So I mean, I just -- parents care. And sometimes parents kind of want to be involved. And necessarily, that's not always the most helpful thing in the world.

MS. GRIFFIN: You know what, you're --

SERGEANT EATLEY: So --

MS. GRIFFIN: -- exact on the money. My parents would do anything to make this go away and --

SERGEANT EATLEY: Right.

MS. GRIFFIN: -- and they can't. So they -- and they live there still. So I've tried to tell her mom and dad, I'm take -- I've got this. And -- and I will tell them how wonderful you are and that you've got this. And -- and for that, I'm super grateful.

And I will get you every detail from the people that I've worked with to help me get some, you know, information around what's going on there without going too far because I knew who was of the utmost -- I don't have a legal background and I don't pretend to. So that's why I came to you. And also, it's just been -- it's been -- you know, it's been a process for me in my healing to even be able to have this phone call just because it's so horrified -- horrifying.

SERGEANT EATLEY: Okay. All right. By the way, is this number you called me on, is this your cell phone?

MS. GRIFFIN: This is my cell phone. Yeah.

SERGEANT EATLEY: All right. I'm going to text you picture of my -- my -- my business card here in a minute that way you just have all that, my -- my email.

MS. GRIFFIN: You can text me anytime you want on this number.

SERGEANT EATLEY: (Indiscernible) have it. I haven't even opened -- it doesn't really matter, but I haven't actually opened a case report yet. So I will get that to you via email.

That being said, don't call -- don't -- don't -- don't -- just call me directly.

MS. GRIFFIN: Okay.

SERGEANT EATLEY: You don't need to call, like, the CID, the -- the detective division and get my report number and ask. Just -- just call me directly.

MS. GRIFFIN: On -- on your cell phone? I don't want to bother you on -- call you on your cell phone.

SERGEANT EATLEY: Well, I'm going to give you -- I'm going to give you my desk phone number.

MS. GRIFFIN: Okay.

SERGEANT EATLEY: And if push comes to shove, and you can't reach me any other way, you can call -- I -- like I told you earlier, I don't have a -- I dont have a whole lot of problem about handing out my cell phone number.

MS. GRIFFIN: Okay.

SERGEANT EATLEY: Because if push comes to shove, about the person, I can always block the person. I don't think you'll be one of those people. So if you need to -- if you need to contact me, that's fine. Just realize that -- that's my personal cell phone, so when they answer the phone I might be like, hey, I might not know who the heck is calling.

MS. GRIFFIN: And I wanted to ask you one more thing. I want to make sure I follow the rules. If I -- on my phone, I just -- I recorded on my iPad too, so I had something to refer

back to help me write the notes; is that okay?

SERGEANT EATLEY: Sure.

MS. GRIFFIN: Okay.

SERGEANT EATLEY: Say that one more time.

MS. GRIFFIN: I recorded on my iPad. I pushed star, and I didn't tell you that at the beginning because I wanted to have the notes so I could make notes to help me; is that okay that I have it recorded?

SERGEANT EATLEY: I don't care.

MS. GRIFFIN: Okay. Thank you.

SERGEANT EATLEY: It makes no difference to me. I didn't say anything that was bad.

MS. GRIFFIN: No. No. I just didn't know if it was -- I don't -- I don't want to hurt my own legal process. So I just wanted to tell you.

SERGEANT EATLEY: No. No. No. You're not going to be using your -- I'm -- I'm not going to ever ask for your copy of your recording anything else there. I'm pretty sure in New York for some things, just -- I -- yeah, I'm actually pretty positive about this, I'd have to look it up. But I'm almost -- almost 100 percent positive that New York requires both parties have a recorded conversation to be -- just be aware that it's being recorded to be amicable. Texas, however, it's not.

MS. GRIFFIN: I think --

SERGEANT EATLEY: There's always one person.

(Indiscernible) as long as one person knows -- one person knows that it's being recorded that is perfectly admissible.

MS. GRIFFIN: Okay.

SERGEANT EATLEY: Have you had any contact with this Mr. [redacted]

MS. GRIFFIN: No way. No way. No chance.

SERGEANT EATLEY: I'm going to throw something out there. You're 100 percent -- (indiscernible) go through myself and some -- sometimes this is -- this doesn't really fit your situation. I don't know -- well, you know what, no. I'm very -- I'm -- I'm going to tell you what I was going to say, but --

MS. GRIFFIN: Okay.

SERGEANT EATLEY: -- I don't think it's a really good idea. We have something here that the only called a one party can tape a phone call. And basically, I'll have a (indiscernible) and usually when it's like a boyfriend/girlfriend thing or say, I have, like, a juvenile victim who's under the age 14 and can't consent (indiscernible) boyfriend. I'll have them come into my office and I have them call from here. And I basically record the entire conversation and they -- they -- they basically during the course of the conversation, they -- what's the word I'm looking for? They elicit incriminating information from the individual.

But in your particular case, because there's just no reasonable, rational reason for you to reach out to him after

all this time, it wouldn't make any sense. So yeah, I don't think (indiscernible).

MS. GRIFFIN: Well, if you change your mind, you know, like -- change your mind.

SERGEANT EATLEY: (Indiscernible) my head, but there just be no real reason (indiscernible) why would you --

MS. GRIFFIN: I -- I've gone so far away from him --

SERGEANT EATLEY: Unless you took the (indiscernible) where you were going to call him and say, you know (indiscernible) look, after all these years, I'm just trying to find some closure. I don't want -- I don't want a big hassle, I don't want -- you know, I just -- you can come as -- I -- I just -- I just want an apology. And he might be willing -- I mean, and then, things like that, he might be willing to do it. The only problem with doing that is that you're (indiscernible) you're not here and there's no way for me to do it.

MS. GRIFFIN: Oh. I'm happy to come -- I'm happy to come to you.

SERGEANT EATLEY: You're recording it there -- if you're recording it there would be inadmissible in court.

MS. GRIFFIN: Well, I'm happy to come there and do any -- I'm always happy to come talk to you. I can fly to Texas and get a flight and come --

SERGEANT EATLEY: No. This -- before we go (indiscernible) --

MS. GRIFFIN: Okay.

SERGEANT EATLEY: (Indiscernible) but at the same time, it's -- it's --

MS. GRIFFIN: Anything I can do, I just will make anything work because this is obviously the most important work of my life. So I will leave that to you. But yes, I mean, if you told me to come to Texas because that was the way to do it, I just feel like, you know, I've never spoken to him again since I left the school. I'm horrified by -- I used -- I -- I call him Mr. Ex because I can't even say his name.

SERGEANT EATLEY: Oh. Oh. Crap. I was wrong (indiscernible) party consents to (indiscernible).

MS. GRIFFIN: Yeah, I thought so. I don't know. I was --

SERGEANT EATLEY: It's very difficult because -- well, I guess you could record the conversation because you're doing it right now. Are we on speakerphone?

MS. GRIFFIN: Yeah. I'm on speaker because otherwise, I couldn't record it.

SERGEANT EATLEY: Oh. Oh. Yeah, that's why I was asking. I was -- I thought there might be something new on the iPhone or iPad because I was not aware of it.

MS. GRIFFIN: I wish. I told how -- I told you, I'm not very skilled in that area. I'm not --

SERGEANT EATLEY: You -- you record a call while

talking.

MS. GRIFFIN: No. I wish I knew how to do that.

SERGEANT EATLEY: (Indiscernible) on my desk phone or what I -- what I do is I -- I'll put it on speaker. Let me go in the interview room where it's super quiet and we just record it using the recorded system in there. So -- and I also have a recorder that basically that your -- that your phone goes in your ear. And it's also a microphone and records everything else to the phone. So --

MS. GRIFFIN: Look, you know -- you know.

SERGEANT EATLEY: (Indiscernible).

MS. GRIFFIN: I know nothing. I'm just going to follow your lead. I feel a huge weight has been lifted --

SERGEANT EATLEY: I appreciate it.

MS. GRIFFIN: -- off my shoulders to give this to you because I -- I trust you and I'm grateful and, you know, I'm -- it's hard to also -- I'm sure you know also, but it's hard to be living so far away, which was on purpose by design. I had to get away from there. It's hard to then just call someone on the phone and recall your story of -- for -- again. It's not --

SERGEANT EATLEY: Right.

MS. GRIFFIN: It's already swirling around in my head. So I really thank you for making me comfortable and hearing me out on every detail and, you know, just helping me get through the -- the last two hours.

SERGEANT EATLEY: No. That's not a problem, ma'am. And like I said, I'm working for you right now. Just I work for all my other victims. So I will do everything I can. I will send you my -- my information. I'll just text you a picture of my card here in a few minutes. And if you do not get an email from me this evening, please call me tomorrow because it just means I probably screwed up --

MS. GRIFFIN: Okay.

SERGEANT EATLEY: -- on your email.

MS. GRIFFIN: Okay.

SERGEANT EATLEY: I probably just screwed up somewhere writing it down or typing it in or something like that, but you should get an email from me probably here in the next --

MS. GRIFFIN: I can also email you right now too. I can also email the [redacted] or just [redacted]

SERGEANT EATLEY: No. [redacted]-

MS. GRIFFIN: Yeah. [redacted]

SERGEANT EATLEY: [redacted]

MS. GRIFFIN: Yeah. I've got it. I've got it. I'll just make the dot really big.

SERGEANT EATLEY: And I'm going to send you an email from that email address, that way you know it's me. And so when you see it (indiscernible). All right.

MS. GRIFFIN: Gordon, thank you so much. I so

appreciate your time and -- and -- and listening -- and listening to me.

SERGEANT EATLEY: It's not a problem, ma'am. I will speak with you soon --

MS. GRIFFIN: Okay.

SERGEANT EATLEY: -- as soon as I know something else, okay.

MS. GRIFFIN: Okay. Bye.

SERGEANT EATLEY: All right. Thank you, ma'am. Bye-bye.

(End of recording.)

# CERTIFICATE OF TRANSCRIBER

I, Sarah Albaladejo, do hereby certify that I was authorized to transcribe the foregoing recorded proceeding; and that the transcript is a true and accurate transcription, to the best of my ability, taken while listening to the provide recording.

I FURTHER CERTIFY that I am not of counsel or attorney for either or any of the parties to said proceedings, nor in any way interested in the events of this cause, and that I am not related to any of the parties thereto.

Dated this 3rd day of June 2026.




Sarah Albaladejo

# EXHIBIT B

July 19th, 2020

First therapy session with [redacted]
- observation: I always fixated on the fact that I leant a dress to the sweet girl [redacted] at the children's home... leaned into being kind and doing for others rather than excepting what was actually happening. (This was for Dusti-Day!)

July 20th...

One cannot be all joy and light... there has to be something behind it all that pushes the joy' light outward

... It's always been there... maybe you have danced around it to make others like you but now you can realize that you did nothing wrong.

# EXHIBIT C

Today I feel the saddest I have ever felt in my life and yet there is huge compassion for myself even joy. Today is a new beginning. Today I can go back and love the 12 year old me who didn't get to be! At some point I can start to grow again and I only hope that will translate to my kids. I want them to trust me and know who I am at my core.

- Not sure whether I will tell them but they will know something about me is very different

# EXHIBIT D


THE TELL
Oprah's
Book Club
2025
A MEMOIR
AMY GRIFFIN


THE TELL
AMY GRIFFIN
THE DIAL
PRESS

U.S. $29.00
CANADA $39.00

**AN ASTONISHING MEMOIR THAT REVEALS HOW FAR WE WILL GO TO PROTECT OURSELVES, AND THE HEALING MADE POSSIBLE WHEN WE CONFRONT OUR SECRETS AND BEGIN TO SHARE OUR STORIES**

For decades, Amy ran. Through the dirt roads of Amarillo, Texas, where she grew up; to the campus of the University of Virginia, as a student athlete; on the streets of New York, where she built her adult life; through marriage, motherhood, and a thriving career. To many outsiders, it all looked perfect. But Amy was running from something—a secret she was keeping not only from her family and friends but unconsciously from herself. "You're here, but you're not here," her daughter said to her one night. *"Where are you, Mom?"* So began Amy's quest to solve a mystery trapped in the deep recesses of her own memory—a journey that would take her into the burgeoning field of psychedelic therapy, to the limits of the judicial system, and, ultimately, home to the Texas Panhandle, where her story began.

In her search for the truth, to understand and begin to recover from buried childhood trauma, Amy Griffin interrogates why pursuing perfectionism, maintaining control, and keeping up appearances drive so many women, asking, *When, in our path from girlhood to womanhood, did we learn to look outside ourselves for validation? What kind of freedom is possible if we accept the whole story and embrace who we really are?* With hope, heart, and relentless honesty, she points a way forward for all of us, revealing the power of radical truth-telling to deepen our connections—with others and ourselves.


THE TELL
AMY GRIFFIN
THE
DIAL
PRESS

# 1. FREE

I want to tell you about the things that I remember. The things I have always remembered, things I remember still. The way it felt as a little girl when I'd get on my banana-seat bike, faded pastel pink with tassels on the handlebars, and ride through the streets of Amarillo with the breeze on my face. The sound of the cicadas chirping in the summertime. The way a change in the wind on the cattle yards outside of town, caked with manure, could leave you running for cover. Or a surprise on the cherry tree in our front yard: a loveliness of ladybugs swarming along its bark. I would stand there with a jar, collecting them excitedly. They would crawl up the glass, and I'd watch for a while, naming them. Then I'd set them free.

Free—that was what my childhood in the Texas Panhan-

dle felt like to me. Free like the wide-open spaces, where you could see for miles. Free to stay out until dark, trusting that nothing bad would happen. Free to do cartwheels through the park. Free to roam the neighborhood in search of friends who wanted to ride their bikes to the convenience store for a Coke and a candy bar.

MY FAMILY OWNED THAT convenience store, and several others in town. They were called Toot'n Totum, and there were locations all over Amarillo. The closest to our house was the store on Wimberly. My friends and I would ride there, then use our kickstands to park our bikes next to the building, up against its red-and-white-brick siding, leaving the bikes unlocked.

I can hear it now in my memory: the swish of the door opening and the jingling bell announcing the arrival of a customer. I can feel the blast of air—flat and cold—hitting my face as I walked inside, a reprieve from the dry heat. I can see the hot dogs that had been turning too long in the hot dog machine, which probably needed to be thrown out; my dad didn't like when they were overcooked, which they often were. In the front aisle, there was candy, and lots of it, with a colorful array of gum: I liked the bright, shiny yellow of Juicy Fruit and the synthetic watermelon tang of Hubba Bubba. Chewing gum was discouraged in my family, so much so that my grandmother Novie didn't allow it, considering it an offense as bad as smoking. Once, at a restaurant, my father pointed out a pretty woman smoking a cigarette. "See that woman over there?" he said. "Do you think she's beautiful?"

"Yes," I said.

"No," my dad said. "She'll be wrinkly soon, because she smokes." This was a clever way of keeping me and my siblings away from cigarettes, by appealing to our vanity. Tattoos and motorcycles were similarly verboten, but you couldn't get either of those at the Toot'n Totum.

My favorite snack, the choicest of all options, was a bag of Funyuns. Or I'd mix up a Slush Puppie, pulling the handle to dispense the frozen ice; the store had a machine where you pumped the syrup yourself, and I would use all the flavors, one after another, so that the slush turned my teeth black. Sometimes I would go into the store with my father, usually to pick up a case of Capri Sun when my mom volunteered to bring the drinks to a soccer tournament or community fundraiser. We would walk to the back, into the walk-in freezer where the drinks were stored, past the racks of Hostess Twinkies, Mrs. Baird's white bread, and Planters peanuts. My dad had a sweet tooth: He would usually pick up a pack of M&M's, alternating between classic milk chocolate and peanut; it was always a surprise that I would find stashed, half melted, in the center console of his Suburban. The clerk, in a bright-green apron with pockets, would ring us up, smiling under fluorescent strip lights. When I looked down at my pink jelly sandals, I'd see the gleam of the white linoleum floors, always spotless. Everything was perfect.

Toot'n Totum wasn't the only store in town. Sometimes I would ride my bike to Joan Altman's, a gift shop in a strip mall not far from my house, where there was candy in the shape of red and black berries. I would study them, trying to decide which color I liked better, even though they tasted the same; or did they? I could never tell. Joan had gray hair and a demeanor that could turn on a dime; depending on the

my younger self; I was adult Amy, conscious and aware, but I was being shown a vivid scene from my own life. It was familiar to me, this scene; I knew that I had lived it. Strangely, I did not want to turn it off. I could feel that it was important, this thing I was witnessing. Immersed in the session, I lost all track of time.

I saw myself on the floor, on my stomach, and he was stepping on my back with his cowboy boot.

"I must have made this up," I said out loud to Olivia.

My back was bare. Where was my shirt? I was twelve years old.

"This couldn't have happened to me," I said.

The rounded heel of his boot dug into the left side of my rib cage. I felt it in the same place where I'd had pain for years. I didn't move. I held my breath.

"Maybe I saw this in a movie," I said.

I looked around the bathroom. I knew every inch of that place. Even the divot in the sink that held the soap was familiar to me. The handle that would turn to open the window inward, directly opposite the door, which was closed and did not have a lock. The green stall and the gap between the bottom of the stall and the tiled floor. The toilet paper holder on the right-hand side of the stall.

"What is happening?" I asked Olivia. "I can't make it go away."

His hand was on the nape of my neck, pressing my head against the wall.

"I wasn't scared of him," I said. "I'm not scared of him now." A feeling had begun to slowly bloom inside me. A weight on my chest, but one of absolute security and truth. The place I had gone to had no fear, no insecurity, no doubt.

It was the place where my most essential self lived. I stared at the memory. It was all happening in real time.

"He was one of the good guys," I said.

In the memory, I was sitting on the toilet in the middle stall, facing him. I felt myself start to pass out, and as I slipped off the toilet, I remember thinking that I could grab on to the toilet paper holder to the right of me as I fell to the floor.

"He was always around," I said. "He cared so much about me."

He grabbed me by my left arm and pulled me along the floor to the middle of the bathroom. I saw the outline of his body moving, the crease in his pants at the knee, those cowboy boots, cappuccino-colored leather. Some part of him was always in motion, and I scanned his body from the ground up, watching the way he raised his arm or bent his knee.

"How can this be real?" I asked.

His foot was on my back again.

Then, a familiar memory—one I'd recalled so many times before, repeatedly throughout my life. I was walking down the hallway, and he stopped me, smiling. "We all know you're the real leader of this school," he said. I felt so special that day. He saw me for who I wanted to be.

"Mr. Mason," I said out loud, "thank you for seeing that in me, even though I didn't win."

And suddenly it was Navarro Day, the highlight of the middle-school year. My date was Bradley Jones, the boy who had beaten me to become student council president. I was so happy to be on his arm, even just for the night; I wished he liked me, that he wanted to kiss me, but he always had eyes for other girls.

"I asked Bradley to be my date," I said. It was a Sadie Hawkins–style dance, where the girls asked the boys. I was wearing a poofy dress with shoulder pads, in a bold floral pattern, made of fabric so thick it felt like wearing a curtain. I had borrowed it from a family friend. It was the first time I'd put on a fancy dress, and I loved the way I felt—ceremonial, important.

But then I was in Mr. Mason's classroom. It was early evening and still light outside. The frilly dress was pulled up over my head and I was bent over a desk while he was raping me from behind. I could feel the weight of the dress over my head, blotting out the light.

"This doesn't make sense," I said. "When would I have been alone at the dance?"

Next I was in the girls' locker room, with my hands on the metal locker, bent over at the waist. He was behind me. I felt the cold metal under my hands as he moved back and forth. I stared at the horizontal slats in the locker door.

"Could I be making it up?" I asked. But I knew that I wasn't. I was just trying to build a trapdoor in the scene, looking for an out. The fact of these memories was almost leaden, as if it were weighing down my body. I felt it in my chest cavity, the certainty of this deep truth, and I sighed heavily.

"I am going to tell him," I said, "*I know what you did to me*. I will ring his doorbell. Him in his fucking khaki pants. Always looking at me." I saw myself going into the bathroom and then leaving it, feeling numb.

Suddenly I thought of my daughters. "Oh my God," I said. "My girls." Gracie was thirteen and Gigi was ten. I felt a visceral need to protect them. Was I doing enough to keep them safe? "I can never let them be alone with anyone."

My memory turned back to the auditorium. Coach Taylor was talking about the recipient of the award. "This student works harder than anyone in her class," she said. "She is the teammate that lifts everyone up, she uses her body to accomplish extraordinary things, and above all, she is kind. She will go on to achieve greatness." I had wondered who it was. And then she called my name. Mr. Mason must have been in the auditorium, rows behind me. I could feel his eyes on the back of my head.

This memory was clearest of all—I knew it so well. I'd run through it in my mind a million times. I was crying, and so was my father. My mother was hugging me. I stood in the aisle, holding the award. I looked at my father's tears. And in a flash, I felt the edge that had been in this memory my whole life, that I had never understood before.

There was a brief moment, seeing the tears in my dad's eyes, watching him cry, where I wondered if he knew what was happening. He hadn't, of course—he was crying because he was happy. But the stickiness of the memory wasn't only because of his pride. It carried such a potent emotional charge and had remained with me all those years, because in that moment, I thought maybe I had been found out.

But I hadn't. Nobody knew. Instead, the world saw me how I wanted to be seen: as a leader. *The real leader of this school,* just as Mr. Mason himself had said. That memory, receiving the award, confirmed that if I just kept on achieving, nobody would ever have to know the truth. This was how I could continue hiding.

I had always thought back to that memory and felt confused. It had been exhilarating to be singled out, to be recognized. But I had also felt strangely detached, more numb than proud. I never knew why. Now, holding Olivia's hand,

my adult mind lending insight to that childhood memory, I saw it clearly for the first time. I thought of that sweet girl, my barely-thirteen-year-old self, standing alone in front of all those people, being given an award, and the fear she felt on that stage. She couldn't be proud of what she'd earned through her hard work and kindness, not when she was so afraid people would discover her secret. I put my hand on my heart. The tenderness was almost unbearable. I felt profound compassion for that little girl—me—and all she'd endured. The warmth and sweetness and beauty reminded me of the way I'd felt that day in the sea in Ibiza—a perfect day, bathed in sunlight.

A weight I'd been carrying forever slipped off my shoulders. It was the first time I had ever been honest with myself about what happened. I did not feel any shame. I was free, free as I'd been as a girl doing cartwheels, free as I had been riding my banana-seat bike through the brick-lined streets of Amarillo.

"Oh," I said simply, realizing, "I did nothing wrong." Then I repeated it. "I did nothing wrong." I exhaled, accepting it. "This all happened."

I had been holding on to my denial like a life raft for so many years, certain that if I let go, I would drown. It was only once I finally did that I could allow the truth to take shape. And now, fully submerged, I found that I could swim—that I was just fine in these waters. Transfixed by the beauty and the horror of what I had been afraid to see from the surface, I wondered why I had waited so long to dive into the deep end. The only thing that had been waiting for me there was myself.

. . .

EIGHT HOURS LATER, LONG after the sun had gone down, the warmth of the medicine fading away, I took the eyeshades off, adjusting to the dim light. First I looked at Olivia. Then I pulled my hair up into a messy bun. I slumped over and buried my head in my hands. I felt as though an eighteen-wheeler truck had been parked in front of my house for as long as I could remember, emitting a low, polluting hum and blocking out the daylight. Now, as it drove away, leaving only peaceful silence and sunlight streaming in, the calm was disorienting. I didn't miss the noise, but I also didn't know how to live without it. Part of me wanted to jump onto the back as it drove away.

"How will I tell John?" I asked. "This will destroy him." There was no part of me that feared he would see me as damaged goods; I knew his love was unconditional. It was that I felt his love for me so profoundly that I did not want to hurt him by revealing my own pain. We shared everything with each other; irrationally, I felt like I had been keeping something from him, even though I had been keeping it from myself too.

I looked down at the floor. "Olivia, can you go get him?"

An eternity passed and then I felt him sit down beside me. I could not look him in the eye. I felt devoid of any emotion. I just had to say it, even though I knew that once I did, I would never be able to take it back. I held on to it for one final second before life changed forever, then I spoke.

"John," I said clearly, "I have to tell you something. I was abused by a teacher as a child." To say it out loud was both the most anguished and the most liberated I had ever felt. They were the most important words I had spoken to him since I'd said "I do" at the altar. The glass case of denial had shattered.

He paused for a long time and exhaled heavily. Then, slowly, he reached for me. "Amy, I'm so sorry," he said. He said more words, but I couldn't take them in; all I could hear was the grief in his voice.

John took my hand and led me into our bedroom, where he pulled the covers back so I could crawl into bed. It was late, and I was exhausted, but I could not sleep. Instead I lay awake, reeling. *Is my entire life a lie?* I wondered absently. *How am I going to recover from this?* As my awareness began to sharpen, some practical machinery appeared that I could grab on to. *What am I going to do now? How do I move forward? How will I get out of bed tomorrow morning? Will I ever eat again? How will I sleep? How will I survive? Is this a bad dream that I'm going to wake up from?* I had no answers, only more questions. Then—

"Can I help you into the bath?" I looked over to find John, his face etched with concern. I could see dawn peeking in from behind the curtains. I nodded gratefully, and he walked me to the bathroom, turning the faucet.

The sound of the water filling the tub had always given me permission to take a deep breath, an acknowledgment that it was safe now to unwind. This was the same tub where I'd taken baths with all my babies, the same tub I'd filled with buckets of ice to relieve my aching body after long training runs. But now all I could think about was how this was my first bath after my life had changed forever, a baptism in my new reality. The person who had taken all those baths was gone. I was someone new.

How had I not known? My memories of childhood were so crisp; even something as mundane as a bathtub like this one could trigger a host of images, sharp as photographs in

my mind. There was the time Rachel and I shared a hotel room on the fifth-grade school trip to Washington, D.C., chaperoned by my mother and her best friend. I could recall with utter clarity the shock of pulling back the shower curtain to find them in their pajamas in the tub one night after we had come back from a monument tour, a half-drunk bottle of champagne smuggled upstairs, smoking cigarettes, crying with laughter. "Mom!" I said, stunned. "It looks like you're having fun."

She giggled. "Let's not tell your father about this," she said. "I promise I don't smoke."

Just as vivid was the occasion, around the same time, one of my siblings got the chicken pox. Back then, it was typical to put all your kids together so you could get the whole thing over with, so my siblings and I spent several weeks in and out of the bathtub, the water turning pink from the calamine lotion caked onto our little bodies. One year we even took a photo for our Christmas card in that tub. We were still young enough that all four of us could fit, covered in giant bubbles and grinning toothlessly.

I had submerged myself in so many bathtubs, in motels from Albuquerque to Austin, traveling for tennis and volleyball tournaments as a young athlete. I could see them in my mind's eye, those bathrooms, semiclean under institutional light fixtures, in tired rooms with faded accent pillows and Gideon Bibles in the nightstand, in chain hotels with rubber plants in the atrium and a complimentary continental breakfast, and I could remember all of them, those spaces where I'd allowed myself a few hours' rest before continuing to wear my body out.

How was it possible that I could remember all those bath-

rooms but had forgotten the one where something so horrific took place?

I had a *great* memory. I knew everything that had happened to me. Right?

I lay in the water, in silence, looking around the room, searching for answers. I knew that John didn't have any. He stood in the corner, his head hung low, one foot crossed over the other and a hand resting on my vanity, balanced on a delicate tightrope. I suspected he didn't want to take up too much space, but he also didn't want to leave me alone. On the edge of the tub, next to an expensive black candle I always thought about lighting but never did, was a milky white bar of lavender soap. I had upgraded from Dove, the brand I had long trusted because it was sold at the Toot'n Totum, the soap I'd always packed in my monogrammed camp bathroom caddie from Joan Altman's. I'd used that soap for years, then traded it in for something nicer, the way I'd done with everything in my pursuit to make my life bigger, brighter, and shinier—closer to some ideal of perfection that I couldn't even define. There were so many invisible lines connecting the girl I'd been to the woman I'd become, Texas to New York, my past to my present.

I understood, suddenly, that everything was connected. The choices I'd made in the life I'd built. The things I remembered and the things I could not bear to remember. In a flash, all the pieces snapped together, and not just the memories themselves but the significance of them; that is, *why* they mattered. It clicked into place, crisply, like parts that were designed to interlock. A jigsaw puzzle took shape over my head, an awareness fusing, the way people say something can suddenly dawn on you, as if I'd had the cor-

ner pieces assembled but not the full contents of the puzzle, and I had turned a little pile of cardboard fragments into a clear picture for the first time. Now it all made sense. I understood why there were things that I had remembered for so many years, that I had seen constantly, running on a track through my mind. Memories of Mr. Mason would come in like lighting a match, without warning and devoid of any emotion, then disappear from my brain—the flame extinguishing before I'd had a chance to attach any meaning to the memories. Finally, I knew what the memories *meant*—and I could hold on to them.

I saw myself running around the middle school, day after day, unable to look at it—turning away from the place where the abuse had happened.

I saw my disappointment when I lost the election to Bradley Jones, and then the prickling of surprise when Mr. Mason stopped me in the hallway that day. I felt so special.

He had known that I wanted, more than anything, to be seen as a leader. He had identified that need within me and he had exploited it. He had validated my desire to be exceptional, the same thing that had been nurtured in me by my parents and my school and my community—that I had come to believe was so important; he had taken this drive I'd had as a little girl, and he had used it to earn my trust.

I saw myself watching him pull out of the school parking lot, waving goodbye to me. That memory had replayed in my mind like a broken record, but I'd never known why it had felt so charged. Now I could feel my sneakers on the lip of the curb, that physical barrier that separated me from him.

I saw myself gripping the edge of the chair after my friend had recounted her own story of being violated as a

child, knowing it had happened to me too, yet being unable to face it.

It was all right there. It always had been. I had just never been able to see it.

Rage bubbled up in me. I reached for the bar of soap, dense and slightly rounded at the edges. It felt good to grab something so solid. I cried out in anguish and fury, a mangled and desperate sound, and hurled the soap across the room. It hit the floor with a thud, skipping along the tile, leaving a thin trail of suds, and landing at the base of the sink, next to John's feet. He leaned over to pick it up.

"That's how he got to me," I said. "He told me I was special." I shook my head. "That's why I spent all that time alone in the school hallways. That's why he found me in the hallway to tell me he knew I was the real leader." I slapped the surface of the water with my hands, spewing the words out. "Oh my God, that's how he groomed me! I see how it all happened!"

John took my hand to help me out of the bathtub. I stepped out, wrapping myself in a towel. As I walked back into the hallway, I felt my body start to quiver, then give out. I fell to the floor, towel half covering me, shaking violently. I wailed like a wounded animal, gripping the carpet, trying to hold on to the solid ground underneath me with my hands while I kicked the wall with my bare feet.

"What can I do?" John asked calmly. I looked up and he was standing above me, and even though his face was so kind, the sight of a man standing over me in a bathroom was a too-familiar echo of something menacing.

"Can you come down here?" I sobbed. "Please sit with me and put your hand on me."

Slowly, he sank down onto the carpet next to me, as close as he could get. Gently he pressed one hand onto my lower back, where the towel was wrapped around me. I was still wet from the bath. "I can't get up," I said, weeping. "I can't move. I don't know what to do."

Minutes passed as he sat with me. "You don't have to do anything," he said. "You can stay here as long as you want. I'll stay with you. Just be here."

THAT FIRST MORNING, THE world was unrecognizable to me. I made my way onto the street, outside for the first time in nearly twenty-four hours. A doorman down the block greeted me, friendly as ever. I pushed wordlessly forward, my head down, eyes obscured behind sunglasses. Cyclists and joggers gathered at the entrance to the park, ready to take on the day. I sat numbly at a coffee shop, staring into my watery iced cappuccino with its cheerful red straw. I wasn't ready to face my life yet.

Back at our apartment, John handed me a blank journal that he'd had in a desk drawer, a navy blue notebook. "Journaling was important for me after my first session," he said gently. "It helped me get grounded and sort through what I was feeling."

I turned the notebook over in my hands. On the cover was embossed text that read: PLEASANT DREAMS. I would have found it funny if it weren't so painful.

I scribbled down only a few sentences the day after my session. "I lent a dress to a sweet girl, Claudia," I wrote. "Being kind and doing things for others created a distraction from what was happening to me."

Why was Claudia, a girl I'd barely known, the first thing I wrote about after recovering these memories? It was because there was another memory, one that had played repeatedly in my mind for years, long before the session with Olivia. Now, in a flashback, I saw it again: Mr. Mason was standing in the hallway by the cafeteria talking to Claudia. His hand was on her shoulder. I walked past, slinking behind them into the bathroom. I had never understood the significance of this memory, why it had stayed with me.

Now it made sense. On some level, I must have assumed it was happening to her too. The sight of them together made it real to me in a way that my own abuse could not be. Through the prism of Claudia, I had experienced the horror of what was being done to me. And in the memory, after I slid past them and through the swinging door, I stood in the empty bathroom with my hand on my heart and took several quick breaths. My chest was tight. I was panicked. My inhalations were shallow. I was so relieved he hadn't followed me inside.

There was another memory, from around the same time, that had always been with me. I was peering through the slats of the venetian blinds in my childhood bedroom as I saw a car pull up on our street. Claudia got out and walked up to the front door, carrying the dress I had loaned her in a thin, plastic dry-cleaning bag.

She rang the doorbell.

I hid in my room.

I was embarrassed for her.

I was embarrassed for us both.

I had always thought the feeling, that flush of shame, was because I was self-conscious that my family lived in a better

neighborhood than hers. But was there more to it? I could not be sure. What if nothing had happened between Mr. Mason and Claudia, and instead I had projected what was happening to me onto her? Had I given her the dress in a subconscious show of solidarity because I believed she too was being abused? Or was I only thinking that now that my own abuse had been unearthed? It had all been so long ago. I wondered where she was and what kind of life she'd built for herself. Eventually, I thought, I would find her.

I thought about this, the gears of my mind turning as I tossed and turned in my bed, as the first twenty-four hours became the first forty-eight, as day turned to night and back again. I canceled everything on my calendar. It was the height of summer, and my children were busy with sports, camp, and friends. I knew they could withstand a few days of my hiding in my bedroom. I spoke only to John.

"When am I going to tell my parents?" I asked him numbly. It was late at night, and I couldn't sleep. "This will break my mom."

"I don't know," he said, shaking his head, "but I'm not sure if your dad can handle it." Would he even believe me?

ON THE THIRD DAY after the session, I dragged myself to the gym to swim in the pool, knowing that the water would bring me comfort, as it always did. As I crossed the surface, an image of a blue bandanna flashed through my brain. At first I couldn't place it. But as I stayed with the image, I realized that I'd seen it before—from Mr. Mason. He had used a blue bandanna to tie my hands behind my back in the middle school bathroom.

I swam faster, my freestyle propelling me across the pool. *What the fuck?* I thought. *How could I not have remembered that?* I thought back to John playfully tying my hands with the yoga strap all those years earlier, my seemingly inexplicable reaction. *How could I not have known?* I took a big gulp of air, dipping back below the surface.

Then I saw an open mouth full of teeth, like what a dentist would see staring down at a patient. And I heard Mr. Mason's voice.

"If you tell anyone," he said in a low Texas twang, "I'll rip your teeth out."

I gasped. Was it really possible that he'd said that to me? I remembered how I'd run out of the dentist's office in a panic, hysterical. I pulled myself out of the pool, feeling the muggy air hit my skin, and bolted for the locker room.

It wasn't until I got into the car with John that the pieces of the memory suddenly fused together. I saw myself on my knees in the middle-school bathroom, Mr. Mason's bandanna keeping my hands tied behind my back as he shoved his penis into my mouth. Then, in my memory, he was washing my mouth out with a bar of soap. "You come from one of the nicest families in town," he said. "No one will believe you." No wonder I had hurled that bar of soap across the room a few days earlier. The solidness of it, feeling its weight in my hand, had made it real.

The floodgates had opened.

An electricity surged through me, from the top of my head down to my toes.

"Why didn't anyone save me?" I screamed. "Why didn't anyone protect me?" I thrashed wildly, tearing at the seat belt. "I can't handle this!" My body jerked and convulsed in-

voluntarily, my muscles seizing. There was so much rage pulsing through me, I could have shredded the seat belt into ribbons.

THREE DAYS LATER I was sitting across from Lauren, a fine-featured woman with chestnut hair and a warm but professional demeanor, who had come highly recommended by our family doctor. I was desperate for a lifeline, and Lauren—with her pedigree, medical credentials, and expertise in both trauma and psychedelic-assisted therapy—was it. Sensing that I was in extreme distress, she had cleared several hours for a consultation. I curled up, wrapped myself in a blanket, and started talking.

I told her the story of my childhood, and how my parents had raised me; about the culture of Amarillo, and how much had changed for me since leaving Texas. Lauren listened attentively, affirming my experience where she could. "It sounds like your parents loved you a lot," she said. "It also sounds like the expectations placed on you—from them, and from yourself—were incredibly high."

We'd been talking for more than an hour when I finally started talking about the memories I'd recently uncovered. I didn't cry as I recounted what I remembered. It felt good to say the words to another person, to get the images out of my brain. Yet as I talked, I could feel my own doubt beginning to slip in. The memories were so clear, the images so vivid. I could feel these experiences so viscerally in my body that they *had* to be real. But how was it possible that I hadn't remembered the abuse—not even one fragment of an image—for so long?

question of where you are in your trust—in yourself and your story, and in me and our relationship." With her help, I tried to plot out the best way to have this unbearable conversation with my parents, even though I knew there was no way to prepare for something like this. I wrote bullet points, practicing how I would start off. I thought through how to deliver the news in a way that would stress key takeaways. I wanted to get this right. Even with this, I was still an overachiever—a perfectionist no matter the circumstances.

I now understood why telling people felt so important to me, as excruciating as it was. I had kept this secret for so long, even denying it to myself, and the secrecy had made me sick. Talking about it was the remedy, the cure. It neutralized the shame. The only way to heal now was to speak out loud what had been done to me—to say it over and over again, as loud as I could, looking directly into someone else's eyes. For so many years, these secrets, this truth, had lived inside me. Now I needed it outside of me. All those years, I'd had a tell. Now I needed *to* tell.

I knew, as with Lizzie, I would have to tell my parents in person. John and I arranged to visit them in Arizona, where they spent a lot of time at a house on a golf course in Phoenix that had belonged to my grandmother Novie. It was the place where I'd swum in a freezing-cold pool that my father didn't heat on principle, where Courtney and I had blasted Madonna from our jam box, where I'd been amazed to see grapefruit hanging from a tree, since you could see for miles in the Texas Panhandle, no tropical fruit in sight. The house in Arizona held a lot of history, and it was there that I would rewrite mine.

At the end of my weekly session with Lauren, she pre-

sented me with a deck of cards, each with a different animal. "What do you think—do you want to pull a card?" she said. "You've been working so hard. This will be fun."

The cards fanned out before me, face down, I tugged at several, finally pulling one at the back of the stack. I turned it over, face up.

"The earthworm?" I said incredulously. "After all the therapy and processing, journaling and reflecting—now I'm being compared to an earthworm? This feels like a cruel joke."

"Just a minute, Amy," Lauren said. "Let's not be so critical. Look at that card. What does it say?"

I read the card. "The earthworm feels small and insignificant, but it's an important part of the web of life. It can be hard to see the big picture, especially when you are down in the dirt, but please know that you matter. Your life has great purpose and meaning." I looked back at Lauren. "Sorry, I'm still stuck on the fact that I'm a worm. Not the inspiration I was hoping for." She smiled. "But I get it. This is where I am. I'm in the dirt, investigating every possible hole." And I knew I was going to have to stay there for a while.

ON THE FLIGHT TO Arizona, I was still practicing my delivery—thinking through what my parents could handle hearing—when I got a message from William. "I know today is a big day," he wrote. "Remember to put your feet on the ground and just breathe. There's nothing you can't do today." He sent along a quote from an Adrienne Rich poem that he loved: "There must be those among whom we can sit down and weep, and still be counted as warriors." That was exactly

what I wanted: to know that I could cry and howl and grieve and not be seen as weak but be seen instead as someone who was fighting for survival. I tore a scrap of paper out of my notebook and wrote the passage down, slipping it into my pocket.

As we pulled up to my parents' house, I felt like my organs were frozen inside my body. "Heads-up, Mom called me last night," Lizzie texted me. "She asked if I knew why you guys were coming. She thought maybe John was thinking of making a career change or that you were going to upend the kids and move overseas. Just wanted you to know she's asking questions." I touched the scrap of paper in my pocket. *Just breathe.*

Making our way up the drive, I could see my mother was already standing on the edge of the curb under a palm tree to greet us, waving brightly.

"I made a cheese plate!" she said. "We're so happy you're here. Do you want to go over to the hotel and have lunch—or should we go for a walk?"

"Can we all sit on the patio and catch up?" I said. Suddenly I was as centered as I'd ever been. It was go time. I had to let this out. I had come here because the investigation couldn't continue until my parents knew the truth, but now that I was here, I could feel that it was about more than that: It was time they understood what I had been running from all these years. I'd kept it a secret for so long, and now I was finally freeing myself of that burden.

"That's a great idea," she said, but I could hear the hesitation in her voice; she knew something was up. She grabbed blankets so we could get cozy on the covered porch. I sat on the couch with John, my father sitting in a chair next to my

I opened the diary to the first page. "I lent a dress to the sweet girl, Claudia," I had written. "Being kind and doing things for others created a distraction from what was happening to me."

Claudia had been a dead end, just like everything else; I remembered Cate said that when Claudia spoke to the investigator, she barely remembered me. But something about it nagged at me. Idly, I wondered how her life had turned out. Was she still living in Amarillo?

I dug out all the files from the investigation I'd abandoned two years earlier. I had never read them in detail. I had been so raw, so powerless, and so out of control, when it was all first coming up, that I hadn't known if I was strong enough to face all the facts myself. Instead I had allowed Cate to be the intermediary, summarizing the findings for me. But now I knew that I could handle it.

There was a photo of Mr. Mason in the file. I studied the picture, taking it in. He looked the same, just older and more worn; in the picture, he was sitting in a metal folding chair with his wife, who had her arm around him. I pitied her. He had the same good-ol'-boy grin he'd had thirty years earlier. I set the photo aside and moved on to the reports from the investigators.

They'd spoken with so many people from back home and questioned them about their memories of Mr. Mason without using my name. As I read back through the reports, I found that, just as Cate had explained two years earlier, nobody seemed to have any particularly damning recollections of him, at least nothing that would hold up in court. It was just a bunch of stray threads—revelations that had felt explosive at the time but ended up leading nowhere. I felt discour-

aged and disheartened all over again. *How had I been the only one?*

I turned to the next file and found it was Claudia's. I opened the transcript of the conversation and started scanning it.

**INVESTIGATOR:** Is it correct that you were a student at Navarro Middle School in seventh and eighth grade?

**CLAUDIA:** That sounds about right.

**INVESTIGATOR:** That would have been 1988 to 1990?

**CLAUDIA:** I would have to go back and do the math.

She seemed standoffish in the transcript, but then again, so had many people when the investigators had called them. So much for southern hospitality. I wondered if there was anything to the fact that she couldn't remember when she'd been at Navarro. I knew from everything I had read about childhood trauma that it was common to struggle with the recall of traumatic memories. But it was probably nothing.

**INVESTIGATOR:** Do you recall any rumors of inappropriate behavior regarding teachers at school?

**CLAUDIA:** No.

**INVESTIGATOR:** What are your memories of school?

**CLAUDIA:** I had a normal adolescence. Middle school was horrible. Nothing in particular.

Middle school was horrible, but nothing about it was horrible in particular? Were these just standard recollections of teen angst, I wondered, or could it be something else?

**INVESTIGATOR:** Did you have Mr. Mason as a teacher?

**CLAUDIA:** I don't remember. Name doesn't sound familiar.

**INVESTIGATOR:** Do you remember any school dances?

**CLAUDIA:** No.

I continued scanning the document, annoyed that she remembered so little.

**INVESTIGATOR:** Do you remember someone giving you a dress?

**CLAUDIA:** I remember borrowing a dress from someone. Amy lent it to me. Amy something. My mom would remember the name.

Suddenly, I was riveted. Wasn't that funny? She didn't remember anything except that one object—the dress I had loaned her. Like Professor Bice with his teddy bear all those years earlier, even in the blurriest memory, something tangible had the power to cut through.

**INVESTIGATOR:** Were you friends with Amy?

**CLAUDIA:** Not really. Friendly acquaintances, not confidantes. We probably had classes together.

INVESTIGATOR: Why did she give you a dress?

CLAUDIA: I think my mother asked her parents for a dress. My family didn't have any money.

INVESTIGATOR: Do you remember thanking her?

CLAUDIA: Yes. I don't remember the verbiage. I remember how gracious she was.

I set down the page, overwhelmed. *She remembered me because of the dress.* The memory was incredibly important to me, crystal clear in my mind. Of course Cate couldn't have known how significant the dress was to me. But in my memory, the dress and Claudia and Mr. Mason were all linked in some mysterious way I couldn't explain.

I knew enough to know that the magic of the medicine was its ability to cut through the clutter of the mind to a place of essential truth. So why was it that the first thing I wrote after the MDMA had unlocked these memories was about Claudia—not about the abuse, or the teacher, but about her?

There had to be something there. I didn't know what, but I knew that in the memory of Claudia, there was a thorn, a thing as yet unresolved within me—the same way that there had been something unresolved in that young woman's obedient voice, saying "Yes, ma'am." I felt a flicker of familiarity, the filament of myself that had been in her and that was also in Claudia—the reflection of how it felt to be subordinated. It was all connected.

The investigator had included Claudia's full name in the report, since she had married and taken her husband's name.

I typed it into my keyboard. Why had it taken me so long to do this?

In a matter of seconds, I was staring at her picture on my screen. She had the same smile and the same eyes. She was married to a lawyer and lived a few hours east of Amarillo. A moment later, I had her phone number.

"Hi Claudia," I texted. "This is Amy from middle school. I know, such a long time ago. Hope you don't mind that I looked you up. I'm trying to reconstruct some memories from those years and wondered if you might be open to chatting with me. I'll be in your area soon if you'd be open to a coffee. It would be so nice to reconnect."

She wrote back. "I would be happy to have coffee if time allows," she said. "Someone reached out to me a bit ago. As I explained to them, I have no memory of many of the people involved. But if I can assist, I will. Let me know when you are in town."

I looked up to find John standing in the doorway, where I had all the papers spread out before me. My relationship with John had always been my greatest source of strength, but we had become closer than I could have imagined when I walked down the aisle all those years ago. It wasn't lost on me that he had done "the work" of dissolving his own shame with the help of MDMA before I had. It was only because I trusted him so emphatically that I had been willing to do my own. Through my coming to know myself more deeply, our connection had deepened too. Even during the darkest nights, when I fell asleep crying on the closet floor, I would wake up to find he had gotten up to cover me with a blanket. He was steadfast, a wise owl whose love for me had never faltered.

"What are you working on?" he asked.

"I think I have to go back," I said. It was the first time I had said the words out loud, and the sound of them surprised me. But it was time. I had to excavate my own foundation. This was the last piece of the puzzle.

"John," I said, "I think I have to go home."

## ABOUT THE AUTHOR

Amy Griffin lives in New York City with her husband, John, and their four children. She is the founder of G9 Ventures, an early-stage investment firm.

thetellbook.com
Instagram: @amygriffin

*Books Driven by the Heart*

Sign up for our newsletter
and find more you'll love:

thedialpress.com

@THEDIALPRESS

@THEDIALPRESS

Penguin Random House collects and processes your personal information. See our Notice at Collection and Privacy Policy at prh.com/notice.



**AMY GRIFFIN** lives in New York City with her husband, John, and their four children. She is the founder of the investment firm G9 Ventures.

THETELLBOOK.COM
INSTAGRAM: @AMYGRIFFIN

**Also available from Penguin Random House Audio**

JACKET DESIGN: GRACE HAN
JACKET ART: VIKTAR SARKISIAN/GETTY IMAGES
AUTHOR PHOTOGRAPH: © JAKE ROSENBERG

THEDIALPRESS.COM

**THE DIAL PRESS**
© 2025 BY PENGUIN RANDOM HOUSE LLC

## ADVANCE PRAISE FOR THE TELL

"A beautiful account of the journey of courage it takes to face the truth of one's past."

**—BESSEL VAN DER KOLK, #1 *New York Times* bestselling author of *The Body Keeps the Score***

"Transformative and illuminating . . . a powerful story of what can happen when self-compassion replaces fear as the governing force of one's life."

**—CHANEL MILLER, *New York Times* bestselling author of *Know My Name***

"*The Tell* is the most powerful memoir I've read in years. It's the rare story that will liberate you from shame, empower you to stop cycles of abuse, and make it safer for you to tell the truth."

**—ADAM GRANT, #1 *New York Times* bestselling author of *Hidden Potential***

"Our minds may repress, but our bodies keep the score. *The Tell* is an honest book that will help us trust that wisdom."

**—GLORIA STEINEM**

"Amy Griffin's courageous, generous memoir is both a reckoning with a terrible, all-too-common experience and a searching and empathetic inquiry into the meanings of goodness, self-blame, and forgiveness."

**—HANYA YANAGIHARA, *New York Times* bestselling author of *A Little Life* (on Instagram)**

"An extraordinary memoir paced like an expertly plotted thriller . . . I will be thinking about this book for a long time."

**—JESSICA KNOLL, *New York Times* bestselling author of *Bright Young Women***

"I started *The Tell* while sitting in my car . . . and literally spent the morning in the parking lot because I couldn't stop reading. Your own heart will break, and mend, as you read."

**—SUSAN CAIN, #1 *New York Times* bestselling author of *Bittersweet* and *Quiet*, and host of the Quiet Life community**

"Overflowing with heart and determination, *The Tell* is the story of the day-by-day, step-by-step, hard-won push through harrowing emotional terrain. Griffin shines a path forward through the dark."

**—MARISKA HARGITAY**

ISBN 978-0-593-73120-8
52900
9 780593 731208

# EXHIBIT E

March of 2022

—-The Flow of Water

As an English major and student-athlete in college there was little time to organize my thoughts before I wrote my papers. No doubt a product of my own doing as there never was enough time to sit still and focus. I kept ten plates spinning at all times on purpose. I found pockets of time that didn't exist, multi-tasking always, and bullet pointed assignments in my head. We swam as a volleyball team for conditioning several times a week and it was in the water with the monotonous back and forth that I got relief from the world around me to think, to breathe and to write. After climbing out of the pool, I would rush back to my room with wet hair to clack out the words on my laptop. My first computer weighed close to eight pounds and often while writing on long conference game bus trips, the clunky 90's machine would overheat on my lap. By the time we reached our destination there was often a pillow and several books positioned between me and the computer to keep my legs from overheating. It was the combination of long bus trips and long swims that gave me a framework to process and write.

The water is where I feel held, alive and free. Maybe I should have been a swimmer growing up but instead chose volleyball at a young age which had the advantage of being part of a team and working towards a greater goal. I also loathe being cold and getting up early so swimming would have been rough for me as a teen.

Who knew after all the papers I wrote in my head in the old Memorial Gym pool, which is now a storage space for files, that I would someday use this valuable skill to write the most important words of my life. While on vacation with my husband and four children, I skipped the group surf lesson and went for a long swim along the coast line. I darted in and out of schools of fish and spiny sea urchins that lined the ocean floor. Something came over me that I still can't fully explain. The words, my words, my truth came pouring out effortlessly. I couldn't turn off the flow of words if I tried as they were there on the tips of my fingers. Turns out, my time as a college athlete had prepared me for life in a way that I hadn't anticipated. Organizing my thoughts in the water would prove to be a far more valuable skill than hitting a white ball over a net.

I emerged from the warm water on our first day of vacation after what felt like a never ending northeast winter with gratitude for the sun and water and sat down to write. Here I was for the first time in my life writing for me. I wrote without caring about my audience because these are my words and what I alone experienced. This is my story and I'm coming out of my cocoon. I've been in the chrysalis phase long enough. Time to show my true colors.

I grew up in a small Texas town, but a place that has a bigger heart than anywhere I've traveled in the world. Amarillo at first glance might seem like a place you would stop for a bathroom break on a long haul cross country trip. Blink and you are on your way to New Mexico after passing truck stops that are worlds of their own and the infamous Big Texan steakhouse is always a talking point in case you are up for attempting to eat an entire 72 ounce steak with all the trimmings including dessert. It's free if you succeed and those who complete it will likely have some stomach issues to sort out but major bragging rights.

Away from the concrete walls and multiple highway lanes that split the town in half, you will find a group of people who care about community and connection. When coming home after along absence, I was stopped while jogging and asked if I needed a ride or directions. People go out of their way to support each other and raising kids is a collective experience in the Panhandle. Amarillo is one of those small towns that you read about that seems fictional. I

never got around to watching the show Friday Night Lights because I lived it. There are healthy sports rivalries between high schools that have endured for generations. As kids, we were free to roam the neighborhood on our bikes after school and on weekends as long as we were all home by dark. There was a snow cone cart in the parking lot of the grocery store a few blocks from home that sold my favorite flavor called Tiger's Blood. Together with a few friends we pooled our quarters and rode down for a treat often pushing the limits on our curfew. We have a stunning canyon, a temperate climate and the infamous Cadillac Ranch which I visited for the first time a few years ago with my own children. There is something part mystical and part wacky about an arrangement of brightly colored cars sticking out of the earth in the middle of a field.

Growing up in West Texas we were surrounded by all kinds of animals. There were the domesticated and undomesticated varieties and then the indescribable. At one time or another we had rabbits, frogs, snakes, dogs, horses and a cat that lived for twenty-something years. I always beelined for the "win a goldfish by getting the ping pong ball in the glass jar" game at the summer Junior League sponsored Fun-fest event. With fingers crossed, I brought home ten or more fish in bags praying that a few would survive the car ride and like their new bowl mates. I'm sure my mom can recall another dozen species that at one time or another we brought home much to her surprise that she in turn had to figure out how to feed.

There were horny toads with spiky skin and flat bellies that we collected in shoe boxes with holes poked in the top as children. Sadly there is no proof they existed for lack of the iPhone back then to capture an image of the funny little creatures and with climate change and all they are merely fictional characters around the Panhandle these days. There were and still are rattle snakes on the edge of town and every spring you would know school was soon to let out for the summer by the sound of the locusts humming in the evening. In college, I was proud to be the roommate who would pick up a cockroach when a room of screaming girls hovered in a corner as if there was a mountain lion approaching. June bugs, crickets and little snakes put around my toothbrush by my animal loving brother were all just a part of life.

I was classified as a Bear for two years by attending Stephen F. Austin Middle School only a stones throw from where I grew up that to this day has a sign outside that proudly reads: "Home of the Bears" in yellow and green.

And like all bears, I did my fair share of hibernating. I would emerge from my room for school and sports and then often times I would hide away from the world in my bedroom with the matching white rattan headboard and couch with pink and green wallpaper. For good reason, I would disappear.

In my family, the women were as tough and stubborn as wild mustangs. On both sides, I had grandmothers who I would have put into any rodeo ring, each with a different skill set that made them shine. One was a widowed woman who in the 1950's started three business because no one told her that it would be difficult to start a business as a women in Texas, let alone three. Novie Woods was fearless and unapologetic. She had impeccable style and she didn't allow gum chewing in the office. My kinda woman.

My grandmother on my mom's side was Jeannine. I share her name and always felt that I was her favorite as the first of her grandchildren but she made us all feel special. She would howl our shared name like a coyote at all my tennis and volleyball matches to get my attention. When I played well she would say, "that's my girl, Amy Jeannine". When it wasn't going as planned, I could hear her shouting "let's go Amy" with less enthusiasm. Jeannine knew how to command a room. She taught me how to take a catfish off a fishing pole and she made me coffee every Thanksgiving morning before we watched the Macy's Thanksgiving Day parade. Sanka, milk, one packed of Sweet and Low and a few spins inside the microwave made for the

perfect guilty pleasure that was our holiday ritual. The smell of coffee often makes me think of my namesake.

Jeannie Bee as she was called also had a thing for handing out tiny little felt bees that she would pick up from the Golden Bee restaurant in Colorado, Springs. She would dole the bees out like they were first prize ribbons at the state fair. "You get a bee", and "you get a bee and you for sure get a bee", she would say as she passed around the little treasures of fabric. Everyone in my life knows that bumble bees are my link to someone very special.

As a child in the Panhandle, I saw for miles and thought the wide open plains and the smell of cattle feedlots were a metaphor for a bright future. I lived in the present and didn't feel the need to dwell much further ahead of who could drive me to the mall on Saturday afternoon. I was light and free and full of promise. I had parents that rivaled the Cleavers. My mother gave every fiber of her being to the schools, sports teams and communities that the four Mitchell kids inhabited. On Friday nights, she made a habit of spreading a ton of food on the kitchen counter so all the teens would come to our house instead of getting into trouble. Cars of friends lined the driveway and street on weekends and everyone was welcome at our house even when I wasn't home. We thought birthdays were national holidays as my mom found a way to celebrate each meal of the day on your birthday beginning with birthday pancakes and a candle. She helped make every poster when running for class representative and loved me and my three siblings unconditionally.

And my father, who lacked a paternal role model after he lost his dad when he was three, made up his own parenting rules and was a father ten times over as he made sure to do all the things with us that he never got to do with his dad. He taught us to ski, to throw a baseball and how to drive a stick shift car on a hill. Dad coached all my little league sports from soccer to baseball. He wanted us under his watch and to be involved in every aspect of our lives growing up. Everything was about family.

My parents never missed a sporting event in eighteen years. There was one time in high school when I looked up in the stands and they hadn't yet arrived to my volleyball game. It was a long drive and I remember seeing the empty bleachers and panicking. By the time the match started they were front and center holding signs. Dad was usually home by five thirty. Mom helped with homework and we all did the dishes together although I was known to sneak upstairs often with the excuse of too much homework to help rinse and stack.

At an early age, my parents enrolled me in just about every sport one could imagine. I tumbled and went to trampoline practice for years until I got too tall. I used my cartwheel skills to go up and down the soccer field while my dad would tell me to follow the ball and stop going hand over foot. I would laugh from the middle of the field. Come and get me I would think with a childish grin!

And then one day the cartwheels stopped. I always wondered why. They just did. I've asked myself why for such a long time. "Why did the cartwheels stop?"

They stopped when I became a Bear in the seventh grade at Austin Middle School. They stopped because there was an animal that even a bear couldn't put up a fight against, especially at the young age of twelve. This animal sought power without an ounce of compassion. I can see now that there was deep seeded anger and a past that must have been filled with trauma to inflict the harm this animal did to me for years. There was domination, lies and a sense of ownership and entitlement. There is nothing redeeming about this animal. He wore jeans, cowboy boots and in public he looked like the head of a pack of wolves. Always around, always lurking, always smiling, sly and conniving. He posed as a [redacted] teacher.

[redacted] He was a chameleon living amidst the middle school community.

His entire life is a lie. [redacted]

I shutter at the sound of his name so for years have called him Mr. X. That's how I've been able to classify this animal as I can't utter his name. I keep him at a distance by using the letter "X" signifying stay away from this individual at all costs. Like a caged bird, I was trapped in small spaces wanting so badly to fly away. To fly anywhere in those moments. It is no wonder I don't like confined spaces and feel out of control on airplanes.

Mr. X is the only title he deserves from me as I was so young that I didn't know what was happening the first time he came for me, chasing me around [redacted] as if we were animals playing a mating game. I remember myself chuckling uncomfortably knowing that something wasn't right but there was nowhere to hide. This animal groomed me, abused me mentally and physically. I was raped, beaten and tortured in the confines of the school repeatedly for years. No amount of experience with other living creatures as a child could have prepared me for the beast I would face in middle school.

I have no explanation for what happened to me as I wasn't able to comprehend the brut and graphic nature of the moments in his claws. The power dynamic and sheer force he had over me was overwhelming and indescribable to this day. I had taken sex education and been told often by my parents not to let anyone touch me. The emotions I felt transcended anything I had encountered at that point in my life and there was no way to categorize my feelings. I was prey, pretending to be dead while the predator circled, waiting to move in for the kill. I froze, a deer in headlights. I went somewhere else. Somewhere I can't describe but I promise that will be my first question when I depart this life. Where did I go? How did I survive? Why didn't I tell anyone?

There was no one to tell. I walked to and from school most days as the oldest of four children and I wanted my independence. I wanted to leave the corral and find my own way. School is a place where children are meant to be safe. How could my parents ever conceive of what was going on after school and volleyball practice before I walked home? There is no way they could have known. I would walk home, go straight to my room and study.

When I was in control of my own body, I used it for good. I used it to get away, to feel powerful and in control. I arrived at every middle school volleyball practice with my game face ready to put forth the energy it took to be my best. This was a complete departure from my days doing cartwheels and playing with my childhood dog, Annie. I resigned myself to the fact that if I could put in one hundred percent effort at all times, I could escape the animal who followed me, hunted me down and told me that if I told anyone he would kill me.

I escaped and flew off to The University of Virginia on a volleyball scholarship. I leaned into my coaches in middle school and high school and did everything they asked at practice and more. I was athletic and told I had promise but no one would know just how hard I was working to stay quiet. In the last few years I've been able to be honest with myself about the events that

unfolded all those years ago in the bear den. I chose to bury my sadness, shame and guilt in a deep hole and hope that whatever successes I was able to achieve in life were enough to hide from the truth. Even before I could acknowledge my repressed memories, I've said every morning when I put my two feet on the ground, that I know I have to work three times harder than the average person to succeed. I would not let this define me for the rest of my life. I would try to get away from him and the memories.

After college, I moved straight to New York City, moved in with college friends and ordered a 1-800-mattress. I've read that people with severe PTSD are often drawn to big cities. The energy of the city keeps you on your toes and is great place to separate you from your past. There really is something to seeing the Statue of Liberty for the first time. "Give me your tired, your poor, your huddled masses yearning to break free." I was all of those things when I moved to NYC. Yearning to break free resonates strongly.

COVID was truly the first time I couldn't escape myself. We left the city for a few months and I had nowhere to put my thoughts. I was backed into a corner by the stillness. My own internal reckoning was happening while the world was imploding.

Animals are instinctual and I give myself credit for finding my partner in life. John showed me how to accept love and taught me how to trust. He has been through my unraveling and stood patiently by my side, all without trying to fix the situation. It has to be that way for me to heal as he can't do it for me, no one can. Over time, I've been able to release and process the flashbacks and memories with John always an arms length away. Sometimes it was simply waking him at two am to say, "I can't sleep, I'm having flashbacks". He set the stage for me to be me with all the good, difficult and in-between moments. Together we built a solid nest for our children by trying to be good listeners, letting them have their independence and not judging, although I really have to check myself on that part. The letting go part is a tall order for a Texas girl who group up in a loving but strict household while carrying a a heavy load.

I've built a hive fortress of friends from all over the world whom I have called in the middle of the night, texted endlessly, and gone for long walks with in the park. There is the friend who insisted on using a sage stick around the perimeter of my body to rinse away the cobwebs of pain when I broke out in a stress-induced rash. Another of my dearest friends told me we could talk about whatever comes up now and then have the same conversations when we are eighty in a rocking chair on the front porch. The friend who could barely put two feet in front of the other as we hiked and talked for hours in the Colorado mountains. My two best friends from childhood took on the brunt of the tasks that were as mundane as making me get dressed to leave the house for coffee to running point on correspondence with other high school friends. My bees have my back.

Like a gazelle on the plains, I tried to run away. But no amount of running, not even the Ironman I completed, slowly, and not looking exactly like a gazelle or the hours spent swimming endless miles in the ocean could hide my past. Over the years, I built a big life with every resource at my disposal, four beautiful children and a career supporting founders who are changing the world. But that little twelve year old who was left behind wouldn't care about the life I was living now. I've promised her that she is safe and that she won't be judged. She needed assurance that she would no longer be alone with that animal in those confined spaces ever again.

All my life I've had flashbacks, memories, triggers that have taken me back to empty hallways. I was told I was important and a leader, sent notes to leave class early and remember Mr. X leaning over my shoulder at lunch even critiquing what I was eating. The signs have all been there and friends and family too say they've always wondered why I exhibited certain behaviors. I'm just finally able to admit it happened. All of it happened and it is sad. Really

sad. My teacher, [redacted] says, "yes, Amy it would be much easier if this hadn't happened. You don't want this, need this or have the time to deal with this. But it all happened." It has taken endless amounts of compassion for myself and and a lot of strength to talk about the past but I'm moving forward. I remember horrific moments at the least expected times but I've learned to let the thoughts in, not fight them, accept them and even appreciate that they surfaced.

Often times as I processed all that happened in my childhood, I felt like a blowfish stuck in a metal pipe that had been dropped at the bottom of the ocean. There were definitely times when I swam into the pipe hoping to escape the flashbacks and feelings that I didn't know how to handle. As a blowfish, I could see that on the other side of the pipe there was a colorful coral reef, out of reach from the thrashing shark teeth on the other end of the pipe. I knew that from a practical perspective I was safe as the shark wasn't small enough to fit into the pipe, but there were many moments when I would swell up with emotion and be stuck in the tunnel unable to move forward or backward. I could see the shark. I could see the little fish and brightly colored reef ahead, but I had to do my own work to release the pain, breathe and move slowly towards the light.

I've turned to every type of therapy to heal the baggage of the past. Sometimes the trauma sits in brown grocery store bags waiting to be transferred to the fridge and cabinets. It all has a place and I'm sorting out where everything is best stored. The bag is never empty as this is a process that will last a lifetime. As I sort through all the emotions, I realize many of them are expired and can now be thrown out. Other coping mechanisms are shelf-stable and will last forever but I know I am one of the lucky ones as I am blessed to have many resources at my disposal. Grocery shopping alone is a monotonous, thankless task. I want others to have the same resources I have had to sort through their own grocery bags.

Many wise owls helped me get to this place: My mother who has infinite wisdom, my loving younger sister who has said more than once that she wished it could have been her, a brilliant mentor in my apartment building, my doctor who I say is witchy as we are in sync and have spent so much time together, my Divine Feminine who brought me into the light, my friend and lawyer Kate who took on this challenge to help make change, my oldest friends from Texas who buzzed around me in the darkest of hours and my friends from adulthood whom I chose for their strength to get me to the other side.

My mom wrote me one day recently to say, "Amy this is your time. Tell your story in your own words." My mom named me Amy which means beloved. To be believed is to be loved. And the next day my upstairs mentor said to me, "If it was me, I would share my story with honesty and conviction and know what outcome I want." I want to live up to my name by telling my story, to be believed. By using my voice, I will help others. That's the outcome I want and the reason I've finally been able to put my experiences in writing.

Before leaving for spring break, I went to both of my girls and asked for advice. "I'm thinking of writing my story, of telling it publicly. What do you think?" They gave me the same message in different conversations. "It's kind of insane that you were even able to come to us with your story" Gigi said. She continued by saying "You are so brave and powerful Mom and whatever you do, your words will make change." Gracie added, "Your story will have ripples and it is important that you do share what happened. I'm behind you all they way."

It is said that your children are your greatest teachers and mine are surely that. Call it instinct, science or nature, but as my girls approached the ages of my abuse, I decided to come forward with my story. I've been told by doctors that it is a common phenomenon for women to share their story when their children are the ages that they experienced their trauma. Many women don't come to terms with their childhood sexual abuse until their children are grown

and out of the house. I consider myself lucky that I finally acknowledged my abuse when I did and although I suffered alone for years, I pray the cycle of abuse ends with me.

I remember sitting on one of their beds late into the night during the pandemic and the girls asked me if I was ok and why I didn't seem reachable. I went to bed that night feeling devastated and a failure as a mother. Why was I feeling so disconnected? It would be only a matter of months before I sat my girls down separately to tell them my story. It took a lot of planning before I shared the details with my children. To date, I have not told my youngest as he is too young to understand what happened to me when I was only a few years older than he is now. The right moment to share will present itself in due time. Until then, at bedtime, I sing him a song in Maori that speaks to love and understanding. In some ways, the song feels like my way of sharing, of moving on and forgiveness even though all three are still very much in process. After telling my oldest, Jack, he didn't ask many questions in the moment, but he hugs me a little tighter these days and even lets me put my arm around him which feels like a huge win.

"It's time" my husband said. "The girls feel it. The floor is yours but they are starting to ask me questions." Our younger daughter asked him, "Dad, did something ever happen to Mom? Like when she was growing up?" I recognized the conversation could have long-lasting effects on my children so I dropped everything to prepare for what I thought would be several of the most challenging moments in my life. On the contrary, it was quite the opposite. My girls were poised, loving and devastated all at the same time. The girls said exactly what I needed to hear in those moments. I thought I would be counseling them but they lifted me up while aching alongside me. They are part of me and could feel the deep sadness. The process of honestly sharing has brought me closer to all my children. It has brought clarity in all my relationships.

Telling my parents was as expected quite possibly the most difficult day in the process as it was gut wrenching to deliver such hurtful news to the two people who gave me life. That day in early January was a low point yet an essential moment on my road to healing. I will forever remember seeing my mother curled up on the stone floor in a ball. She looked like a turtle who never wanted to come out of her shell again. It was too much for her to hear, to much to hold. Too painful. Too horrific. My father turned after I finished speaking and said, "We somehow missed this in the first half of your life, but we are going to support you every step of the way for the second half of this journey." It was a symbolic day. I needed them as a grown woman, wife and mother of four just as I needed them as twelve year old, but didn't know then how to ask for help. Fate would have it that on the day I told my parents we huddled together for twenty four hours and emerged to learn that there was an invasion of The United States Capital. It was all surreal.

Since then, I've often needed to repeat stories to my parents as they are understandably difficult to fully process in large doses. That said, my mom and dad's constant support has never wavered from the moment I told them what happened so long ago.

In the last few years, I've worked harder than I ever have in my life to trust myself, to allow the pain in and move through what has been anything but a linear process. There is no perfect handbook or Google search on how to heal. The process has been daunting and no amount of running could take the pain away. No matter how many good deeds I did for others it didn't feel like enough. The process had to begin with me and ends with me realizing there is no end in sight only forward movement, acceptance and a release of shame.

My doctor and I did an exercise almost two years ago where I drew a card from a deck that contained the essences of various animals to help start a conversation. I drew the earth worm. "The earthworm" I said. Not the strongest animal I anticipated drawing in my time of need. But I have indeed been an earthworm for the last twenty-four months. I have excavated every hole in my heart, explored unchartered territory and built tunnels and bridges of compassion and self-acceptance. Two years later, we took the deck of cards out again and I shuffled the deck wondering what animal I would draw and if it would have personal significance. I pulled out the whale. I got chills. [redacted] gasped. She couldn't contain her sense of awe and I swear I saw a tear. "The whale" she said " is the ultimate wise and knowing feminine card in the stack." The whale symbolizes truth and grace. No surprise that I drew the magical creature who rules the ocean deep, my safe harbor in the world.

My predator told me "No one will ever believe you. You are from one of the nicest families in town and they won't love you if they know the truth." It took me a along time to find the truth. The truth is I did nothing wrong. I have nothing to feel guilty or ashamed about and this is not my burden to carry. I've held onto the pain for far too long and only recently acknowledged this all happened decades ago. I've tried to doubt myself, to build others up around me so I didn't have to look myself in the mirror. I had two options, one being to survive with the alternative being death. I chose survival but never spoke my truth.

And here I am today. Part earthworm, bear, butterfly, gazelle, whale, bumblebee, you name it. I am me. I am a survivor.

I've shed my coat of shame and moved on with my life with so much of the past in the review mirror but there is still work to be done. It is time for me to show others they can do the same. I can't live with myself knowing the animal who pinned me down could have and likely did harm others. There isn't a minute that goes by that I don't worry about who else he groomed and molested in his long career as an educator. My heart goes out to anyone who reads this who was hurt by Mr. X but is unsure about coming forward. A child is physically abused every sixty seconds in this country. The reverberation that has on our society is astounding as the pain is not only felt in the moment but lasts a lifetime.

Whether you tell your story publicly or within your hive you are being honest and transparent with yourself and for that simple reason alone you will heal yourself and others. I struggled with how to tell my story. It is sadly a common one with one in every three women experiencing sexual trauma in their lifetime. I thought of letting a journalist draw the details out of me. Should I use Instagram or some form of social media to express my thoughts? Did anyone really care or would I be shamed back into my hole?

As I've told other women my story, I've seen a sadness in their eyes that often matches mine. There are women in positions of great power in business, education and philanthropy who I've been blessed to call friends who have looked at me and said, "I know, because I've experienced the same trauma." And then astonishingly many women go on to tell me that they've never told a soul. Some not even their spouses. Me telling my story has even reminded some women of their own stories that they couldn't face and locked away for another lifetime. This can no longer go on. Birds of a feather, we must fly together. END

# EXHIBIT F

It was late morning when I got into town and I was still full having downed my cherry donut and bean burrito. Just the self care I needed while home for twenty four hours and before meeting with Claudia.

I had texted her the night before to ask where we should meet and her response was comforting. [redacted] had always been a thing with my grandmother since I was a child so I knew she would be with me during our meeting.

I pulled up to the cafe to find the cutest flower cart out in front and I had to smile in seeing the giant bumble bee in white neon lights when I walked though the front doors. Breathe, I thought. You've done nothing wrong. This time is for you not against you. Your showing up is brave enough I thought and kind of Claudia to meet with someone she hadn't seen in thirty years. You don't need anything from this meeting except to show yourself compassion. You don't need anything from her. Telling her your story regardless of what she says back will be freeing. And listen, I had to remind myself not to talk too much when I got nervous.

I surveyed the room looking for [redacted] but in noticing that she had yet to arrive, I did a lap around the room,found a small cafe style table for two and then went to the bathroom to compose myself. I locked the door and looked at myself in the mirror. You've got this. Kindness and compassion no matter what comes up. Just go with it.

Within minutes, [redacted] arrived. There she was standing directly in front of me. We skipped the intros as my hands were outstretched towards her as I moved in closer to give her a nervous hug. She looked exactly as she had all those year ago but with a bit longer hair.

We ordered drinks and in my nervousness scanned the menu for what looked like their speciality drink. Lavender chia latte. Sounds delicious I said while thinking I could use the calming lavender in this moment. I don't remember who paid but we carried our drinks over to the table I had picked out before her arrival, sat down and fidgeted in the pause before any words were spoken.

[redacted] thank you so much for meeting today. I know it seems so out of the blue but you have no idea how much it means that you are here in front of me. So you have kids, yes and yes I know our life is wild with sports on the weekends too with four kids. This is such a busy phase of our lives, fun, but I agree it's a lot.

My voice was shaking and I felt like a I was a balloon that was rising and falling with every breath as I made small talk and then told [redacted] exactly why I had come to see her. Some lawyer called me awhile back and I told them I really don't remember anything about middle school. It was an awful time in my life. Really, I said. I'm so sorry. As I leaned in to share my story, I could feel she was leaning backwards. I came to tell you what happened to me so long ago as I feel like you are the final piece in a puzzle that has been haunting me for several years. That's just it she said, memory is s funny thing and I think the mind can sometimes create things that were there or weren't there from the past so you just can't trust it.

I wanted to cry. Was she saying in that moment from the get go that she didn't believe me. Was she talking about her own memory or mine? Where did I go from here as it was clearly she was putting up a wall? Umm, that's just it. I'm here to share my memories and that's all I can do to move on. I don't know if you remember the teacher Mr. [redacted] He was our [redacted] teacher? No, I told the lawyers that called me awhile back that I didn't remember much

from that time. My home life wasn't great and I moved around a lot. Plus the girls in that grade were so mean. I don't hold it against them. That's just a rough time in life in general. Oh I'm so sorry I said. I have such distinct memories of you, you being around Mr. [redacted] and several of our interactions during middle school. In all my memories you are a constant and although we weren't close friends I felt connected to you—remember looking into your eyes and feeling I saw you. She wasn't offering up any other personal details other than the ages of her kids and that she had only been home to Amarillo a few times since in the last few decades.

I brought the conversation back to me. So Mr. [redacted] raped and abused me starting in the seventh grade at Austin Middle School. It's taken a lot for me to be able to believe myself, to say the words I'm saying to you out loud. I've kept a journal for the last three years and you were the first thing I wrote in the journal I said to her. Find [redacted] Ask her about the dress.

She was the first person who didn't tear up or gasp or flinch or reach for my hand when I told her my story. How was I to interpret her reaction? BOUNDARY She bit her lip, barely blinked and didn't really react so I filled in the awkward spaces. So again, I just thank you for coming to meet me as again I don't need anything from you I said. But I knew in my heart that wasn't the truth. Did I hope she would crumble and tell me that the same had happened to her and we would ride off into the sunset together having solved the mystery. Or did I hope that she would comfort me and say it never happened, we would hug and I would return back to New York and move on with my life knowing that my story was enough.

As I cried, she remained stoic but then she spoke. There is one thing that I do remember, her voiced cracked. You, she said. I remember you being so kind to me. Really, I said as I used the napkin from my far to sweet chai drink that I had barely touched to dry my eyes. Yes, you loaned me a dress for the dance. The PINK one, I interjected and motioned with my hands, the one with the puffy sleeves. Yes yes, she said. My family was so poor and I think my mom asked your dad if I could borrow a dress. You loaned me the dress and I have thought about you and the gesture over the years as one of the kindest moments in my life. She was choking on her words now as she said and not because you gave me the dress but because you didn't tell anyone. You didn't embarrass me. You made me feel so safe. For the first time, we leaned in towards one another and wiped furiously at our eyes.

[redacted] I see it so clearly, this time with you has been so helpful. It all makes sense to me as I too have always remembered how good it felt to loan you the dress. It was the first act of kindness that I remember ever performing for someone and it felt so good to me too. Giving you the dress was who I am at my core. The me before I had to be perfect. The me before I had to hide all my secrets. Knowing that you remember me and that you wore my dress to the dance is really all I could have hoped for. NEED TO TALK ABOUT the story of me getting the award.

I can't believe you brought me Taco Villa. It's always been my favorite. My mom always reminds me I said to open the hot sauce away from you as it stains. Oh I know she said.

And with that she was gone, I was both exhausted and filled with energy. I turned to leave but noticed that [redacted] left her sunglasses sitting on the table. Right there in front of her. Something she could see but…….

# EXHIBIT G

# THE REMEMBERING

By Amy Griffin

First Draft

September 6, 2023

So I arrived at practice early. I paid attention at all times, even when the other kids were distracted. I stayed late at school, so late that the only people left would be [redacted] and [redacted] I remember watching him pull out of the faculty parking lot in his wine-red [redacted] with decals on the side, waving goodbye to me as I stood on the curb. That I was even staying later than the teachers at school was a testament to my commitment. I went out of my way to acknowledge everyone, from the school janitors to my favorite history teacher. I organized the volleyball team to purchase a gift for [redacted]—a James Avery ring with a cross on it, which we pooled our money to buy. When we presented it to her, she was moved to tears.

Kindness was infectious; I wanted to do nice things whenever I could. There was a girl in my grade named Claudia who had blue eyes and blunt cut bangs; I understood that her family was poor, and her home life turbulent. A few weeks before cotillion, I learned that Claudia didn't have a dress to wear. "I'll lend you a dress," I said. "I have two options—a floral one, and a pink one. Which one do you want?" The joy I felt to be able to give her that dress was boundless. The thought of her feeling special, wearing it, made me feel special.

When I saw Claudia in the shiny pink dress with puffy sleeves the night of the dance, I smiled at her and flashed her a thumbs-up. She looked beautiful. But when she looked back at me, her eyes were clouded, vulnerable, as if she were afraid I might reveal her secret. I wanted to tell her that I never would, that it would undermine the act entirely. I knew how to keep a secret. These acts of kindness were not a performance for an audience. They were something else—gifts to others that were also to myself.

There was one memory that I thought about more than any other, that replayed on a loop in my mind for years after. On the day we graduated the eighth grade, [redacted] got up to give the highest student award of the year. The winner would have their photo framed on the

memories, you're a constant. Although we weren't close friends, I felt connected to you. I remember looking in your eyes and feeling like I saw you."

She shifted in her seat, looking uncomfortable. "Anyway," I said. "The reason all this has come up for me is because [redacted] raped and abused me repeatedly starting in the seventh grade."

In the years I had been telling my story, I had grown accustomed to a range of reactions—people tearing up, gasping, or flinching. Sometimes they reached for my hand and held it. But they always leaned in. Claudia was the first person I had met who leaned out. I felt her energy shift, a stiffening in her body. She bit her lip and didn't blink.

Was she setting a nonverbal boundary with me, I wondered—or was she tightening up because there was something she, too, couldn't face?

"It's taken a lot for me to be able to even believe myself, to say the words I'm now saying to you out loud," I said. "But I've kept a journal for the last three years, and you were the first thing I wrote about it in the journal—this memory I have, of lending you a dress. So I knew I had to find you. And I knew—I just knew I had to tell you that, I guess."

She said nothing. She looked down at the floor. I had to fill the silence. "So again, I'm just grateful to you for coming to meet me," I said. I leaned in further. "And I don't need anything from you."

But I knew in my heart that wasn't the truth. I had hoped for catharsis. I had hoped she would crumble and tell me it had happened to her too. We would ride off into the sunset together having solved the mystery. Or I had hoped that she would confidently tell me that nothing happened, but that she was sorry for my pain. I would believe her, know from the truth in her eyes that he had not victimized her too. We would hug and I would go back to New York and

move on with my life, having made peace with the fact that my story alone was enough, with no loose ends still waiting to be tied up.

Instead, she was giving me nothing.

I felt tears streaming down my cheeks.

Claudia's face was stoic.

Then, finally, she spoke.

"I remember you," she said. Her voice cracked and the energy shifted again. "I remember that you were kind to me." Her eyes were red. "You were the only person who was kind to me, Amy."

"Really?" I said. I used the napkin from the drink I hadn't touched to wipe my eyes.

"Yes," she said. "You loaned me a dress for the dance."

"The pink one," I said, motioning with my hands. "The one with puffy sleeves."

"Yes," she said. "My family was so poor. I think maybe my mom asked your dad if I could borrow a dress, or maybe you and I talked about it—I don't know. But you gave it to me. And I have thought about you and that gesture so many times over the years." She began to cry. "Not because you gave me the dress, but because you didn't tell anyone. You didn't embarrass me. You could have told everyone, but you didn't. You kept it a secret, so I wouldn't be more humiliated than I already was."

We were both weeping now, gathered around this little table. "All I had wanted was to be kind," I said. "Even when [redacted] brought me up on stage that day, it was like—I didn't understand why I was being given an award for being kind. Weren't we all supposed to be kind? I would never have told anyone. That wasn't why I did it. I just wanted to help you. I knew—I knew

things were bad for you. And they were bad for me too, just in a different way. Maybe that's why I felt connected to you."

"I just feel so bad, Amy," she cried. "I wish that I could help you. But at that age, you're so focused on yourself. All I thought about was myself. I didn't notice that there was something going on with you. I wish I had. But I had no idea. I'm just so sad that I can't help you—that I don't remember anything, when such a horrible thing was happening to you." She wiped her eyes. "And when they called me to ask me about it, I just—I searched my memory, I did, because I wanted to help you, but I just couldn't. I couldn't remember anything."

I sat there, processing, realizing that I had misread her reticence. Her body language hadn't been because she was ashamed to share what had happened to her. She was ashamed because she wanted to help me the way I had helped her, but she could not.

*But then why had the medicine brought me back to her? Why was she the first thing I had written about? Why had I been unable to get her out of my head all these years?*

Interlocking pieces snapped into place. And, once again, I saw it all so clearly.

I hadn't given Claudia the dress because she was being abused.

I had given Claudia the dress because that was who I was.

What had [redacted] said, in my first meeting with her? She called it rebecoming. "You have always been you," she said. "You just have to remember who you were." That was what the medicine had been trying to show me.

There was a me that still lived somewhere inside me, an essential me that no abuse could ever harm. The me before I had to be perfect. The me before I had shame. The me that wanted to be kind not as a distraction from what was happening to me, but simply because it was the purest expression of love I knew. All of that was always within me.

# EXHIBIT H

12:40 4:18

< 1020

[redacted]

iMessage
Encrypted

Apr 1, 2023 at 12:11PM

Hi [redacted] this is Amy Mitchell from middle school. I know, such a long time ago. Hope you don't mind that I looked you up. I'm trying to reconstruct some memories from those years and wondered if you might be open to chatting with me. I'll be in your area in a few weeks if you'd be open to a coffee. Would be so nice to reconnect.

Xx Amy

I would be happy to have coffee if time allows. Attorneys reached out to me a bit ago. As I explained to them I have no memory of
any
I also explained, I am still

+ iMessage

12:40 4:23

1020

Xx [redacted]

I would be happy to have coffee if time allows. [redacted] reached out to me a bit ago. As I explained to them I have no memory of many of the people involved. I also explained, I am still friends with two women from middle school who might be able to help. The attorneys were insistent this was not necessary.

My life during that time was traumatic for other reasons and no doubt I remember very little. If I can assist I will. Let me know when you are in town and I will see if I am in town. Have a few trips coming up. Cheers-

So kind [redacted]. It would mean the world to me to grab coffee if you are in ... will be in [redacted] on April 21st. Would you

iMessage

12:40 4:29

1020

will. Let me know when you
wn an [redacted] if I
am in town. H
trips coming

So kind [redacted]. It would mean the world to me to grab coffee if you are in town. I will be in [redacted] on April 21st. Would you happen to be in town that Friday? I promise not to take up too much of your time.

Grateful 🙏
Amy

I am here on April 21. Would 9 work? Where are you staying?

Apr 1, 2023 at 3:08 PM

Any chance you can do any time later that morning? Happy to come to you to make it convenient. I will just be getting into town. If nine is your only time I will make it work.

So look forward to reconnecting. XAmy

iMessage

12:40 4:34

I am here on April 21

1020 work [redacted] e

you staying?

Apr 1, 2023 at 3:08 PM

Any chance you can do any time later that morning? Happy to come to you to make it convenient. I will just be getting into town. If nine is your only time I will make it work.

So look forward to reconnecting. XAmy

How about 11?

Perfect perfect 🙏

Let me know where best to meet you. Thanks again

Marked my calendar. Be safe and talk soon.

Apr 19, 2023 at 4:52 PM

Hi [redacted] Just getting my timing organized for my trip. Excited and grateful to connect with you. Do you

iMessage

12:40 4:40

< 1020

So f [redacted] o
reco [redacted] Amy

How about 11?

Perfect perfect 🙏

Let me know where best to meet you. Thanks again

Marked my calendar. Be safe and talk soon.

Apr 19, 2023 at 4:52 PM

Hi [redacted] Just getting my timing organized for my trip. Excited and grateful to connect with you. Do you want to give me a spot that works best for us to have coffee at eleven on Friday. Happy to meet you anywhere that is most convenient for you.

Xx Amy

Apr 19, 2023 at 9:41 PM

+ iMessage

This is

favorites. Depending on the

12:40 4:46

1020

my ca[redacted]e
safe and talk [redacted]

Apr 19, 2023 at 4:52 PM

Hi [redacted] Just getting my timing organized for my trip. Excited and grateful to connect with you. Do you want to give me a spot that works best for us to have coffee at eleven on Friday. Happy to meet you anywhere that is most convenient for you.

Xx Amy

Apr 19, 2023 at 9:41 PM

This is one of my favorites. Depending on the weather it may be crowded but the staff is friendly. I may be 5 min behind racing from a 10:30 mtg. Will let you know n Friday how everything is looking.

IMG_6961 in

iMessage

12:41 4:52

1020 [redacted]

Apr [redacted] 1PM

This is one of my favorites. Depending on the weather it may be crowded but the staff is friendly. I may be 5 min behind racing from a 10:30 mtg. Will let you know n Friday how everything is looking.

IMG_6961.jpeg
JPEG Image · 13 KB

This sounds perfect. And don't stress if you are five or even ten mins late. Xx Amy

Do you mind sending the address. I can't seem to open the photo on a map. Thanks

Apr 20, 2023 at 8:08 PM

Hi hi...Sorry to bother you for the name of the spot. Can't [illegible] tomorrow at 11. Xx Amy

iMessage

12:41 5:01

< 1020 [redacted]

IMG_69[redacted]jp
eg
JPEG Image ·
13 KB

This sounds perfect. And don't stress if you are five or even ten mins late. Xx Amy

Do you mind sending the address. I can't seem to open the photo on a map. Thanks

Apr 20, 2023 at 8:08 PM

Hi hi...Sorry to bother you for the name of the spot. Can't pull it up on the pin. See you tomorrow at 11. Xx Amy

[redacted] Sorry for delay, I frequently leave my phone.

Perfect Xx

+ iMessage

Safe travels.

12:41 5:07

< 1020

[redacted]

[redacted] Sorry for delay, I frequently leave my phone.

Perfect. Xx

Safe travels.

Apr 21, 2023 at 1:40 PM




Wildly grateful to you for spending time with me this morning.

+ iMessage

12:41 5:12

1020



Wildly grateful to you for spending time with me this morning. ❤️🙏🐝

May 17, 2023 at 9:07 PM

[redacted], Thank you for your courage. I see you. I understand you. I am here for you. 🙏

Jun 7, 2023 at 3:56 PM

I think about you every day and so hope I can hold your hand. 💔🙏

Jun 11, 2023 at 8:31 PM

Thank you. All is well. Best to you

Jun 11, 2023 at 9:50 PM

[redacted],
Thanks so much for getting back to me. Means so much

iMessage

I just wanted to see if you

12:41 5:17

1020 [redacted]

you. A [redacted] Best to you

Jun 11, 2023 at 9:50 PM

[redacted]
Thanks so much for getting back to me. Means so much.

I just wanted to see if you might be up for talking about the postcard? I will get on a plane any day this week and come down to support you.

I've cried so much in the last few weeks in just hoping I didn't open up too many difficult memories for you and in knowing that it wasn't just me.

Lots of love. My oldest graduates from high school tomorrow. My family is all here from home. Nice to all be together.

Lots of love

iMessage

12:41 5:25

1020 [redacted]

Jun [redacted] PM

[redacted],
Thanks so much for getting back to me. Means so much.

I just wanted to see if you might be up for talking about the postcard? I will get on a plane any day this week and come down to support you.

I've cried so much in the last few weeks in just hoping I didn't open up too many difficult memories for you and in knowing that it wasn't just me.

Lots of love. My oldest graduates from high school tomorrow. My family is all here from home. Nice to all be together.

Lots of love
Amy

iMessage

12:41 5:32

1020 [redacted]

What postcard?

I am in Sarasota. Been here for rowing National Championships for 5 days. Home for work meetings this week then weekend w my other son

I just assumed the postcard was from you...

I was sent a postcard to my apartment without anyone signing it two weeks ago that said...

“I didn’t have it in me to tell you the truth.”

It also had a quote that we had spoken about...

It read:

“Why was I given an award

what you are supposed to

iMessage


12:41
5:41
Home for work meetings
1020
k the [redacted] w
my other son [redacted]
I just assumed the postcard was from you...

I was sent a postcard to my apartment without anyone signing it two weeks ago that said...

"I didn't have it in me to tell you the truth."

It also had a quote that we had spoken about...

It read:

"Why was I given an award for being kind, isn't that what you are supposed to do" —Amy, 8th grade

So I just assumed you remembered things from the past and I felt bad that things were coming back up for you. I obviously have
devastated by all and
have been trying to put the
iMessage

12:42 5:49

1020

[redacted]

So I just assumed you remembered things from the past and I felt bad that things were coming back up for you. I obviously have been devastated by all and have been trying to put the pieces together.

I hope it didn't come off as weird when I thanked you for your courage as I just thought you wanted to share with me and I was so grateful.

Rowing championship! Wow. I'm about to start travel for volleyball for one daughter and lacrosse for the second.

Really appreciate hearing from you. I'm even more confused. It's been hard.

iMessage

12:42 5:54

1020

[redacted] to start travel for volleyball for one daughter and lacrosse for the second.

Really appreciate hearing from you. I'm even more confused. It's been hard.

Xx Amy

I sorry but it was not me

Am

💗

Thanks for letting me know 🙏

Read

+ iMessage

# EXHIBIT I

**From:** Amy Griffin <Amy@G9.Ventures>
**Sent:** Saturday, April 1, 2023 5:13 PM EDT
**To:** Sam Lansky <sam.lansky@gmail.com>
**CC:** Alex Bragan <alex@samlansky.com>; Samantha Materek <Samantha@G9Group.com>
**Subject:** Re: Trip

Yes yes. Perfect.

On Apr 1, 2023, at 5:10 PM, Sam Lansky <sam.lansky@gmail.com> wrote:

Sorry Sam this is for Thursday April 20 we would go LA to Amarillo - NOT April 21. Would fly to [redacted] morning of Friday April 21 then back to NYC by end of day.

On Sat, Apr 1, 2023 at 4:53 PM Amy Griffin <Amy@g9.ventures> wrote:

> Sam
> So…here goes.
> On the 21st of April Sam and I will fly from LA to Amarillo. We will plan to get there on the early side. Maybe around 11 or 12 if possible. We will stay the night at my parents house and then fly to [redacted] Tennessee the next morning in time to make an 11am meeting. My guess is that we will be on the plane again by 2 at the latest. I know I have [redacted] bday that night so might have to go straight there.
>
> Just a heads up on all. Thanks and Sam copied here.

# EXHIBIT J

**From:** Sam Lansky <sam.lansky@gmail.com>
**Sent:** Friday, April 21, 2023 6:21 PM EDT
**To:** Frick, Whitney <wfrick@penguinrandomhouse.com>; Amy Griffin <Amy@g9.ventures>
**Subject:** rough outline

Hi Whitney!! Coming to you after Amy and I have had the most incredible two days in Amarillo visiting her family and going back to her middle school, and then a meeting with [redacted] in [redacted]. Think it's been a deeply cathartic and healing experience for Amy that I know she will want to tell you all about when we sit together next Saturday.

In advance of that, wanted to send over a super-rough outline with how we are now thinking about the structure of the book—no doubt some of this will require some explanation and decoding but thought it would be good to share with you so you could take a look before we sit together!

Will share doc with you under separate cover.

Can't wait to meet in person. xox

# EXHIBIT K

[redacted]

TRANSCRIPT OF

Recording between

Female Speaker and Male Speaker

AUDIO RECORDING

FILE NAME:

[redacted]

Transcribed By: Adrea Knoll

[redacted]

FEMALE SPEAKER: I never said to them or her I was coming for work. I just said I'll be in there (indiscernible). So I never lied to her.

MALE SPEAKER: Okay.

FEMALE SPEAKER: So it started off -- are you recording?

MALE SPEAKER: Yeah.

FEMALE SPEAKER: Oh, it started off that she said, you know, "I wanted to come tell you thank you for meeting me," I forget how it really started. And I said -- gosh, how did it -- the first thing I said --

MALE SPEAKER: I was keeping half an eye on you and it looked pretty like smiley and chatty in the beginning.

FEMALE SPEAKER: Yeah, yeah.

MALE SPEAKER: And then I like looked over at one point and you guys were both kind of --

FEMALE SPEAKER: Well, she took a moment to soften.

MALE SPEAKER: Yeah.

FEMALE SPEAKER: I said, right away, I said, you know, "I'm going to come and share something with you," and I -- and then I said, "Do you remember," -- I said, "Gosh," I -- I might have said at that point in time, I can't remember the very -- the very beginning, I said, "I went,"

I, you know, "(Indiscernible) well yesterday," because I talked about Taco Villa and she goes -- first, we talked about our kids --

MALE SPEAKER: Yeah.

FEMALE SPEAKER: -- for two seconds. So she said, "I have a [redacted]" I was like, "Oh my gosh, I have, you know, four kids," and then I said -- it was probably the -- the most natural conversation in the way that I got it all out and --

MALE SPEAKER: Yeah.

FEMALE SPEAKER: -- and then I said, "You know, I know -- I know that someone reached out to you and you said to me it's a lawyer but I just want to tell you it wasn't a lawyer. I just want to make sure you know it," --

MALE SPEAKER: Yeah.

FEMALE SPEAKER: -- "was a private investigator." And she's like -- and then I said, "You know, I have done a lot of work over the last three years and I'm really coming into these stories, these -- these memories, and you know, it's been really hard."

And I said, "In the process of doing that, I've come so far and I just really needed to come tell you my story and I know you said to her you don't remember me." And then I said, "I -- part of the reason why I wanted to come talk to you is because the woman that you spoke to, it

[redacted]

was only recently and that's why I texted you, that I realized," and this is where -- well, that's further along. I said, "You know, when I first was going through all this, she contacted you and they said that you don't remember me, you don't remember the dress, you remember the school, you remember the teacher, you remember (indiscernible)." And she -- she was very like unresponsive for a while --

MALE SPEAKER: Yeah.

FEMALE SPEAKER: -- in the beginning. And -- and right in the beginning when I said, "You know, I'm coming to you because when all these memories came back," and then I think I could tell - and she said it - but the first thing she said really triggered me. She said, "You know, memories -- memories are a crazy thing and I don't have any memories from that time. But the memories that I have sometimes I think memories play with you, your brain, and that can even be a positive thing that you can take and turn into a negative thing. And so memories can," --

MALE SPEAKER: Mmm.

FEMALE SPEAKER: -- "you -- you don't really know if you can trust your memories." And so then I'm like thinking --

MALE SPEAKER: Mmm.

FEMALE SPEAKER: -- like, cause she's kind of got her defenses up.

MALE SPEAKER: Yeah.

[redacted]

MALE SPEAKER: (Indiscernible). Did she tell you what was going --

FEMALE SPEAKER: So --

[redacted]

MALE SPEAKER: -- on with her family?

FEMALE SPEAKER: So she wouldn't really go there so I didn't press but she said, "I haven't been back to Amarillo in 10 years." The -- the Taco Villa was a really good segue way in; we were talking about Taco Villa --

MALE SPEAKER: Mmm-hmm.

FEMALE SPEAKER: -- and Donut Stop and I said I had a cherry donut this morning and she's like, "Oh, my God," and that was really like a connection.

MALE SPEAKER: Yeah.

FEMALE SPEAKER: And then she said, "But I changed schools all the time." And then she said, "You know, I don't remember a lot from that time period because this is how it started," because this is really important, "because at that age," and she was almost making an apology for it, which I didn't realize at the time she said it, "That age you're so focused on yourself and it's all about (indiscernible) yourself," and I think she was trying to say to me, "I'm really sorry that I wasn't noticing anything."

MALE SPEAKER: Mmm-hmm.

FEMALE SPEAKER: And I said, "Look," and I told this story, I said, "The reason why I'm here is because, you know, I went through all this process," -- and this is how I started out, I said, "I went through this process,"

and I said, "I wrote in this journal for six weeks and I -- I remembered you from -- I put -- I put it away and then three years later I pulled it out," and I said, "You're the first thing I wrote about, was find [redacted]" And then I made a joke and I was like, it hit me a few weeks later, I'm like, "(Indiscernible)," I said, "Couldn't have a (indiscernible) over it?" She goes, "Yep."

MALE SPEAKER: Wow.

FEMALE SPEAKER: And I said, "Didn't have a (indiscernible) date?" It's like --

MALE SPEAKER: Yeah.

FEMALE SPEAKER: -- which is important for me because --

MALE SPEAKER: Yeah.

FEMALE SPEAKER: -- that's like my memory of how intense my memory is.

MALE SPEAKER: Yeah.

FEMALE SPEAKER: And she goes, "Well, I don't have a good memory; obviously, you really do." But she said, "I didn't want to remember those moments of my childhood." And she goes, "I only remember two things." So when -- like I kind of got snagged a little bit by her saying memories can be --

MALE SPEAKER: Yeah.

FEMALE SPEAKER: -- all over the place. And I

[redacted]

said, "Well," and then I said, "Well, I went yesterday to school and I walked it." And she goes, "You did?" I said, "Yeah, it made my memories so concrete cause every single detail that I remember is exactly as I remember it."

MALE SPEAKER: Yeah.

FEMALE SPEAKER: And she said -- and then eventually we came around to me saying, [redacted] and she goes, "I'm just so sorry, I don't remember anything. I don't remember." She goes, "I only remember one teacher, who's a [redacted] teacher." I go, "[redacted]?" (Phonetic). She goes, "Yes." I said, "[redacted] taught us [redacted] [redacted] -- [redacted] is the second semester we went to Mr. [redacted] he taught us [redacted] downstairs." I said, "I remember because I was very excited that, you know, as a seventh grader you get to change parts of the building." I said, "Remember how the school gets so monotonous?"

MALE SPEAKER: Yeah.

FEMALE SPEAKER: "And you get to move to a different part of the building."

MALE SPEAKER: Yeah.

FEMALE SPEAKER: "And I remember thinking this is great because I'm moving to another part of the building." And she's like, "I don't remember any of that." And she said, "Like I said -- like I said, I was not in a good

[redacted]

place." And then she said, and, "You know, socioeconomically, I didn't fit in."

MALE SPEAKER: Yeah.

FEMALE SPEAKER: "I didn't -- I didn't fit in." And I said -- there's a couple of people that I mentioned; one of them is my -- my close friend and she said, "Yeah, our (indiscernible) was," --

MALE SPEAKER: Yeah.

FEMALE SPEAKER: And so then it shifted a little bit and I said, "I want to tell you something. I came here," because I could tell she was a little defensive.

MALE SPEAKER: Yeah.

FEMALE SPEAKER: I was like, "I don't have anything to give you."

MALE SPEAKER: Yeah.

FEMALE SPEAKER: And then she said, you know, after I (indiscernible) up, and -- and she did say, "I searched my memory, I searched my memory, and I tried to (indiscernible)." She's like, you know, "I just don't have it. I don't have it." I said, "Gosh, well," I said, "But that's not why I'm coming here for you." I said, "I'm coming here because I need this closure through all this process because you're the first person I wrote about." And I said, "But beyond that," and then she goes, "the only things," she goes, "Maybe the only things I remember from

middle school is that one teacher who was kind of (indiscernible)," and then she goes -- and then she started crying and she -- oh, I -- at that point I think is when I said -- at some point in there I said, "I was," I said, "So recently, I've read these reports from the," -- I said, "Also, not only the journal, but recently, I reread some reports," and I said, "it really didn't sit well with me." I said, "What was really hard for me was about my memory closure," --

MALE SPEAKER: Yeah.

FEMALE SPEAKER: -- "was that when you said, 'I don't remember her, I don't remember the dress, I don't remember this (indiscernible) with the teacher,'" I started to think I was crazy about what happened to me --

MALE SPEAKER: Yeah.

FEMALE SPEAKER: -- because you claim -- because I was told you didn't remember me.

MALE SPEAKER: Yeah.

FEMALE SPEAKER: And I said, "So then it invalidated everything that had gone on with me."

MALE SPEAKER: Yeah.

FEMALE SPEAKER: And I said, "I remembered it like it was yesterday." And I looked at her and I said -- and then she said, "Amy, you're the only thing I remember from that school and the only person I remember." And she

said, and this is exactly how I remember it and how we've written it, "The fact that you were so kind to me at that age when people were so awkward and I was so embarrassed," just as we wrote, "I was so embarrassed that socioeconomically, I didn't fit it. We were so poor. I was moving schools all the time." And she goes, "And my mom asked your dad if I could borrow a dress and it got down to you," and I said, "It was a pink dress with big puffy sleeves," and she goes, "Yes, it was."

MALE SPEAKER: Mmm.

FEMALE SPEAKER: And she started crying and she goes, "It's the only thing I remember." I said, [redacted] I think that moment was a seminal moment in my life that shaped who I am."

MALE SPEAKER: Mmm.

FEMALE SPEAKER: I said, "That sent me on a path of like moving -- helping women, seeing -- seeing how good it felt to help other women and to be in their corner. And unknowingly, the joy I got from giving you that dress and I remember seeing you in the hallway giving you the thumbs up and locking eyes with you but I never told any of my friends." I said, "To this day, when I've gone back," I said -- I said, "You know, Courtney became a middle school counselor because she couldn't figure out what happened to me (indiscernible)."

[redacted]

And then she said, kind of like, "You know, I'm just so -- I just feel so badly about when that lady called me and I just don't have anything." And I was like, "No, no, no, I rest -- I want you to rest assure, I want you to close that chapter, because just the fact that we got to acknowledge this act of kindness," --

MALE SPEAKER: Yeah.

FEMALE SPEAKER: -- "30 years later," --

MALE SPEAKER: Yeah.

FEMALE SPEAKER: -- "and that you remember exactly as I do," --

MALE SPEAKER: Yeah.

FEMALE SPEAKER: -- "is all that I needed in a confirmation of my memories," --

MALE SPEAKER: Yeah.

FEMALE SPEAKER: -- "that what I know to be true is true."

MALE SPEAKER: Yeah.

FEMALE SPEAKER: "Having nothing to do with what happened to me."

MALE SPEAKER: Yeah.

FEMALE SPEAKER: And I said, "And that's part of the whole thing, when you talk about being a child at that age and you're talking how selfish you are and how you're saying the world respects -- it relates to you," I said,

"Growing up in Amarillo, like," I said, "you know, my family was a prominent family in town that there was not the opportunity with -- between religion and (indiscernible) and community that how people saw you." I said, "I didn't have the language to say what was happening to me."

MALE SPEAKER: Yeah.

FEMALE SPEAKER: I said, "How could you expect me to -- how could I expect you to see something -- it's not something that's normally seen in this world."

MALE SPEAKER: Right.

FEMALE SPEAKER: I said, "I'm not pleased to walk away from this." I said, "I also want to tell you," then she started crying again, I said, "Please, I meant to tell you, please don't walk away thinking that I don't -- I'm upset that you don't remember anything. I actually was coming to thank you."

MALE SPEAKER: Mmm.

FEMALE SPEAKER: And she started crying and she said -- I said, "And then I want to tell you -- another thing, [redacted] I want to tell you," -- are you okay?

MALE SPEAKER: Yeah, it's really emotional.

FEMALE SPEAKER: I said, "I want to tell you that when you brought the dress back and had it drycleaned and I saw it in saran wrap and I was embarrassed for you," cause

[redacted]

I said, "I think I'm embarrassed of my privilege."

MALE SPEAKER: Yeah.

FEMALE SPEAKER: And so, I said, "I went into my room and I closed the door and I went over to my shutters," which I said I saw yesterday, "and I opened the shutter and peered out and I said, 'I don't want to be the one to answer the door when you brought the dress."

MALE SPEAKER: Mmm.

FEMALE SPEAKER: And she just was like -- she said, "I'll never forget it the rest of my life."

MALE SPEAKER: Mmm.

FEMALE SPEAKER: And I said, "Well," I said, "can I tell you how validating that is to me? Because it was one of the great joys of my life and one of the simplest acts I've ever done." And then I said, "I think of you all the time even though I haven't -- I think of the interaction that we had that was truly a catalyst."

She goes, "Well, I just feel so bad. There was so much going on behind the scenes." And then I -- and then kind of towards the end, I go, [redacted] I have to ask you something. You said in the beginning of our conversation that you think memories can," -- I said, "that memories can act different ways," but she wasn't very articulate when she said it. I said -- she said, "Memories -- you get your happy memories and sad memories and you can

just make up things in your mind the way you want to be seen. You can see things differently than the way they really happened."

I said, "The thing you said in the beginning," and she goes, "No, no, no, I'm not trying to take that away from you." And then she said, "Not at all. I'm just saying that my memories are so scattered from that time." She goes, "You know how dreams happen like when you see something during the day and then that night you dream about it and it's all wrapped up in your dreams?" I said, "I know but what happened to me was kind of (indiscernible)." And I said, "I confirmed it yesterday," and I said, "and I'm confirming it by seeing you." And I said, "And it's wrapping it all up in a really -- it's actually really beautiful."

And then I said, I told her the story, I said -- I said, I went through all the processes, I told her about [redacted] (phonetic). I said, "You remember [redacted] She goes, "Yeah, I remember her." And I said, I -- I went (indiscernible) giving the yearbooks, all that, and then she said -- I said, "I want to tell you where I am." And I said, "So I went down this process and then I was going to write an article and it's going to," -- and then I said, "My mom and my upstairs neighbor, like -- we're like -- they convinced me to," I said to my mom, "I'm

[redacted]

writing a book," and she said, "I've been telling you this all along." And I said, "So I wanted to tell you that, you know, I'm in the process of writing it and I've written a lot about our rela -- our interaction."

MALE SPEAKER: Yeah.

FEMALE SPEAKER: I said, "I," -- I said, [redacted] I saw you. I saw you for who you were." I said, "I saw you also for my scared self." This is exactly what I said: "I saw you for my scared self and I saw you being scared."

MALE SPEAKER: Mmm.

FEMALE SPEAKER: "And I saw that vulnerability between both of us."

MALE SPEAKER: Mmm-hmm.

FEMALE SPEAKER: "And the fact that I could step in and give you a little boost of confidence to make you feel good in that pink dress was like everything for me." And she said -- and I said, "So I've written a lot about it." And I said, "You know, I wanted to tell you, like do you mind if I -- if you're in -- you're in the book? Your name has been changed and all I do is talk about this interaction." She goes, "Yeah, yeah, it's totally fine, it's all good, like that's totally fine." I said, "So," --

MALE SPEAKER: That's great.

FEMALE SPEAKER: I said, "Thank you so much for -

- for hearing me out because I know that it can be daunting to take this on." And then at the very end, I was a little hurt that when I told her my whole story she was stone-faced --

MALE SPEAKER: Yeah.

FEMALE SPEAKER: -- and it was like -- and I was like she doesn't believe me.

MALE SPEAKER: Mmm.

FEMALE SPEAKER: She doesn't believe me and she thinks memories are weird and she's --

MALE SPEAKER: Yeah.

FEMALE SPEAKER: -- I don't know what she's thinking. And I'm like she doesn't believe me. At the very end she like crinkled her face and choked up and she goes, "I just," -- she put it on herself again, "I can't -- I just can't believe that I wasn't seeing what was going on when all these horrible things were going on around you."

MALE SPEAKER: Mmm.

FEMALE SPEAKER: "That's such a horrible thing and I couldn't see it and I didn't -- I can't help you."

MALE SPEAKER: Mmm.

FEMALE SPEAKER: "And I'm so sad that I can't help you."

MALE SPEAKER: Mmm.

FEMALE SPEAKER: And so she did say not -- I

[redacted]

don't even think she even used the word "I'm sorry," but she said, "And all these horrible things were clearly going on around you." And she just -- so she acknowledged it but that wasn't happening in the beginning.

MALE SPEAKER: Right.

FEMALE SPEAKER: So it was like a believe me, all in --

MALE SPEAKER: Yeah.

FEMALE SPEAKER: -- an hour and a half --

MALE SPEAKER: When she came full circle.

FEMALE SPEAKER: -- and she came --

MALE SPEAKER: Yeah. Yeah.

FEMALE SPEAKER: -- full circle.

MALE SPEAKER: Wow.

FEMALE SPEAKER: And that's the crux of it.

MALE SPEAKER: I mean, it's really, really, really, super, super, super powerful.

[redacted]

CERTIFICATE OF TRANSCRIBER

I, ADREA KNOLL, do hereby certify that I was authorized to transcribe the foregoing recorded proceeding; and that the transcript is a true and accurate transcription, to the best of my ability, taken while listening to the provided recording.

I FURTHER CERTIFY that I am not of counsel or attorney for either or any of the parties to said proceedings, nor in any way interested in the events of this cause, and that I am not related to any of the parties thereto.

Dated this 15th day of SEPTEMBER, 2025.

Adrea Knoll

[redacted]


**1**

[redacted]

**3**

**30**
12:8

**A**

**acknowledge**
12:6
**acknowledged**
18:3
**act**
12:6 14:23
**acts**
14:15
**age**
6:15,17 11:3
12:24
**Amarillo**
6:4 13:1
**Amy**
10:24
[redacted]
**apology**
6:15
**article**
15:23
**articulate**
14:24
**assure**
12:4
**awkward**
11:3

**B**

**back**
4:11 6:3
11:22 13:24
**bad**
14:18
**badly**
12:2
[redacted]
**beautiful**
15:15
**beginning**
2:14,25 4:9,
10 14:21
15:4 18:4
**big**
11:8
**bit**
7:22 9:10
[redacted]
**book**
16:1,20
**boost**
16:16
**borrow**
11:7
**brain**
4:16
**brought**
13:24 14:7
**building**
8:16,20,23

**C**

**called**
12:2
**can't**
2:24 17:15,
[redacted]
7:4 8:7
11:12 13:21
14:20 16:7
**catalyst**
14:17
**change**
8:16
**changed**
6:12 16:21
**chapter**
12:5
**chatty**
2:13
**cherry**
6:8
**child**
12:23
**childhood**
7:21
**choked**
17:14
**circle**
18:10,13
**claim**
10:16
**close**
9:6 12:5
**closed**
14:4
**closure**
9:22 10:9
**community**
13:4
**concrete**
8:3
**confidence**
16:16
**confirmation**
12:14
**confirmed**
15:12
**confirming**
15:13
**connection**
6:9
**contacted**
4:4
**conversation**
3:8 14:22
**convinced**
15:25
**corner**
11:18
**couldn't**
7:6 11:24
17:20
**counselor**
11:24
**couple**
9:5
**Courtney**
[redacted]
**crazy**
4:14 10:14
**crinkled**
17:14
**crux**
18:15
**crying**
10:3 11:11
13:14,19

**D**

**dad**
11:7
**date**
7:10
**daunting**
17:1
**day**
11:22 15:9
**defenses**
4:25
**defensive**
9:11
**detail**
8:4
**didn't**
5:16 6:3,16
7:9,20 9:2,4

[redacted]

10:7,17 11:5 13:5 17:20
**differently** 15:2
**doesn't** 17:7,9,13
**donut** 6:7,8
**don't** 3:23 4:4,5, 14,20 6:13 7:18 8:8,9, 24 9:13,19, 20 10:12 12:3 13:15, 16 14:6 17:12 18:1
**door** 14:4,7
**downstairs** 8:14
**dream** 15:9
**dreams** 15:8,10
**dress** 4:5 10:12 11:7,8,19 13:24 14:7 16:17
**drycleaned** 13:24

**E**

**earth** 8:12
**eighth** 5:16,17,21
**embarrassed** 11:3,4 13:25 14:1
**emotional** 13:22
**end** 14:20 17:2, 14
**eventually** 8:7
**excited** 8:15
**expect** 13:8,9
**eye** 2:12
**eyes** 11:21

**F**

**face** 17:14
**faced** 17:4
**fact** 11:2 12:5 16:15
**family** 6:1 13:2
**feel** 12:2 14:18 16:17
**felt** 11:18
**FEMALE** 2:1,5,8,15, 18,21 3:5, 11,16 4:9, 20,24 5:2,5, 7,9,11,13,25 6:2,7,11,22 7:9,12,15, 18,25 8:6, 19,22 9:4,9, 13,16 10:11, 16,19,22 11:11,16 12:8,10,13, 16,19,22 13:8,12,19, 23 14:3,9,12 16:6,12,15, 25 17:6,9, 12,19,22,25
18:6,9,11, 13,15
**figure** 11:24
**find** 7:4
**fine** 16:22,23
**fit** 9:2,4 11:5
**focused** 6:17
**forget** 2:10 14:10
**friend** 9:6
**friends** 11:22
**full** 18:10,13

**G**

**give** 9:14 16:16
**giving** 11:19,20 15:20
**God** 6:9
**good** 6:5 7:19 8:25 11:17 16:17,23
**gosh** 2:11,23 3:6 9:20
**grade** 5:21
**grader** 8:15
**great** 8:23 14:14 16:24
**Growing** 13:1
**guys** 2:17

**H**

**half** 2:12 18:9
**hallway** 11:20
**happen** 15:8
**happened** 10:14 11:24 12:20 15:3, 11
**happening** 13:5 18:4
**happy** 14:25
**hard** 3:20 10:8
**haven't** 6:3 14:16
**hearing** 17:1
**helping** 11:17
**hit** 7:5
**honest** 5:9
**horrible** 17:17,19 18:2
**hour** 18:9
**hurt** 17:3

**I**

**important** 6:14 7:12
**indiscernible** 2:3 3:1 4:6 5:21,23 6:18

[redacted]


7:6,7,10 9:7,17,19 10:2,13 11:25 13:4 15:12,20

**intense** 7:16

**interaction** 14:17 16:4, 22

**invalidated** 10:20

**investigator** 3:16

**it's** 3:13,20 6:17 7:10 11:12 13:9,22 15:10,14,23 16:22,23 18:16

**I'll** 2:2 14:10

**I'm** 2:22 3:18 4:10,21 5:2, 3 6:19,23 7:6 8:8,23 9:21 12:1 13:12,15 14:1 15:5,6, 13,25 16:3 17:13,22 18:1

**I've** 3:21 10:5 11:22 14:15 16:1,3,18

J

**joke** 7:5

**journal** 7:1 10:6

**joy** 11:19

**joys** 14:14

K

**keeping** 2:12

**kids** 3:3,7

**kind** 2:17 4:24 5:18 7:22 10:1 11:2 12:1 14:20 15:11

**kindness** 12:6

L

**lady** 12:2

**language** 13:5

**lawyer** 3:13,14

**lied** 2:3

**life** 11:13 14:10, 14

**live** 8:12,13

**locking** 11:21

**looked** 2:13,16 10:23

**lot** 3:18 6:13 16:4,18

M

**made** 7:5 8:3

**make** 3:14 15:1 16:16

**making** 6:15

**MALE** 2:4,7,12,16, 20 3:4,10,15 4:8,19,23 5:1,4,6,8, 10,12,23 6:1,6,10,21 7:8,11,14, 17,24 8:5, 18,21 9:3,8, 12,15 10:10, 15,18,21 11:10,15 12:7,9,12, 15,18,21 13:7,11,18, 22 14:2,8,11 16:5,11,14, 24 17:5,8, 11,18,21,24 18:5,8,10, 12,14,16

**meant** 13:14

**meeting** 2:10

**memories** 3:19 4:11, 14,15,16,18, 21 7:23 8:3 12:14 14:22, 23,24,25 15:7 17:10

**memory** 7:15,16,19 9:18 10:8

**mentioned** 9:5

**middle** 10:1 11:23

**mind** 15:1 16:20

**Mmm** 4:19,23 5:4, 10 11:10,15 13:18 14:8, 11 16:11 17:8,18,21, 24

**Mmm-hmm** 5:6,8,12 6:6,21 16:14

**mom** 11:6 15:24, 25

**moment** 2:18 11:13

**moments** 7:20

**monotonous** 8:17

**morning** 6:8

**move** 8:19

**moved** 5:19

**moving** 8:23 11:6,17

N

**natural** 3:8

**needed** 3:22 12:13

**negative** 4:18

**neighbor** 15:24

**night** 15:9

**noticed** 5:20

**noticing** 6:19

[redacted]


**O**

**opened** 14:5
**opportunity** 13:3

**P**

**part** 3:24 8:20,23 12:22
**parts** 8:16
**path** 11:16
**peered** 14:6
**people** 9:5 11:3 13:4
**period** 6:13
**person** 9:23 10:25
**phonetic** 8:11 15:18
[redacted]
**pink** 11:8 16:17
**place** 7:25 9:1
**play** 4:16
**pleased** 13:12
**point** 2:17,24 10:3,4
**poor** 11:5
**positive** 4:17
**powerful** 18:17
**press** 6:3
**pretty** 2:13
**private** 3:16
**privilege** 14:1
**process** 3:21 6:24,25 9:23 15:22 16:3
**processes** 15:17
**prominent** 13:2
**puffy** 11:8
**pulled** 7:3
**put** 7:2 17:15

**R**

[redacted]
**reached** 3:12
**read** 10:5
**realize** 6:16
**realized** 4:2
**reason** 3:24 6:23
**recently** 4:1 10:5,6
**recording** 2:6
**rela** 16:4
**relates** 12:25
**religion** 13:3
**remember** 2:23,25 3:23 4:4,5,6 6:13 7:20,21 8:4, 8,9,14,16, 22,24 9:25 10:12,13,17, 24,25 11:1, 12,20 12:10 13:16 15:18, 19
**remembered** 7:2 10:22
**reports** 10:5,7
**reread** 10:6
**respects** 12:25
**rest** 12:4 14:10
**room** 14:4

**S**

**sad** 14:25 17:22
**saran** 13:25
**scared** 16:8,9,10
**scattered** 15:7
**scenes** 14:19
**school** 4:5 5:15,16 8:2,17 10:1, 25 11:23
**schools** 5:19 6:12 11:6
[redacted]
8:10,12,13
**searched** 9:18
**seconds** 3:5
**segue** 6:5
**selfish** 12:24
**semester** 8:12
**seminal** 11:13
**seventh** 5:15,17 8:15
**shaped** 11:14
**share** 2:22
**she's** 3:17 4:24 5:21 6:8 8:24 9:19 17:10,12
**shifted** 9:9
**shutter** 14:5
**shutters** 14:4
**simplest** 14:14
**single** 8:3
**sit** 10:7
**sixth** 5:15
**sleeves** 11:9
**smiley** 2:13
**snagged** 7:22

**socioeconomically**
9:2 11:5
**soften**
2:19
**SPEAKER**
2:1,4,5,7,8,12,15,16,18,20,21 3:4,5,10,11,15,16 4:8,9,19,20,23,24 5:1,2,4,5,6,7,8,9,10,11,12,13,23,25 6:1,2,6,7,10,11,21,22 7:8,9,11,12,14,15,17,18,24,25 8:5,6,18,19,21,22 9:3,4,8,9,12,13,15,16 10:10,11,15,16,18,19,21,22 11:10,11,15,16 12:7,8,9,10,12,13,15,16,18,19,21,22 13:7,8,11,12,18,19,22,23 14:2,3,8,9,11,12 16:5,6,11,12,14,15,24,25 17:5,6,8,9,11,12,18,19,21,22,24,25 18:5,6,8,9,10,11,12,13,14,15,16
**spoke**
3:25
**started**
2:5,8,10 6:14,25 10:2,13 11:11 13:14,19
**step**
16:15
[redacted]
**stone-**
17:3
**Stop**
6:7
**stories**
3:19
**story**
3:23 6:23 15:16 17:3
**super**
18:17

**T**

**Taco**
3:2 6:4,5
**talk**
3:25 12:23 16:21
**talked**
3:2
**talking**
6:5 12:24
**taught**
8:11,13
**teacher**
4:6 8:9,10 10:1,13
**teary**
5:18
**telling**
16:1
**texted**
4:1
**that's**
4:1,2 5:20 7:15 9:21 12:22 13:10 16:23,24 17:19 18:15
**there's**
9:5
**thing**
2:11 4:13,14,17,18 7:4 10:24 11:12 12:23 13:21 15:4 17:19
**things**
7:21 9:25 15:1,2 17:17 18:2
**thinking**
4:22 8:22 13:15 17:13
**thinks**
17:10
**thumbs**
11:20
**time**
2:24 4:15 6:12,13,16 11:6 14:16 15:7
**told**
6:22 10:17 11:21 15:16,17 17:3
**totally**
16:22,23
**town**
13:2
**triggered**
4:13
**true**
12:16,17
**trust**
4:21
**turn**
4:18

**U**

**unknowingly**
11:19
**unresponsive**
4:7
**upset**
13:16
**upstairs**
15:24

**V**

**validating**
14:13
**Villa**
3:2 6:4,5
**vulnerability**
16:12

**W**

**walk**
13:12,15
**walked**
8:2
**wanted**
2:9 3:24 16:2,19
**wasn't**
3:13 5:22 6:19 14:23 17:16 18:4
**ways**
14:23
**weeks**
7:1,5
**weird**
17:10
**weren't**
5:20
**we're**
15:25
**we've**
11:1
**who's**
8:10
**woman**
3:25
**women**
11:17,18

[redacted]

**word**
18:1
**work**
2:2 3:18
**world**
12:25 13:10
**wouldn't**
6:2
**Wow**
7:8 18:14
**wrap**
13:25
**wrapped**
15:10
**wrapping**
15:14
**write**
15:23
**writing**
16:1,3
**written**
11:2 16:3,18
**wrote**
7:1,4 9:23
11:4

**Y**

**year**
[redacted]
**yearbooks**
15:20
**years**
3:18 6:4 7:3
12:8
**yesterday**
3:1 8:1
10:23 14:5
15:12
**you're**
6:17 7:3
9:23 10:24
12:24 16:20

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

**PROOF OF SERVICE**

STATE OF CALIFORNIA )
) ss.
COUNTY OF LOS ANGELES )

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is Willkie Farr & Gallagher LLP, 2029 Century Park East, Suite 2900, Los Angeles, California.

On **June 15, 2026**, I served a copy ☑ / original ☐ of the foregoing document(s) described as **DECLARATION OF AMY GRIFFIN IN SUPPORT OF DEFENDANT AMY GRIFFIN'S SPECIAL MOTION TO STRIKE PLAINTIFF JANE DOE'S COMPLAINT UNDER THE CALIFORNIA ANTI-SLAPP STATUTE, CODE OF CIVIL PROCEDURE §§ 425.16 ET SEQ.** on the interested parties in this action addressed as follows:

**SEE ATTACHED SERVICE LIST**

☑ **BY ELECTRONIC SERVICE (CCP § 1010.6; CRC Rule 2.251(g)):** I transmitted the above-stated document(s) and a copy of this declaration from my computer (electronic notification address ***Jlee6@Willkie.com***) located at Willkie Farr & Gallagher LLP, 2029 Century Park East, Suite 2900, Los Angeles, California 90067, to the interested parties in this action whose names and e-mail addresses are listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on **June 15, 2026**, at Los Angeles, California.

Jenny Lee

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

**SERVICE LIST**

*Jane Doe v. Amy Griffin, et al.*

Los Angeles County Superior Court, Case No. 26STCV07012

| | |
|---|---|
| Zach Rosenblatt<br>ZSR LAW<br>406 Broadway, #125<br>Santa Monica, CA 90401<br>Telephone: (310) 529-1213<br>Email 1: zachsrosenblatt@gmail.com<br>Email 2: zach@zsrlawfirm.com | Attorneys for Plaintiff<br>JANE DOE |
| Eduardo Martorell<br>Christopher A. Rosario<br>Evan Miller<br>MARTORELL LAW APC<br>222 N. Pacific Coast Highway, Suite 1300<br>El Segundo, CA 90245<br>Telephone: (323) 840-1200<br>Email: EMartorell@Martorell-law.com<br>Email: CRosario@Martorell-Law.com<br>Email: EMiller@Martorell-Law.com<br>Email: Jsotolongo@Martorell-law.com<br>Email: Rrodriguez@Martorell-law.com | Associated Counsel for Plaintiff<br>JANE DOE |
| Dan Laidman<br>Sam F. Cate-Gumpert<br>Linda Steinman<br>Amanda B. Levine<br>DAVIS WRIGHT TREMAINE LLP<br>350 S. Grand Ave., 27th Floor<br>Los Angeles, CA 90071<br>Email: DanLaidman@dwt.com<br>Email: SamCateGumpert@dwt.com<br>Email: LindaSteinman@dwt.com<br>Email: AmandaLevine@dwt.com | Attorneys for Defendants<br>PENGUIN RANDOM HOUSE, LLC and<br>DIAL PRESS |

# Exhibit L

# Exhibit L

August 31, 2021 Audio Recording

(1) USB Flash Drive

Manually Filed Pursuant to LR IC 1-1(d)

# Exhibit M

the previous year. He was a slim, well-groomed man in his late twenties who always wore cowboy boots. He raised his hands when I entered the room. "Amy's here!" he said brightly to the group. "She has to be part of our homeroom." He paused and looked at me. "She's the real leader of this school." I pulled my shoulders back, standing up straighter. These words of praise put a new spring in my step. I felt like he was seeing me for who I really was. Now I was a part of the group. He had confirmed what I believed myself to be, the same thing my parents expected me to be. All I had to do was continue living up to that title. *The real leader of this school.*

So I arrived at practice early. I paid attention at all times, even when other kids were distracted. I stayed late at school, so late that the only people left in the building were Coach [redacted]Taylor and Mr. Mason; I remember watching him pull out of the faculty parking lot, his elbow on the sill of the rolled-down car window, in his wine-red Bronco with decals on the side, waving goodbye as I stood on the curb. That I was even staying later than the teachers was a testament to my commitment. I even organized the volleyball team to purchase a gift for Coach [redacted]Taylor—a James Avery ring with a cross on it, which we pooled our money to buy. When we presented it to her, she was moved to tears.

Doing nice things for others made me feel good about myself; it was something my parents had modeled. There was a girl in my grade named Claudia who had blue eyes and blunt cut bangs; I understood that her home life was turbulent. A few weeks before cotillion, I learned that Claudia didn't have a dress to wear. "I'll lend you a dress," I said. "I have two options—a floral one, and a pink one. Which do you want?" The joy I felt to be able to offer Claudia that dress was boundless. The thought of her feeling special, wearing it, made me feel special.

When I saw Claudia in the ~~shiny pink~~floral dress with puffy sleeves the night of the dance, I smiled at her and flashed her a thumbs-up. She looked beautiful. But when she looked back at me, her eyes were clouded, vulnerable, as if she were afraid I might reveal her secret. I wanted to tell her that I would never tell anyone that the dress she was wearing wasn't her own; doing that would undermine how good it felt to lend it to her. I knew how to keep a secret.

[xx]

**Commented [CT36]:** Space break

There was one memory that replayed on a loop in my mind for years. On the day we graduated from eighth grade, Coach [redacted]aylor stood to give the highest student award of the year, which was for leadership—not just scholastic achievement, but also kindness. The winner would have their photo framed on the wall in the main hallway of the school for years to come. As she spoke, touting the accomplishments of a student who was hard-working, dedicated, and inspiring to her peers, her voice cracked and she began to cry.

**Commented [CT37]:** Were these photos present at the school when you later visited as an adult? Can you say that p. 248-252? If not, I think delete this sent here. Feels like a detail we don't need.

**Commented [sl38R38]:** Good catch

Then she looked at me. I heard my name, but I couldn't move.

"Amy, it's you," the friend sitting next to me said. "You have to go up there."

I stood up, looked around and made my way to the stage. Time seemed to move in slow motion. I felt both overwhelmed and numb. Up there, looking out at the crowd, I saw my parents looking back at me, clapping. Time stopped. Tears streamed down my father's face. I had never seen him cry before.

Why do I remember this so clearly? It wasn't about the award. The image of my parents' pride, their joy in me, stay so vivid in my mind because it was the moment I knew that I was the living fulfillment of their dreams. I was to exemplify their finest qualities. I was supposed to be the brightest—perfect.

**Commented [CT39]:** Great!

# Exhibit N

Dear Amy,

As you know, we have been reporting an article about your memoir, “The Tell,” since May. Throughout this process, we have worked hard to be as fair and empathetic as possible. We would still welcome the opportunity to sit down with you for an interview. Please let us know if you would like to do so.

Below, you will find a comprehensive summary of details and facts that are likely to be included in this article.

Please let us know if there are any errors whatsoever – even the smallest or seemingly most inconsequential detail.

Please let us know by 5pm on Tuesday if you would like to comment on the record specifically about any particular detail we are reporting, and/or broadly and generally about this article.

Sincerely,

Katie Rosman 917-495-7005

Liz Egan 917-596-7709

We share a recap of your book, “The Tell,” a memoir in which you write about engaging in psychedelic drug therapy and, while under the influence of MDMA – which you refer to as “the medicine” – recovering memories of being violently raped on many occasions by a middle-school teacher in Amarillo, Texas, starting when you were 12.

We report that your book, which includes what you describe as recovered memories of flashes of shocking assaults, was an instant sensation and received exuberant endorsements from celebrities and influencers with large social media platforms.

We report that the book was buttressed by the tailwinds of the #MeToo movement, and the “believe women” idea that all claims of sexual abuse should be believed.

We report that the book was a cause celebre but has also become the subject of skepticism.

We report that the skepticism is now spilling out into the public, particularly onto Maureen Callahan’s podcast, which we quote from.

We report that a middle school classmate of yours shared with The New York Times detailed accounts of being attacked — by a different teacher — in several of the same locations, including at the same middle-school dance, and that her accounts raise questions about your recovered memories.

We report that we reviewed your book proposal, which provided additional information about your story, and contacted dozens of your former classmates.

We report that we interviewed more than 80 people from Amarillo, the publishing industry, the medical and MDMA communities, Texas law enforcement and governmental agencies.

We report that it is impossible to know what transpired between you and your teacher in the late 1980s. We report that, in your book, you write that “there was no smoking gun, no physical evidence, no tangible proof. There had been no witnesses.”

We report that despite the expectation of law enforcement, victims’ advocates and Amarillo residents who read your book, there has been no local MeToo response.

We report that the teacher you write about as your attacker is referred to in the book by the pseudonym Mr. Mason, and that he is described in the book with enough specificity that many readers in Amarillo have been able to discern his identity.

We report that the Times was able to identify the teacher as well because his name appeared in your book proposal as did mention of [redacted] In addition, his name was shared with people in Amarillo by your relatives. (We do not mention [redacted] in our article.)

We report that this teacher (who we do not name in our article) worked in the school district for [redacted]. State education officials told the Times that a complaint was not filed against him during his [redacted].

We report that the teacher did not respond to our requests for comment.

We report that some people who have worked at and attended the middle school told The Times that they are say they are troubled by the specter of undetected child abuse.

We report that others told The Times that they are alarmed that a teacher with an unblemished record has been deemed a rapist without a chance to defend himself.

We report that since the book was published, locals say they have not seen the teacher around town.

We report that MDMA is an illegal hallucinogen that the Food and Drug Administration declined to approve for therapeutic use last year.

We report that over the course of more than three months, you declined the Times’s interview requests.

We report that neither you nor Penguin Random House would tell The Times whether the teacher or local school officials were made aware of the book or its accusations, or were given a chance to respond before publication.

From the book, we share that you paint a portrait of halcyon days growing up in Amarillo in the 1980s.

But you write that in middle school, your life took a horrifying turn — one you said you remembered 35 years later during MDMA-assisted therapy.

You write about your head hitting the wall, the clang of a belt buckle on the floor, being raped in the middle school bathroom, the locker room, a classroom and under the bleachers, of Mr. Mason/[redacted] tying your hands behind her back with a bandanna, of "his penis in my mouth" and "his pubic hair on my face." You write that he beat you, dragged you on the bathroom floor, washed your mouth out with soap and assaulted you in his unlocked classroom on the night of the Austin Day eighth-grade dance.

You write that he told you, "If you tell anyone, I'll rip your teeth out."

You write of the final assault, when you were 16 and ran into Mr. Mason while on your way to a tennis match.

In the book, you write that while your adult life might have appeared charmed to outsiders, you were not happy and began to feel that something was not right.

Just before the pandemic, you and your then 10-year-old daughter had a fight, with her questioning what she saw as your need to appear perfect.

You write that you began to ponder what your need for perfection might be masking.

Your husband had an interest in psychedelic assisted therapy and you decided to try it.

You told the MDMA-administrator/therapeutic facilitator (you say there was one but we were told by Rick Doblin there were two, as is best-practice) that you felt there was something upsetting that had happened to you in the past.

There were three sessions in total.

In the first five minutes of the first session, you wrote that you said, "Why is he here?," referring to Mr. Mason/[redacted]

You were involved in three MDMA-assisted therapy sessions in total, then engaged in subsequent psychotherapy sessions with a counselor who assured you that your violent memories were most likely real.

Throughout the book, you acknowledge a reader's potential skepticism.

You share with the reader that you were initially uncertain, but came to believe in the fidelity of the retrieved memories.

We report that, in your book proposal, you described how MDMA helped you remember being sexually assaulted as a child by a family friend whom you cite by name. We report that the family friend is not included in the memoir, nor is that claim of assault. We report that when we contacted the family friend, he denied your claims.

We report that after the MDMA therapy, you assembled a team of lawyers and private investigators and set out to try to mount a criminal case against your middle school teacher.

We report that one of your lawyers contacted the D.A.'s offices in Amarillo.

You then had a two hour phone call with "Sgt. Hank Jones," in which you detailed your memories of abuse.

You write that one of your lawyers advised you not to tell the police that your recollections of being attacked were retrieved through the use of illegal psychedelics. (That lawyer, Dean Roper, declined to comment.)

You write that Sgt. Jones says this is one of the most credible calls he has received. But before he can investigate, he calls back to tell you that the incidents you reported from middle school fall outside of the statute of limitations.

(Sgt. Gordon Eatley confirmed this all to us in an interview.)

We report that in 2007, Texas eradicated its statute of limitations for child sex abuse, but that your case could not be grandfathered in.

You write that you considered bringing a civil suit, but decided against it after one of your lawyers said that Mr. Mason could sue you for defamation.

You decided to write a book.

You hired Sam Lansky, who collaborated with Britney Spears on her memoir, "The Woman in Me."

In March 2023, you circulated a 38-page book proposal. (The book was then called "Believe Me.")

In it, you wrote that, despite the fact that you would be compromising your privacy and anonymity, you couldn't not write the memoir.

Like many book proposals, yours was accompanied by a list of people who would potentially help to promote the memoir upon publication. There were 91 names on your list, including celebrities, media industry insiders and leaders of companies you have invested in.

You sold the book to Penguin Random House's Dial Press for nearly $1 million.

We report that this is your first book.

We report that you were able to get an early copy of “The Tell” to Gayle King – with whom you had mutual friends – and that Ms. King urged Ms. Winfrey to read it.

In October 2024, five months before “The Tell” came out, Instagram accounts for Oprah Daily and Oprah’s Book Club promoted the memoir.

On your pub day, you sent your network an email asking for support for the book. The email included a five-page deck with suggesting promotional language and links.

In March 2024, in what appeared to be a coordinated campaign, there was an outpouring of support for the book on Instagram, with dozens of your friends chiming in.

We report that many of those who have endorsed and promoted your book on social media are involved with businesses, charities and political campaigns that receive financial backing from you.

At your launch party at the Ford Foundation, Mariska Hargitay moderated a discussion. The large crowd required an over-flow room.

We report that Oprah Winfrey, Reese Witherspoon and Jenna Bush Hager stood onstage and posed with your book.

We report that Ms. Winfrey – who chose “The Tell” as her 112th book club pick – remarked that it was the first time these book-club leaders had all been together.

We report that until that time, you were best known as an investor in female-led companies, and that you often shared pictures of your life on Instagram, including photos that signified your close friendships with celebrities like Reese Witherspoon and Gwyneth Paltrow.

We report that after the launch party, you went on the road for public events with Sheryl Sandberg (in San Francisco), Hoda Kotb (New Canaan, Conn.), Reese Witherspoon (Nashville), Gwyneth Paltrow (Summerland, Calif.), and Jenna Bush Hager (Austin, Texas).

There was a good deal of media attention for “The Tell,” including from Ms. Winfrey’s book club podcast, Martha Stewart’s podcast and Drew Barrymore’s TV talk show.

You were selected as one of Time magazine’s “most influential” people of the year and Ms. Witherspoon wrote an essay about you for the magazine.

We report that your book spent four weeks near the top of the New York Times best-seller list.

We report that your memoir’s copyright page includes a boilerplate acknowledgment that some details have been changed to protect people’s privacy.

We report that our review shows that you liberally changed details.

We report that like most memoirs, this one was not fact-checked by its publisher.

We report that Whitney Frick told the Times that she and Dial trust you and your memories.

We report that you are 49.

We report that you were raised as a scion of one of Amarillo's most influential families, the Mitchells. When you were young, your family owned about 50 Toot'n Totum convenience stores. This fall, the family will open their 1,000th.

We report that the Mitchell family's influence is understated in "the Tell."

After graduating from the University of Virginia in 1998, you worked in marketing for Sports Illustrated, a job your left several months before marrying your husband, a hedge fund investor whose former fund, Blue Ridge Capital, managed $9 billion at its peak.

Through G9 Ventures, a company you started in 2017, you invest in women-founded companies like Goop, Hello Sunshine and Spanx. You sit on the board of Bumble, the dating app, and the Metropolitan Museum of Art.

You and your husband are among the wealthiest people in the country, with a primary residence that was purchased in 2019 for $77 million. The townhouse is more than 14,000 square-feet, tax records show.

You have four children and homes in various locations, including the Bahamas and New Zealand, to which you travel by private jet.

We report that the scope of your family's wealth is not included in your book.

We report that you have financially supported an organization in Amarillo called Family Support Services.

You helped pay for a "soft room" where victims of sexual violence can share their stories with therapists, advocates or police officers in a comforting space.

We report that, according to Michelle Shields, the organization's director of advocacy services, it was important to you that the room be ready before the book came out, in anticipation of the victims that would come forward with stories of abuse, Ms. Shields said the room has not yet been used for this purpose, and that she is surprised there have not been other claims brought out by the publicity from "The Tell."

The real name of "Sgt. Hank Jones" is Gordon Eatley, a detective in the Amarillo Police Department's Special Victims Unit.

He said that, as described in “The Tell,” he was enthusiastic to investigate the claim you brought to him before realizing that the statute of limitations would preclude any prosecution.

Sgt. Eatley did not know that your story was based on recovered memory until he learned about “The Tell,” he said that he had been told you were just finally ready to share your story.

Even if he had known about the use of MDMA in recovering the memories, if there had been no statute of limitations, he would have tried to mount a case.

But he told us that the involvement of MDMA would likely have made for a difficult road, with pushback and skepticism from prosecutors and defense attorneys about what is a hallucination and what is a memory.

When Sgt. Eatley heard about “The Tell” several years later– and learned that it was receiving significant publicity because of its celebrity supporters and Oprah’s Book Club – he was enthused anew because he anticipated hearing from more victims of the teacher you were accusing, which could provide him with claims that were not outside the statute of limitations.

He said there have not been any.

We report on a book club meeting at The Burrowing Owl Bookstore outside of Amarillo, where about 20 people gathered to discuss the book this summer.

They discussed the challenges that a scion of a prominent family might have faced in revealing abuse.

Some people know [redacted] and a few had been his students.

Readers expressed support for you – “Nail him right to the wall, right where he belongs,” one person said, for example.

There were also many questions from those who support you and believe your story, including why there has not been any local MeToo response, why you did not show visible signs of physical abuse that would have been noticed by adults and why someone would target one of the wealthiest students in Amarillo.

We report that across Amarillo, many readers believe you because they admire your family and don’t see what you had to gain by writing “The Tell.”

We report that aside from you and Mr. Mason, the most important character in “The Tell” is “Claudia.” You write that you have a suspicion that she, too, was victimized as a child by Mr. Mason.

You write that you long remembered seeing them together in a school hallway, with Mr. Mason’s hand on Claudia’s shoulder.

We report that your representatives declined to share Claudia's identity.

We report that, relying on a middle school yearbook class list, we interviewed many of your middle school classmates, including someone whose background and experiences match those of Claudia.

We report that the similarities include that the classmate grew up in what is now called the Amarillo Children's Home, which is a detail you ascribed to Claudia in your book proposal.

We report that the classmate has clear memories that dovetail with central anecdotes that you write about in your book.

We report that this classmate is certain that Claudia is based on her.

The classmate learned that you had written a book when she was contacted by us and we mailed her a copy.

The classmate spoke to us on the condition of anonymity because she said that she never sought to make her private life public.

We report that this classmate says that she was abused in middle school, by a teacher whom she describes in a way that clearly differentiates him from Mr. Mason/[redacted] The teacher that your classmate said assaulted her left the Amarillo school district decades ago.

The classmate shared with us vivid and detailed information about the abuse.

The classmate said that she has thought about this abuse frequently over the course of the decades since it occurred and has told others of her experiences.

We interviewed one of the classmate's adult children who said that her mother told her about the middle school abuse more than a decade ago.

The classmate says that some of your descriptions in "The Tell" are very similar to the abuse she endured.

The classmate wonders if you were aware as a child of the abuse she was suffering and whether you have appropriated her experiences.

We report that the night the classmate finished reading "The Tell," she wrote a song whose lyrics include, "I feel so used./I didn't even know it was possible./To steal someone's abuse."

We report that as this classmate read your book, she wondered if your descriptions of being abused by a teacher in middle school were about you or about her.

We report that as adults, your life and that of the classmate are markedly different. We note that this summer, you traveled by private plane to the Venice wedding of Jeff Bezos and Lauren Sanchez, as the classmate did hourly wage work as a home aide to an Alzheimer's patient.

We report that in middle school, you were not friends, but that your lives intersected at school and at church.

We report that the classmate said she strove for acceptance by the wealthy set, and that you treated her with distant benevolence.

We report that in the book, you write that you lent Claudia a "floral," "poofy" dress for Cotillion, and that you felt joy in doing so.

We report that the classmate told the Times she was ultimately forbidden by the Children's Home from attending cotillion. She wore the dress that you lent to her to the eighth grade/Austin Day dance.

We report that you write about your own experience at this dance, where you were wearing a "floral," "poofy" dress that you had borrowed. You write that you were raped that night in Mr. Mason's classroom.

We report that in interviews with the Times, the classmate shared a detailed story about her own experience at that dance, about how the teacher who was abusing her created a ruse to get her to leave the dance with him and walk to a different part of the school where he assaulted her. He then ejaculated on the dress that she had borrowed from you.

The classmate shared with the Times specific details about returning to the dance floor with her hair disheveled, her dress soiled and smelling of sex. She said she was certain students knew why she and the teacher left and returned together but that it was not explicitly discussed.

We report that she said when she returned the dress to your house, it was during a church youth group meeting and that she apologized profusely to you for the stain on the dress (which she said was in fact in a drycleaning bag but that the dress had not been cleaned). She said that she asked for you and her friends to pray for her so that no one would think she was "a bad girl." She believed everyone understood what had taken place at the dance.

We report that in your book, you note that in your memory between "the dress and Claudia and Mr. Mason were all linked in some mysterious way I couldn't explain."

We report that in your memoir, you share that after the MDMA therapy, you felt an urgency to reconnect with Claudia.

We report that you write that you and she met at a coffee shop and that you told her that you had been abused by Mr. Mason and asked Claudia if she had been as well. You write that Claudia said that she had not been.

We report that you write that you received an unsigned postcard that says in part, "I didn't have it in me to tell you the truth." You write that you texted Claudia, who denied sending the postcard.

We report that in interviews with The Times, the classmate said she met with you at a coffee shop. She said you did not inquire about sexual assault and did not share your recovered memories. She said you mostly discussed your interest in empowering women.

We report that the classmate said at the end of the coffee shop meeting that you handed her a postcard, wrote your address in New York on the card and asked her to send her a note if she was interested in getting involved in your network to support women's empowerment.

We report that the classmate said she mailed the postcard several days later. She said that she has not heard from you directly since.

We report that your lawyer agreed to show The Times the postcard.

We report that the penmanship — a traditional cursive — does not match a sample provided by the classmate and that she recalls writing a jocular message, with a very tone from the one in the book.

We report that in "The Tell," you write that the postcard writer includes a quote ascribed to "Amy, circa 7th grade."

We report that on the postcard shared with The Times by Tom Clare, the quote is attributed to "Amy, circa 2nd grade."

We report that Rick Doblin, the country's leading advocate for the therapeutic use of MDMA, told the Times that he read multiple drafts of your book and considers it an important work. We report that he said he connected you to your MDMA therapists.

We report that you write in the book that your husband had funded research into psychedelic assisted therapy without describing the extent of the involvement. We report that he donated $1 million to MAPS and that you and he invested in the for-profit Lykos, according to Dr. Doblin.

We report that Dr. Doblin told The Times that memories retrieved with MDMA – which we report is the active chemical in ecstasy and Molly – are often symbolic, and that people develop stories to help them make sense of their lives. From a therapeutic perspective, he told us, the truth of the story is not what is important. The emotion that emerges during the therapy is real and valuable.

We report that Dr. Doblin told the Times that MDMA helps people resurface frightening memories and also that people should be dubious about recovered memories.